**No. 23-40217**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Texas Medical Association; Tyler Regional Hospital, LLC.; Doctor Adam Corley,
Plaintiffs-Appellees,

v.

United States Department of Health and Human Services; Department of Labor;
Department of the Treasury; Xavier Becerra, Secretary, U.S. Department of Health
and Human Services; Julie A. Su, Acting Secretary, U.S. Department of Labor;
Janet Yellen, Secretary, U.S. Department of Treasury,
Defendants-Appellants.

LifeNet, Incorporated; East Texas Air One,
Plaintiffs-Appellees,

v.

United States Department of Health and Human Services; Xavier Becerra, Secretary,
U.S. Department of Health and Human Services; United States Department of the
Treasury; Janet Yellen, Secretary, U.S. Department of Treasury; United States
Department of Labor; Julie A. Su, Acting Secretary, U.S. Department of Labor;
United States Office of Personnel Management; Kiran Ahuja,
Defendants-Appellants.

*On Appeal from the United States District Court for the Eastern District of Texas*
*District Court No. 6:22-CV-372-JDK*

**BRIEF OF AMERICA'S HEALTH INSURANCE PLANS**
**AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS**

Julie Simon Miller
Thomas M. Palumbo
AMERICA'S HEALTH INSURANCE PLANS
601 Pennsylvania Ave. NW
South Building, Suite 500
Washington, DC 20004

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Tel.: 202-868-6915
Fax: 202-609-8410
Email: hhunt@deutschhunt.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF INTERESTED PARTIES

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 23-40217

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Texas Medical Association
Tyler Regional Hospital, LLC
East Texas Health System, LLC
AHS East Texas Health System, LLC
University of Texas Health Sciences
    Center at Tyler
Dr. Adam Corley

*TMA Plaintiffs-Appellees and Their Affiliated Entities*

Eric D. McArthur
Brenna Jenny
Jaime L.M. Jones
Madeleine Joseph
Manuel Valle
(Sidley Austin LLP)

*Counsel for TMA Plaintiffs-Appellees*

LifeNet, Inc.
East Texas Air One, LLC
AHS East Texas Health System, LLC

*Air Ambulance Plaintiffs-Appellees and Their Affiliated Entities*

Steven Shepard
(Susman Godfrey LLP)

*Counsel for Air Ambulance Plaintiffs-Appellees*

U.S. Department of Health and Human Services
Xavier Becerra, Secretary, U.S. Department
    of Health and Human Services
U.S. Department of the Treasury
Janet Yellen, Secretary, U.S. Department of Treasury
U.S. Department of Labor
Julie A. Su, Acting Secretary, U.S. Department of Labor
U.S. Office of Personnel Management
Kiran Ahuja
*Defendants-Appellants*

Kevin B. Soter
Brian Boynton
Anna L. Deffebach
Joshua M. Salzman
(U.S. Department of
    Justice)

*Counsel for Defendants-Appellants*

i

America's Health Insurance Plans, Inc.

*Amicus Curiae on this Brief*

Hyland Hunt
Ruthanne M. Deutsch
(Deutsch Hunt PLLC)

Julie Simon Miller
Thomas M. Palumbo
(America's Health Insurance Plans)

*Counsel for Amicus Curiae on this Brief*

Under Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), America's Health Insurance Plans, Inc. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

s/Hyland Hunt
Hyland Hunt

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ..................................................i

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF INTEREST OF *AMICUS CURIAE* ..............................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ...................................................................................6

I.    The No Surprises Act Aims To Remedy Market Dysfunction Where Patients Have No Opportunity To Choose Their Providers. ...................6

II.   Reasonable IDR Procedural Guardrails Are Essential To Promote Voluntary Dispute Resolution As Congress Designed. ...........................8

    A.   The Act Is Designed to Resolve Disputes Voluntarily and Efficiently, and Apart from a Few Specialties, It Is Largely Working. ...............................................................................8

        1.   Congress designed IDR to be rarely used...........................8

        2.   Congress designed IDR to be efficient. ..............................9

        3.   The Act is largely working to foster settlements around the QPA, but concentrated exploitation of IDR is driving volume to unsustainable levels. ...............................................10

    B.   The Final Rule Minimally Furthers Congress's IDR Design through Basic Procedural Safeguards. ..............................................13

        1.   The Final Rule does not implement a sub silentio presumption favoring the QPA. ..................................................13

        2.   The Final Rule reasonably requires arbitrators to give weight only to credible, relevant, and non-cumulative information and to explain their decisions. ...........................................14

    C.   Marginal Increases in lDR Predictability and Stability Yield Real Benefits for All Americans. ...................................................17

III.  The Final Rule Appropriately Reflects The QPA's Credibility And Fosters Its Stability. ...............................................................................19

    A.   The QPA Reflects Reasonable Negotiated Market Rates. .......................19

    B.   Robust Transparency and Oversight Guard the QPA's Reliability. ........22

C.     The QPA Is—and Must Remain—Stable to Serve Its Many Crucial Functions under the Act. .............................................................24

IV.  The Final Rule Supports Patient Access To Quality Networks........................26

CONCLUSION ......................................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197 (2016) ...................................16

*Tex. Med. Ass'n v. HHS*,
    587 F. Supp. 3d 528 (E.D. Tex. 2022) (*TMA I*)................................. 3, 19
    No. 6:22-cv-450-JDK (E.D. Tex.) (*TMA III*) ....................................19

## Statutes

42 U.S.C.
    § 300gg-111 ..................................................................... *passim*
    § 300gg-131 .............................................................................7
    § 300gg-132 .............................................................................7
    § 300gg-135 .............................................................................7
    § 18031 ...................................................................................26

5 U.S.C. § 556 ......................................................................................14

## Regulations

45 C.F.R.
    § 149.140.......................................................................... 22, 23
    § 149.510.......................................................... 3, 13, 14, 15

86 Fed. Reg. 36,872 (July 13, 2021).............................................. *passim*

86 Fed. Reg. 55,980 (Oct. 7, 2021).....................................................3, 6

87 Fed. Reg. 52,618 (Aug. 26, 2022) .......................................... *passim*

## Other Authorities

Loren Adler et al., *High air ambulance charges concentrated in private equity-
owned carriers*, Brookings Inst. (Oct. 13, 2020) ...................................7

AHIP, *Charges Billed by Out-of-Network Providers: Implications for Affordability*
(Sept. 2015) ...........................................................................................6

AHIP, *No Surprises Act Prevents More than 9 Million Surprise Bills Since January
2022* (Nov. 2022)................................................................................10

Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health
Affairs Forefront (Mar. 26, 2021) ......................................................21

Ctrs. for Medicare & Medicaid Servs., *Amendment to the Calendar Year 2023 Fee
Guidance for the Federal [IDR] Process under the No Surprises Act: Change in
Admin. Fee* (Dec. 23, 2022)................................................................18

Ctrs. for Medicare & Medicaid Servs., *Federal [IDR] Process—Status Update* (Apr. 27, 2023) ............................................................................ 11, 12

Ctrs. for Medicare & Medicaid Servs., *Initial Report on the Independent Dispute Resolution (IDR) Process, April 15-September 30, 2022* (Dec. 2022) ...............12

Ctrs. for Medicare & Medicaid Servs., *List of certified Independent Dispute Resolution entities* (2023).................................................................................16

Ctrs. for Medicare & Medicaid Servs., *Partial Report on the Independent Dispute Resolution Process: October 1 – December 31, 2022* (Apr. 27, 2023) ...............12

Gary Claxton et al., *An analysis of out-of-network claims in large employer health plans*, Peterson-KFF Health Sys. Tracker (Aug. 13, 2018) ...................................6

Gary Claxton et al., *Employer strategies to reduce health costs and improve quality through network configuration*, Peterson-KFF Health Sys. Tracker (Sept. 25, 2019)...........................................................................................................27

Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. Pol. Econ. 3626 (2020)........................................................7

Kaiser Family Foundation, *2021 Employer Health Benefits Survey* (Nov. 10, 2021)....................................................................................................27

Jacqueline LaPointe, *Understanding the Value-Based Reimbursement Model Landscape*, Revcycle Intelligence (Sept. 9, 2016) ..............................................21

Jeff Monhait, *Baseball Arbitration: An ADR Success*, 4 Harv. J. Sports & Ent. L. 105 (2013).................................................................................................. 8, 10

Nat'l Conf. of State Legislatures, *Health Insurance Network Adequacy Requirements* (Apr. 27, 2023) ...........................................................................26

U.S. Dep't of Labor, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022) ...................20

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

America's Health Insurance Plans, Inc. (AHIP) is the national trade association representing the health insurance community. AHIP advocates for public policies that expand access to affordable health care coverage to all Americans through a competitive marketplace that fosters choice, quality, and innovation. AHIP's members have extensive experience working with nearly all health care stakeholders to ensure that patients have affordable access to needed medical services and treatments. That experience gives AHIP broad first-hand knowledge and a deep understanding of how the nation's health care and health insurance systems work.

AHIP's members strive to reach agreements with health care providers to offer Americans affordable networks that provide them with choices for their medical care. When network agreements cannot be secured before treatment is rendered—which is particularly common for emergency care, air ambulance services, and other specialties where patients are unable to select a provider in advance—health insurance providers seek to negotiate reasonable out-of-network payments to protect patients from surprise medical bills.

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amicus*, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2), (4).

Before the No Surprises Act, some providers would refuse to participate in networks and reject reasonable out-of-network payments, instead sending patients excessive surprise bills to extract payments well above typical market rates. Congress, after significant debate, ultimately arrived at a bipartisan solution to protect patients from surprise bills and out-of-network payment disputes, which includes an arbitration process called Independent Dispute Resolution (IDR). In AHIP's expert judgment, the now-vacated provisions of the Interim Final Rule better served congressional intent, because they anchored IDR decisions to the "qualifying payment amount" (QPA), generally the median in-network rate for a similar service. In the Final Rule challenged here, however, the Departments did *not* anchor IDR determinations to the QPA. The Departments established only minimal procedural guardrails to "encourage[] a consistent methodology for evaluation of information" by arbitrators. 87 Fed. Reg. 52,618, 52,627 (Aug. 26, 2022).

AHIP writes separately to explain why, drawing on its members' experience as participants in IDR disputes, the Final Rule's imperfect and minimalist guidance nevertheless helps the IDR system operate as Congress intended. By striving to maintain some measure of consistency to arbitrators' methodology and the transparency of their decision-making, the Final Rule helps foster an IDR system that permits the parties to learn from IDR decisions, resolve more and more disputes voluntarily, and minimize the high administrative costs associated with IDR. The

alternative—forcing arbitrators to operate with effectively no implementing guidance—would operate at cross-purposes to Congress's design to minimize IDR proceedings and protect Americans from high and unpredictable costs.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress intended IDR to be a rarely used process that generates predictable, stable results anchored around the QPA. Congress listed the QPA first among the "[c]onsiderations" for IDR entities, followed by "additional circumstances" in a separate paragraph.[2] Congress did not explicitly direct *how* arbitrators were to weigh the QPA and additional factors, much less issue a self-executing command to weigh each consideration equally.

The Departments' original (but now abandoned) interim rule appropriately implemented congressional intent by requiring selection of the offer closest to the QPA absent credible information dictating a materially different rate. 86 Fed. Reg. 55,980, 55,984 (Oct. 7, 2021). But the district court vacated that provision. *Tex. Med. Ass'n v. HHS*, 587 F. Supp. 3d 528, 535-36, 541 (E.D. Tex. 2022) (*TMA I*). Heeding that decision, the rule challenged here authorizes arbitrators to select whichever offer they determine "best represents the value of the … item or service," without requiring them to give any particular weight to the QPA.[3]

---

[2] 42 U.S.C. § 300gg-111(c)(5)(C).
[3] 45 C.F.R. § 149.510(c)(4)(ii)(A).

In AHIP's view, the Final Rule falls far short of delivering the predictability, stability, and efficiency of IDR that Congress intended. Early experience under the Act shows that a system organized around the QPA works to maximize voluntary dispute resolution. Even without a constraining IDR rule, because the QPA represents a credible, market-driven rate, more than 90% of out-of-network payments are resolved by the providers accepting QPA-based payments or settling disputes through negotiation, reserving IDR for rare cases.

However, for a fraction of providers in a few medical specialties—principally those that most often leveraged surprise bills before the Act—IDR has become a default option, initiated in the hopes of netting a windfall in a rule-free process. Tethering the IDR process to the QPA—as the superseded Interim Final Rule did—would have forestalled this exploitation of IDR.

The Final Rule at issue here won't achieve that goal. Still, its minimal procedural guardrails and transparency measures would better serve Congress's objective of minimizing costly arbitrations than the free-for-all the district court's decision mandates. Without some procedural guidelines—even the basic ones at issue here—the possibility of wildly disparate IDR approaches would defeat any effort by IDR parties to learn from IDR decisions and avoid future IDR proceedings. Ultimately, it will be patients who lose out if the district court's no-guidance-allowed holding stands, for two reasons. First, more IDR proceedings drive up administrative

costs. Second, accepting Plaintiffs' challenge would significantly upend the important role the QPA plays in determining out-of-pocket costs and other cost-sharing requirements under the Act.

With that important function in mind, the Rule's requirement to deem the QPA credible is reasonable and consistent with Congress's vision. Congress defined the QPA at length and designed it to reflect reasonable market-based rates. The Departments' implementing rules have ensured it does, and providers' widespread acceptance of QPA-based payments confirms it. Unlike any other information that arbitrators may consider, the QPA calculation is transparent, governed by exhaustive rules, and subject to audit. Those strictures provide the requisite indicia of trustworthiness. Because the QPA is a fixed number serving different purposes throughout the Act, including patient cost-sharing and IDR reporting, permitting arbitrators to recalculate the QPA would upend the statutory scheme Congress carefully established.

Though Plaintiffs and their *amici* have argued in the district court that the Final Rule will drive health insurance providers to slash rates and narrow networks, market reality reflects otherwise. Networks are designed to provide affordable access to quality care and breadth of choice, not just organized around cost. Because the Final Rule in some small measure maintains a modicum of IDR predictability

and transparency, it should encourage such network-building, which ultimately benefits the patients who receive high-value, quality care.

## ARGUMENT

### I. The No Surprises Act Aims To Remedy Market Dysfunction Where Patients Have No Opportunity To Choose Their Providers.

For most medical services, rates are set in advance through negotiation between health insurance providers and medical providers. Health insurance providers work with medical providers to offer networks that provide Americans access to affordable, high-quality care. *See* AHIP, *Charges Billed by Out-of-Network Providers: Implications for Affordability*, 3 (Sept. 2015), https://tinyurl.com/3k8mfr98. Under the resulting contracts, the network provider is limited to the payment it has agreed to accept and does not send surprise bills to patients. *See* 86 Fed. Reg. 36,872, 36,874 (July 13, 2021); Gov. Br. 4-5.

For some services, however, patients are less able, or entirely unable, to choose an in-network provider in advance, including for air ambulance services, emergency care, and providers assigned by a hospital without patient direction (like anesthesiologists and pathologists). Providers in these specialties have less incentive to join networks, and therefore participate in networks less frequently. *See* 86 Fed. Reg. at 56,046; Gary Claxton et al., *An analysis of out-of-network claims in large employer health plans*, Peterson-KFF Health Sys. Tracker (Aug. 13, 2018), https://tinyurl.com/3fp5psf9.

6

Before the Act, such providers often sent surprise bills to patients for any part of their unilaterally set billed charge that was not paid by the patient's health plan. 86 Fed. Reg. at 36,874. By leveraging the threat to "balance bill" patients, they were often able to obtain significantly higher payments than other medical specialties. *See* Gov. Br. 7. This approach was especially common for air ambulance services and emergency care; substantial private equity investment in both fields correlated to aggressive surprise billing and skyrocketing charges. *See* Loren Adler et al., *High air ambulance charges concentrated in private equity-owned carriers*, Brookings Inst. (Oct. 13, 2020), https://tinyurl.com/3dbyn523; Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. Pol. Econ. 3626, 3629, 3631 (2020).

The Act remedied this acute market dysfunction by taking two key steps to protect patients from unpredictable and out-of-control out-of-network costs. First, unless state law provides otherwise, the Act sets patients' cost-sharing based on the QPA, which is generally the health plan's median in-network contract rate for the same service in the same area, reflecting competitive market dynamics.[4] Medical providers are prohibited from balance billing patients for the rest of their charges.[5] Second, the Act establishes IDR as a streamlined arbitration process to conclusively

---

[4] 42 U.S.C. § 300gg-111(a)(1)(C)(iii), (a)(3)(E), (H), (b)(1)(B).
[5] *Id.* §§ 300gg-131, 300gg-132, 300gg-135.

resolve the amount to be paid for out-of-network services.[6] Acceptance of Plaintiffs'

challenge to the Final Rule would undermine both steps.

## II.    Reasonable IDR Procedural Guardrails Are Essential To Promote Voluntary Dispute Resolution As Congress Designed.

### A. The Act Is Designed to Resolve Disputes Voluntarily and Efficiently, and Apart from a Few Specialties, It Is Largely Working.

#### 1. *Congress designed IDR to be rarely used.*

One of the central organizing principles of IDR is that Congress designed it

to be used as rarely as possible, expecting that most disputes would be settled

instead. To that end, Congress chose arbitration features known to promote

settlement: requiring a mandatory pre-IDR 30-day negotiation period, limiting

arbitrators to selecting one of the two offers, and clarifying that the parties can settle

at any time before an arbitrator's decision.[7]

These features, often called "baseball-style" due to their association with

baseball salary disputes, have long been recognized as encouraging settlement. *See*

Jeff Monhait, *Baseball Arbitration: An ADR Success*, 4 Harv. J. Sports & Ent. L.

105, 131 (2013). Baseball-style arbitration is so effective at encouraging settlement

because it "leads to a convergence of offers." *Id.* at 133. It does so because—unlike

more open-ended arbitration, where the arbitrator might be expected to split the

---

[6] *Id.* § 300gg-111(c).
[7] *Id*. § 300gg-111(c)(1), (2)(B), (5)(A).

difference—parties have incentives to land on a more reasonable final offer, rather than an "aspirational" number. *Id*. at 132.

Beyond encouraging settlement for a first dispute, Congress precluded further arbitrations between the same parties about similar services for 90 days after an IDR decision.[8] The extended pre-IDR negotiation period, time bar on similar proceedings, and the choice of baseball-style arbitration all show Congress's intent that most out-of-network disputes should be resolved outside of IDR. But without some predictability in how arbitrators evaluate information, as well as a reasonable understanding of why they reach their decisions, such settlement incentives are undermined. *See* 87 Fed. Reg. at 52,634. Parties can only reasonably assess when to settle if there is some rational pattern to IDR decision-making.

### 2. *Congress designed IDR to be efficient.*

If the parties do not settle, Congress crafted IDR to be an expeditious yet well-informed process to arrive at an expert payment decision, not a drawn-out enterprise. Arbitrators must have "sufficient medical, legal, and other expertise and sufficient staffing to make determinations ... on a timely basis."[9] They must choose one of the offers within 30 days.[10] By statute, the QPA is the first consideration an arbitrator must consider when choosing between the two offers.[11]

---

[8] 42 U.S.C. § 300gg-111(c)(5)(E)(ii).
[9] 42 U.S.C. § 300gg-111(c)(4)(A)(i).
[10] *Id.* § 300gg-111(c)(5)(A).
[11] *Id.* § 300gg-111(c)(5)(C)(i).

As with baseball-style arbitration generally, cost-effectiveness and speed are key features of the IDR process. *See* Monhait, *supra*, at 131 (finding "the [baseball] system lowers the costs of resolving salary disputes and avoids holdouts, comporting with cost-benefit analysis"). Other congressional choices, like requiring batching to "encourag[e] … efficiency (including minimizing costs) of the IDR process,"[12] likewise reflect Congress's intent that IDR be efficient and minimize costs.

### 3. The Act is largely working to foster settlements around the QPA, but concentrated exploitation of IDR is driving volume to unsustainable levels.

For most providers and services, the Act is working as Congress intended to encourage settlement, minimize the use of IDR, and generate predictable results. An initial AHIP analysis of a mix of large national and medium-sized regional health insurance providers' IDR experience indicates that payment for nearly all out-of-network services is resolved through agreement, most of the time via medical providers' acceptance of payments at or around the QPA, without the need for IDR.

In the Act's first year, patients were protected from about 12 million surprise medical bills. AHIP, *No Surprises Act Prevents More than 9 Million Surprise Bills Since January 2022* (Nov. 2022), https://tinyurl.com/2syeh838 (finding about 9 million surprise bills avoided in nine months). Per AHIP's initial research, for nearly 88% of items or services covered by the Act and not subject to state dispute

---

[12] 42 U.S.C. § 300gg-111(c)(3)(A).

10

resolution processes, payments for those services—generally centering around the QPA—were accepted without any negotiation. Of the 12% that enter open negotiations, over a third (37%) are resolved by settlement, meaning fewer than 8% of out-of-network claims enter IDR. Based on government data, about 60% of IDR claims resolved through March 2023 were ineligible or closed for other reasons (including settlement). Ctrs. for Medicare & Medicaid Servs., *Federal [IDR] Process—Status Update*, at 1-2 (Apr. 27, 2023), https://tinyurl.com/2dp48eyd (IDR Status Update). As depicted in the below graphic, the upshot is that only about 3% of all out-of-network bills initiated under the No Surprises Act end up in valid IDR proceedings. The rest are resolved voluntarily in QPA-centered negotiations, consistent with congressional design.



Though 3% of claims going to IDR may seem small, it is far more than Congress intended or the Departments projected. Nearly 335,000 IDR proceedings were initiated between mid-April 2022 and March 2023—nearly fourteen times the number projected for the first full calendar year. IDR Status Update, at 1. Closer examination of that volume, moreover, indicates that it stems from concentrated exploitation of the IDR system by a handful of practice or revenue management companies for providers in a tiny fraction of specialties—typically, those that profited the most from surprise billing before the Act.

The lion's share (over 80%) of non-air-ambulance claims that went to IDR involved emergency services, with over half of all IDR disputes relating to just five emergency department visit codes. *See* Ctrs. for Medicare & Medicaid Servs., *Initial Report on the Independent Dispute Resolution (IDR) Process, April 15-September 30, 2022*, at 19 (Dec. 2022), https://tinyurl.com/mtp7kd3k (IDR Report); Ctrs. for Medicare & Medicaid Servs., *Partial Report on the [IDR] Process: October 1 – December 31, 2022*, at 23 (Apr. 27, 2023), https://tinyurl.com/mrx7sk66 (IDR Fourth Quarter Report). What's more, a single entity initiated one third or more of the total non-air-ambulance disputes. IDR Report, at 16; IDR Fourth Quarter Report, at 26. Air ambulance volume was similarly driven by a few providers, with three providers (out of more than 60) generating about three quarters of IDR proceedings. IDR Report, at 26; IDR Fourth Quarter Report, at 26.

Outside of a handful of entities in a few specialties that built their business models around surprise billing, there is widespread acceptance of payments around the QPA. Apart from these high-volume former surprise-billing outliers, Congress's design is largely working to foster voluntary dispute resolution centered on a QPA that reflects reasonable market rates. This experience supports Congress's choice to organize the IDR process around voluntary dispute resolution, centered on the QPA.

## B. The Final Rule Minimally Furthers Congress's IDR Design through Basic Procedural Safeguards.

Although the Final Rule does not further the central role of the QPA as it should, it strives to bring the IDR system closer to Congress's design by requiring arbitrators to consider the QPA first (as the statute mandates); base their decisions on credible, relevant information; and explain their decisions. Together, these features will help inform future offers and negotiations and to some (limited) degree foster voluntary settlements and more stable out-of-network costs.

### 1. *The Final Rule does not implement a sub silentio presumption favoring the QPA.*

The Final Rule leaves arbitrators the full discretion, in all cases, to choose the offer that they "determine[] best represents the value of the … item or service."[13] In AHIP's view, this approach does not go nearly far enough to foster IDR predictability, precisely because it does not make the QPA a de facto benchmark.

---

[13] 45 C.F.R. § 149.510(c)(4)(ii)(A).

The QPA, instead, is but one factor, to be considered first but weighed alongside any other relevant, non-cumulative, and credible information.[14] As the Government explains, there is no "continue[d] … thumb on the scale" for the QPA, although the district court wrongly concluded otherwise. *See* ROA.1860; Gov. Br. 49-53.

All that the Final Rule requires is that, to be given weight, information must be: 1) credible ("worthy of belief and … trustworthy"), 2) relevant ("relate to either party's offer"); and 3) non-cumulative (not "already accounted for by" other information).[15] This guidance in no way constrains the final IDR outcome. It simply ensures that the decision is not based on information that is untrustworthy, irrelevant, or double-counted. AHIP agrees with the government that such evidentiary rules are fully consistent with the statutory text and fall well within Congress's delegation of rulemaking authority to the Departments. Gov. Br. 27-31. They also foster—albeit sub-optimally—Congress's IDR objectives of predictability and efficiency.

> ### 2. *The Final Rule reasonably requires arbitrators to give weight only to credible, relevant, and non-cumulative information and to explain their decisions.*

By requiring that information be relevant, credible, and non-cumulative to be given weight, the Final Rule does nothing more than assure the bare procedural minimum: an adjudication consistent with basic norms. *See* 5 U.S.C. § 556(d)

---

[14] *Id*. § 149.510(c)(4)(iii).
[15] *Id*. § 149.510(a)(2)(v), (c)(4)(iii)(E).

("[T]he agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence.").

For example, the Rule precludes arbitrators from giving weight to information that is not "related to" either party's offer. That makes sense; if, for example, a provider's level of training had no "impact on the care that was provided,"[16] then it is not relevant to the value of that care and the Departments reasonably decided that arbitrators should not give it weight. The Departments also reasonably restricted arbitrators from double-counting information that "is already accounted for by" the QPA "or other credible information."[17] The no-double-counting rule applies to any credible information, not just the QPA, so it is even-handed. Far from requiring arbitrators to overweight the QPA, such rules simply guard against unpredictable decisions that land far outside the zone of reasonableness because they are based on wholly irrelevant or double-counted considerations.

The Rule also reasonably requires a written decision covering specific issues so that the parties can understand the reasoning behind IDR decisions. *See* 87 Fed. Reg. at 52,631-32. This requirement reduces the need for IDR as Congress intended. After all, if the parties cannot understand why arbitrators reached their decisions, then they cannot use past IDR decisions to inform future payments and settlements.

---

[16] 45 C.F.R. § 149.510(c)(4)(iv)(B).
[17] *Id.* § 149.510(c)(4)(iii)(E).

Therefore, mandating an informative written decision helps further the goal of minimizing IDR and fostering settlement.

Yet the district court rejected the requirement that arbitrators explain why additional information, if it is given weight, is not already accounted for in the QPA. ROA.1860. But this requirement does not privilege the QPA, as the district court held. *Id.* It does not constrain an arbitrator from finding that the QPA fails to account for additional factors that justify selecting a provider's offer. It simply requires an arbitrator to explain why it reached that conclusion—just as the arbitrator must also explain why it gave the QPA weight, if it does. 87 Fed. Reg. at 52,632. Without such granularity, IDR decisions are "black boxes" that provide no guidance for future negotiations, impeding Congress's aim of fostering voluntary dispute resolution.

Such minimal guidelines for how myriad arbitrators operate are essential to "one" effective dispute resolution system.[18] If Congress had intended for private entities to determine hundreds of millions of dollars in health care reimbursements with zero guidance beyond the general framework set forth in the statute, it would have said so—not expressly directed the Departments to adopt IDR rules. To have no rules beyond the bare statutory categories would be definitionally arbitrary and inconsistent with standard norms of dispute decision-making. *Cf. Kirtsaeng v. John*

---

[18] *See* 42 U.S.C. § 300gg-111(c)(2)(A). To date, thirteen different entities have been certified. *See* Ctrs. for Medicare & Medicaid Servs., *List of certified [IDR] entities* (2023), https://tinyurl.com/3w3dx9pj. Each entity employs numerous arbitrators with differing expertise.

*Wiley & Sons, Inc.*, 579 U.S. 197, 204 (2016) ("[U]tterly freewheeling inquiries often deprive litigants of 'the basic principle of justice that like cases should be decided alike.'") (quoting *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005)).

Early experience with IDR proceedings—mostly conducted before the Final Rule went into effect and after it was vacated—illustrates the unworkability of a no-guidance system. Although IDR decisions must be issued within 30 days, initial AHIP research indicates that decisions are taking substantially longer, with the average running more than twice that. What's more, the delayed decisions are vague and conclusory, providing little information that would enable parties to understand arbitrators' reasoning.  If the Departments are barred from issuing even the modest guidance embodied in the Final Rule, then any degree of voluntary dispute resolution centered on the QPA is likely to devolve as more and more providers decide to roll the dice in an arbitrary, non-transparent IDR process. The statute does not require the Departments to let IDR continue as an arbitrary free-for-all.

### C. Marginal Increases in lDR Predictability and Stability Yield Real Benefits for All Americans.

Even marginal improvements in the predictability and transparency of the IDR process can help reduce the high volume of IDR proceedings (and their associated costs), ultimately benefiting all Americans.

There are several drivers of spiraling administrative costs in IDR. Both parties must pay an administrative fee (now $350), and the losing party must pay IDR fees

that can reach $700 for a single item, or up to $1,200 for a batched claim with a substantial number of items. Ctrs. for Medicare & Medicaid Servs., *Amendment to the Calendar Year 2023 Fee Guidance for the Federal [IDR] Process under the No Surprises Act: Change in Admin. Fee*, at 6-7 (Dec. 23, 2022) https://tinyurl.com/mwxerbj7.

There are also substantial IDR-related staffing and technology expenses. Early experience indicates these costs have been substantially higher than anticipated due to the overwhelming volume of IDR disputes. Per AHIP's research, multiple large health insurance providers have spent, on average, over $3 million on staff hired specifically to process IDR disputes. These costs are in addition to the costs for project management, negotiators, reporting, finance, and additional support positions needed to complete the federal IDR process.

Without the Final Rule's bare minimum of guidance, the chance of securing an unreasonably high payment by relying on wholly irrelevant factors or double-counting others would likely drive IDR volume up over time, not down as Congress intended. As it is, government data indicate that the providers' offer was selected more than two-thirds of the time in IDR proceedings during a period when implementing guidance was largely absent. IDR Status Update, at 2 (reporting results through March 2023). The upshot of that trend continuing—or more likely, worsening—would be increased health care costs for all Americans—without one

18

penny of the increased costs benefiting patients through improved health care value or quality.

### III. The Final Rule Appropriately Reflects The QPA's Credibility And Fosters Its Stability.

#### A. The QPA Reflects Reasonable Negotiated Market Rates.

The QPA is designed to "reflect[] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889. Aligning the QPA with negotiated, market-based in-network rates is essential for the QPA's two key functions: setting patient cost-sharing and informing IDR decisions.

Despite the district court's skepticism of the QPA as a "proxy for the in-network price" of a service, *TMA I*, 587 F. Supp. 3d at 543 n.4, that is precisely how the QPA is designed and operates. The Departments' implementing rules have ensured that the QPA hews as closely as possible to a rate the parties would have agreed to had they negotiated in advance. And the proof is in the pudding; as described above, most physicians agree that QPA-based out-of-network payments are reasonable and accept them without any negotiations or dispute.

Although Plaintiffs did not challenge the Departments' QPA methodology in this case, they have done so in a related case still pending in the district court, *Tex. Med. Ass'n v. HHS*, No. 6:22-cv-450-JDK (E.D. Tex.) (*TMA III*), and their claim to standing in this case hinges on the speculative contention that the challenged rule will result in arbitrators more often choosing closer-to-QPA offers, *see* Gov. Br. 24-

19

27, an outcome that they disparage as meaning they would not be paid a reasonable market rate. The premise that the QPA reflects sub-market rates is fatally flawed. The Act delegated to the Departments the authority to develop a QPA methodology precisely to ensure it represents negotiated market rates, and the Departments have done so. In their *TMA III* suit—the one place where Plaintiffs have even attempted to show that the QPA fails to accurately reflect the market—Plaintiffs flyspeck disparate pieces of the Departments' methodology, unconvincingly. Even cursory examination shows how the Departments' challenged methodological choices brings the QPA closer to market reality and renders it more reliable, not less.

For example, the QPA properly includes all agreed, contracted network rates because the negotiated rate reflects market value, regardless of how often a provider has provided a given service. The Departments have made sure that the QPA reflects any market variation by specialty by clarifying that per-specialty rates must be calculated whenever they make a material difference. U.S. Dep't of Labor, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55*, at 16-17 (Aug. 19, 2022), https://tinyurl.com/3zvt3w3j.

The Departments also reasonably addressed contracts where payments are made on a basis other than a specific fee for a particular service. Many alternative payment models include retrospective value adjustments (up or down) that are not tied to specific services (the appropriate metric for the QPA), but to a particular

provider's (or facility's) overall performance over a period of time. Jacqueline LaPointe, *Understanding the Value-Based Reimbursement Model Landscape*, Revcycle Intelligence (Sept. 9, 2016), https://tinyurl.com/yr76k7ny. The Departments reasonably determined that such retrospective quality bonuses and penalties should be excluded from the QPA, 86 Fed. Reg. at 36,893-94, and their exclusion does not artificially depress the QPA because such adjustments can both raise and lower provider compensation.

Finally, the Departments also rightly excluded "ad hoc arrangement[s] with a nonparticipating provider" that cover "a specific … beneficiary … in unique circumstances" from the QPA. 86 Fed. Reg. at 36,889. Before the Act, health insurance providers agreed to such one-off arrangements to try to better protect patients from surprise balance bills. *See* Erin C. Fuse Brown *et al., The Unfinished Business of Air Ambulance Bills,* Health Affairs Forefront (Mar. 26, 2021), https://tinyurl.com/yxbzfpb7. As the Departments recognized, excluding post-service ad hoc rates from the QPA "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." 86 Fed. Reg. at 36,889.

The reasonableness of the Departments' choices illustrates how the Act's implementing rules are not a one-way ratchet to suppress payments to providers, as the district court appeared to believe. Rather, the rules are designed to ensure that

the QPA is as reliable as possible given the crucial functions that Congress assigned it in terms of cost-sharing and as a central consideration for the IDR process.

### B. Robust Transparency and Oversight Guard the QPA's Reliability.

Medical providers' widespread acceptance of QPA-based payments confirms that the QPA is a reliable indicator of market rates. That is by design. The statutory definition of the QPA is a cornerstone of the Act, spanning at least 20 paragraphs and subparagraphs of the U.S. Code.[19] That definition is further unpacked and implemented by about 30 paragraphs of regulatory text, as explained in ten pages of the Federal Register.[20] Congress also established an audit process for the QPA to be implemented by the governing Departments.[21] Given this statutory and regulatory backdrop, the Final Rule appropriately recognized that a rule-compliant QPA "will meet the credibility requirement" to be given weight. 87 Fed. Reg. at 52,627.

The QPA's credibility derives from its transparency and reliability. Health insurance providers must disclose the QPA to medical providers when making initial payments for out-of-network services.[22] They must also certify that the QPA was used as the basis for their enrollee's cost-sharing amount and that it was calculated in accordance with the rules.[23] Given the extensive rules, this certification reveals a

---

[19] 42 U.S.C. § 300gg-111(a)(3)(E).
[20] *See* 45 C.F.R. § 149.140; 86 Fed. Reg. at 36,888-98.
[21] 42 U.S.C. § 300gg-111(a)(2).
[22] 45 C.F.R. § 149.140(d)(1)(i).
[23] *Id.* § 149.140(d)(1)(iii).

great deal about how the QPA was calculated. Moreover, health insurance providers must make several additional disclosures if requested.[24]

As for reliability, the Act tasks health insurance providers with calculating the QPA in the first instance. Health insurance providers understand that it is crucial to get it right, for several reasons. For starters, the accuracy and reliability of the QPA matters for the millions of plan enrollees for whom health insurance providers must determine cost-sharing. In addition, ensuring that the QPA accurately reflects reasonable negotiated market rates is necessary for providers to accept at or near-QPA payments, as they have largely done.

Beyond these imperatives, QPA calculations are subject to intense scrutiny, including regulatory audits and provider complaints. Congress established an audit process to ensure that the QPA is correctly calculated. QPA audits must be conducted on a random sampling basis and may also be conducted as the result of a complaint—including complaints from physicians.[25] If providers are concerned about QPA compliance, the audit process is the congressionally approved remedy. Such audits are now underway.

Recognizing the credibility afforded by the tight and verifiable constraints on the calculation of QPA, while requiring other information submitted by either party

---

[24] *Id.* § 149.140(d)(2).
[25] 42 U.S.C. § 300gg-111(a)(2)(A)(ii).

to "meet the same credibility standard that the QPA already meets through other mechanisms," is an even-handed approach that ensures a credibility floor for all information given weight in the IDR process. 87 Fed. Reg. at 52,672.

### C. The QPA Is—and Must Remain—Stable to Serve Its Many Crucial Functions under the Act.

Deeming the QPA credible is consistent not only with Congress's detailed rules for calculating and auditing the QPA, but also with its decision to assign the QPA many functions. As the government explains (Br. 39-40), Plaintiffs' objection to the credibility rules is at bottom a plea for case-by-case review of the QPA. But if arbitrators were permitted to question whether the submitted QPA is actually the median in-network rate meeting the statutory definition, it would undermine the stability essential for the QPA to serve the many functions assigned to it in the Act.

For this reason, arbitrators are not permitted to recalculate the QPA. 87 Fed. Reg. at 52,627 & n.31. Instead, IDR "payment determinations … should center on a determination of a total payment amount … based on the facts and circumstances of the dispute at issue, rather than an examination of a plan's or issuer's QPA methodology." *Id.* at 52,626. IDR entities cannot look behind a given QPA because the "statute places the responsibility for monitoring the accuracy of plans' and issuers' QPA calculation methodologies with the Departments (and applicable state authorities) by requiring audits." *Id.*

The governing agencies maintain such tight oversight of the QPA because it serves as a lynchpin of the Act, providing a fixed input for several key statutory functions, well beyond the bounds of any individual IDR decision: patient cost-sharing, mandatory IDR consideration, and IDR reporting.[26]

Given the QPA's role in cost-sharing, requiring that arbitrators be permitted to reopen the calculation of the QPA in the name of even-handedness—after the enrollee already paid a cost-share based on an agency-audited QPA—would introduce just the type of uncertainty for patients that the No Surprises Act was intended to address. It would also introduce a host of questions for implementing the reporting provisions that depend on the QPA, like: which QPA should be used for reporting results? The statutorily defined one, calculated by health insurance providers, used to establish patient cost-sharing, and audited by the Departments? Or the one generated by an individual arbitrator? What if another arbitrator comes up with yet a different answer? What should an insurance provider do if the Departments' audit confirms a QPA is accurately calculated, but an arbitrator says otherwise? The statute stops these questions from arising, because it provides for only a single QPA for each insurance provider and service, which arbitrators may not recalculate (yet may still give no weight in choosing between offers).

---

[26] 42 U.S.C. § 300gg-111(c)(7)(A)(v), (B)(iii)-(iv).

## IV.    The Final Rule Supports Patient Access To Quality Networks.

The district court accepted Plaintiffs' theory that the Final Rule impermissibly privileges the QPA (which it doesn't), and suggested that close-to-QPA payments do not reflect fair, market-based rates. *See* ROA.1853-1854 & n.9. As described above, that theory is wrong, and so is the related contention—oft repeated by Plaintiffs and their *amici* in the district court, and likely to be repeated here—that the Final Rule harms patients because it will lead health insurance providers to refuse to contract for above-QPA rates and drop any physicians who seek above-QPA rates from their networks. This simply isn't happening.

First, even under the Interim Final Rule—when, unlike now, the rule *did* anchor IDR around the QPA—there was no such move to cut rates and narrow networks. Cost is far from the only consideration when designing high-quality networks. Health insurance providers must also consider quality of care, legal requirements for network adequacy, and market demand for breadth of choice, among other considerations.

Legal network adequacy requirements set a floor that requires, for example, that patients be able to access a breadth of provider specialties within a certain distance of their homes, among other potential metrics. *See, e.g.*, 42 U.S.C. § 18031(c)(1)(B) (discussing network-adequacy standards for certification as a "qualified health plan"); Nat'l Conf. of State Legislatures, *Health Insurance*

*Network Adequacy Requirements* (Apr. 27, 2023), https://tinyurl.com/sy4cz9hw (surveying state laws).

Because health insurance providers' product is their network, however, the breadth of most networks far exceeds legal minimums. Employers' preferences are especially critical because they sponsor health benefits for over 150 million Americans. Kaiser Family Foundation, *2021 Employer Health Benefits Survey* (Nov. 10, 2021), https://tinyurl.com/mr2x62ks. Employers overwhelmingly favor broad networks, with only 5% of employers reporting in a 2019 survey that they offer their employees a narrow-network plan. Gary Claxton et al., *Employer strategies to reduce health costs and improve quality through network configuration*, Peterson-KFF Health Sys. Tracker (Sept. 25, 2019), https://tinyurl.com/ydzxn6ux.

Moreover, in building networks, health insurance providers recognize that competitive market rates are appropriately higher for certain types of services, *e.g.*, specialized facilities like pediatric hospitals and teaching hospitals. There is thus a range of rates for any given service, of which the QPA is only the median. The Act provides no incentive for health insurance providers to start offering median-or-below rates to such specialized facilities and providers, especially given the market imperative to offer networks that include prominent hospitals and specialty care.

Even a minimal increase in IDR predictability and the accuracy of IDR decision-making under the Final Rule, moreover, will encourage network

participation by fostering negotiations around a shared understanding of the range of reasonable values for services. In contrast, the rule-free IDR process mandated by the district court's ruling will open the door to out-of-network payments based on irrelevant, untrustworthy, and double-counted information. Such an approach will only make providers more likely to continue the pre-Act practice of refusing to participate in networks. By discouraging network participation, this anything-goes IDR approach would increase health care costs to patients' detriment, much as surprise billing used to do.

## CONCLUSION

The judgment of the district court should be reversed.

July 19, 2023

Julie Simon Miller
Thomas M. Palumbo
AMERICA'S HEALTH INSURANCE PLANS
601 Pennsylvania Ave. NW
South Building, Suite 500
Washington, DC 20004

Respectfully submitted,

s/ Hyland Hunt
  Hyland Hunt
  Ruthanne M. Deutsch
  DEUTSCH HUNT PLLC
  300 New Jersey Ave. NW, Suite 900
  Washington, DC 20001
  Tel.: 202-868-6915
  Fax: 202-609-8410
  Email: hhunt@deutschhunt.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Times New Roman proportional font, except for footnotes in 12-point Times New Roman proportional font per Circuit Rule 32.1, and contains 6,078 words, and thus complies with the type-volume limitation set forth in Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure.


s/Hyland Hunt                      
Hyland Hunt

July 19, 2023

## CERTIFICATE OF SERVICE

I hereby certify that, on July 19, 2023, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

s/Hyland Hunt
Hyland Hunt