# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-40217

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.;
DOCTOR ADAM CORLEY,

*Plaintiffs-Appellees,*

– v. –

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
DEPARTMENT OF LABOR; DEPARTMENT OF THE TREASURY; XAVIER
BECERRA, Secretary, U.S. Department of Health and Human Services; JULIE
A. SU, Acting Secretary, U.S. Department of Labor; JANET YELLEN, Secretary,
U.S. Department of Treasury,

*Defendants-Appellants.*

---

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS, CASE NO. 6:22-CV-372
HONORABLE JEREMY DANIEL KERNODLE, U.S. DISTRICT JUDGE

## BRIEF FOR *AMICUS CURIAE* BLUE CROSS BLUE SHIELD ASSOCIATION IN SUPPORT OF APPELLANTS AND REVERSAL

K. LEE BLALACK, II
ANDREW R. HELLMAN
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

*Attorneys for Amicus Curiae*

LIFENET, INCORPORATED; EAST TEXAS AIR ONE,

*Plaintiffs-Appellees,*

– v. –

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
XAVIER BECERRA, Secretary, U.S. Department of Health and Human Services;
UNITED STATES DEPARTMENT OF THE TREASURY; JANET YELLEN,
Secretary, U.S. Department of Treasury; UNITED STATES DEPARTMENT OF
LABOR; JULIE A. SU, Acting Secretary, U.S. Department of Labor; UNITED
STATES OFFICE OF PERSONNEL MANAGEMENT; KIRAN AHUJA,

*Defendants-Appellants.*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed in the parties' briefs, have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

*Amicus curiae*: Blue Cross Blue Shield Association is a non-profit entity with no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

*Counsel:* K. Lee Blalack, II, and Andrew R. Hellman of O'Melveny & Myers LLP.

/s/ K. Lee Blalack, II
K. Lee Blalack, II
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS........................i

INTEREST OF *AMICUS CURIAE*..........................................................................1

INTRODUCTION ................................................................................................2

ARGUMENT .......................................................................................................6

I.   THE QPA REFLECTS THE REASONABLE VALUE OF
     HEALTHCARE SERVICES. ............................................................6

II.  CONGRESS UNDERSTOOD THE UTILITY OF THE QPA
     FOR CURBING FURTHER DISTORTIONS IN THE
     MARKET FOR HEALTHCARE SERVICES AND
     RESTRAINING HEALTHCARE COSTS FOR PATIENTS,
     AND THE FINAL RULE EFFECTUATES THIS
     CONGRESSIONAL INTENT. ........................................................12

     A.   Surprise Billers have commanded above-market rates by
          exploiting the inability of their patients to choose
          alternative healthcare providers, and this minority of
          providers in specialties covered by the Act has had an
          outsized impact on the payment rates for those services........13

     B.   Private equity groups have fueled the growth of surprise
          billing. .....................................................................................16

     C.   Congress found that the QPA would help restrain rising
          healthcare costs for patients while fairly compensating
          out-of-network providers. ........................................................18

III. REQUIRING THE IDR ENTITY TO START WITH THE
     QPA WILL NOT LEAD TO UNDULY NARROW
     PROVIDER NETWORKS OR IMPEDE PATIENT ACCESS
     TO CARE. .....................................................................................21

     A.   Payors have market incentives to maintain broad provider
          networks, which benefit both health plans and patients. .........22

     B.   Because of the many benefits associated with provider
          networks, payors remain incentivized to contract with
          even high-cost healthcare providers. ......................................23

## TABLE OF CONTENTS
### (continued)

Page

C.     State and federal network adequacy requirements ensure that payors would not offer unduly narrow provider networks for patients. .................................................................24

D.     Empirical evidence suggests that prioritizing the QPA—much less instructing IDR entities to simply start with it—would not lead to unreasonably narrow provider networks or impede patient access to care, as plaintiffs allege. .....................................................................................25

CONCLUSION ....................................................................................27

CERTIFICATE OF SERVICE .............................................................27

CERTIFICATE OF COMPLIANCE ....................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*FTC v. ProMedica Health Sys., Inc.,*
2011 WL 1219281 (N.D. Ohio Mar. 29, 2011)..................................................23

*Kleen Prods. LLC v. Ga.-Pac. LLC,*
910 F.3d 927 (7th Cir. 2018)...............................................................................13

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.,*
2016 WL 5817176 (C.D. Ill. Sept. 30, 2016).....................................................22

*New Eng. Deaconess Hosp. v. Sebelius,*
942 F. Supp. 2d 56 (D.D.C. 2013) .......................................................................7

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.,*
-- F. Supp. 3d --, 2023 WL 1781801 (E.D. Tex. Feb. 6, 2023)...................... 5, 12

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.,*
587 F. Supp. 3d 528 (E.D. Tex. 2022) .................................................................4

**Statutes**

42 U.S.C. § 300gg-111 ................................................................................ *passim*

42 U.S.C. § 300gg-131 .........................................................................................2

42 U.S.C. § 300gg-132 .........................................................................................2

42 U.S.C. § 18031 ...............................................................................................25

**Regulations**

42 C.F.R. § 413.134 ..............................................................................................8

45 C.F.R. § 149.510 .................................................................................... *passim*

45 C.F.R. § 156.230 ............................................................................................25

*Requirements Related to Surprise Billing,*
87 Fed. Reg. 52,618 (Aug. 26, 2022) ...................................................................7

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Requirements Related to Surprise Billing: Part II*,
   86 Fed. Reg. 55,980 (Oct. 7, 2021) ............................................................. 7, 8, 9

**Other Authorities**

Benjamin L. Chartock et al., *Arbitration Over Out-of-Network
   Medical Bills: Evidence from New Jersey Payment Disputes*, 40(1)
   Health Affairs 130 (Jan. 2021) ..............................................................20

Bill Johnson et al., *Comparing Commercial and Medicare
   Professional Services Prices*, Health Care Cost Inst. (Aug. 13,
   2020)................................................................................................26

Caitlin Owens, *TeamHealth Sent Thousands of Surprise Medical Bills
   in 2017*, Axios (Dec. 5, 2019) ..............................................................16

*Charges Billed by Out-of-Network Providers: Implications for
   Affordability*, AHIP Ctr. for Pol'y & Rsch. (Sept. 2015)....................................15

Christen Linke Young et al., *The Relationship Between Network
   Adequacy and Surprise Billing*, USC-Brookings Schaeffer Initiative
   for Health Pol'y (May 10, 2019) .................................................... 24, 25

Cong. Budget Office, *Estimate for Divisions O Through FF H.R. 133,
   Consolidated Appropriations Act, 2021, Public Law 116-260
   Enacted on December 27, 2020* (Jan. 14, 2021) .................................................19

Conn. Ins. Dep't, Market Conduct Report on Aetna Health Inc., 2014
   CT Market Conduct LEXIS 25 (June 6, 2017) ....................................................25

Eileen Appelbaum & Rosemary Batt, *Private Equity Buyouts in
   Healthcare: Who Wins, Who Loses?* (Inst. for New Econ. Thinking,
   Working Paper No. 118, 2020) .................................................... 17, 18

Erin L. Duffy et al., *Policies to Address Surprise Billing Can Affect
   Health Insurance Premiums*, 26(9) Am. J. Managed Care 401 (Sept.
   11, 2020)................................................................................................19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Erin Duffy et al., *Surprise Medical Bills Increase Costs for Everyone, Not Just for the People Who Get Them*, USC-Brookings Schaeffer Initiative for Health Pol'y (Oct. 2, 2020) ................................................. 10, 15, 19

Erin Fuse Brown et al., *Private Equity as a Divining Rod for Market Failure: Policy Responses to Harmful Physician Practice Acquisitions*, USC-Brookings Schaeffer Initiative for Health Pol'y (Oct. 2021) ................................................................................................. 17, 18

Fla. Off. of Ins. Regul., Target Market Conduct Final Examination Report of Humana Medical Plan, 2014 FL Market Conduct LEXIS 17 (Oct. 30, 2015) ................................................................................. 25

George A. Nation III, *Taking Advantage of Patients in an Emergency: Addressing Exorbitant and Unexpected Ambulance Bills*, 62 Vill. L. Rev. 747 (2017) ......................................................................................... 9

Glenn Melnick & Katya Fonkych, *Regulating Out-of-Network Hospital Emergency Prices: Problem and Potential Benchmarks*, Health Affairs Forefront (Mar. 23, 2020) ............................................... 15

H.R. 2328, 116th Cong. (2019) ................................................................. 8

H.R. 5800, 116th Cong. (2020) ................................................................. 8

H.R. 5826, 116th Cong. (2020) ................................................................. 8

H.R. Rep. No. 116-615, pt. I (Dec. 2, 2020) ................................... *passim*

Jane B. Wishner & Jeremy Marks, *Ensuring Compliance with Network Adequacy Standards: Lessons from Four States*, Urban Inst. (Mar. 2017) ................................................................................ 25

Jane M. Zhu et al., *Private Equity Acquisitions of Physician Medical Groups Across Specialties, 2013–2016*, 323(7) JAMA 663 (Feb. 18, 2020) ................................................................................................. 17, 18

Jean Fuglesten Biniek et al., *How Often Do Providers Bill Out of Network?*, Health Care Cost Inst. (May 28, 2020) ................................ 8

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

Jeanette Thornton, AHIP, *Can We Stop Surprise Medical Bills AND Strengthen Provider Networks? California Did*, Am. J. Managed Care (Aug. 22, 2019) ...................................................................26

Julie Appleby, *Here's What the New Ban on Surprise Medical Billing Means for You*, NPR (Dec. 30, 2021)...................................................10

Katherine Baicker & Amitabh Chandra, *The Labor Market Effects of Rising Health Insurance Premiums*, 24 J. Labor Econ. 609 (2006) ...................18

Kevin Kennedy et al., *Surprise Out-of-Network Medical Bills During In-Network Hospital Admissions Varied by State and Medical Specialty, 2016*, Health Care Cost Inst. (Mar. 28, 2019) ......................................8

Letter from Sen. Patty Murray & Rep. Frank Pallone, Jr. to Sec'y Xavier Becerra (Jan. 7, 2022)..............................................................8

Letter from TeamHealth Holdings, Chief Executive Officer, to U.S. Senate Bi-Partisan Workgroup on Surprise Medical Billing (Mar. 13, 2019)...............................................................................................16

Loren Adler et al., *Breaking Down the Bipartisan Senate Group's New Proposal to Address Surprise Billing*, USC-Brookings Schaeffer Initiative for Health Pol'y (May 21, 2019) .........................................15

Loren Adler et al., *California Saw Reduction in Out-of-Network Care from Affected Specialties After 2017 Surprise Billing Law*, USC-Brookings Schaeffer Initiative for Health Pol'y (Sept. 26, 2019)................. 26, 27

Loren Adler et al., *State Approaches to Mitigating Surprise Out-of-Network Billing*, USC-Brookings Schaeffer Initiative for Health Pol'y (Feb. 2019) ....................................................................... 13, 14

Loren Adler et al., *Understanding the No Surprises Act*, USC-Brookings Schaeffer Initiative for Health Pol'y (Feb. 4, 2021)............................9

Loren Adler, *Experience with New York's Arbitration Process for Surprise Out-of-Network Bills*, USC-Brookings Schaeffer Initiative for Health Pol'y (Oct. 24, 2019)...........................................................20

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Mark A. Hall & Paul B. Ginsburg, *A Better Approach to Regulating Provider Network Adequacy*, USC-Brookings Schaeffer Initiative for Health Pol'y (Sept. 2017) ..............................................................22

Matthew Fielder et al., *Recommendations for Implementing the No Surprises Act*, USC-Brookings Schaeffer Initiative for Health Pol'y (Mar. 16, 2021)...................................................................21

Nisha Kurani et al., *Price Transparency and Variation in U.S. Health Services*, Peterson-KFF Health Sys. Tracker (Jan. 13, 2021) .............................11

Paul B. Ginsburg, *Wide Variation in Hospital and Physician Payment Rates Evidence of Provider Market Power*, Ctr. for Studying Health Sys. Change, Rsch. Br. No. 16 (Nov. 2010) ........................................................11

Peter R. Kongstvedt, *Essentials of Managed Care* (6th ed. 2013)................... 23, 24

Richard M. Scheffler et al., *Soaring Private Equity Investment in the Healthcare Sector: Consolidation Accelerated, Competition Undermined, and Patients at Risk*, Am. Antitrust Inst. (May 18, 2021) .............16

Robert Murray, *Hospital Charges and the Need for a Maximum Price Obligation Rule for Emergency Department & Out-of-Network Care*, Health Affairs Forefront (May 16, 2013)...................................................14

S. 1895, 116th Cong. (2019) ......................................................................8

Sarah L. Barber et al., *Price Setting and Price Regulation in Health Care*, World Health Org. (2019) .........................................................11

Tim Xu et al., *Variation in Emergency Department vs. Internal Medicine Excess Charges in the United States*, 177(8) JAMA Internal Med. 1139 (Aug. 1, 2017).......................................................14

# INTEREST OF *AMICUS CURIAE*[1]

The Blue Cross Blue Shield Association ("BCBSA") is the non-profit association that promotes the national interests of thirty-four independent, community-based, and locally operated Blue Cross Blue Shield health insurance companies ("Blue Plans"). Together, the Blue Plans provide health insurance for over 115 million people—one in three Americans—in every zip code in all fifty states, the District of Columbia, and Puerto Rico. Blue Plans offer a variety of health insurance products to all segments of the population, including federal employees, large employer groups, small businesses, and individuals. As leaders in the healthcare community for more than eighty years, Blue Plans seek to expand access to quality healthcare for all Americans and have extensive knowledge of and experience with the health insurance marketplace. BCBSA supports Congress's efforts to remedy distortions in the market for healthcare services and restrain costs for patients, including those enrolled in Blue Plans, through the No Surprises Act (the "Act"). BCBSA has an interest in advising the Court regarding the manner in which the final rule issued in August 2022 (the "Final Rule") will further Congress's efforts to remedy those market distortions.

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief. No party, party's counsel, or any person other than *amicus curiae*, its members, or its counsel contributed money intended to finance the preparation or submission of this brief.

**INTRODUCTION**

The Final Rule specifies the process by which arbitrators should select the appropriate payment under the Act for services rendered to patients by certain healthcare providers who do not participate in the provider networks offered by the patients' health insurers or health plans ("out-of-network providers"). The Final Rule reflects the Departments'[2] diligent efforts to faithfully implement the intent of Congress when it sought to end so-called "surprise billing," which occurs "when a consumer covered by a health plan is unexpectedly treated by an out-of-network provider and is required to pay the difference between what the plan pays and the provider's charge," often amounting "to thousands of dollars of unforeseen medical costs." H.R. Rep. No. 116-615, pt. I, at 47 (Dec. 2, 2020). The Act applies (1) when patients receive emergency medical care from out-of-network providers; and (2) when patients receive ancillary medical care from out-of-network physicians but at a facility, such as a hospital, that participates in the provider network of the patients' health plan. *See* 42 U.S.C. §§ 300gg-131, 300gg-132.

---

[2] As used herein, the "Departments" collectively refers to the institutional defendant-appellants in this action: the U.S. Department of Health and Human Services ("HHS"), the U.S. Department of Labor, the U.S. Department of the Treasury, and the Office of Personnel Management.

Congress recognized that surprise billing was becoming an increasingly common practice in the healthcare market and that *all* patients were paying the price. *See* H.R. Rep. No. 116-615, pt. I, at 53-55. A minority of emergency medicine providers and hospital-based physicians ("Surprise Billers") have unfairly leveraged their patients' inability to choose which providers render care in these settings to charge exorbitant rates. Indeed, data shows that many Surprise Billers charge grossly inflated rates, in some instances demanding more than 1,000% of the payments remitted by the Medicare program for the exact same services. In the Act, Congress carefully considered the interests of healthcare providers, payors, and, above all, patients. It balanced those interests in designing an independent dispute resolution ("IDR") process to resolve payor-provider disputes, including by designating the qualifying payment amount ("QPA") as a central consideration in that IDR process. The QPA is the median payment rate allowed by the health insurer or health plan for the same service to its network of contracted providers. Congress instructed IDR entities adjudicating these payment disputes to consider information in two provisions of the Act: (I) the QPA, and (II) "subject to" certain limitations, a range of "additional information" specified in various other provisions of the Act, should the parties choose to submit any such information to the IDR entity or the entity chooses to request it. 42 U.S.C. § 300gg-111(c)(5)(C)(i). These two statutory provisions—one dedicated

3

exclusively to the QPA and that must be considered in all arbitrations, and one

addressing other permissible information that IDR entities must consider only if a

party affirmatively submits it or the IDR entity itself specifically requests it—

reflect the considered judgment of Congress that the QPA ordinarily represents a

reasonable value for healthcare services covered by the Act.

In the statute, Congress also directed the Departments to "establish by

regulation one independent dispute resolution process"—in other words, to

promulgate regulations giving IDR entities more concrete guidance to ensure

predictability and consistency in arbitrations under the Act. *Id.* § 300gg-

111(c)(2)(A). Pursuant to that congressional directive, in September 2021, the

Departments promulgated an interim final rule (the "IFR") that among other things

instructed IDR entities adjudicating covered payment disputes to start from a

presumption favoring the offer closest to the QPA. *See* 45 C.F.R.

§ 149.510(c)(4)(ii)(A) (2021). BCBSA respectfully submits that the Departments

exercised lawful authority in promulgating the IFR, including the presumption in

favor of the QPA, and that the IFR comported with the congressional intent

underlying the Act. The district court, however, disagreed and vacated the portions

of the IFR that it deemed to impermissibly favor the QPA. *See Tex. Med. Ass'n v.*

*U.S. Dep't of Health & Hum. Servs.* ("*TMA I*"), 587 F. Supp. 3d 528 (E.D. Tex.

2022).

The Departments heeded the district court's guidance and ultimately chose not to include any comparable provisions privileging the QPA when promulgating new regulations. In contrast to the IFR, the Final Rule simply instructs arbitrators as follows: "The certified IDR entity must select the offer that the certified IDR entity determines best represents the value of the qualified IDR item or service as the out-of-network rate." 45 C.F.R. § 149.510(c)(4)(ii)(A) (2022). The district court, however, concluded that the "Final Rule nevertheless continues to place a thumb on the scale for the QPA," primarily "by requiring arbitrators to begin with the QPA" and then consider the other information submitted by the parties, and thus "impermissibly alter[s] the Act's requirements." *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.* ("*TMA II*"), -- F. Supp. 3d --, 2023 WL 1781801, at *11 (E.D. Tex. Feb. 6, 2023). That conclusion is unfounded. Congress expressly directed the Departments to create uniform guidelines to govern arbitrations under the Act, and the Final Rule's requirement for IDR entities to consider the QPA at the outset of their analysis—again, without restricting their ultimate discretion and requiring them to finally select whichever offer they deem most appropriate—is entirely consistent with the congressional judgment codified in the Act.

Indeed, empirical evidence shows that there are sound policy reasons for IDR entities to start with the QPA—the best reflection of fair market prices—as Congress recognized when it passed the Act. Congress understood that the status

quo is a market highly susceptible to distortion by the inability of patients to choose providers of emergency medicine and ancillary hospital-based services based on cost, and that Surprise Billers have exploited that opportunity in a manner that has inflated healthcare costs for all patients.  Congress rejected that status quo, including, importantly, by drafting the Act to contemplate a central role for the QPA in the IDR process.  The Final Rule's requirement for arbitrators to start with the QPA—to the extent that such an order-of-operations affects outcomes of the IDR process at all—will help to ensure that patients enjoy the benefits that Congress intended.  Plaintiffs and their *amici* have contended that these benefits would come at steep costs to the breadth of provider networks and, consequently, patients' access to needed care.  But market-based incentives and network adequacy requirements codified in state and federal laws ensure that provider networks will remain sufficiently broad to meet patients' needs, as empirical evidence from states that have implemented similar measures confirms.

## ARGUMENT

## I.    THE QPA REFLECTS THE REASONABLE VALUE OF HEALTHCARE SERVICES.

The Act defines the QPA as "the median of the contracted rates recognized by the plan or issuer … for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished"—in other words, the median contracted

rate. 42 U.S.C. § 300gg-111(a)(3)(E). The QPA must be calculated as of January 31, 2019, using a methodology that Congress directed the Departments to establish, and then adjusted over time for inflation, *id.*; the Act also provides that health plans are subject to audit by the Secretary of HHS to ensure that they comply with the rules for calculating and applying their QPAs, *id.* § 300gg-111(a)(2)(A). When the Departments promulgated the IFR, they explained that the Act codified Congress's judgment that the QPA "represents a reasonable market-based payment for relevant items and services." *Requirements Related to Surprise Billing: Part II*, 86 Fed. Reg. 55,980, 55,996 (Oct. 7, 2021); *see also Requirements Related to Surprise Billing*, 87 Fed. Reg. 52,618, 52,623 (Aug. 26, 2022) (observing that "[m]any commenters supported the approach set forth in the" IFR for reasons including that "the QPA represents a reasonable, market-based rate" for healthcare services). Indeed, the median contracted rates reflected in the QPA represent the best evidence of true "market" prices for healthcare services; thus, as "the statute contemplates," "typically the QPA will be a reasonable out-of-network rate." 86 Fed. Reg. at 55,996.

The reasonable market value of a good or service "is 'the price that [it] would bring by bona fide bargaining between well-informed buyers and sellers,'"—that is, "the price [it] would sell for in an arm's length, open-market transaction." *New Eng. Deaconess Hosp. v. Sebelius*, 942 F. Supp. 2d 56, 59

7

(D.D.C. 2013) (quoting 42 C.F.R. § 413.134(b)(2)).  Median contracted rates

typically represent reasonable market values because they "are established through

arms-length negotiations between providers and facilities and plans and issuers (or

their service providers)." 86 Fed. Reg. at 55,996.  Contracted rates account for the

vast majority of transactions in the private healthcare market: most patients receive

care from providers who participate in a payor's network rather than on an out-of-

network basis, even among healthcare specialties in which patients are most likely

to receive care from out-of-network providers.[3]  Congress understood that median

contracted rates reflect reasonable market values.  *Each* of the congressional

committees that reported bills that ultimately resulted in the passage of the Act

"determined the QPA to be a reasonable, market-based rate" and "included the

QPA as the primary rate that IDR entities should consider when making

decisions."[4]  The Departments applied this congressional judgment in the IFR,

declaring that "the QPA should reflect standard market rates arrived at through

---

[3] *See* Jean Fuglesten Biniek et al., *How Often Do Providers Bill Out of Network?*, Health Care Cost Inst. (May 28, 2020), https://tinyurl.com/3jfj62nm; Kevin Kennedy et al., *Surprise Out-of-Network Medical Bills During In-Network Hospital Admissions Varied by State and Medical Specialty, 2016*, Health Care Cost Inst. (Mar. 28, 2019), https://tinyurl.com/ymweu794.

[4] Letter from Sen. Patty Murray & Rep. Frank Pallone, Jr. to Sec'y Xavier Becerra, at 4 (Jan. 7, 2022); *see* H.R. 2328, 116th Cong. (2019); S. 1895, 116th Cong. (2019); H.R. 5800, 116th Cong. (2020); H.R. 5826, 116th Cong. (2020).

typical contract negotiations and should therefore be a reasonable out-of-network rate under most circumstances."  86 Fed. Reg. at 55,996.

While the Act permits IDR entities to consider certain information other than the QPA, it prohibits consideration of a few specified criteria, and comparing these prohibited considerations with the QPA illustrates nicely why Congress concluded that the QPA represents a reasonable market rate.  The Act directs that arbitrators "shall not consider usual and customary charges" or "the amount that would have been billed" by the provider if not limited by the Act.  42 U.S.C. § 300gg-111(c)(5)(D).  Billed charges do not represent reasonable market values because they reflect rates unilaterally demanded by a healthcare provider rather than rates that a payor and provider have negotiated.  "Usual and customary" charges suffer from the same flaw: a "usual and customary" charge under the Act "refers to the amount providers in a geographic area usually charge for the same or similar medical service."  86 Fed. Reg. at 55,999.[5]  There is often "a big difference between usual and customary charges and the usual and customary amount that providers actually get paid"—in other words, the true market rate.[6]  On the other

---

[5] *See* Loren Adler et al., *Understanding the No Surprises Act*, USC-Brookings Schaeffer Initiative for Health Pol'y (Feb. 4, 2021), https://tinyurl.com/5n7kr99p (noting that usual and customary charges are typically based on "unilaterally set" billed charges).

[6] George A. Nation III, *Taking Advantage of Patients in an Emergency: Addressing Exorbitant and Unexpected Ambulance Bills*, 62 Vill. L. Rev. 747, 750 (2017).

hand, the Act prohibits IDR entities from selecting traditional Medicare or other government-mandated payment rates.  42 U.S.C. § 300gg-111(c)(5)(D). Traditional Medicare, like other public health plans, "sets prices administratively in an attempt to reflect efficient costs."[7]  Thus, Congress prohibited IDR entities from considering payment amounts set unilaterally—whether by healthcare providers or traditional Medicare and other government benefit programs—and instead required them to consider payment rates determined through bilateral, private-market negotiations: the median contracted rates embodied in the QPA.[8]

Contracted rates are *not* unilaterally dictated by health insurers and health plans, as plaintiffs and their *amici* have suggested.[9]  Robust empirical evidence shows that contracted rates—negotiated by private parties in the marketplace—for both facilities and physicians vary significantly across and within geographic markets and medical specialties, both absolutely and relative to the rates paid by Medicare.  A recent study found that the mean contracted rate for a hip replacement in the New York metropolitan area, for example, was more than twice

---

[7] Erin Duffy et al., *Surprise Medical Bills Increase Costs for Everyone, Not Just for the People Who Get Them*, USC-Brookings Schaeffer Initiative for Health Pol'y (Oct. 2, 2020), https://tinyurl.com/8647t36a.

[8] *See* Julie Appleby, *Here's What the New Ban on Surprise Medical Billing Means for You*, NPR (Dec. 30, 2021), https://tinyurl.com/v4ed53c6.

[9] *See, e.g.*, Br. of Am. Soc'y of Anesthesiologists et al. as *Amici Curiae* at 13, *TMA II* (No. 6:22-cv-00372) (E.D. Tex. Oct. 19, 2022), ECF No. 53 (suggesting that "the Final Rule … favors rates unilaterally set by insurers").

as much as the mean contracted rate for the same procedure in the Baltimore area, and that contracted rates for outpatient lower back MRIs varied drastically *within* the Miami area, with rates of under $200 at the 25th percentile and more than $1,400 at the 75th percentile.[10]  Another study likewise found significant variations in the ratio of average private contracted rates to Medicare rates both between and within geographic areas and medical specialties.[11]  This substantial variance in average contracted rates dispels any argument that health insurers set those rates by fiat, because such variations occur when prices are determined through individual negotiations rather than unilateral price setting.[12]  Payors *and healthcare providers* negotiate contracted rates, and ample evidence shows that median contracted rates are the best available measure of the reasonable value of healthcare services for patients.

---

[10] Nisha Kurani et al., *Price Transparency and Variation in U.S. Health Services*, Peterson-KFF Health Sys. Tracker (Jan. 13, 2021), https://tinyurl.com/2jb3xyhk.

[11] *See generally* Paul B. Ginsburg, *Wide Variation in Hospital and Physician Payment Rates Evidence of Provider Market Power*, Ctr. for Studying Health Sys. Change, Rsch. Br. No. 16 (Nov. 2010), https://tinyurl.com/2d8yfhkb.

[12] *See, e.g.*, Sarah L. Barber et al., *Price Setting and Price Regulation in Health Care* 29-30, World Health Org. (2019), https://tinyurl.com/mw6y8p2t.

**II.    CONGRESS UNDERSTOOD THE UTILITY OF THE QPA FOR CURBING FURTHER DISTORTIONS IN THE MARKET FOR HEALTHCARE SERVICES AND RESTRAINING HEALTHCARE COSTS FOR PATIENTS, AND THE FINAL RULE EFFECTUATES THIS CONGRESSIONAL INTENT.**

Because the QPA is tied to the median contracted rates from 2019 and then adjusted for inflation, the market distortions caused by surprise billing, and the inflated payment rates that have resulted, are already baked into the IDR process established by the Act.  Requiring IDR entities to consider the QPA in all arbitrations—as the Act itself does, independently of the Final Rule, *see* 42 U.S.C. § 300gg-111(c)(5)(C)—will further Congress's goal of preventing future market distortions and restraining costs for patients.  The Final Rule's directive that arbitrators must start their analysis with the QPA merely reinforces this congressional intent.

The other aspects of the Final Rule that the district court invalidated similarly reflect reasonable procedural guidelines consistent with the Act.  In particular, the district court objected to the Final Rule's instruction that arbitrators should not give weight to "information relating to the non-QPA factors that happens to be 'already accounted for' in the QPA."  *TMA II*, 2023 WL 1781801, at *12 (quoting 45 C.F.R. § 149.510(c)(4)(iii)(E)).  This objection is baseless.  The Final Rule merely directs arbitrators to avoid weighting *any* duplicative information, whether it is "already accounted for by the [QPA] … or other credible

information" submitted by the parties.  45 C.F.R. § 149.510(c)(4)(iii)(E).  This

sensible requirement ensures that arbitrators do not tip the scales in *either* party's

favor by double-counting certain information—and the district court did not

explain what language in the Act would suggest that this logical rule is inconsistent

with the text.

### A.    Surprise Billers have commanded above-market rates by exploiting the inability of their patients to choose alternative healthcare providers, and this minority of providers in specialties covered by the Act has had an outsized impact on the payment rates for those services.

Congress passed the No Surprises Act to correct an increasingly worrying

"failure in the health care market."  H.R. Rep. No. 116-615, pt. I, at 53.  Most

healthcare providers negotiate contracted rates with health plans and offer their

services to members of those plans at the negotiated rates.[13]  But market distortions

have caused some "providers—particularly in certain specialties—to have little or

no incentive to contract to join a health plan's network."  *Id.*  Some providers "face

highly inelastic demands for their services because patients lack the ability to

meaningfully choose or refuse care"[14]:  patients rarely ask if a physician or facility

---

[13] *See, e.g.*, Loren Adler et al., *State Approaches to Mitigating Surprise Out-of-Network Billing* 4, USC-Brookings Schaeffer Initiative for Health Pol'y (Feb. 2019), https://tinyurl.com/2m8385a6.

[14] Inelastic demand is present when higher prices for a good or service do not deter buyers from purchasing the good or service, such as when buyers lack meaningful options between sellers.  *See, e.g.*, *Kleen Prods. LLC v. Ga.-Pac. LLC*, 910 F.3d 927, 931 (7th Cir. 2018).

has contracted with their health plans before receiving urgent care in the

emergency room, or when treated by ancillary hospital-based physicians, like

radiologists and anesthesiologists, that patients seldom choose themselves. *Id.* In

the years before Congress passed the Act, growing numbers of Surprise Billers

began exploiting their patients' lack of choice to increase their own charges and

payment rates. *See* Appellants' Br. at 5-8. While Surprise Billers represent a

minority of providers, their outsized impact on the market has led to "highly

inflated payment rates" in these specialties; Congress found that "the median billed

charge for emergency medicine is 465 percent of the Medicare rate," for example,

while the median billed charges for diagnostic radiology and anesthesiology are

402% and 551% of Medicare rates, respectively. H.R. Rep. No. 116-615, pt. I, at

53.[15] Average billed charges in these specialties exceed Medicare rates by far

greater margins than average billed charges in other specialties.[16] Even the

---

[15] Studies have similarly shown that hospitals' billed charges for emergency services have grown at a faster rate than hospitals' billed charges for non-emergency services. *See* Robert Murray, *Hospital Charges and the Need for a Maximum Price Obligation Rule for Emergency Department & Out-of-Network Care*, Health Affairs Forefront (May 16, 2013), https://tinyurl.com/4jfcy69a.

[16] *See* Adler et al., *supra* n.13, at 7, https://tinyurl.com/2m8385a6; *see also* Tim Xu et al., *Variation in Emergency Department vs. Internal Medicine Excess Charges in the United States*, 177(8) JAMA Internal Med. 1139 (Aug. 1, 2017), https://tinyurl.com/mr3eju3m (finding that some emergency medicine providers charge as high as 12.6 times the Medicare rate).

*average* billed charges for certain procedures have run as much as *1,000%* of Medicare rates.[17]

The inelastic demand for emergency and hospital-based services, in short, allows Surprise Billers "to bill out-of-network patients at basically whatever rate they choose, which in turn allows them to negotiate very high rates when they do come in-network," leading to higher average contracted rates across the specialties most associated with surprise billing.[18]  While average contracted rates for all physicians represented 128% of original Medicare rates in 2018, the average contracted rates of the specialties most associated with surprise billing represented significantly higher multiples of the Medicare rate:  200% for radiologists, 306% for emergency physicians, and 344% for anesthesiologists.[19]  The comparatively higher contracted rates in these specialties were rooted in the ability of Surprise Billers to balance bill their patients in the out-of-network setting[20]—and some Surprise Billers openly embraced that they relied on the threat of "balance billing"

---

[17] *See Charges Billed by Out-of-Network Providers: Implications for Affordability* 4, AHIP Ctr. for Pol'y & Rsch. (Sept. 2015), https://tinyurl.com/mejaed9m.

[18] Loren Adler et al., *Breaking Down the Bipartisan Senate Group's New Proposal to Address Surprise Billing*, USC-Brookings Schaeffer Initiative for Health Pol'y (May 21, 2019), https://tinyurl.com/bdwwdxus; *see also* Glenn Melnick & Katya Fonkych, *Regulating Out-of-Network Hospital Emergency Prices: Problem and Potential Benchmarks*, Health Affairs Forefront (Mar. 23, 2020), https://tinyurl.com/4bfjy8wt.

[19] Adler et al., *supra* n.18, https://tinyurl.com/bdwwdxus.

[20] Duffy et al., *supra* n.7, https://tinyurl.com/8647t36a.

as a "source of contract negotiating leverage" with health insurers.[21]  Congress

passed the Act fully aware of evidence that Surprise Billers use the threat of

balance billing to charge "highly inflated payment rates," which "are, in turn,

reflected in the cost of in-network care."[22]  H.R. Rep. No. 116-615, pt. I, at 53.

## B.    Private equity groups have fueled the growth of surprise billing.

Private equity groups in particular have been a driving force in the growth of

surprise billing and the resulting inflation of payment rates for healthcare

services.[23]  As Congress recognized, "the financial opportunity from inflated out-

---

[21] Letter from TeamHealth Holdings, Chief Executive Officer, to U.S. Senate Bi-Partisan Workgroup on Surprise Medical Billing, at 1 (Mar. 13, 2019), https://tinyurl.com/4r88zmbj; *see also* Caitlin Owens, *TeamHealth Sent Thousands of Surprise Medical Bills in 2017*, Axios (Dec. 5, 2019), https://tinyurl.com/mujncz48.

[22] Plaintiffs' *amici* in the district court ignored this market reality when they pointed to a letter from BlueCross BlueShield of North Carolina ("BCBS-NC") as an example of abusive market conduct by health insurers resulting from the IFR. *See* Amicus Curiae Br. by Physicians Advoc. Inst. et al. at 12 n.19, *TMA II*, 2023 WL 1781801 (No. 6:22-cv-00372-JDK) (E.D. Tex. Oct. 19, 2022), ECF No. 51; Br. of Am. Soc'y of Anesthesiologists et al. as *Amici Curiae* at 11-12, 14-15, *TMA II*, 2023 WL 1781801 (No. 6:22-cv-00372-JDK) (E.D. Tex. Oct. 19, 2022), ECF No. 53; Br. of *Amici Curiae* Am. Med. Ass'n & Am. Hosp. Ass'n at 20, *TMA II*, 2023 WL 1781801 (No. 6:22-cv-00372-JDK) (E.D. Tex. Oct. 19, 2022), ECF No. 54.  BCBS-NC, a single-state, not-for-profit insurer, sent the letter to less than 0.001% of healthcare providers in its network—54 in total, out of well over 15,000 providers in the network.  This small minority of providers maintained legacy contracted rates that BCBS-NC sought to renegotiate based on reasonable market rates.

[23] *See* Richard M. Scheffler et al., *Soaring Private Equity Investment in the Healthcare Sector: Consolidation Accelerated, Competition Undermined, and Patients at Risk* 39 & n.143, Am. Antitrust Inst. (May 18, 2021),

of-network prices … has made health care an attractive market for private equity

firms." H.R. Rep. No. 116-615, pt. I, at 53-54.  Private equity firms have acquired

physician practices at increasing rates, with one study finding year-over-year

increases in practice acquisitions across the study period of 2013 (59 acquisitions)

through 2016 (136 acquisitions).[24]  At the same time, hospitals increasingly relied

on physician staffing companies to supply medical professionals for their

emergency departments and other needs, and private equity groups now control the

two largest staffing firms that together account for 30% of that market.[25]

    Private equity firms acquiring physician practices have focused "heavily in

emergency medicine staffing companies and the ancillary hospital-based

specialties that have been able to leverage out-of-network balance billing as a

profit strategy."[26]  In one study, for example, anesthesiologists represented the

highest proportion of physician practice acquisitions (33.1%), from 2013 through

---

https://tinyurl.com/2w9jcd7e; *see also* Erin Fuse Brown et al., *Private Equity as a Divining Rod for Market Failure: Policy Responses to Harmful Physician Practice Acquisitions* 27, USC-Brookings Schaeffer Initiative for Health Pol'y (Oct. 2021), https://tinyurl.com/32km27km; Eileen Appelbaum & Rosemary Batt, *Private Equity Buyouts in Healthcare: Who Wins, Who Loses?* 5 (Inst. for New Econ. Thinking, Working Paper No. 118, 2020), https://tinyurl.com/25d49jcj.

[24] Jane M. Zhu et al., *Private Equity Acquisitions of Physician Medical Groups Across Specialties, 2013–2016*, 323(7) JAMA 663 (Feb. 18, 2020), https://tinyurl.com/3b9zdsmx.

[25] Appelbaum & Batt, *supra* n.23, at 3, 55, https://tinyurl.com/25d49jcj.

[26] Brown et al., *supra* n.23, at 11, https://tinyurl.com/32km27km.

2016, followed by emergency physicians (15.8%).[27]  The focus of private equity

firms on these practices is a direct result of how "surprise medical bills allow them

to extract high payments for medical care from patients and/or insurance

companies"[28]—and how their ability to surprise bill gives them "greater leverage

in price negotiations with insurers when they are in-network."[29]  These tactics have

contributed to rising healthcare costs for patients, as Congress recognized in

passing the Act.  *See* H.R. Rep. No. 116-615, pt. I, at 53-54.

### C.     Congress found that the QPA would help restrain rising healthcare costs for patients while fairly compensating out-of-network providers.

By making every conceivable effort to minimize the role of the QPA in the

IDR process, plaintiffs seek to protect the inflated charges and the market

distortions that surprise billing perpetuates at patients' expense.  Patients ultimately

bear the burden of higher healthcare costs in the form of higher premiums and

patient responsibility, such as co-insurance.[30]  Accordingly, while surprise billing

takes a particularly grave toll on patients facing unexpected liabilities to certain

---

[27] Zhu et al., *supra* n.24, https://tinyurl.com/3b9zdsmx.

[28] Appelbaum & Batt, *supra* n.23, at 68-69, https://tinyurl.com/25d49jcj.

[29] Brown et al., *supra* n.23, at 12, https://tinyurl.com/32km27km.

[30] Katherine Baicker & Amitabh Chandra, *The Labor Market Effects of Rising Health Insurance Premiums*, 24 J. Labor Econ. 609, 631 (2006) (finding that "the cost of increasing health insurance premiums is borne primarily by workers in the form of decreased wages for workers with [employer health insurance]—so that they bear the full cost of the premium increase").

out-of-network providers, they are not the only consumers harmed by surprise

billing; the market distortions caused by surprise billing have increased the overall

cost of healthcare services, and "those costs are passed on to enrollees through

higher premiums."[31]

The Act itself requires arbitrators to consider the QPA in the IDR process,

which will help to curb future market distortions by limiting inflated costs and thus

restraining the growth of premiums, benefitting all patients; the Final Rule's

requirement that arbitrators start with the QPA merely reinforces Congress's effort

to realize those goals.[32]  The Congressional Budget Office's analysis of the Act

confirms that reliance on the QPA would prompt healthcare providers whose rates

are outliers—well surpassing the median—to adjust their rates toward the median,

which "would reduce premiums by between 0.5 percent and 1 percent."[33]  Studies

reflect that the role of the QPA in the IDR process significantly affects the IDR

system's ability to realize these lower costs for patients.  Data from New York,

which enacted a statute similar to the No Surprises Act but tied its IDR process to

the 80th percentile of a billed charges database, suggests that an IDR process based

---

[31] Duffy et al., *supra* n.7, https://tinyurl.com/8647t36a.

[32] *See id.*; Erin L. Duffy et al., *Policies to Address Surprise Billing Can Affect Health Insurance Premiums*, 26(9) Am. J. Managed Care 401 (Sept. 11, 2020), https://tinyurl.com/yc4nhj7a.

[33] Cong. Budget Office, *Estimate for Divisions O Through FF H.R. 133, Consolidated Appropriations Act, 2021, Public Law 116-260 Enacted on December 27, 2020* (Jan. 14, 2021), https://tinyurl.com/553pbz8y.

on providers' "rack rates" results in increased costs that are ultimately passed on to patients.[34]  Data from New Jersey, which enacted a comparable statute, suggests the same.[35]  Empirical evidence thus confirms the reasoning behind the Act: designating the QPA as a central consideration in the IDR process will "generally slow the rapid growth of health care costs, both by lowering costs in the near term relative to the status quo and by slowing the rate of health care cost inflation in future years."  H.R. Rep. No. 116-615, pt. I, at 57-58.

The Final Rule closely tracks the Act, which requires arbitrators to consider the QPA, by instructing arbitrators to begin their analysis there.  That reasonable interpretation of the statute embodied in the Final Rule will not "unfairly skew IDR results in insurers' favor," as plaintiffs have alleged.[36]  First, by tying the QPA to median contracted rates from 2019, the Act defines the QPA to reflect healthcare market dynamics as they stood before the Act was passed.  *See* 42 U.S.C. § 300gg-111(a)(3)(E).  The QPA thus locks in contracted rates that payors and healthcare providers negotiated in the market environment distorted by surprise billing—in

---

[34] Loren Adler, *Experience with New York's Arbitration Process for Surprise Out-of-Network Bills*, USC-Brookings Schaeffer Initiative for Health Pol'y (Oct. 24, 2019), https://tinyurl.com/4bfwcc6r.

[35] Benjamin L. Chartock et al., *Arbitration Over Out-of-Network Medical Bills: Evidence from New Jersey Payment Disputes*, 40(1) Health Affairs 130 (Jan. 2021), https://tinyurl.com/2c6zu9u5.

[36] Pls.' Mot. for Summ. J. at 2, *TMA II* (No. 6:22-cv-00372) (E.D. Tex. Oct. 12, 2022), ECF No. 41.

fact, some critics of the Act have argued that its definition of the QPA codifies payment rates "inflated by the threat of surprise billing" and does not do enough to remedy the market distortions caused by surprise billing.[37]  Second, plaintiffs do not and could not dispute that the Final Rule requires an IDR entity to "consider [any other qualifying] information submitted by a party" and ultimately "select the offer that [it] determines best represents the value of the … item or service" at issue.  45 C.F.R. § 149.510(c)(4)(ii)-(iii).  Thus, the Final Rule unquestionably *requires* the arbitrator to choose the most appropriate offer based on all permissible information, including the QPA.  Plaintiffs do not explain how that would "unfairly skew" results in either direction.

## III.    REQUIRING THE IDR ENTITY TO START WITH THE QPA WILL NOT LEAD TO UNDULY NARROW PROVIDER NETWORKS OR IMPEDE PATIENT ACCESS TO CARE.

There is no evidentiary basis to find that requiring arbitrators to begin their analysis with the QPA would cause health insurers and health plans to contract their provider networks to inadequate levels that hinder patients' access to care. This is true, in part, because payors have market and regulatory incentives to maintain robust provider networks.

---

[37] Matthew Fielder et al., *Recommendations for Implementing the No Surprises Act*, USC-Brookings Schaeffer Initiative for Health Pol'y (Mar. 16, 2021), https://tinyurl.com/4ns2syv9.  Tying the QPA to 2019 median contracted rates, as the Act does, also rebuts any notion that health insurers and health plans will be able to artificially depress the QPA through future contracting practices.

### A.    Payors have market incentives to maintain broad provider networks, which benefit both health plans and patients.

Plaintiffs' *amici* have argued that instructing IDR entities to start with the QPA would encourage payors to severely restrict their networks to the cheapest available healthcare providers.[38]  But they fail to acknowledge the market forces that encourage broad provider networks.  Many health insurers sell broader networks as a benefit of their health plans, "because their customers value flexibility when making decisions regarding healthcare."  *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *2 (C.D. Ill. Sept. 30, 2016).  "Large employers," in particular, "tend to require broad networks to satisfy the preferences of diverse work forces with a single or small number of insurance plans," leading insurers to "contract with the majority of hospitals and physicians in a market, in order to best compete for the large employer groups that compose the bulk of the market."[39]  Market forces, in other words, discourage health insurers from unduly narrowing their provider networks, because "plans that do not have sufficient geographic coverage in a market will have difficulty marketing

---

[38] *See, e.g.*, Amicus Curiae Br. by Physicians Advoc. Inst. et al. at 12-13, *TMA II*, 2023 WL 1781801 (No. 6:22-cv-00372-JDK) (E.D. Tex. Oct. 19, 2022), ECF No. 51; Br. *Amicus Curiae* of Emergency Dep't Prac. Mgmt. Ass'n at 14-15, *TMA II*, 2023 WL 1781801 (No. 6:22-cv-00372-JDK) (E.D. Tex. Oct. 19, 2022), ECF No. 55.

[39] Mark A. Hall & Paul B. Ginsburg, *A Better Approach to Regulating Provider Network Adequacy* 1, USC-Brookings Schaeffer Initiative for Health Pol'y (Sept. 2017), https://tinyurl.com/3y43wd6f.

their insurance products to employers and their employees." *FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *7 (N.D. Ohio Mar. 29, 2011).

Thus, there remain strong competitive and market forces that incentivize health insurers to maintain sufficiently broad networks, and there is no reason to believe that a rule requiring the IDR entity to start its analysis with the QPA would alter these longstanding market incentives.

### B.    Because of the many benefits associated with provider networks, payors remain incentivized to contract with even high-cost healthcare providers.

Aside from the market forces that incentivize payors to maintain broad provider networks, there are other administrative and operational reasons why payors prefer to contract with healthcare providers.  Contracting with hospitals and hospital-based providers allows payors to better facilitate disease management and care coordination for patients, including those with chronic conditions.  For example, network providers are often included in a payor's utilization and quality management programs.[40]  In addition, network contracts allow payors to facilitate the referral of their members to other network providers where possible, thus

---

[40] *See* Peter R. Kongstvedt, *Essentials of Managed Care* ch. 4 (6th ed. 2013) (explaining that a health plan can require a healthcare provider to agree to cooperate with the plan's utilization management program and quality management program, and to agree to the plan's right to audit clinical and billing data for care provided to plan members).

improving continuity of care.[41]  These efforts help to prevent readmissions and offer more integrated and higher quality care to patients, which in turn reduces costs to payors.

Moreover, because network contracts typically set forth the payment rates that a payor will remit to the healthcare provider for specific services, they afford the payor certainty on reimbursement rates, which in turn reduces administrative costs attendant to provider appeals, litigation, and arbitrations.[42]  Thus, quite apart from market forces that encourage broader networks, there are many economic incentives for payors to maintain adequate provider networks and none of those incentives will be impacted by the Act or the Final Rule.

### C.     State and federal network adequacy requirements ensure that payors would not offer unduly narrow provider networks for patients.

State and federal laws offer an additional backstop to the market-based incentives for health insurers to maintain sufficiently broad provider networks. Since the mid-1990s, most states have adopted "network adequacy standards that require[] each network plan to demonstrate that it ha[s] contracted with sufficient providers throughout its service area."[43]  "Today, network adequacy standards are

---

[41] *See id.*

[42] *See id.*

[43] Christen Linke Young et al., *The Relationship Between Network Adequacy and Surprise Billing*, USC-Brookings Schaeffer Initiative for Health Pol'y (May 10, 2019), https://tinyurl.com/5n7m5ucn.

in place in all states for most insured products."[44]  Federal law has also imposed

network adequacy standards on qualified health plans since 2012.[45]  Health plans

take network adequacy laws seriously, as do state regulators.[46]  State insurance

regulators conduct examinations that scrutinize whether health plans offer provider

networks sufficient to serve their patients' needs.[47]  Statutory and regulatory

network adequacy requirements are thus designed to ensure that health plans

maintain sufficiently robust provider networks.

> ### D.  Empirical evidence suggests that prioritizing the QPA—much less instructing IDR entities to simply start with it—would not lead to unreasonably narrow provider networks or impede patient access to care, as plaintiffs allege.

Empirical evidence suggests that the Final Rule—even as plaintiffs construe

it—would not prompt health insurers to narrow their provider networks to levels

---

[44] *Id.*

[45] *See* 42 U.S.C. § 18031(c)(1) (Affordable Care Act provision requiring HHS to "establish criteria for the certification of health plans as qualified health plans"); 45 C.F.R. § 156.230.

[46] *See, e.g.*, Jane B. Wishner & Jeremy Marks, *Ensuring Compliance with Network Adequacy Standards: Lessons from Four States* 8, Urban Inst. (Mar. 2017), https://tinyurl.com/bdcxamt2 ("Regulator respondents in all four study states reported that upon receipt of initial network filings, they had instructed an insurer to alter a proposed network offer or offer 'alternative access accommodations' to ensure the adequacy of a proposed provider network.").

[47] *See, e.g.*, Fla. Off. of Ins. Regul., Target Market Conduct Final Examination Report of Humana Medical Plan, 2014 FL Market Conduct LEXIS 17, at *15-16 (Oct. 30, 2015) (reporting on plan's addition of oncologists to satisfy network adequacy standards); Conn. Ins. Dep't, Market Conduct Report on Aetna Health Inc., 2014 CT Market Conduct LEXIS 25, at *35-38 (June 6, 2017) (examining compliance with network adequacy requirements).

that impede patients' access to care.  State surprise billing laws that were enacted

before the No Surprises Act offer valuable evidence on this question.

In 2017, for instance, California enacted a surprise billing law that "requires

fully-insured plans to pay out-of-network physicians at in-network hospitals the

greater of the insurer's local average contracted rate or 125% of the Medicare

reimbursement rate."[48]  On average, contracted rates for *all* physicians' services in

California equated to 128% of Medicare rates.[49]  If plaintiffs' hypothesis were

correct, California would have experienced a substantial narrowing of provider

networks after passage of this law; indeed, more substantial than they imagine

under the Final Rule, which leaves ultimate decisions to arbitrators' discretion and

requires them to consider provider-submitted information that the California law

excludes.  The data does not bear out that theory, however.  One study concluded

that "on average, in-network specialty doctors either remained flat, or increased by

as much as 26%."[50]  Another study found "a modest shift toward claims from in-

network service providers across all the affected specialties tied to the law's

---

[48] Loren Adler et al., *California Saw Reduction in Out-of-Network Care from Affected Specialties After 2017 Surprise Billing Law*, USC-Brookings Schaeffer Initiative for Health Pol'y (Sept. 26, 2019), https://tinyurl.com/yckhn54j.

[49] Bill Johnson et al., *Comparing Commercial and Medicare Professional Services Prices*, Health Care Cost Inst. (Aug. 13, 2020), https://tinyurl.com/mr36a6hu.

[50] Jeanette Thornton, AHIP, *Can We Stop Surprise Medical Bills AND Strengthen Provider Networks? California Did*, Am. J. Managed Care (Aug. 22, 2019), https://tinyurl.com/2th4dbbn.

implementation," but did not find "similar changes for emergency medicine, which was unaffected by the law," a research finding that flatly "contradicts … claim[s] of widespread diminishing network breadth."[51]  The available evidence simply offers no support for plaintiffs' allegations of disastrous consequences for patient access to network providers.

## CONCLUSION

For the foregoing reasons, the Court should reverse the order of the district court below.

---

[51] Adler et al, *supra* n.48, https://tinyurl.com/yckhn54j.

Dated:  July 19, 2023

Respectfully submitted,

/s/ K. Lee Blalack, II
K. Lee Blalack, II
Andrew R. Hellman
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
(202) 383-5300
lblalack@omm.com

**Counsel for *Amicus Curiae***
**Blue Cross Blue Shield Association**

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2023, a true and correct copy of the foregoing was filed electronically using the CM/ ECF system, which served counsel for the parties.

/s/ K. Lee Blalack, II
K. Lee Blalack, II

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,492 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font, except for footnotes in 12-point Times New Roman font per Circuit Rule 32.1.

/s/ K. Lee Blalack, II
K. Lee Blalack, II