No. 23-40217

# In the United States Court of Appeals for the Fifth Circuit

---

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.; DOCTOR ADAM CORLEY,

*Plaintiffs – Appellees,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; DEPARTMENT OF LABOR; DEPARTMENT OF THE TREASURY; XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY,

*Defendants – Appellants.*

---

LIFENET, INCORPORATED; EAST TEXAS AIR ONE,

*Plaintiffs – Appellees,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF THE TREASURY; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; KIRAN AHUJA,

*Defendants – Appellants.*

---

On Appeal from United States District Court for the Northern District of Texas

---

**BRIEF *AMICI CURIAE* OF THE AMERICAN BENEFITS COUNCIL, BUSINESS GROUP ON HEALTH, COUNCIL OF INSURANCE AGENTS AND BROKERS, DFW BUSINESS GROUP ON HEALTH, ERISA INDUSTRY COMMITTEE, HOUSTON BUSINESS COALITION ON HEALTH, NATIONAL ALLIANCE OF HEALTH CARE PURCHASER COALITIONS, NATIONAL RETAIL FEDERATION, PURCHASER BUSINESS GROUP ON HEALTH, SELF-INSURANCE INSTITUTE OF AMERICA, TEXAS BUSINESS GROUP ON HEALTH, AND TEXAS EMPLOYERS FOR AFFORDABLE HEALTHCARE IN SUPPORT OF APPELLANTS**

---

Seth T. Perretta
Ryan C. Temme
Matthew W. Lanahan
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Tel: (202) 857-0620
sperretta@groom.com
rtemme@groom.com
mlanahan@groom.com

*Counsel for Amici*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fifth Circuit rules 28.2.1 and 29.2, the undersigned counsel of record for *amici curiae* provides this supplemental statement of interested parties to fully disclose all those in an interest in the *amicus* brief. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

<u>*Amici Curiae* on this Brief</u>

*Amici Curiae* have no parents and no corporation(s) owns stock in them.

<u>Counsel for *Amici Curiae*</u>

Seth T. Perretta
Ryan C. Temme
Matthew W. Lanahan
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006

Dated: July 19, 2023

<u>*s/ Seth T. Perretta*</u>
Seth T. Perretta

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ........................ i

TABLE OF AUTHORITIES ..................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................7

Argument..............................................................................................10

   I.   The Tri-Agencies' Obligation to  Promulgate a Rule Implementing the
      IDR Process Is Clear and the Final Rule Should Receive Deference. ..........10

   II.   The Final Rule Follows the Text and Structure of the NSA. ........................14

   III.  The Final Rule Furthers Congress' Intended Public Policy Outcomes.........18

Conclusion ...........................................................................................24

CERTIFICATE OF COMPLIANCE........................................................................25

CERTIFICATE OF SERVICE ..............................................................................26

# TABLE OF AUTHORITIES

**Cases**                                                            **Pages**

*Castillo-Perales v. Mukasey*,
  298 F. App'x 366 (5th Cir. 2008) ........................................................... 11

*Coca-Cola Co. v. Atchison, Topeka, & Santa Fe Ry. Co.*,
  608 F.2d 213 (5th Cir. 1979) ................................................................. 11

*O'Sullivan v. Countrywide Home Loans, Inc.*,
  319 F.3d 732 (5th Cir. 2003) ................................................................. 12

*Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
  587 F. Supp. 3d 528 (E.D. Tex. 2022) ..................................................... 7

*United States v. Bos. Farm Ctr., Inc.*,
  590 F.2d 149 (5th Cir. 1979) ................................................................. 12

*Wal-Mart Distrib. Ctr. #6016 v. Occupational Safety & Health Rev. Comm'n*,
  819 F.3d 200 (5th Cir. 2016) ................................................................. 11

**Statutes**

5 U.S.C. § 554 ........................................................................................ 13

29 U.S.C. § 1185e(a)(2) ................................................................. 14, 15, 16

42 U.S.C. § 300gg-22 .............................................................................. 13

42 U.S.C. § 300gg-92 .............................................................................. 13

42 U.S.C. § 300gg-111 ....................................................... 12, 16, 17, 21

**Rules**

Fed. R. App. Pro. 29 ................................................................................. 1

Fed. R. App. Pro. 32(g) .......................................................................... 25

**Regulations**

29 C.F.R. § 2590.716-8(c)(4)(iii)(E) ........................................................ 15

45 C.F.R. § 149.140(b) ............................................................................ 17

45 C.F.R. § 150.443 ................................................................................13

Requirements Related to Surprise Billing:,
   Final Rules, 87 Fed. Reg. 52618 (the "Final Rule")........................................ 7, 19

## Other Authorities

No Surprises Act, H.R. 133 - The Consolidated Appropriations Act,
   Division BB  ...................................................................................... *passim*

H.R. REP. No. 116-615 (2020) ...............................................................20

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici* are a group of entities comprised of trade organizations, employer and industry groups and coalitions that collectively represent thousands of employers that together provide health insurance coverage for many millions of employees and their families.[2] In fact, *Amici*, which include both national and Texas-based organizations, are involved in some way in the provision of health insurance coverage for nearly all Americans covered by employer-sponsored group health plans. And as payers of health care services, *Amici* have an immense interest in the implementation of the No Surprises Act.

As Appellants ably explain, surprise medical bills can be financially and emotionally devastating to participants already dealing with the challenges of a medical emergency or serious health condition. Prior to the No Surprises Act, participants had no meaningful way to avoid surprise bills, especially with respect to emergency care, and the financial burden imposed by surprise bills was in many cases extraordinary. This is why, prior to the No Surprises Act, plan sponsors (such

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, *Amici* respectfully submits this brief amicus curiae in support of Defendants-Appellants and reversal and states that all parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than *amici curiae* or their counsel contributed money that was intended to fund the preparation or submission of this brief.

[2] Details pertaining to the identity of each amicus signing onto this brief are provided in the table at the end of this section.

1

as *Amici* and their members) often bore this burden, stepping in to provide financial protection for the employees and their families facing surprise bills.

In addition, the occurrence of surprise billing practices by providers undermined plans' efforts to develop high-quality, cost-effective network designs as some provider groups and types were incented to remain out-of-network with plans and issuers. This, in turn, resulted in unnecessary and increased costs on the health care system generally, but most specifically, for plan sponsors (such as *Amici* and their members) and the individuals enrolled in the plans they offer, through higher premium contributions, reduced benefits, or both.

More specifically, *Amici* have substantial interests in the independent dispute resolution ("IDR") process set out under the No Surprises Act, not only because plan sponsors are and will continue to be a party to the IDR process and impacted by the associated administrative costs and burdens, but also because the IDR process impacts the willingness of providers to go or stay in-network and the in-network rates providers will accept. All of these elements play a large role in determining access to, and the cost of, employer-sponsored coverage.

Collectively, *Amici* have expended considerable efforts to support a federal solution to the scourge of surprise medical bills—with the twin goals of eliminating surprise medical bills to participants and reducing overall health care costs to the system caused by surprise billing practices. Many of the *Amici* engaged

with Congress, including its individual members and various committees, for over

three years regarding a potential federal legislative solution and were extensively

involved in the legislative process that resulted in the No Surprises Act. *Amici* not

only worked with members of Congress to develop and refine federal legislation,

including, specifically the No Surprises Act, they also testified before

congressional committees regarding the harmful effects of surprise medical billing

on group health plans and their participants, the need for a comprehensive and

effective solution to surprise bills, and how a well-designed and implemented

solution could help bring down health plan costs caused by surprise billing

practices.  *Amici* also advocated on behalf of their members and employees during

the rulemaking process that followed the enactment of the No Surprises Act. For

all these reasons, *Amici* are uniquely positioned to assist the Court by providing

insight into the requirements under the statute and its impact on the American

people.

| Organization | Brief Description |
|---|---|
| American Benefits Council | The American Benefits Council is a national non-profit organization dedicated to protecting and fostering privately sponsored employee benefit plans. Its approximately 440 members are primarily large, multistate employers that provide employee benefits to active and retired workers and their families. The Council's membership also includes organizations that provide employee-benefit services to employers of all sizes. Collectively, the Council's members either directly sponsor or provide services to retirement and health plans covering virtually every American who participates in employer-sponsored benefit programs. The American Benefits Council regularly participates as amicus curiae in cases affecting employee benefits. |

| Organization | Brief Description |
|---|---|
| Business Group on Health | Business Group on Health is the leading non-profit organization representing large employers' perspectives on optimizing workforce strategy through innovative health, benefits and well-being solutions and on health policy issues. The Business Group keeps its membership informed of leading-edge thinking and action on health care cost and delivery, financing, affordability and experience with the health care system. The Business Group's over 440 members include 74 Fortune 100 companies as well as large public sector employers, who collectively provide health and well-being programs for more than 60 million individuals in 200 countries. |
| Council of Insurance Agents and Brokers | The Council of Insurance Agents & Brokers represents over 200 employee benefits and property/casualty agencies and brokerage firms. Council member firms annually place more than $300 billion in commercial insurance business in the United States and abroad. They place 90 percent of all U.S. insurance products and services as well as administer billions of dollars in employee benefits. Council members conduct business in some 30,000 locations and employ upward of 350,000 people worldwide, specializing in a wide range of insurance products and risk management services for business, industry, government, and the public. |
| DFW Business Group on Health | The DFW Business Group on Health (DFWBGH) is a regional coalition of 65 large and mid-size DFW area employers committed to improving health care quality, costs and outcomes in North Texas. DFWBGH members spend over $4 billion annually on healthcare for nearly 1 million local employees and their families. DFWBGH's mission is to educate and empower DFW area employers and their employees to make informed healthcare decisions and to encourage healthcare providers to continuously improve their performance. |

| Organization | Brief Description |
|---|---|
| ERISA Industry Committee | The ERISA Industry Committee (ERIC) is a national nonprofit organization advocating exclusively for large plan sponsors that provide health, retirement, paid leave, and other benefits to their nationwide workforces. With member companies that are leaders in every sector, ERIC advocates on the federal, state, and local levels for policies that promote flexibility and uniformity in administering their employee benefit plans, while fighting against a patchwork of conflicting and burdensome rules. ERIC also fights in federal court against state and local laws that conflict with ERISA and joins legal cases as amicus curiae to support large plan sponsors in litigation impacting critical employee benefit plan design or administration. |
| Houston Business Coalition on Health | HBCH is a multi-stakeholder but employer centric coalition. HBCH is the leading resource for Houston employer purchasers and their provider partners dedicated to improving the price, quality and consumer experience in healthcare delivery. HBCH represents more than 70 organizations and 1 million employer-sponsored lives. Our members include many of the largest private, governmental and educational employers in the Houston market. HBCH accomplishes its mission through the collective influence of its member organizations. HBCH's NorthStar strategic inputs consist of the use and promotion of transparency tools for hospital costs as a function of its financial sustainability needs, and provider quality. NorthStar outputs include the development and promotion of clinically integrated network models with primary care as their foundation, integrated with behavioral health, and referral to specialists based on value. |
| National Alliance of Health Care Purchaser Coalitions | The National Alliance of healthcare purchaser coalitions is an alliance of approximately 45 regional coalitions of employers and other plan sponsors. It supports over 12,000 healthcare purchasers ranging from 60% of the Fortune 100 companies, many midsized companies, public sector employers (cities, states, school districts, federal employees) and union groups (e.g. UAW, 32BJ) who collectively provide health coverage to over 45 million Americans. The National Alliance helps to lead improvements in health, equity and value for organizations and communities across the country. |

| Organization | Brief Description |
|---|---|
| National Retail Federation | The National Retail Federation ("NRF") is the world's largest retail trade association, representing all aspects of the retail industry. NRF's membership includes discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and Internet retailers. Retail is the nation's largest private sector employer, supporting one in four U.S. jobs – 52 million working Americans. Contributing $3.9 trillion to annual GDP, retail is a daily barometer for the nation's economy. NRF regularly advocates for the interests of retailers, large and small, in a variety of forums, including before the legislative, executive, and judicial branches of government. |
| Purchaser Business Group on Health | PBGH is a nonprofit coalition representing nearly 40 private employers and public entities across the U.S. that collectively spend $100 billion annually purchasing health care services for more than 15 million Americans and their families. PBGH has a 30-year track record of incubating new, disruptive operational programs in partnership with large employers and other health care purchasers. Our initiatives are designed to test innovative methods and scale successful approaches that lower health care costs and increase quality across the U.S.. |
| Self-Insurance Institute of America | The Self Insurance Institute of America, Inc. ("SIIA") is an association of self-insured employers and industry participants, including third-party administrators, captive managers, and excess carriers. See SIIA, About SIIA, https://www.siia.org/i4a/pages/index.cfm?pageid=4451. |
| Texas Business Group on Health | The Texas Business Group on Health is a statewide association of Texas employers and regional employer-led healthcare coalitions, including DFW Business Group on Health, Houston Business Coalition on Health, and San Antonio Business Group on Health. TBGH represents Texas employers' interests as key purchasers of healthcare for employees and serves its members by promoting innovation, accountability, quality and value in the design, financing, and delivery of health care. TBGH also serves as a valuable resource for employers in health benefits design and purchasing issues, and provides guiding influence and leadership in state healthcare policy development. |

| Organization | Brief Description |
|---|---|
| Texas Employers for Affordable Healthcare | Texas Employers for Affordable Healthcare is a 501(c)(4) established to mobilize employers, employees and their families, and other healthcare stakeholders across the state to rein in the excessive prices paid for employer-sponsored healthcare for almost half of all Texans and approximately 14 million people. |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The interim implementing regulations of the No Surprises Act, H.R. 133 - The Consolidated Appropriations Act, Division BB ("NSA"), related to the IDR process (the "IFR") promulgated by the United States Department of Labor, Department of Treasury, and Department of Health and Human Services (the "Tri-Agencies"), have been subject to a series of legal challenges which have significantly pruned their application due to findings that the Tri-Agencies exceeded their statutory authority in promulgating them. *See Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528 (E.D. Tex. 2022) ("TMA I")*, appeal dismissed,* No. 22-40264, 2022 WL 15174345 (5th Cir. Oct. 24, 2022)*.* In response to that ruling, and to the numerous comments received by the Tri-Agencies, the Tri-Agencies issued Requirements Related to Surprise Billing: Final Rules, 87 Fed. Reg. 52618 (Aug. 26, 2022) (the "Final Rule") to implement the NSA. The Final Rule, which addressed

the concerns of the court and the Appellees in TMA I, has now also been struck down, leading to this appeal.

The Final Rule varies significantly from the IFR. The Final Rule does not, as Appellees contend, direct IDR entities to place any specific weight on a given statutory factor, nor does it create any preference for the offer submitted that is closest to the Qualifying Payment Amount (sometimes referred to as the "QPA Presumption"). To the contrary, the Tri-Agencies removed and disavowed the QPA Presumption, and instead the Final Rule instructs IDR entities to select the offer that the IDR entity determines best represents the value of the item or service. The Final Rule also provides IDR entities with broad discretion to consider and weigh information permissibly received from the parties, consistent with the mandatory and prohibited considerations detailed in the statute. The Final Rule fully reflects that the IDR entity's determination should incorporate all relevant additional circumstances as specified in statute (the "Additional Circumstances") and further both fulfills Congress's explicit directive that the Tri-Agencies implement regulations on the IDR process and addresses important gaps in the legislation regarding the manner in which an IDR entity is to assess the credibility and utility of a given additional circumstance.

To be clear, *Amici* strongly supported the IFR, including the QPA Presumption, for the important, favorable policy reasons described at length in TMA

I. *See* TMA I, No. 6:21-CV-00425 (E.D. Tex. Jan. 18, 2022), ECF No. 89. Although we would have strongly preferred the IFR, *Amici* now express support for the Final Rule because it is preferable to what Appellees suggest, which is an IDR system without clear guidelines, open to abuse and overuse, and leading to increased health care costs for plans and participants. More specifically, *Amici* believe the Final Rule fits squarely within the statutory text, because regulation establishing the details of the IDR process is *explicitly* required by the NSA. The Final Rule conforms to the regulatory structure created by the NSA in establishing common sense, minimum, but essential, procedural guardrails around how IDR entities should evaluate the various factors that it must consider—guardrails that are necessary to prevent IDR entities from considering information that is (1) duplicative, (2) not credible or (3) unrelated to the benefit claim before the IDR entity.

While the Final Rule does require that the IDR entity consider the QPA as part of its determination, the Final Rule's invocation of the QPA as part of the IDR process follows the NSA's statutory language and structure explicitly. Not only is the QPA identified as the first factor to consider in the statute, it is also a carefully calculated amount that reflects the objective, arms-length negotiations between plans and network providers. Congress recognized the value of the QPA in designing a federal solution to surprise medical bills by including it as a mandatory consideration for IDR entities and basing the patient's cost-share on the QPA in many cases.

Accordingly, under the statutory design the QPA plays a central and recurring role with respect to the NSA and its surprise billing protections. While the Additional Circumstances play a similarly important role in providing the IDR entity with additional bases for evaluating offers and making determinations, they are by design non-standard and variable from claim to claim. The Final Rule helps ensure that IDR entities review information on the Additional Circumstances in a way that does not incentivize abusive practices by parties to the IDR process who would seek unfounded gain through the IDR process. The Final Rule does reflect the express statutory language by requiring the IDR entity to consider the QPA and the Additional Circumstances under comparable procedural rules. In that sense, the Final Rule promotes the minimal levels of predictability and consistency needed for the statutory structure to function as intended by Congress, which as Appellants note is intended to enhance efficiency and predictability in order to lower health care costs for consumers. The need for this type of predictability and consistency becomes even more apparent in light the overwhelming number of IDR requests received to date, a number that exponentially exceeds the Tri-Agencies' original estimates and imposes massive administrative costs on the health care system.

## Argument

I.   **The Tri-Agencies' Obligation to Promulgate a Rule Implementing the IDR Process Is Clear and the Final Rule Should Receive Deference.**

In enacting the NSA, Congress included an express direction to the Tri-Agencies to engage in rulemaking with regard to the specifics of the IDR process. Furthermore, in requiring the Tri-Agencies to promulgate rules, Congress anticipated that those rules would benefit from the Tri-Agencies' expertise and would be the product of a permissible grant of rulemaking authority under well-established case law. Any effort to undermine the regulations issued pursuant to that explicit rulemaking authority would undermine the unassailable intent of Congress and should be avoided.

It is well understood that agencies have authority to interpret ambiguities or gaps in statutes. "Courts generally grant 'great deference' to an agency's interpretation of its enabling statute." *Coca-Cola Co. v. Atchison, Topeka, & Santa Fe Ry. Co.*, 608 F.2d 213, 222 (5th Cir. 1979). Where a statute is silent or ambiguous with respect to a specific issue, the court gives "substantial deference to an agency's interpretation of its own regulation." *Wal-Mart Distrib. Ctr. #6016 v. Occupational Safety & Health Rev. Comm'n*, 819 F.3d 200, 204 (5th Cir. 2016). "[A]n agency interpretation of a regulation is entitled to due deference, [but] the interpretation must rationally flow from the language of the regulation." *Castillo-Perales v. Mukasey*, 298 F. App'x 366, 368 (5th Cir. 2008). "Where, as here, agency regulations are promulgated under express congressional authority, they are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."

*O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 740 (5th Cir. 2003). That deference is especially strong in the case of interpretation issued via notice and comment rulemaking, as is the case here. *See United States v. Bos. Farm Ctr., Inc.*, 590 F.2d 149, 151 (5th Cir. 1979) (stating that rules issued by notice and comment are due significant deference because "[t]he fuller rule-making due process serves the purposes of accuracy and fairness"). Here, Section 103 of the NSA directs the Tri-Agencies to issue regulations developing a single IDR process to decide the out-of-network payment amount for certain services that cannot be settled via negotiation between out-of-network providers and group health plans and issuers. *See* 42 U.S.C. § 300gg-111(c)(2)(A). More specifically, it states that "[n]ot later than 1 year after December 27, 2020, the [Tri-Agencies] shall establish by regulation one independent dispute resolution process." *Id.*

While the NSA includes numerous details about the IDR process including, for example, specifying the period of negotiations required prior to the initiation of the IDR process,[3] the batching of medical claims in the IDR process,[4] the selection and certification of IDR entities,[5] the submission of offers by the parties,[6] and the factors the IDR must consider and those the IDR must not consider,[7] several issues

---

[3] 42 U.S.C. § 300gg-111(c)(1)(A).

[4] *Id.* at § 300gg-111(c)(3).

[5] *Id.* at § 300gg-111(c)(4).

[6] *Id.* at § 300gg-111(c)(5)(B).

[7] *Id.* at §§ 300gg-111(c)(5)(C)–(D).

remain unaddressed, including how arbitrators should weigh information presented to them, the burden of proof applicable to evidence that the IDR entity must consider, and what guiding principles or methodologies arbitrators should use in deciding which offer to select. Given the directive to the Tri-Agencies per Section 103 of the statute, Congress clearly understood there would be a necessary role for the Tri-Agencies in promulgating rules to develop a fulsome and comprehensive IDR review process in accord with the statutory text and policy goals of the statute, including by addressing those aspects of the statutory scheme that warrant additional detail.[8] Thus, the statute itself should be read as support for the limited guidelines the Tri-Agencies established in the Final Rule addressing how IDR entities are to evaluate the offers from the parties to the IDR process to enhance efficiency and predictability to lower health care costs for consumers.

---

[8] Indeed, analogous regulations have been promulgated in circumstances similar to those present with respect to the NSA. For example, the statutory language comprising the Health Insurance Portability and Accountability Act ("HIPAA") also includes an administrative review procedure as part of its enforcement regime. *See* 42 U.S.C. § 300gg-22. While those procedures cross-reference 5 U.S.C. § 554, no standard of review is specified in the statute. *Id.* When the Tri-Agencies promulgated implementing regulations for HIPAA, *see* 42 U.S.C. § 300gg-92, the regulations included a burden of proof provision as well as a standard of review provision. *See* 45 C.F.R. § 150.443. The IDR process established by the Tri-Agencies addresses similar omissions.

## II.     The Final Rule Follows the Text and Structure of the NSA.

The NSA specifies that the IDR entity shall consider the QPA and any of the Additional Circumstances set forth in the statute that are presented to the IDR entity to determine the out-of-network rate. The QPA represents the only consideration that must be submitted to the IDR entity according to the statute (*i.e.*, if no evidence was submitted regarding any Additional Circumstances, the only factor that the IDR entity must consider is the QPA). *See* 29 U.S.C. § 1185e(c)(5)(C). The Final Rule follows the statute in delineating the factors that the IDR entity must consider, while providing important procedural guardrails that prevent the IDR entity from considering duplicative or unsubstantiated factors in evaluating which of the two offers is the payment amount that best represents the value of the item or service at issue.

While the Final Rule requires the IDR entity to also consider the Additional Circumstances, it properly seeks to avoid double-counting of information that would result in cost inefficiencies or excess provider reimbursements. Though this non-duplication rule applies to all information submitted, we note that the Additional Circumstances that IDR entities must consider in many cases are subsumed within the QPA calculation. The QPA calculation itself "may account for relevant payment adjustments that take into account quality or facility type (including higher acuity settings and the case-mix of various facility types) that are otherwise taken into

14

account for purposes of determining payment amounts with respect to participating facilities." 29 U.S.C. § 1185e(a)(2). Promoting the duplicative consideration of these components of provider payments could result in bizarre and commercially unreasonable payments for a given service, a result Congress would not have sought or contemplated in adopting the statutory scheme that it did.

Ultimately, because Congress opted against adopting a specific benchmark rate, the IDR entity is tasked in the statute with identifying the most reasonable of the two offers presented. However, this does not mean that the IDR entity must be permitted to consider all of the factors presented regardless of whether the factor's impact on the payment amount is already accounted for in the QPA or in other information already submitted. Moreover, the protection against double counting in the Final Rule is supported by sound public policy and well-established principles of judicial economy.

Moreover, the Final Rule properly prevents the IDR entity from considering the Additional Circumstances to the extent that they do "not relate to either party's offer for the payment amount for the qualified IDR item or service." 29 C.F.R. § 2590.716-8(c)(4)(iii)(E). In so doing, the Final Rule ensures that the resulting payment determinations are based on the factual circumstances under which the IDR-eligible item or service was rendered, as opposed to circumstances that are not probative of the question before the IDR entity—the determination of which offer is

most reasonable. This basic requirement regarding probative value not only promotes both consistency and predictability in outcomes, but also importantly promotes efficiency in the IDR process itself, which helps mitigate some of the burden imposed on parties and IDR entities by the unexpected volume of IDR initiation requests.

Additionally, as a matter of common sense, Congress could not have intended that unreliable or non-credible evidence be relied upon in determining a commercially reasonable payment rate, an outcome that has the absurd result of resulting in unreasonably high out-of-network rate determinations by the IDR entity. The immediate and facial goal of the statutory construct adopted by Congress was to create a system whereby patients were held harmless in surprise balance billing situations and payers and providers paid or received adequate financial consideration for the services rendered. To create a solution to the problem of surprise balance billing that permits the IDR entity to rely upon untrustworthy, non-credible information in evaluating the offers submitted would clearly undermine the statutory language Congress did adopt by rendering it meaningless. As such, the provision in the Final Rule instructing IDR entities to evaluate whether the information presented is credible, is fully consistent with the NSA.[9]

---

[9] For example, as discussed above, the NSA includes specific instructions on which factors are to be considered by the IDR entity. *See* 42 U.S.C. §§ 300gg-111(c)(5)(C)–

While the district court found that the Final Rule's requirement that information other than the QPA be found to be credible was a "thumb on the scale" of the IDR process, the nature of the QPA itself is as an objective, credible source of information. Under the statute, the QPA generally is the median of the contracted rates recognized by the plan or issuer on January 31, 2019 for the same or similar item or service that is provided by a provider in the same or similar specialty and provided in a geographic region in which the item or service is furnished, increased for inflation. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I); 45 C.F.R. § 149.140(b). Because the QPA is set by the median of contracted rates for the same or similar services, and accounts for factors such as provider specialties and geography, it is inherently an objective assessment of the amount of remuneration that providers of similar services in similar geographic areas accept from the same plan for the particular service at issue.

Importantly, in addition to its role in the IDR process, the QPA is the amount on which plans must base participant cost-sharing in many circumstances under the NSA. 42 U.S.C. § 300gg-111(a)(1)(C). For these reasons, Congress took great pains to specify the manner in which plans and issuers should calculate the QPA and directed the Tri-Agencies to implement a specific audit and enforcement scheme to

(D); *see also* 29 U.S.C. § 1185e(a)(2) (specifying required rulemaking by the Tri Agencies regarding the QPA).

17

ensure that plans and issuers were meeting the statute's requirements. *Id.* § 300gg-111(a)(2). As a result, the QPA is credible.

The NSA's express requirement of regulatory interpretation by the Tri-Agencies paired with its silence with respect to the method of evaluating any evidence presented during the IDR Process necessitates that the Tri-Agencies address that issue. In the Final Rule, the Tri-Agencies have sought to ensure that the Additional Circumstances receive the same level of scrutiny that the QPA does. While the statute is silent on the question of whether IDR entities should consider factors that lack credibility, *Amici* believe that there is but one reasonable interpretation of the statute, the interpretation as clarified by the Final Rule. The position espoused by Appellees would create the potential for gaming of the IDR process to such a degree as to render the statutory definitions meaningless and undermine the clear intent of Congress that IDR entities consider a host of factors detailed in the statute.

## III. The Final Rule Furthers Congress' Intended Public Policy Outcomes.

The Appellees' preferred approach could result in IDR entities placing potentially inappropriate or undue weight on the Additional Circumstances when they are either not credible or duplicative of other information submitted. Such a process would create significant adverse outcomes for both plans and participants in the form of not only inflated out-of-network rates, but also in administrative costs

18

that add additional financial burdens to the health care system in the aggregate. In contrast, as the Tri-Agencies have noted, the Final Rule ensures "that all certified IDR entities approach payment determinations in a similar manner, which will promote consistency and predictability in the process, thereby lowering administrative costs and encouraging consistency in appropriate payments for out-of-network services." 87 Fed. Reg. at 52627. In so doing, the Final Rule furthers, at least to some degree, several of Congress' intended public policy outcomes in enacting the NSA.

Reasonable evidentiary and procedural guardrails on the IDR process, such as those included in the Final Rule, prevent providers and plans from using the IDR process as a means of inappropriately maximizing or minimizing out-of-network payments on an ad hoc basis, either of which would create significant inefficiencies to the health care system as a whole. *See, e.g.* Peter Whoriskey, *Financiers bought up anesthesia practices, then raised prices,* Washington Post (June 29, 2023) https://www.washingtonpost.com/business/2023/06/29/private-equity-medical-practices-raise-prices/. The Final Rule is intended to protect against those inefficiencies by ensuring that IDR entities evaluate offers for the same or similar service based on consistent evidentiary requirements, *i.e.*, non-duplication and credibility. By providing some minimal evidentiary requirements, the Final Rule also promotes IDR determinations that will result in providers receiving adequate

compensation for their services while protecting plans and participants from increased health care costs.

In addition, the more predictable the IDR process is, the more likely it is that excessive administrative costs will be mitigated. This is because a predictable and consistent process should result in more efficient use of the NSA's negotiation process, promoting earlier settlement, thereby reducing the amount of IDR, and the related administrative expenses. By promoting a modicum of predictability and consistency in how IDR entities evaluate information before them, the Final Rule encourages providers to evaluate whether IDR is appropriate and limits the frivolous use of IDR as a negotiating tactic.

The Final Rule also supports more consistent results across different plans and providers, as compared to an IDR system with no guardrails. Clear guidance on the IDR process benefits all involved by allowing for similar claims to be processed in the same way preventing dissonant outcomes in similar circumstances, which would vex both providers and insurers by potentially awarding different amounts for the same services provided under nearly identical circumstances, contrary to Congress' intent and the directive to establish a single, uniform IDR process. H.R. REP. No. 116-615, Pt. 1, 57–58 (2020). As reported by some *Amici*, experience to date with IDR decisions demonstrates a lack of predictability that is undermining some of the key goals of the NSA. In some cases, IDR entities are treating the allowed factors as

a checklist and feel compelled to adjust their determination for each factor. In other cases, the IDR entities use the QPA as the starting point and adjust only for the relevant factors. Accordingly, different IDR entities are reaching different conclusions for the same out-of-network service between the same provider and payer with some IDR decisions resulting in out-of-network payment rates in excess of the provider's *billed* charges. Without a consistent standard and consistent IDR results, the goal of encouraging providers and payors to reach a contractual relationship is undermined.

The Final Rule also addresses, to some degree, another key consideration of Congress in enacting the NSA—Congress's clear desire for strong provider networks. In one of the Additional Circumstances, Congress included "good faith efforts (or lack of good faith efforts)…to enter into network agreements" as well as contracted rates for the previous four years. 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(V). Thus, if credible and if provided to the IDR entity, the IDR entity must consider a provider's decision to go out of network and their prior contracted rates, if any. Failing to implement the IDR process consistent with the statute will increase incentives for in-network providers to negotiate higher in-network rates to stay in-network, or create incentives for providers to avoid or leave networks, thus driving up the patient cost sharing outside of surprise billing situations, increasing overall premium costs for employers and enrollees, and reducing savings for taxpayers—all

results Congress clearly sought to avoid. If IDR entities considered duplicative or non-credible information, the IDR process would have the deleterious effect of encouraging providers to go or remain out of network to recover higher rates through the IDR process, which would weaken networks, disrupt the health care efficiencies gained through plan networks, and result in higher costs for both plans and participants.

While most providers do enter networks and reach mutually agreeable payment terms with plans and issuers, market failures exist for certain types of providers that incentivize them to leave or stay out of networks altogether. When these market failures exist, double counting the Additional Circumstances or accepting non-credible information regarding the Additional Circumstances will provide new market-distorting incentives for providers to threaten to leave those networks in an effort to extract unreasonable payment terms from plans and issuers, driving up the patient cost-shares, overall premium costs, and/or limiting access to new and innovative benefits.

Importantly, all of the policy implications noted above bear on one of the primary considerations of Congress in enacting the NSA—cost savings to the health care system as a whole. The NSA was designed with the twin goals of protecting patients from financial harm associated with surprise balance billing and thus

creating cost savings for patients and the health care delivery system as a whole.[10]
While the Final Rule promotes that underlying policy to a lesser extent than the IFR
did, the modicum of predictability and consistency promoted by the Final Rule helps
avoid a situation in which the implementation of the NSA, in and of itself, raises
overall costs to the health care system.

Moreover, *Amici* emphasize that concerns about the potential overuse of IDR,
which would undermine the NSA's goal of lowering health care costs, are not
theoretical and are instead based on experience. The Department of Health and
Human Services recently reported that "[b]etween April 15, 2022 and March 31,
2023 disputing parties initiated 334,828 disputes…[which was] nearly fourteen
times greater than the Departments initially estimated the caseload would be over
the course of a full calendar year." *See* U.S. Dep't of Labor, Federal Independent
Dispute     Resolution     Process     –Status     Update     (Apr.     27,     2023),

---

[10] The joint statement announcing the bipartisan, bicameral agreement on the NSA
Committee leadership focused on the NSA not raising health insurance premiums.
*See* S. Comm. on Health, Educ., Labor & Pensions, Congressional Comm. Leaders
Announce     Surprise     Billing     Agreement     (Dec.     11,     2020),
https://energycommerce.house.gov/posts/congressional-committee-leaders-
announce-surprise-billing-agreement. Similarly, the CBO determined that the IDR
provision would generate significant savings as the result of lower premium rates
(which thus reduces federal tax expenditures through lower tax subsidies). *See* CBO
Estimate for Divisions O through FF of H.R. 133, Consol. Appropriations Act (Dec.
27,     2020),     https://www.cbo.gov/system/files/2021-01/PL_116-260_div%20O-
FF.pdf. *See also* Jan. 7, 2022 Letter from Sen. Murray and Rep. Pallone to Xavier
Becerra, Sec. of U.S. Dep't of Health and Human Servs. at 4.

https://www.dol.gov/agencies/ebsa/laws-and-regulations/laws/no-surprises-act/federal-idr-process-status-update. This data makes clear that the potential for incredibly voluminous IDR is real and underscores the need for rules that provide as much efficiency and predictability as possible. And the IDR process included in the Final Rule does add some level of predictability and consistency essential for the efficient operation of the health care delivery system.

## Conclusion

The Final Rule is fully consistent with the text and structure of the NSA and is the minimum necessary to effectuate Congress's intent that IDR entities operate predictably and consistently in selecting an offered payment amount in surprise balance billing situations. The Court should overturn the district court's judgment, grant Appellants' appeal, and uphold the Final Rule.

Dated: July 19, 2023               Respectfully submitted,

*s/ Seth T. Perretta*
Seth T. Perretta
Ryan C. Temme
Matthew W. Lanahan
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Tel: (202) 867-0620
Fax: (202) 659-4503
sperretta@groom.com
rtemme@groom.com
mlanahan@groom.com

*Counsel for Amici*

24

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of Rule 29(a)(5) because it contains 5805 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Times New Roman font in a size equivalent to 14 points or larger.

Dated: July 19, 2023                                    *s/ Seth T. Perretta*
                                                        Seth T. Perretta

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on July 19, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Seth T. Perretta*
Seth T. Perretta
