No. 23-40217

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.;
DOCTOR ADAM CORLEY,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
DEPARTMENT OF LABOR; DEPARTMENT OF THE TREASURY; XAVIER
BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR;
JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY,

*Defendants-Appellants.*

_____

LIFENET, INCORPORATED; EAST TEXAS AIR ONE, L.L.C.,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER
BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES; UNITED STATES DEPARTMENT OF THE TREASURY; JANET
YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY; UNITED STATES
DEPARTMENT OF LABOR; JULIE A. SU, ACTING SECRETARY, U.S.
DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT; KIRAN AHUJA,

*Defendants-Appellants.*

_____

On appeal from the United States District Court for the
Eastern District of Texas (Kernodle, J.)
Nos. 6:22-cv-372 and 6:22-cv-373

_____

## BRIEF OF APPELLEES TEXAS MEDICAL ASSOCIATION,
## TYLER REGIONAL HOSPITAL, AND DR. ADAM CORLEY

_____

COUNSEL LISTED ON INSIDE COVER

ERIC D. MCARTHUR
  *Counsel of Record*
BRENNA E. JENNY
MANUEL VALLE
CODY AKINS
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8011
Email: emcarthur@sidley.com

JAIME L.M. JONES
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-0751
Fax: (312) 853-7036
Email: jaime.jones@sidley.com

***Counsel for Plaintiffs-Appellees***

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**A.    Plaintiffs-Appellees**

1. Texas Medical Association
2. Tyler Regional Hospital, LLC
3. Doctor Adam Corley
4. LifeNet, Incorporated
5. East Texas Air One, LLC

**B.    Attorneys for Plaintiffs-Appellees**

1. For Texas Medical Association, Tyler Regional Hospital, LLC, and Doctor Adam Corley:

    Sidley Austin LLP
    Eric D. McArthur
    emcarthur@sidley.com
    Brenna E. Jenny
    bjenny@sidley.com
    Manuel Valle
    manuel.valle@sidley.com
    Madeleine Joseph
    mjoseph@sidley.com
    Cody Akins
    cakins@sidley.com
    SIDLEY AUSTIN LLP
    1501 K Street, NW

Washington, DC 20005
Telephone: (202)736-8000
Facsimile: (202) 736-8111

Jaime L.M. Jones
jaime.jones@sidley.com
Joseph R. LoCascio
joseph.locascio@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-0751
Facsimile: (312) 853-7036

Penny Packard Reid
preid@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3413
Facsimile: (214) 981-3400

2. For LifeNet, Inc. and East Texas Air One, LLC:

Susman Godfrey LLP
Stephen Shackelford, Jr.
sshackelford@susmangodfrey.com
Steven M. Shepard
sshepard@susmangodfrey.com
James Craig Smyser
csmyser@susmangodfrey.com
Max Isaac Straus
mstraus@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Ave. of the Americas, Fl. 32
New York, NY 10019
Telephone: (212) 336-8340
Facsimile: (212) 336-8340

**C.** *Amici Curiae*

1. Physicians Advocacy Institute
2. American Association of Neurological Surgeons
3. Congress of Neurological Surgeons
4. American Society of Anesthesiologists
5. American College of Emergency Physicians
6. American College of Radiology
7. American Medical Association
8. American Hospital Association
9. The Emergency Department Practice Management Association
10. American Benefits Council
11. Business Group on Health
12. Council of Insurance Agents and Brokers
13. DFW Business Group on Health
14. ERISA Industry Committee
15. Houston Business Coalition on Health
16. HR Policy Association
17. National Alliance of Health Care Purchaser Coalitions
18. National Retail Federation
19. Purchaser Business Group on Health
20. Self-Insurance Institute of America
21. Texas Business Group on Health
22. Texas Employers for Affordable Healthcare
23. Leukemia & Lymphoma Society
24. Hemophilia Federation of America
25. CancerCare
26. United States Public Interest Research Group, Inc.
27. National Multiple Sclerosis Society
28. Epilepsy Foundation
29. Families USA Action
30. ALS Association
31. America's Health Insurance Plans
32. Cancer Support Community
33. The Mended Hearts, Incorporated
34. U.S. PIRG
35. Blue Cross Blue Shield Association

**D.** **Attorneys for *Amici Curiae***

1. For Physicians Advocacy Institute, American Association of Neurological Surgeons, and Congress of Neurological Surgeons:

> Athene Law, LLP
> Long Xuan Do
> long@athenelaw.com
> ATHENE LAW, LLP
> 5432 Geary Blvd. #200
> San Francisco, California 94121
> Telephone: (415) 680-7419
> Facsimile: (844) 619-8022
>
> Eric David Chan
> eric@athenelaw.com
> ATHENE LAW, LLP
> 10866 Washington Blvd., #142
> Culver City, CA 90232
> Telephone: (310) 913-4013
> Facsimile: (844) 619-8022

2. For American Society of Anesthesiologists, American College of Emergency Physicians, and American College of Radiology:

> Powers Pyles Sutter & Verville PC
> Ronald S. Connelly
> ron.connelly@ppsv.com
> POWERS PYLES SUTTER & VERVILLE PC
> 1501 M Street NW
> Ste Seventh Floor
> Washington, DC 20005
> Telephone: (202) 466-6550
> Facsimile: (202) 785-1756

3. For American Medical Association and American Hospital Association:

Akin Gump Strauss Hauer & Feld LLP
James Tysse
jtysse@akingump.com
Kelly M. Cleary
kcleary@akingump.com
Kristen Loveland
kloveland@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 887-4000

4. For The Emergency Department Practice Management
Association:

ArentFox Schiff
Jack R. Bierig
jbierig@schiffhardin.com
ARENTFOX SCHIFF
233 South Wacker Drive
Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5511
Facsimile: (312) 258-5600

The Stafford Davis Firm, PC
Catherine Susan Bartles
cbartles@stafforddavisfirm.com
Stafford Grigsby Helm Davis
sdavis@stafforddavisfirm.com
THE STAFFORD DAVIS FIRM, PC
815 S Broadway Ave
Tyler, TX 75701
Telephone: (903) 593-7000
Facsimile: (903) 705-7369

5. For American Benefits Council, Business Group on Health Council of Insurance Agents and Brokers, DFW Business Group on Health, ERISA Industry Committee, Houston Business Coalition on Health, HR Policy Association, National Alliance of Health Care Purchaser Coalitions, National Retail Federation, Purchaser Business Group on Health, Self-Insurance Institute of America, Texas Business Group on Health, and Texas Employers for Affordable Healthcare:

    Groom Law Group
    Ryan Temme
    rtemme@groom.com
    Seth T. Perretta
    sperretta@groom.com
    Matthew W. Lanahan
    mlanahan@groom.com
    GROOM LAW GROUP
    1701 Pennsylvania Ave NW
    Ste 1200
    Washington, DC 20024
    Telephone: (202) 861-6659
    Facsimile: (202) 659-4503

6. For Leukemia & Lymphoma Society, Hemophilia Federation of America, CancerCare, United States Public Interest Research Group, Inc., National Multiple Sclerosis Society, Epilepsy Foundation, Families USA Action, Cancer Support Community, ALS Association, The Mended Hearts, Incorporated, and U.S. PIRG:

    Wardenski P.C.
    Joseph J Wardenski
    joe@wardenskilaw.com
    WARDENSKI P.C.
    195 Plymouth Street
    Brooklyn, New York 11201
    Telephone: (347) 913-3311

7. For America's Health Insurance Plans and Cancer Support Community:

> Deutsch Hunt PLLC
> Hyland Hunt
> hhunt@deutschhunt.com
> DEUTSCH HUNT PLLC
> 300 New Jersey Ave., Suite 900
> Washington, DC 20001
> Telephone: (202) 868-6915
> Facsimile: (202) 609-8410

8. For Blue Cross Blue Shield Association:

> O'Melveny & Myers, L.L.P.
> Kenneth Lee Blalack, II
> lblalack@omm.com
> Andrew Robert Hellman
> andrewhellman@omm.com
> O'MELVENY & MYERS, L.L.P.
> 1625 Eye Street, N.W.
> Washington, DC 20006
> Telephone: (202) 383-5300

## E.    Entities with a Financial Interest:

The following additional persons may have a financial interest in the outcome of the litigation.

1.  Texas Medical Association Library dba TMA Knowledge Center
2.  Texas Medical Association Special Funds Foundation
3.  Texas Medical Association Foundation
4.  TMF Health Quality Institute
5.  Texas Medical Association Alliance
6.  Texas Medical Association Political Action Committee
7.  TMA Practice Management Holdings, LLC
8.  TMA Specialty Services, LLC

9.     PSO Services, LLC
10.   Physicians Benevolent Fund
11.   Improving The Health Of All Texans
12.   TMA Insurance Trust
13.   Texas Medical Liability Trust
14.   Annie Lee Thompson Library Trust Fund
15.   Dr. S. E. Thompson Scholarship Fund
16.   May Owen Irrevocable Trust
17.   East Texas Health System, LLC
18.   AHS East Texas Health System, LLC
19.   The University of Texas Health Sciences Center at Tyler

## F.     Federal Rule of Appellate Procedure 26.1:

1. Texas Medical Association has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. Tyler Regional Hospital, LLC is part of East Texas Health System, LLC, which is a joint venture between AHS East Texas Health System, LLC (the majority owner) and University of Texas Health Sciences Center at Tyler. No publicly held corporation owns 10% or more of Tyler Regional Hospital, LLC's stock.

3. Doctor Adam Corley is a natural person.

Dated: September 11, 2023

/s/ Eric D. McArthur
Eric D. McArthur

# REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully request oral argument. This case presents important questions regarding the proper interpretation of the No Surprises Act, a statute that no federal court of appeals has yet construed. The issues involved will benefit from airing at oral argument, during which counsel can address any questions the Court might have. Because the decisional process will be significantly aided by oral argument, it is appropriate here under Fed. R. App. P. 34(a)(2).

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS ......................................... i

REQUEST FOR ORAL ARGUMENT ...................................................... ix

TABLE OF AUTHORITIES ................................................................... xii

INTRODUCTION ................................................................................... 1

STATEMENT OF ISSUES .................................................................... 5

STATEMENT OF THE CASE ............................................................... 6

A.   The No Surprises Act ................................................................ 6

B.   The Independent Dispute Resolution Process ......................... 8

    1.   The arbitrators are private and independent. ...................................................... 8

    2.   Congress directed that arbitrators "shall consider" many factors, not just the QPA. ................. 10

    3.   The IDR process is the result of years of congressional deliberation and compromise. .............. 12

C.   The QPA-Calculation Rule ...................................................... 14

D.   The QPA Presumption ............................................................ 16

E.   The *TMA I* Litigation ............................................................ 17

F.   The Final Rule ......................................................................... 19

    1.   The "double-counting" rule ......................................... 20

    2.   The written-explanation requirement ....................... 21

    3.   The QPA-first mandate ............................................... 22

    4.   The narrow "related to" requirement ......................... 22

    5.   The lopsided credibility test ....................................... 23

G.     The Decision Below ................................................................ 23

STANDARD OF REVIEW ................................................................... 25

SUMMARY OF ARGUMENT ............................................................... 26

ARGUMENT ....................................................................................... 28

I.     Plaintiffs Have Standing ................................................................ 28

II.     The Final Rule Violates The NSA ................................................. 33

     A.     Congress left no room for the Departments to
          dictate how arbitrators weigh the statutory
          factors. ................................................................................ 33

     B.     The challenged provisions conflict with the
          statute .................................................................................. 42

          1.     The "double-counting" rule ..................................... 43

          2.     The written-explanation requirement ...................... 46

          3.     The QPA-first mandate ............................................ 50

          4.     The narrow "related to" rule ................................... 54

          5.     The lopsided credibility test .................................... 58

     C.     The Final Rule unlawfully reinstates the QPA-
          centric scheme Congress rejected. ..................................... 60

III.     The District Court Did Not Abuse Its Discretion By
          Vacating The Final Rule's Unlawful Provisions. .......................... 67

CONCLUSION ..................................................................................... 72

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Corn Growers Ass'n v. EPA,*
  291 F.3d 1 (D.C. Cir. 2002) ......................................................... 47, 59

*Am. Hosp. Ass'n v. NLRB,*
  499 U.S. 606 (1991) ........................................................................ 39

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................................ 32

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) .................................................................... 28

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023), *petition for cert. filed,* No. 22-
  976 (U.S. Apr. 7, 2023) ................................................................... 69

*Cent. & S.W. Servs., Inc v. EPA,*
  220 F.3d 683 (5th Cir. 2000) .......................................................... 70

*Cent. United Life. Ins. Co. v. Burwell,*
  827 F.3d 70 (D.C. Cir. 2016) .......................................................... 34

*Checkosky v. SEC,*
  23 F.3d 452 (D.C. Cir. 1994) .......................................................... 69

*Chem. Mfrs. Ass'n v. Dep't of Transp.,*
  105 F.3d 702 (D.C. Cir. 1997) ........................................................ 39

*Coffelt v. Fawkes,*
  765 F.3d 197 (3d Cir. 2014) ........................................................... 40

*Cuozzo Speed Techs., LLC v. Lee,*
  579 U.S. 261 (2016) ........................................................................ 42

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
  45 F.4th 846 (5th Cir. 2022) ..................................................... 25, 67

*DIRECTV, Inc. v. Budden,*
   420 F.3d 521 (5th Cir. 2005).............................................................56

*Djie v. Garland,*
   39 F.4th 280 (5th Cir. 2022) ...........................................................44

*Doe v. Chao,*
   540 U.S. 614 (2004).........................................................................66

*Driftless Area Land Conservancy v. Valcq,*
   16 F.4th 508 (7th Cir. 2021) ...........................................................71

*Earl v. Boeing Co.,*
   515 F. Supp. 3d 590 (E.D. Tex. 2021)..............................................40

*El Paso County v. Trump,*
   982 F.3d 332 (5th Cir. 2020) ...........................................................31

*Ethyl Corp. v. EPA,*
   51 F.3d 1053 (D.C. Cir. 1995) .........................................................35

*FEC v. Ted Cruz for Senate,*
   142 S. Ct. 1638 (2022).....................................................................32

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,*
   314 U.S. 95 (1941)...........................................................................56

*Feds for Med. Freedom v. Biden,*
   63 F.4th 366 (5th Cir. 2023), *petition for cert. filed*, No. 23-
   60 (U.S. July 21, 2023)............................................................71, 72

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
   141 S. Ct. 1017 (2021).....................................................................57

*Franciscan All., Inc. v. Becerra,*
   47 F.4th 368 (5th Cir. 2022) ...........................................................67

*Freytag v. Comm'r,*
   501 U.S. 868 (1991).........................................................................44

*Gallardo ex rel. Vassallo v. Marstiller,*
   142 S. Ct. 1751 (2022).....................................................................44

*Glen v. Am. Airlines, Inc.,*
 7 F.4th 331 (5th Cir. 2021) ............................................................. 32

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
 968 F.3d 454 (5th Cir. 2020) ................................................... 36, 38, 41

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lynch,*
 523 U.S. 26 (1998) ......................................................................... 43

*Little Sisters of the Poor Saints Peter & Paul Home v.*
 *Pennsylvania,*
 140 S. Ct. 2367 (2020) .................................................................... 52

*Lujan v. Defs. of Wildlife,*
 504 U.S. 555 (1992) ................................................................. 29, 32

*MCI Telecomms. Corp. v. AT&T Co.,*
 512 U.S. 218 (1994) ....................................................................... 66

*Mo.-Kan.-Tex. R.R. v. United States,*
 632 F.2d 392 (5th Cir. 1980) ......................................................... 51

*Monsanto Co. v. Geertson Seed Farms,*
 561 U.S. 139 (2010) ....................................................................... 71

*Morales v. Trans World Airlines, Inc.,*
 504 U.S. 374 (1992) ....................................................................... 57

*Nat'l Mining Ass'n v. Dep't of Lab.,*
 292 F.3d 849 (D.C. Cir. 2002) ....................................................... 39

*Nat'l Pork Producers Council v. EPA,*
 635 F.3d 738 (5th Cir. 2011) .................................................... 34, 35

*New Mexico v. Dep't of Interior,*
 854 F.3d 1207 (10th Cir. 2017) ..................................................... 30

*New York v. Reilly,*
 969 F.2d 1147 (D.C. Cir. 1992) ..................................................... 38

*Parker Drilling Mgmt. Servs., Ltd. v. Newton,*
 139 S. Ct. 1881 (2019) ................................................................... 38

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ............................................................... 54

*Peugh v. United States,*
    569 U.S. 530 (2013) ........................................................ 47, 51

*Pub. Serv. Co. of Ind. v. ICC,*
    749 F.2d 753 (D.C. Cir. 1984) ...................................... 42, 45

*Ragsdale v. Wolverine World Wide, Inc.,*
    535 U.S. 81 (2002) ............................................................... 66

*Ramirez v. ICE,*
    471 F. Supp. 3d 88 (D.D.C. 2020) ................................. 38, 51

*Smith v. United States,*
    507 U.S. 197 (1993) ............................................................. 66

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ............................................................. 31

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
    989 F.3d 368 (5th Cir. 2021) .............................................. 70

*Tex. Med. Ass'n v. HHS,*
    587 F. Supp. 3d 528 (E.D. Tex. 2022) ...................... *passim*

*Tex. Oil & Gas Ass'n v. EPA,*
    161 F.3d 923 (5th Cir. 1998) .............................................. 45

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) (*MPP*), *rev'd on other grounds*
    *sub nom. Biden v. Texas*, 142 S. Ct. 2528 (2022) ................. 67, 69, 71

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) .............................................. 29

*Texas v. United States,*
    497 F.3d 491 (5th Cir. 2007) .................................. 30, 60, 61

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ...................................... 25, 70

*Texas v. United States*,
　809 F.3d 134 (5th Cir. 2015) (*DAPA*) ........................................ *passim*

*United States v. Aldawsari*,
　740 F.3d 1015 (5th Cir. 2014) ............................................................ 38

*United States v. Lawrence*,
　727 F.3d 386 (5th Cir. 2013) .............................................................. 52

*United States v. Mecham*,
　950 F.3d 257 (5th Cir. 2020) ...................................................... 50, 64

*United States v. Texas*,
　143 S. Ct. 1964 (2023) ......................................................................... 68

*United Steel v. Mine Safety & Health Admin.*,
　925 F.3d 1279 (D.C. Cir. 2019) ......................................................... 69

*Util. Air Regul. Grp. v. EPA*,
　573 U.S. 302 (2014) ...................................................................... 33, 40

*Uzuegbunam v. Preczewski*,
　141 S. Ct. 792 (2021) ........................................................................... 31

*White Stallion Energy Ctr., LLC v. EPA*,
　748 F.3d 1222 (D.C. Cir. 2014), *rev'd sub nom. Michigan
　v. EPA*, 576 U.S. 743 (2015) ............................................................... 67

## Statutes and Regulations

National Parks Omnibus Management Act of 1998, Pub. L.
　No. 105-391, 112 Stat. 3497 (1998) ................................................... 51

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260,
　134 Stat. 1182 (2020). ............................................................................ 6

42 U.S.C. § 300gg-111(a)(1)........................................................... 6, 7, 8

42 U.S.C. § 300gg-111(a)(2)(B)........................................................... 49

42 U.S.C. § 300gg-111(a)(3)(E)............................................................. 7

42 U.S.C. § 300gg-111(a)(3)(H) ............................................... 7

42 U.S.C. § 300gg-111(b)(1)..................................................... 6

42 U.S.C. § 300gg-111(b)(1)(A) ............................................... 7

42 U.S.C. § 300gg-111(b)(1)(B) ............................................... 7

42 U.S.C. § 300gg-111(b)(1)(D) ............................................... 7

42 U.S.C. § 300gg-111(c)(1)(A) ............................................... 8

42 U.S.C. § 300gg-111(c)(1)(B) ............................................. 35

42 U.S.C. § 300gg-111(c)(2)(A) ......................................... 39, 40

42 U.S.C. § 300gg-111(c)(3)(A) ............................................. 35

42 U.S.C. § 300gg-111(c)(3)(B) ............................................. 35

42 U.S.C. § 300gg-111(c)(4) ................................................. 37

42 U.S.C. § 300gg-111(c)(4)(A) ............................... 9, 32, 35, 41

42 U.S.C. § 300gg-111(c)(4)(B) ............................................... 9

42 U.S.C. § 300gg-111(c)(4)(C) ............................................... 9

42 U.S.C. § 300gg-111(c)(4)(F) ......................................... 10, 35

42 U.S.C. § 300gg-111(c)(5)(A) ............................... 12, 34, 36, 45

42 U.S.C. § 300gg-111(c)(5)(B) ............................... 8, 53, 56

42 U.S.C. § 300gg-111(c)(5)(C) ....................................... *passim*

42 U.S.C. § 300gg-111(c)(5)(D) ............................... 12, 34, 44

42 U.S.C. § 300gg-111(c)(5)(E) ......................................... 10, 12

42 U.S.C. § 300gg-111(c)(5)(F) ............................................... 9

42 U.S.C. § 300gg-111(c)(7)(A) ......................................... 49, 50

42 U.S.C. § 300gg-111(c)(7)(B) ...................................................... 50

42 U.S.C. § 300gg-111(c)(7)(C) ...................................................... 35

42 U.S.C. § 300gg-111(c)(7)(D) ...................................................... 36

42 U.S.C. § 300gg-111(c)(8)(A) ...................................................... 36

42 U.S.C. § 300gg-111(c)(8)(B) ...................................................... 36

42 U.S.C. § 300gg-111(c)(9) ........................................................... 36

42 U.S.C. § 300gg-112(c)(5)(C) ...................................................... 11

17 C.F.R. § 201.411(a) ................................................................... 39

45 C.F.R. § 149.140 ........................................................................ 15

45 C.F.R. § 149.140(a)(7) .............................................................. 15

45 C.F.R. § 149.140(a)(8) .............................................................. 15

45 C.F.R. § 149.140(d) .............................................................. 15, 62

45 C.F.R. § 149.510(a)(2)(v) ......................................................... 23

45 C.F.R. § 149.510(c)(4)(ii)(A) ........................................ 19, 41, 63

45 C.F.R. § 149.510(c)(4)(iii)(A) .................................................. 22

45 C.F.R. § 149.510(c)(4)(iii)(B) .................................................. 22

45 C.F.R. § 149.510(c)(4)(iii)(E) ...................................... 20, 22, 43

45 C.F.R. § 149.510(c)(4)(iv)(A) .................................................. 48

45 C.F.R. § 149.510(c)(4)(iv)(B) ............................................ 23, 55

45 C.F.R. § 149.510(c)(4)(iv)(C) ............................................ 20, 62

45 C.F.R. § 149.510(c)(4)(vi)(B) ...................................... 21, 47, 62

86 Fed. Reg. 36,872 (July 13, 2021) ........................................... 15

86 Fed. Reg. 55,980 (Oct. 7, 2021)........................................ 16, 17, 33, 65

87 Fed. Reg. 52,618 (Aug. 26, 2022)................................................ *passim*

**Legislative Materials**

H.R. 3630, 116th Cong. (2019) ................................................................. 12

H.R. 5800, 116th Cong. (2019) ................................................................. 13

S. 1895, 116th Cong. (2019) ..................................................................... 12

**Scholarly Authorities**

Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L.
     Rev. 1121 (2020)..................................................................................68

Brian S. Prestes, *Remanding Without Vacating Agency
     Action*, 32 Seton Hall L. Rev. 108 (2001) ...........................................69

**Other Authorities**

5th Cir. Pattern Criminal Jury Instruction (2019) ................................. 42

*Black's Law Dictionary* (6th ed. 1990) (West) ........................................53

*Black's Law Dictionary* (3d ed. 1933) .....................................................68

CMS.gov, *List of certified independent dispute resolution
     entities* (last accessed Sept. 6, 2023),
     https://perma.cc/N7J5-NS9L .................................................................9

U.S. Dep't of Lab., *FAQs about Affordable Care Act and
     Consolidated Appropriations Act, 2021 Implementation
     Part 55* (Aug. 19, 2022) ..................................................................... 16

## <u>INTRODUCTION</u>

In the No Surprises Act (NSA), Congress created a new mechanism for compensating certain out-of-network healthcare providers for their services. The NSA prevents those providers from billing patients for amounts above their cost-sharing obligations. Instead, the NSA creates a process for a provider to obtain reimbursement directly from the patient's insurer. If the provider and insurer cannot agree on the appropriate payment  amount, the statute channels their dispute into an arbitration called the independent dispute resolution (IDR) process. This is a "baseball-style" arbitration in which a private arbitrator, selected by the parties and paid by the parties, chooses between two payment offers: one proposed by the provider and the other proposed by the insurer.

Congress provided meticulous instructions to these independent arbitrators on how they must decide which party's offer is the most appropriate payment for the provider's service. The NSA specifies a detailed list of factors that the independent arbitrators both "shall consider" and "shall not consider" in making their payment determinations. Congress did not prioritize any one factor, but rather

instructed the arbitrators to consider all of the factors and left the weight to be given each factor to the arbitrators' sound discretion.

The NSA's carefully crafted arbitration process was the outcome of extensive legislative debate and compromise. Insurers lobbied to have out-of-network reimbursement rates anchored to a measure of the insurer's median in-network rate (referred to in the NSA as the "qualifying payment amount" or "QPA"). And Congress considered multiple proposed bills that would have set the reimbursement amount at the QPA or would have made the QPA the presumptive reimbursement amount subject to adjustment by the arbitrator only in limited circumstances. But Congress rejected those bills. Instead, Congress adopted a multifactor balancing test under which the QPA—a figure that is unilaterally calculated by insurers and often under-compensatory—is just one factor among many that arbitrators "shall consider."

What insurers could not obtain through the legislative process, the federal Departments implementing the NSA have given them through rulemaking. First, the Departments rewrote the NSA—in the guise of "interpreting" it—by issuing an interim rule requiring arbitrators to presume that the offer closest to the QPA was the proper reimbursement

amount unless other factors "clearly demonstrate[d]" otherwise. Healthcare providers challenged this rule, and the district court promptly vacated the QPA presumption. The court held that the rule "conflict[ed] with the statutory text" and "impermissibly altered the Act's requirements" by placing a "thumb on the scale for the QPA." *Tex. Med. Ass'n v. HHS*, 587 F. Supp. 3d 528, 540, 542 (E.D. Tex. 2022) (*TMA I*).

At issue here is the Final Rule the Departments issued in the wake of *TMA I*. Although the Final Rule formally disclaims the vacated QPA presumption, it imposes a new set of requirements that similarly privilege the QPA and thereby tilt the IDR process in insurers' favor. These requirements restrict the discretion that Congress gave to the independent arbitrators by forcing them to begin their analysis with the QPA, presume the QPA is credible, and ignore the other, non-QPA factors unless the arbitrators conclude, and explain in writing, that those factors meet a heightened burden that appears nowhere in the statute. Just like the earlier QPA presumption vacated in *TMA I*, these new requirements will often prevent arbitrators from selecting the offer farther from the QPA, which will almost invariably be the provider's offer. Healthcare

providers—the plaintiffs here—again sued, and, as before, the district court held that the challenged rules violate the NSA.

This Court should now affirm. The NSA's detailed and comprehensive instructions, which are directed to the arbitrators, leave no room for the Departments to promulgate rules restricting how the arbitrators weigh the statutory factors. What the Departments claim is a statutory "gap" for them to fill is instead a zone of discretion Congress granted to the arbitrators—the qualified and *independent* private professionals that Congress tasked with rendering payment determinations under the NSA. Even if there were a "gap," the challenged rules conflict with the NSA because they bar arbitrators from carrying out their statutory mandate to consider all of the required factors and because they improperly prioritize the QPA. The Departments' policy arguments cannot justify overriding the statute. Nor can they justify biasing the IDR process in insurers' favor, contrary to the congressional compromise the IDR process embodies.

In these circumstances, where the challenged rules are unlawful from start to finish, vacatur is not just warranted but required.

## STATEMENT OF ISSUES

I. Whether healthcare providers have Article III standing to challenge rules governing arbitrations that determine their reimbursement rates, where those rules (i) unlawfully deprive providers of statutorily guaranteed procedures protecting their financial interest in obtaining adequate reimbursement and (ii) are likely to systematically reduce providers' reimbursement rates.

II. Whether the Departments may, consistent with the NSA, promulgate rules that (i) supplement Congress's comprehensive framework governing how arbitrators make payment determinations, (ii) restrict arbitrators' discretion in weighing the statutory factors, (iii) prevent arbitrators from considering evidence Congress mandated that they "shall consider," (iv) skew IDR outcomes toward the QPA, and thus in favor of insurers, and (v) replace the IDR process Congress enacted with a QPA-centric process that Congress rejected.

III. Whether the district court abused its discretion by vacating rules that violate the NSA and thus cannot be rehabilitated on remand.

## STATEMENT OF THE CASE

### A.     The No Surprises Act

Congress enacted the NSA to address the problem of unanticipated balance, or "surprise," billing for certain healthcare services. *See* Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–890 (2020). Historically, when a patient with health insurance received out-of-network services from a provider, the provider would submit the bill to the patient's insurer. Because an out-of-network provider does not have a contract with the insurer specifying its rates, the insurer would unilaterally determine how much to pay. The patient remained liable for the remaining balance, which could result in a "balance bill" from the provider to the patient. These bills were sometimes called "surprise" bills because they could result from situations (*e.g.*, emergency care), in which patients were unaware they had received (or did not choose to receive) out-of-network treatment.

The NSA prohibits balance billing in these circumstances and removes patients from reimbursement disputes. It does so by capping patients' liability for certain out-of-network healthcare services. *See* 42 U.S.C. § 300gg-111(a)(1), (b)(1). For such services, neither insurers nor providers may require a patient to pay more than the cost-sharing

amount (*e.g.*, copay, deductible, and coinsurance) that would apply if the services had been furnished by an in-network provider. *Id.* § 300gg-111(a)(1)(C)(ii), (b)(1)(A). Unless a state law provides otherwise, the statute bases the patient's cost-sharing on the "qualifying payment amount" or "QPA." *Id.* § 300gg-111(a)(1)(C)(iii), (b)(1)(B), (a)(3)(H). The QPA is an insurer-calculated figure generally representing the median of the insurer's 2019 contracted rates (adjusted for inflation) for the same or similar item or service furnished by a provider in the same or similar specialty and in the same geographic region. *Id.* § 300gg-111(a)(3)(E).

In limiting the amount patients could be required to pay, Congress understood that providers would need to look elsewhere to recoup the fair value of their services. The NSA therefore obligates covered insurers[1] to directly reimburse providers at an "out-of-network rate." *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D). Unlike for patient cost-sharing, the NSA does not tie out-of-network reimbursement to the QPA or any mathematical formula. Instead, and again absent an applicable state

---

[1] The NSA imposes its obligations on "group health plan[s]" and "health insurance issuer[s] offering group or individual health insurance coverage." 42 U.S.C. § 300gg-111(a)(1). This brief refers to them collectively as "insurers."

7

law, Congress required insurers to make an initial payment directly to the provider. Congress then channeled disputes about the sufficiency of that payment into a carefully structured process of negotiation and, if necessary, arbitration—what the NSA calls "independent dispute resolution." *Id.* § 300gg-111(a)(1)(C)(iv)(I), (c)(1)(A).

## B.    The Independent Dispute Resolution Process

The IDR process involves a "baseball-style" arbitration in which the provider and insurer submit their best and final offers for the reimbursement amount to an independent private arbitrator. *Id.* § 300gg-111(c)(5)(B), (C)(ii). Each party may submit information to the arbitrator together with its offer. *Id.* § 300gg-111(c)(5)(B)(i)(II), (ii). But neither party is given the right to see the other party's submission. And there is neither discovery nor argument; these arbitrations are decided based solely on the parties' written submissions. The arbitrator (referred to in the statute as a "certified IDR entity") must choose one of the parties' offers after "taking into account" a list of "[c]onsiderations" that are described in the statute. *Id.* § 300gg-111(c)(5)(C).

### 1.    The arbitrators are private and independent.

Congress gave detailed instructions in the NSA about the selection of the private arbitrators who make these important decisions. The

Departments' principal role with regard to these arbitrators is to create a "process to certify" applicants as qualified arbitrators. *See* 42 U.S.C. § 300gg-111(c)(4)(A). Congress required the Departments to ensure that these private arbitrators have sufficient expertise—including "medical" and "legal" expertise—to exercise the discretion given to them. *Id*.

An IDR entity's "certification" from the Departments lasts for five years. *Id.* § 300gg-111(c)(4)(B). Although the Departments have limited power to "decertify" an IDR entity, the Departments may do so only if the IDR entity has engaged in a "pattern or practice of noncompliance" with applicable requirements. *Id.* § 300gg-111(c)(4)(C). The NSA does *not* give the Departments power to decertify or discipline an IDR entity simply because the Departments disagree with that entity's decisions.

The NSA does not oblige the Departments to pay the arbitrators. Instead, the losing party pays the arbitrator's fee. *Id.* § 300gg-111(c)(5)(F). There are currently 13 certified IDR entities, and they charge different fees, ranging from $350 to $700 for a single claim.[2]

---

[2] CMS.gov, *List of certified independent dispute resolution entities* (last accessed Sept. 6, 2023), https://perma.cc/N7J5-NS9L.

Nor do the Departments typically select which IDR entity will preside over a given dispute. Rather, the parties "jointly select" which of the certified IDR entities will preside over their dispute. *Id.* § 300gg-111(c)(4)(F)(i). Only if the parties cannot agree may the Departments select an arbitrator for them. *Id.* § 300gg-111(c)(4)(F)(ii).

Congress also did not provide the Departments with authority to review the arbitrators' decisions or select the payment amount themselves. Instead, the arbitrators' decisions are final and "binding upon the parties involved," absent a fraudulent claim or misrepresentation. *Id.* § 300gg-111(c)(5)(E)(i). The only review that Congress provided of the arbitrators' decisions is "judicial review" under the demanding standards of the Federal Arbitration Act. *Id.*

### 2. Congress directed that arbitrators "shall consider" many factors, not just the QPA.

Congress gave these private arbitrators specific instructions about what information they "shall consider" when "determining which offer is the payment to be applied" for the item or service at issue. 42 U.S.C. § 300gg-111(c)(5)(C)(i). One—but only one—of those considerations is the QPA for the applicable item or service. *Id.* The arbitrator also "shall consider" "information on any circumstance described in clause (ii),"

10

along with any additional information the arbitrator requests or the parties submit relating to their respective offers.

Clause (ii) sets forth five "circumstances" that arbitrators "shall consider":

(1)    the level of training, experience, and quality and outcomes measurements of the healthcare provider that furnished the item or service;

(2)    the market share of the healthcare provider or payor in the geographic region where the item or service was provided;

(3)    the acuity of the individual receiving the item or service or the complexity of furnishing such item or service to such individual;

(4)    the teaching status, case mix, and scope of services of the facility that furnished the item or service; and

(5)    demonstrations of good faith efforts (or lack of good faith efforts) made by the healthcare provider or insurer to enter into network agreements, and, if applicable, contracted rates between the healthcare provider and insurer during the previous four plan years.

*Id.* § 300gg-111(c)(5)(C)(ii)(I)–(V).[3]

Congress also specified three factors that arbitrators "shall not consider": (1) a provider's "usual and customary" charges, (2) the amount the provider would have billed had the NSA's balance-billing provisions

---

[3] The NSA substitutes six parallel circumstances that arbitrators shall consider when deciding rates for air ambulance transports. *Id.* § 300gg-112(b)(5)(C)(ii).

not applied, and (3) the amount that a government payor (*e.g.*, Medicare or Medicaid) would pay. *Id.* § 300gg-111(c)(5)(D).

After "taking into account the considerations specified" in the statute, the arbitrator must "select one of the offers submitted … to be the amount of payment" for the item or service at issue. *Id.* § 300gg-111(c)(5)(A)(i). As noted, that decision is immediately "binding upon the parties" without review by the Departments. *Id.* § 300gg-111(c)(5)(E)(i).

### 3. The IDR process is the result of years of congressional deliberation and compromise.

This detailed scheme, in which the QPA is only one among many mandatory considerations, was the product of over two years of congressional deliberation and compromise. During the legislative process, insurers lobbied Congress to use the QPA as the benchmark rate not just for patient cost-sharing, but also for out-of-network reimbursement. ROA.421. And multiple proposed bills would have followed this path. For example, two bills would simply have pegged out-of-network reimbursement to the median in-network rate. *See* H.R. 3630, 116th Cong. (2019); S. 1895, 116th Cong. (2019). Another would have presumptively set out-of-network reimbursement at the QPA, and only permitted recourse to IDR (and a reimbursement amount different from

the median in-network rate) when the claim exceeded a minimum dollar threshold. *See* H.R. 5800, 116th Cong. (2020).

Congress did not adopt those proposals. As Congress understood, the median in-network rate often will not be a reasonable rate for out-of-network reimbursement. To begin with, the median in-network rate is just that—a median—so it will undercompensate providers with special expertise and experience or where myriad other factors increase the cost of care. More generally, in-network providers often agree to substantially lower contracted rates in exchange for the higher volume, administrative efficiency, and reimbursement certainty that come with being in network. ROA.426. And as members of Congress recognized, "giving too much weight" to median in-network rates—which insurers control—could empower insurers to "push rates down" by threatening to "drop providers from networks." ROA.468 (Rep. Neal Statement). If the IDR process were based on the QPA, then that would give insurers the power to demand that all of their in-network providers drop their rates to that median (as calculated by the insurer)—and the provider would have little leverage to negotiate, since the alternative to acceding to this demand would be to become an out-of-network provider, in which case the IDR

process would result in the same outcome in most cases: payment at the QPA.

In all events, Congress rejected each proposed bill that would have set out-of-network reimbursement at the QPA or otherwise prioritized an insurer's calculation of median in-network rates in determining reasonable reimbursement for out-of-network services. Instead, as described above, Congress adopted a process in which "both the provider's offer and the plan's offer receive equal weight," the arbitrator "considers, but isn't bound by, the plan's median in-network rate," and "the provider is not left in a position to disprove the adequacy of such a rate." ROA.468; *see also* Joint Statement of House Committees on Ways and Means, Energy and Commerce, and Education and Labor, *Protecting Patients from Surprise Medical Bills* (Dec. 21, 2020) (ROA.471) ("This text includes **NO** benchmarking or rate-setting" and requires arbitrators to "equally consider many factors").

## C.    The QPA-Calculation Rule

In July 2021, the Departments issued an interim final rule implementing some of the NSA's requirements, including establishing a

methodology for how insurers must calculate QPAs. *See* 86 Fed. Reg. 36,872 (July 13, 2021); 45 C.F.R. § 149.140.

The Departments' QPA-calculation methodology empowers insurers to resolve a number of issues that require subjective judgment—*e.g.*, the contours of the relevant "insurance market" and "geographic region." 45 C.F.R. § 149.140(a)(7), (8). To make those judgments, insurers rely on information solely within their possession and control, yet the Departments' rule allows insurers to keep most of that information secret from the providers and the arbitrators. *See id.* § 149.140(d) (requiring almost no meaningful disclosure regarding the calculation of the QPA). The basis for a QPA is a black box to everyone but the insurer. Neither providers nor arbitrators have any way of knowing its ingredients or whether it was properly calculated. They are not told the answers to even the most basic questions about the QPA: How many contracted rates were used by the insurer to calculate the QPA? How often were those rates actually paid? Who were the providers that agreed to those rates?

There is already evidence of widespread insurer noncompliance with the QPA-calculation rules. In August 2022, the Departments acknowledged that insurers had violated the requirements for

15

determining whether providers are in the "same or similar specialty." Dep'ts, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* at 16–17 (Aug. 19, 2022).[4] The Departments also acknowledged that some insurers had improperly depressed QPAs by "enter[ing] $0 in their fee schedule[s]" for healthcare services that a provider simply did not offer and then including these "ghost rates" in their QPA calculations. *Id.* at 17 n.29. This practice depresses the QPA because it adds new $0 data points in the calculation of the median in-network rate—even though no provider actually performed or even agreed to perform the service in exchange for $0.[5]

### D.    The QPA Presumption

In October 2021, the Departments published a second interim rule—the rule at issue in *TMA I*. 86 Fed. Reg. 55,980 (Oct. 7, 2021). Adding material terms that do not appear in the statute, this rule

---

[4] https://perma.cc/7WZV-CJ9G.

[5] To illustrate: Suppose the insurer has four in-network rates for the service in the relevant market with providers who actually perform the service: $350, $400, $500, and $550. The median of those rates is $450. Suppose further that the insurer also has an in-network contract with another provider listing $0 as the rate for this service (because the provider does not provide it). If that $0 rate is considered as the fifth data point, then the median of those five rates is just $400.

adopted a "rebuttable presumption" in favor of the QPA, requiring arbitrators to select the offer closest to the QPA unless the other factors "clearly demonstrate[d]" that the QPA was "materially different" from the appropriate out-of-network reimbursement rate. *Id.* at 56,056, 56,104. If the arbitrator did select the offer farther from the QPA, it had to justify its decision with "a detailed explanation." *Id.* at 56,000.

The Departments asserted that the statute was "best interpret[ed]" to impose the QPA presumption because, *e.g.*, it "lists the QPA as the first factor" and information on the other factors would often "already be reflected in the QPA." *Id.* at 55,996–97. The Departments also cited various "policy considerations" for "[a]nchoring" reimbursement to the QPA, which they believed would "increase the predictability of IDR outcomes" and reduce healthcare costs. *Id.* at 55,996.

The QPA presumption favored insurers. Insurers' offers in IDR are almost always closer to the QPA than providers' offers. *See TMA I*, 587 F. Supp. 3d at 538; *see also* ROA.188, 194, 201.

### E.    The *TMA I* Litigation

Texas Medical Association (TMA), a nonprofit association representing over 57,000 physicians and medical students, and Dr. Adam

Corley, an emergency room physician practicing in Tyler, Texas, challenged the QPA presumption on the grounds that it violated the NSA and was unlawfully issued without notice and comment. The district court, after rejecting the Departments' challenge to plaintiffs' standing, agreed on both counts. 587 F. Supp. 3d at 533, 537–39, 549.

The court decided first that the Departments' interpretation was owed no deference "[b]ecause Congress spoke clearly" on the relevant issue by "unambiguously establish[ing] the framework for deciding payment disputes." *Id.* at 540–41. That framework, the court explained, "plainly requires arbitrators to consider all the specified information in determining which offer to select," and does not "suggest anywhere that the other factors or information is less important than the QPA." *Id.* The court rejected as "unpersuasive" the Departments' defense that the "'overall statutory scheme' supports" elevating the QPA over the other factors. *Id.* at 542. To the contrary, the NSA "clearly sets forth a list of considerations and does not dictate a procedure or a procedural order for [those] considerations." *Id.* (quotation marks omitted). Placing a "thumb on the scale for the QPA," the Departments' rule unlawfully "rewr[ote] clear statutory terms." *Id.* at 541–42 (quotation marks omitted).

The court further held that the Departments had violated the APA by promulgating the QPA presumption without notice and comment. *Id.* at 548. In light of these infirmities, the court vacated the provisions of the rule creating the QPA presumption. *Id.* at 548–49.

### F.    The Final Rule

The Departments released the Final Rule challenged in this case six months later. On its face, the Final Rule deletes the express QPA presumption vacated in *TMA I* and now instructs arbitrators to select the offer that "best represents the value of the item or service." 45 C.F.R. § 149.510(c)(4)(ii)(A). But the Final Rule institutes a new set of requirements that—especially when taken together—continue to prioritize the QPA and prevent arbitrators from exercising their independent discretion and giving weight to all of the other statutory factors that Congress required them to consider. Under the Final Rule, the arbitrators are forbidden to give any weight to the other, non-QPA factors unless the arbitrators first make additional and burdensome findings that are not part of Congress's carefully elaborated list of factors that the arbitrator "shall consider."

### 1.    The "double-counting" rule

Under the Final Rule, arbitrators may not "give weight to" any non-QPA factor if it "is already accounted for by the [QPA] … or other credible information." *Id.* § 149.510(c)(4)(iii)(E). For example, although the NSA expressly requires arbitrators to consider patient acuity and the complexity of furnishing the item or service at issue, 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(III), the Final Rule prohibits arbitrators from giving any weight to these factors if "the additional information on the acuity of the patient and complexity of the service is already accounted for in the calculation of the [QPA]," 45 C.F.R. § 149.510(c)(4)(iv)(C)(2).

Nowhere did the Departments explain how arbitrators or providers would be able to determine whether the QPA "already account[s] for" another piece of information. A QPA's inputs are known only by the insurer, and, in fact, the Departments barred arbitrators from even *asking* about those inputs. *See* 87 Fed. Reg. 52,618, 52,627 n.31 (Aug. 26, 2022) (ROA.979). A QPA is merely the end product of a secret calculation by the insurer based on its own records. Without knowing much more about what the inputs were to a QPA's calculation, an arbitrator will be unable to determine whether the QPA "account[s] for" some other factor.

For example: The statute commands arbitrators to consider "[t]he level of training, experience, and quality and outcomes measurements of the provider or facility that furnished [the] item or service." 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(I). If the arbitrator is not given information about the "level of training, experience, and quality" of the in-network providers whose rates were used to calculate the QPA, then the arbitrator cannot determine whether or not this factor was "accounted for" in the QPA.

### 2.    The written-explanation requirement

If an arbitrator gives weight to any non-QPA factor, the arbitrator's "written decision must include an explanation of why" it "concluded that this information was not already reflected" in the QPA. 45 C.F.R. § 149.510(c)(4)(vi)(B). While the double-counting rule at least purports to be evenhanded, this written-explanation requirement does not. Additional explanation is required only when an arbitrator gives weight to factors other than the QPA—thereby disincentivizing an arbitrator from doing so. As noted, arbitrators are paid a flat fee (by the parties) per dispute; there is no extra payment to compensate them for writing answers to the impossible essay prompts demanded by the Departments.

### 3.    The QPA-first mandate

The Final Rule requires arbitrators to begin by first "consider[ing] the [QPA]." 45 C.F.R. § 149.510(c)(4)(iii)(A). Only after the arbitrator has looked to the QPA may it "*then* consider" the other statutory factors. *Id.* § 149.510(c)(4)(iii)(B) (emphasis added). The Departments claimed the QPA-first requirement would "aid" arbitrators in their "consideration of each of the other statutory factors," by putting them "in a position to evaluate whether the 'additional' factors present information that may not have already been captured in the calculation of the QPA." 87 Fed. Reg. at 52,628 (ROA.980). Thus, the QPA-first rule, like the written-explanation requirement, reinforces the double-counting prohibition.

### 4.    The narrow "related to" requirement

The Final Rule bans arbitrators from "giv[ing] weight to" any non-QPA information if it "does not relate to either party's offer." 45 C.F.R. § 149.510(c)(4)(iii)(E). This ban includes information about the clause (ii) circumstances that Congress mandated arbitrators "shall consider" in every case. 42 U.S.C. § 300gg-111(c)(5)(C)(ii). The Final Rule adopts a narrow view of what "relates to" an offer by requiring evidence of necessity or causation. For example, an arbitrator may not give weight to "the provider's level of training and experience" unless it "was

*necessary* for providing" the service at issue or "*made an impact* on the care that was provided." *Id.* § 149.510(c)(4)(iv)(B) (emphases added).

### 5.    The lopsided credibility test

Finally, the Departments required that, before giving weight to information on any non-QPA factor, the arbitrator must determine that the information is "credible." *Id.* § 149.510(a)(2)(v). No credibility test applies to the QPA, which the arbitrator must consider even if it is suspect. 87 Fed. Reg. at 52,627 & n.31 (ROA.979). The Departments exempted the QPA on the ground that a QPA is necessarily credible "to the extent [it] is calculated" correctly under the Departments' rules. *Id.* at 52,627 (ROA.979). The Departments promulgated this rule just a month after recognizing that insurers had failed to comply with the Departments' QPA-calculation rules. *See supra* at 15–16.

### G.    The Decision Below

TMA and Dr. Corley—this time joined by Tyler Regional Hospital—again sued the Departments under the APA, claiming that these provisions of the Final Rule violated the NSA's unambiguous terms and were arbitrary and capricious. ROA.1849–50. After again rejecting the Departments' challenge to plaintiffs' standing, the district court held that

the challenged provisions "conflict with the [NSA's] unambiguous statutory text and must be set aside." ROA.1857.

The district court declined the Departments' request for *Chevron* deference because "Congress spoke clearly on the issue relevant here." ROA.1859. As the district court concluded, the NSA unambiguously "requires arbitrators to consider all the specified information in determining which offer to select." ROA.1859. By its plain terms, the statute neither "limit[s] arbitrators' discretion in considering the statutory factors," nor "impose[s] heightened scrutiny on information related to the non-QPA factors," nor "create[s] procedural hurdles before considering that information." ROA.1859.

The court concluded that the Departments' rules "impermissibly altered" those clear statutory mandates by "improperly limit[ing] arbitrators' discretion" and "continu[ing] to place a thumb on the scale for the QPA." ROA.1860. The court rejected the Departments' plea that their rules were merely "reasonable evidentiary and procedural rules" that filled a "gap" in the statute concerning how arbitrators should weigh the statutory factors. ROA.1861–62. As the district court explained, Congress "left to the decisionmaker's sound discretion" the weighing of

the statutory factors, and the Departments' rules "invad[ed] the adjudicative role assigned by the statute to the arbitrators, not the Departments." ROA.1862. In concluding, the district court stated the obvious: "Although the Departments have abandoned the 'rebuttable presumption' term, they have not relinquished their goal of privileging the QPA, tilting arbitrations in favor of insurers, and thereby lowering payments to providers." ROA.1864.

As to the proper remedy, the court rejected the Departments' request for remand without vacatur because the challenged rules "conflic[t] with the unambiguous terms of the Act" and "cannot be rehabilitated." ROA.1864. The court likewise rejected the Departments' request for party-specific relief, concluding that voiding a rule was "the ordinary result" of vacatur. ROA.1865–66.

## **STANDARD OF REVIEW**

This Court reviews the district court's grant of summary judgment de novo, *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022), and it reviews the district court's decision to vacate the challenged provisions of the rule for abuse of discretion, *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022).

## SUMMARY OF ARGUMENT

The Court should affirm the district court's vacatur of the challenged rules, which violate the NSA's plain terms and vitiate the carefully crafted legislative compromise the statute embodies.

As a threshold matter, the Departments' challenge to plaintiffs' standing is meritless. Plaintiffs have standing because the Final Rule (i) deprives them of statutorily guaranteed procedures designed to protect their concrete financial interests, and (ii) will systematically depress their reimbursement. The Departments' contrary arguments simply dispute the merits or misinterpret bedrock standing doctrine.

On the merits, the challenged rules conflict with the NSA in multiple respects. To begin with, it is a cardinal rule of administrative law that agencies have no power to supplement a statutory scheme that is "comprehensive." But here the Departments have done just that. The NSA gives comprehensive instructions *to the arbitrators*, who are "independent" of the Departments and whose decisions are unreviewable by the Departments. Those instructions leave no room for the Departments to circumscribe arbitrators' discretion to weigh the statutory factors as they see fit in light of all the facts in a particular case.

26

Yet under the pretense of filling a supposed "gap" in Congress's instructions, the Departments have imposed extrastatutory limits on the discretion Congress unambiguously granted to the arbitrators.

Even if the NSA's comprehensiveness did not foreclose the challenged rules entirely, the Departments' directives are inconsistent with the statute. Whereas the NSA mandates that arbitrators "shall consider" information on *all* the statutory factors, the Departments' rules unlawfully direct arbitrators to disregard such information unless it meets the Departments' heightened, extrastatutory preconditions. And whereas Congress placed the statutory factors on an equal footing, the Departments' rules unlawfully elevate the QPA by requiring arbitrators to start with it and deviate from it only if the other factors meet a heightened burden that does not appear in the statute.

Apart from these specific conflicts, the Final Rule also fails to reasonably implement the statute because it reinstates the QPA-centric regime that Congress considered and rejected. By mandating a process that focuses first and foremost on the QPA (which an arbitrator may not question) and then forces the arbitrator to jump through extrastatutory hoops before giving weight to any information about the non-QPA factors,

the Departments' rules unreasonably tilt the IDR process in insurers' favor. The Departments' policy appeals to "predictability" and "uniformity" are just another way of saying they prefer a process that will not "result routinely in payments greater than [the QPA]." ROA.565. But the Departments' policy-based preferences cannot justify rewriting the statute or overriding the legislative compromise that Congress struck after extensive deliberation and debate on this very issue.

Unlawful from start to finish, the challenged rules were properly vacated by the district court. The Departments' half-hearted appeals for more limited relief—whether remand without vacatur or party-specific relief—are blocked by binding Circuit precedent.

## ARGUMENT

### I.   Plaintiffs Have Standing.

Article III standing requires (1) "an injury in fact" that is (2) "fairly traceable to the challenged conduct" and (3) "likely to be redressed by the lawsuit." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023). Here, plaintiffs have established two independently sufficient bases for standing.

*First*, plaintiffs have standing because the Final Rule deprives them of the process guaranteed by the NSA and replaces it with one that threatens plaintiffs' financial interests. ROA.1852. Under the

procedural-injury doctrine, "[a] plaintiff can show a cognizable injury if [he] has been deprived of 'a procedural right to protect [his] concrete interests.'" *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). The doctrine excuses plaintiffs from "meeting all the normal standards for redressability and immediacy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). Thus, as the district court explained, plaintiffs may satisfy Article III without proving that proper procedures will "necessarily create different outcomes" in IDR. ROA.1853. Instead, they need show only "some possibility" that vacating the challenged rules would result in more favorable IDR outcomes. *Texas v. United States*, 809 F.3d 134, 150–51 (5th Cir. 2015) (*DAPA*) (quotation omitted).

The Departments do not dispute that plaintiffs have standing under the procedural-injury doctrine *if* it applies here. Br. 23–24. Nor could they. Congress carefully "designed" the IDR process "to protect" plaintiffs' "concrete" financial "interest" in obtaining fair reimbursement. *Lujan*, 504 U.S. at 572 n.8. Plaintiffs use IDR to vindicate those interests, *see* ROA.193–94, 188, 201, 205–06; the Departments' QPA-centric rules have deprived them of the process the NSA guarantees, *see infra* Part II;

29

and there is at least "some possibility"—more like a certainty—that vacating the Departments' QPA-centric scheme will result in more favorable IDR outcomes, *DAPA*, 809 F.3d at 150–51.

Unable to dispute this straightforward application of the procedural-injury doctrine, the Departments instead claim the doctrine is limited to cases where the "agency failed to follow the correct procedures when taking the challenged agency action." Br. 23. In other words, because "plaintiffs allege no defect in the procedures through which the [Final Rule] was promulgated," and instead challenge its imposition of unlawful procedures on a separate proceeding (the IDR arbitrations), the Departments contend that plaintiffs cannot invoke the procedural-injury doctrine. *Id.* But the Departments' theory is foreclosed by binding precedent. This Court and others have found standing in precisely these circumstances. *See Texas v. United States*, 497 F.3d 491, 497 (5th Cir. 2007) (plaintiffs had standing to challenge agency regulations that altered procedural protections applicable to plaintiffs in a separate proceeding, without any showing that the regulations were promulgated in a procedurally flawed manner); *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1216–17 (10th Cir. 2017) (same). Nor is there any

reason why a procedural deprivation in the past would create standing, whereas a certainly impending future procedural deprivation would not. *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014).

*Second*, even without the benefit of the procedural-injury doctrine, plaintiffs have standing because the challenged rules will likely harm them financially by systematically reducing their reimbursement. ROA.1853. The Departments' QPA-centric rules make it harder for arbitrators to give effect to the non-QPA factors and, thus, harder to select the offer farther from the QPA. *See infra* Part II.C. Because plaintiffs' offers are almost invariably higher and farther from the QPA than insurers' offers, *see, e.g.*, ROA.188, 194, 201, it is "not only likely and imminent," as the district court concluded, "but inevitable" that the challenged rules will diminish plaintiffs' monetary recoveries in IDR proceedings, ROA.1854. That "[financial] injury is a quintessential injury upon which to base standing." *El Paso County v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020); *see Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021).

The Departments claim that financial injury is "speculative." Br. 25. But this claim rests on several legal errors. To begin with, it "goes

to the merits rather than standing." *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 335 (5th Cir. 2021). The Departments do not dispute that plaintiffs would have standing if the Final Rule did, in fact, favor the QPA. They simply doubt that their "modest procedural requirements" and "express disclaimers" could "have [such an] effect." Br. 26. "For standing purposes," however, a court must "accept as valid the merits of [plaintiffs'] legal claims." *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1647 (2022). Here, that means crediting plaintiffs' claim that the Final Rule is unlawful in part because it privileges the QPA—as it plainly does.

The Departments also argue that plaintiffs' financial injury "depends upon the decision of an independent third party" (*i.e.*, the arbitrator). Br. 26 (quoting *California v. Texas*, 141 S. Ct. 2104, 2117 (2021)). But arbitrators are not "independent" of the Final Rule's operation—they are legally required to apply it. *See* 42 U.S.C. § 300gg-111(c)(4)(A)(iii). Plaintiffs' injury thus depends on the "determinative or coercive effect" of the Final Rule itself. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). In these circumstances, "there is ordinarily little question" that a regulated party has standing. *Lujan*, 504 U.S. at 562.

32

## II.    The Final Rule Violates The NSA.

In issuing the now-defunct QPA presumption, the Departments claimed to be merely "interpret[ing]" the statute. 86 Fed. Reg. at 55,996. That tack having failed, *see TMA I*, 587 F. Supp. 3d at 541, the Departments have given up any pretense of being the authoritative *interpreters* of the NSA. They now contend that the NSA actually says nothing at all about how arbitrators are to weigh the statutory factors. *See* Br. 47. And so, they say, the Final Rule simply carries out Congress's command to fill a statutory "gap" with rules consistent with the statute. Br. 29–31. But this new theory fares no better than the first one. There is no "gap"—only a zone of discretion that Congress granted to the *arbitrators* rather than to the *Departments. See infra* Part II.A. And, in any event, the Departments' rules conflict with the statute's express terms, *see infra* Part II.B, and unreasonably tilt the IDR process in insurers' favor, *see infra* Part II.C.

### A.    Congress left no room for the Departments to dictate how arbitrators weigh the statutory factors.

It is a "core" principle of administrative law that "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Thus, an agency has no power to "supplemen[t]" a "comprehensive" statutory scheme. *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 753 (5th Cir. 2011); *see also Cent. United Life. Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016) (invalidating rule that "tack[ed] on additional criteria" to comprehensive statutory definition). The challenged provisions of the Final Rule violate this fundamental principle. The NSA's directions to the arbitrators regarding payment determinations are complete and leave no room for the Departments to impose additional restrictions on the arbitrators' weighing of the statutory factors. That is clear from at least four features of the statute.

*First*, "[i]n specific and detailed provisions," Congress "expressly and carefully" instructed the arbitrators how to make payment decisions. *DAPA*, 809 F.3d at 179. Congress started by requiring arbitrators to "select one of the offers submitted" rather than devise their own payment amount, 42 U.S.C. § 300gg-111(c)(5)(A)(i)—a requirement that, by itself, already tightly constrains arbitrators' discretion. Congress then meticulously detailed the factors that arbitrators "shall consider," *id.* § 300gg-111(c)(5)(C)(i), and "shall not consider," *id.* § 300gg-111(c)(5)(D). This "level of specificity ... effectively closes any gap the [Departments]

seek to find and fill with additional" restrictions. *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995); *see also Pork Producers*, 635 F.3d at 753 (an agency cannot "create" new provisions in "comprehensive" scheme). As the district court explained in *TMA I*, "[i]f Congress had wanted to restrict arbitrators' discretion and limit how they could consider the other factors, it would have said so—especially here, where Congress described the arbitration process in meticulous detail." 587 F. Supp. 3d at 542.

*Second*, on numerous matters of lesser significance in the IDR process, Congress *expressly* left targeted gaps for the Departments to fill. *See, e.g.*, 42 U.S.C. § 300gg-111(c)(1)(B) (the notification initiating the IDR process must contain "such information as specified by the Secretary" and the process begins upon submission of the notification or "such other date specified by the Secretary").[6] By contrast, the NSA does

---

[6] *See also* 42 U.S.C. § 300gg-111(c)(3)(A) ("[T]he Secretary shall specify criteria" for batching claims); *id.* § 300gg-111(c)(3)(A)(iv) (permitting "an alternative period as determined by the Secretary"); *id.* § 300gg-111(c)(3)(B) ("the Secretary shall provide" for the treatment of bundled payments); *id.* § 300gg-111(c)(4)(A) ("[t]he Secretary … shall establish a process to certify" IDR entities); *id.* § 300gg-111(c)(4)(A)(vii) (arbitrators must meet "such other requirements as determined appropriate by the Secretary"); *id.* § 300gg-111(c)(4)(F) ("[t]he Secretary shall … provide for a method" for selecting arbitrators); *id.* § 300gg-111(c)(7)(C) (arbitrators must "submit to the Secretary such information as the Secretary determines necessary to carry out the provisions of this subsection"); *id.*

not assign the Departments *any* role in dictating how arbitrators should weigh the statutory factors. *See DAPA*, 809 F.3d at 182 (affirming reliance on the *expressio unius* canon in administrative context). To accept the Departments' position that Congress left a "gap" for the Departments to fill regarding the way arbitrators consider the statutory factors, Br. 30–31, this Court would have to conclude that while Congress *explicitly* delegated gap-filling authority on nearly a dozen less consequential aspects of the IDR process, it *silently* delegated gap-filling authority on the aspect that was the subject of a prolonged and focused legislative debate, *see supra* at 12–14. This Court should not "suspend [its] disbelief that high." *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 462 (5th Cir. 2020).

*Third*, Congress gave decisionmaking power directly to the *arbitrators*, not to the Departments. *See* 42 U.S.C. § 300gg-111(c)(5)(A) ("*[T]he certified IDR entity* shall … select one of the offers … to be the

---

§ 300gg-111(c)(7)(D) ("[t]he Secretary shall ensure the public reporting" does not disclose privileged or confidential information); *id.* § 300gg-111(c)(8)(A) (administrative fees paid "at such time and in such manner as specified by the Secretary"); *id.* § 300gg-111(c)(8)(B) (the amount of the fee is to be "an amount established by the Secretary"); *id.* § 300gg-111(c)(9) (timing requirements modified "in cases of extenuating circumstances, as specified by the Secretary").

amount of payment …." (emphasis added)). The Departments have no role in rendering payment determinations and no authority to review the arbitrators' decisions. *See supra* at 8–10. The arbitrators are not agency employees. The Departments do not pay them or even have power to select which arbitrator presides over a dispute, unless the parties are unable to "jointly select" an arbitrator. *Id.* And the arbitrators enjoy something akin to "for cause" protection from being decertified by the Departments during the arbitrators' five-year terms. *Id.* In short, these arbitrators are "independent" of the Departments.

Congress's intention to confer discretion on the arbitrators, rather than the Departments, is further evidenced by Congress's detailed rules regarding who may serve as an arbitrator. *See* 42 U.S.C. § 300gg-111(c)(4). Congress required the Departments to ensure that arbitrators have sufficient expertise—including "medical" and "legal" expertise—to exercise the discretion vested in them. *Id.* In short, the arbitrators are independent experts, expected by Congress to bring "legal" expertise to bear when exercising the discretion conferred upon them.

*Fourth*, reading the NSA "against the backdrop of existing law" confirms that Congress granted arbitrators discretion to weigh the

statutory factors in making payment determinations. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019). Courts have long held that when Congress charges a decisionmaker with considering several factors without assigning them a procedural order or "specific weight," then the weighing of those factors is left to the decisionmaker's sound discretion. *E.g.*, *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992); *Ramirez v. ICE*, 471 F. Supp. 3d 88, 176 (D.D.C. 2020). Indeed, that principle is the foundation of this Court's frequent admonition that district courts have significant discretion to weigh the statutory factors in imposing a criminal sentence. *See, e.g.*, *United States v. Aldawsari*, 740 F.3d 1015, 1021–22 (5th Cir. 2014). Read in light of this background principle, the NSA's omission of any instruction on how to weigh the statutory factors is not a "'gap' for the [Departments] to fill," but a zone of discretion for the arbitrators to operate within. *See Gulf Fishermens*, 968 F.3d at 460 (reaffirming that not every "textual dead zone" signals a grant of agency regulatory authority).

The Departments' assertion that agencies generally "have broad authority to promulgate procedural and evidentiary rules in the context of agency-conducted adjudications" is beside the point. Br. 48 (citation

omitted). As the district court explained, IDR proceedings are not
"agency-conducted adjudications." ROA.1862. In an agency-conducted
adjudication, the agency typically reviews decisions by initial agency
adjudicators de novo, *see, e.g.*, 17 C.F.R. § 201.411(a), so it makes perfect
sense, in that context, for the agency to set rules governing those initial
adjudications. As already explained, however, Congress gave the
Departments no role in rendering payment determinations or in
reviewing the arbitrators' decisions. *See supra* at 8–10. That
distinguishes this statutory scheme from the ones at issue in the cases
relied upon by the Departments. *See Am. Hosp. Ass'n v. NLRB*, 499 U.S.
606, 611–12 (1991) (upholding NLRB rule that would "guide *its*
discretion" in its "case-by-case adjudication[s]" (emphasis added)); *Nat'l
Mining Ass'n v. Dep't of Lab.*, 292 F.3d 849, 872 (D.C. Cir. 2002)
(deferring to agency's evidentiary rule applicable to agency adjudication);
*Chem. Mfrs. Ass'n v. Dep't of Transp.*, 105 F.3d 702, 707 (D.C. Cir. 1997)
(same).

The Departments cite their general rulemaking authority to
"establish" the IDR process. 42 U.S.C. § 300gg-111(c)(2)(A). But even
when an agency has general rulemaking authority, it still may "exercise

39

discretion only in the interstices created by statutory silence or ambiguity." *Util. Air*, 573 U.S. at 326. It may not rewrite the statute under the guise of filling a supposed "statutory gap that Congress did not intend to create." *Earl v. Boeing Co.*, 515 F. Supp. 3d 590, 615 (E.D. Tex. 2021). The Departments' "argument simply misunderstands the 'basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.'" *Id.* at 618 (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)); *see also Coffelt v. Fawkes*, 765 F.3d 197, 202 (3d Cir. 2014).

Moreover, even the NSA's general grant of rulemaking authority does not direct the Departments to issue *any* regulations affecting how the independent arbitrators exercise their power. Rather, the NSA directs the Departments to establish a process "under which … *a certified IDR entity … determines, … in accordance with the succeeding provisions of this subsection*, the amount of payment." 42 U.S.C. § 300gg-111(c)(2)(A) (emphases added). The general rulemaking provision is thus limited by the *statutory* parameters on arbitrators' decisionmaking set out in "this subsection" and reiterates that *arbitrators* (not the Departments) are to determine the payment amount, and that

arbitrators must do so "in accordance with" the *statute's* instructions, not the Departments' regulations. *Cf. id.* § 300gg-111(c)(4)(A)(v) (authorizing certification process under which arbitrators ensure "confidentiality (in accordance with regulations promulgated by the [Departments])").

Of course, the general grant of rulemaking authority permits the Departments to resolve true ambiguities or fill genuine statutory gaps relating to the IDR process, *see Gulf Fishermens*, 968 F.3d at 461, and they may likewise delineate by regulation what is already express or implicit in the NSA itself. Thus, plaintiffs do not object to the rules parroting the statutory instruction that arbitrators must "consider such factors as the QPA and the level of training, experience, and quality and outcomes measurements of the provider or facility that furnished the disputed services." Br. 29. Nor do plaintiffs take issue with the rule requiring arbitrators to select the offer that "best represents the value of the … item or service," 45 C.F.R. § 149.510(c)(4)(ii)(A)—a regulation that merely states what the NSA's text and structure clearly imply. For the same reason, plaintiffs would not object to rules that make explicit a principle that implicitly constrains any decisionmaker's discretion, such as an evenhanded prohibition on considering information that is not

41

credible, *cf.* 5th Cir. Pattern Criminal Jury Instruction 1.09 (2019), or a bar on arbitrators defaulting to "any *one* factor as controlling," *Pub. Serv. Co. of Ind. v. ICC*, 749 F.2d 753, 763 (D.C. Cir. 1984).

But the rules at issue here are of a different order. They do not purport to clarify statutory ambiguities or make the implicit explicit. And there is no gap to be filled. *Compare supra* at 10–12 (detailing the NSA's comprehensive IDR instructions), *with Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 280 (2016) ("[W]hether we look at statutory language alone, or that language in context of the statute's purpose, we find … a 'gap' that rules might fill …."). Rather, these rules add requirements that are nowhere to be found in the Act and that restrict the discretion Congress unambiguously granted to the arbitrators. For that reason alone, they must be set aside.

### B.   The challenged provisions conflict with the statute.

Even if the Departments could supplement Congress's instructions to arbitrators about how to determine the payment amount, the challenged rules would still be unlawful because they conflict with the statute's text and structure. Each rule either directs arbitrators to

disregard information Congress mandated that they consider or unlawfully elevates the QPA over the other statutory factors—or both.

### 1. The "double-counting" rule

The starkest example of these conflicts is the double-counting rule. That rule prohibits arbitrators from giving weight to any non-QPA factor if it "is already accounted for by the [QPA] … or other credible information." 45 C.F.R. § 149.510(c)(4)(iii)(E). In so doing, the rule violates the NSA's mandate that arbitrators "shall consider" the non-QPA factors and improperly elevates the QPA.

The double-counting rule conflicts with the NSA's unambiguous mandate that arbitrators "shall consider" information on the non-QPA factors. *See* 42 U.S.C. § 300gg-111(c)(5)(C)(i). "[T]he mandatory 'shall' … normally creates an obligation impervious to … discretion," *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lynch*, 523 U.S. 26, 35 (1998), and Congress's command lacks qualifications or carveouts. Congress did not permit—let alone require—arbitrators to disregard information on the non-QPA factors simply because that information overlaps with the QPA or other information submitted by a party. The Departments "are not at liberty to create [such] an exception where Congress has declined to do

so." *Freytag v. Comm'r*, 501 U.S. 868, 874 (1991); *see Djie v. Garland*, 39 F.4th 280, 285 (5th Cir. 2022) ("When a regulation attempts to override statutory text, the regulation loses every time[.]").

Indeed, Congress has already specified the information that arbitrators "shall not consider" in making their payment determinations. 42 U.S.C. § 300gg-111(c)(5)(D). If Congress had intended to create an additional category of prohibited information—such as information already "accounted for" or "reflected in" the QPA—then Congress "easily could have drafted language to that effect." *Gallardo ex rel. Vassallo v. Marstiller*, 142 S. Ct. 1751, 1758 (2022). Congress did not.

The Departments nonetheless contend that they are free to impose the double-counting rule to exclude purportedly "duplicative" information. *E.g.*, Br. 2, 26. But information relevant to one of the statutory factors is not "duplicative" simply because it may be accounted for in some way by another factor. For example, a provider's "market share" may well account for the provider's "training, experience, and quality." 42 U.S.C. § 300gg-111(c)(5)(C)(ii). But both factors are still independently probative of the appropriate reimbursement rate. Congress, at least, thought so: it expressly commanded arbitrators to

consider both factors regardless of any overlap. Likewise, if Congress had thought the non-QPA factors were relevant only to the extent they were not already "accounted for" in the QPA—a median figure from 2019—it would not have mandated that the additional case-specific factors be considered *in addition* to the QPA in every case.

The Departments suggested below that the double-counting rule is consistent with the statute's mandate to "consider" all of the specified information because arbitrators still "evaluat[e]" the non-QPA information in some fashion—they just cannot "give weight to" it if it flunks the double-counting rule. ROA.584, 587. But the term "consider" means "take into account," and Congress used those terms synonymously in the relevant provisions. 42 U.S.C. § 300gg-111(c)(5)(A)(i), (C)(i). One does not take a factor into account by giving it no weight. When Congress orders a decisionmaker to "consider" a list of factors, Congress is instructing that "[e]ach factor must be given genuine consideration and some weight" in the final determination, *Pub. Serv. Co.*, 749 F.2d at 763, and the decisionmaker "is not free to ignore any individual factor entirely," *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998).

The double-counting rule also conflicts with the statute by elevating the QPA. For one thing, the double-counting rule operates to disqualify only the non-QPA factors—never the QPA—because, as a *sui generis* figure created by the NSA, the QPA could never be "accounted for" in other evidence. The Departments' justification for the rule thus focused principally on the fact that "in many cases" the non-QPA information "will already be reflected in the QPA." 87 Fed. Reg. at 52,629 (ROA.981).

Making matters worse, the double-counting rule is wholly unworkable—and unworkable in a way that will inevitably skew results toward the QPA. It is unworkable because the arbitrator is given almost no information about how the QPA was calculated or the contracted rates on which it was based. That means the arbitrator has *no way to tell* what information is and is not "accounted for" in the QPA and thus will be unable to give weight to the non-QPA factors. And that unworkability and the attendant QPA-bias that results from it are amplified by the written-explanation requirement, discussed next.

## 2.    The written-explanation requirement

The Final Rule mandates that arbitrators provide an additional explanation whenever they give weight to any factor other than the

QPA—*i.e.*, they must explain why that information is "not already reflected in the [QPA]." 45 C.F.R. § 149.510(c)(4)(vi)(B). This significant extra step makes it harder for the arbitrator to give weight to any information other than the QPA and thereby biases outcomes in favor of the offer closest to the QPA. *Cf. Peugh v. United States*, 569 U.S. 530, 541–42 (2013) (requiring judges to explain variance from Guidelines range "in practice, make[s] imposition of a non-Guidelines sentence less likely"). And unlike the supposedly evenhanded double-counting rule, the written-explanation requirement does not even pretend to be neutral. If the arbitrator gives weight *only* to the QPA, the arbitrator does not have to explain why it believed the QPA accounted for the other factors. "To treat one of the [mandatory] statutory factors in such a dramatically different fashion distorts the judgment Congress directed the [arbitrators] to make." *Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002).

The impact of this additional (and discriminatory) burden is greatly exacerbated by the fact that arbitrators will often have no way to meet their burden of explaining why information is not "reflected in" the QPA. As explained, the QPA is a black box, calculated in secret by insurers

47

with limited disclosures that give providers and arbitrators no way of telling whether a given piece of information is reflected in the QPA. *See supra* at 15. The Departments never even attempt to clarify how an arbitrator could be expected to give the required explanation. The additional-explanation requirement thus forces arbitrators to give no weight to any factor besides the QPA—thereby forcing them to select the offer closest to the QPA—because the arbitrator cannot fulfill the impossible task of explaining, in writing, why the other statutory factors were not "reflected in" the QPA.

The Departments' Example 1 illustrates this problem. It addresses a case involving a service provided by a Level 1 trauma center. *See* 45 C.F.R. § 149.510(c)(4)(iv)(A). The Departments' double-counting rule says that before the arbitrator can give any weight to the "scope of services" provided by the facility—one of the mandatory considerations—it must determine that the QPA does not already reflect that information. How is the arbitrator supposed to do this? The Departments claim that the Level 1 trauma center can provide evidence to the arbitrator demonstrating that the contracted rates on which the QPA is based are with facilities that lack the capability to provide the services of a Level 1

trauma center. *See id.* But the trauma center cannot be expected to know the "scope of services" offered by the in-network provider who agreed to be compensated at the median in-network rate. The trauma center does not have that information because providers do not, and cannot, know which providers' contracted rates were used to calculate the QPA. Only the insurer has that information, and the insurer is not required to share it. *See supra* at 15. Thus, the result is that the arbitrator cannot give weight to the fact that the service was provided by a Level 1 trauma center because the arbitrator will be unable to "explain" in its written decision why the Level 1 trauma center's "scope of services" is not "accounted for" in the QPA.

The Departments' attempts to justify this additional QPA-favoring explanatory burden are incoherent. They claim this burden is "necessary to carry out" their statutory obligations to (i) establish a methodology for calculating QPAs, 42 U.S.C. § 300gg-111(a)(2)(B), and (ii) publish a quarterly report detailing, among other things, how often payment amounts determined through IDR exceed the QPA, *id.* § 300gg-111(c)(7)(A)(v). Br. 41–42. But the Departments' reporting obligations do not require explanation of *why* the arbitrator gave weight to non-QPA

49

factors or *why* the arbitrator selected the offer it did. *See* 42 U.S.C. § 300gg-111(c)(7)(A)(v), (B)(iv). And the fact that an explanation might be useful cannot justify imposing a one-sided burden that will skew arbitration results. The Departments could not, for example, require arbitrators to explain their decisions only when they select the provider's offer and then justify the requirement on the ground that the explanation would be useful to the Departments. It is no different here.

### 3.    The QPA-first mandate

Like the written-explanation requirement, the QPA-first mandate also operationalizes the double-counting rule by forcing the arbitrator to start with the QPA so that it can view the non-QPA evidence in light of the QPA and discount that other evidence accordingly. *See* 87 Fed. Reg. at 52,628 (ROA.980). But the QPA-first mandate, too, violates the statute by unlawfully elevating a single statutory factor and circumscribing arbitrators' discretion to consider the factors in the order they see fit.

By forcing arbitrators in every case to start with the QPA and to use it as the reference point for all other information, the Departments create an "anchoring effect" on the outcome of IDR, nudging arbitrators to select the offer closer to the QPA. *See United States v. Mecham*, 950

50

F.3d 257, 268 (5th Cir. 2020) (recognizing that a sentencing guidelines range has an "anchoring effect" on the ultimate sentence imposed); *see also infra* at 61–64. As the Supreme Court has recognized in the sentencing context, that anchoring effect is often the whole point of prescribing a decisionmaker's starting point. *See Peugh*, 569 U.S. at 541–42.

But the NSA "nowhere states that the QPA is the 'primary' or most 'important factor.'" *TMA I*, 587 F. Supp. 3d at 541 (citation omitted). Instead, the NSA "clearly sets forth a list of considerations and does not dictate a procedure" or a "procedural order" for evaluating them. *See Mo.-Kan.-Tex. R.R. v. United States*, 632 F.2d 392, 412 (5th Cir. 1980). Congress knows how to say that one factor in a list is the most important. *See*, *e.g.*, Nat'l Parks Omnibus Management Act of 1998, Pub. L. No. 105-391, § 403(5)(A)(iv), 112 Stat. 3497, 3506 ("subordinat[ing]" one statutory factor to another in a multifactor list); *id.* § 403(5)(B) (authorizing agency to consider additional "secondary factors"). In other statutes, Congress has prescribed the exact decisionmaking process the Final Rule requires—looking first to one statutory factor and *then* to another. *See Ramirez*, 471 F. Supp. 3d at 176 (discussing 8 U.S.C. § 1232(c)(2)(B),

which instructs the agency to "consider placement ... *after* taking into account" other factors). But Congress "chose not to do so" in the NSA. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020). Instead, it placed all the factors on an equal footing and rejected bills that would have subordinated the other factors to the QPA. *See supra* at 12–14.

The Departments claim that "[t]he structure of the statute ... directs arbitrators to the QPA first" and, by describing the non-QPA factors as "'[a]dditional circumstances,' ... makes clear that the QPA is the starting point for the analysis." Br. 32 (quoting 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I)). But even though the Departments made the same argument almost two years ago in defending their express QPA presumption in *TMA I*, they still cannot cite a single authority for the position that one statutory factor in a list must be considered first simply because it is listed first. Of necessity, some factor must be listed first.

The "additional circumstances" heading does not change the analysis. For one thing, "[s]ubchapter heading[s] cannot substitute for the operative text of the statute." *United States v. Lawrence*, 727 F.3d 386, 393 (5th Cir. 2013). The operative text does not use the word

"additional" to describe the clause (ii) factors. Moreover, "additional" does not mean "subordinate." *See Black's Law Dictionary* (6th ed. 1990) (West) ("This term embraces the idea of joining or uniting one thing to another, so as thereby to form one aggregate."). The statute's subparagraph structure further reinforces that the clause (ii) factors are on par with the QPA: Congress pulled them out into their own separate clause and listed them at the same level of subordination—the QPA is listed in subclause (I) of clause (i), and the clause (ii) factors are listed in subclauses (I) through (V) of clause (ii). 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I), (ii)(I)–(V).

The Departments also seek to justify their QPA-first rule by observing that the QPA is a "quantitative figure," whereas information on the non-QPA factors "will often be qualitative and open to subjective evaluation." Br. 33 (quoting 87 Fed. Reg. at 52,627 (ROA.979)). But other non-QPA factors are also quantitative, such as the parties' prior contracted rates. *See* 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(V). Parties can also submit to the arbitrator their prior allowed amounts (*i.e.*, amounts the insurer previously paid for the service). *See id.* § 300gg-111(c)(5)(B)(ii) (parties may submit "any information relating to such

53

offer"); *id.* § 300gg-111(c)(5)(C)(i)(II) (arbitrators "shall consider" "any additional information provided"). Nothing in the NSA makes these quantitative figures—which may be highly probative—more "subjective" than the QPA. And nothing in the NSA makes qualitative information inferior to quantitative information.

Similarly, the Departments emphasize that the NSA makes the QPA "relevant to the arbitrator 'in all cases.'" *Id.* But that is the case only if the QPA is properly calculated. *See infra* at 59–60. Regardless, even if the QPA must always be considered, it does not follow that it must always be considered *first*. An arbitrator may find another piece of information, such as a prior contracted rate, more probative in the circumstances of a given case and wish to begin with it. *Cf. Pearson v. Callahan*, 555 U.S. 223, 242 (2009) (judges "are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case"). The NSA permits the arbitrator to do so.

### 4.    The narrow "related to" rule

The Final Rule further violates the NSA's plain terms by requiring arbitrators to disregard information on the clause (ii) factors if it does not "relate to" the parties' offers. What the Departments call a simple

"relevance requirement," Br. 37, is, in reality, a strict evidentiary burden found nowhere in the statute that requires arbitrators to ignore evidence bearing on the enumerated factors in violation of their statutory duty.

Consider the Departments' Example 2, which specifies that an arbitrator may not give weight to a provider's level of training and experience if it was not "necessary" to provide the service or did not have an "impact on the care that was provided." 45 C.F.R. § 149.510(c)(4)(iv)(B). According to the Departments, the provider's level of training and experience in such a case must be assigned zero weight because it supposedly does not "relate to" the provider's offer. That conflicts with the statute for at least two reasons.

*First*, the statute requires arbitrators to consider the provider's training and experience (along with the other clause (ii) factors), without stopping to ask whether it "relates to" the parties' offers. 42 U.S.C. § 300gg-111(c)(5)(C)(i)(II). This command is clear and unqualified. Congress did not condition arbitrators' mandatory duty to consider information on the clause (ii) circumstances on its being "related to" the parties' offers. Congress said that arbitrators "shall consider" the clause (ii) information—full stop, no exceptions.

The statute also makes clear that information "relating to" the clause (ii) circumstances *always* "relat[es] to" the parties' offers. *Id.* § 300gg-111(c)(5)(B)(ii). Congress authorized parties to submit "any information relating to" their offers, "*including* information relating to any circumstance described in subparagraph (C)(ii)"—that is, the "additional circumstances." *Id.* § 300gg-111(c)(5)(B)(ii) (emphasis added). The word "including" signals that the items that follow are an "illustrative application of the general" category described. *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941); *see also DIRECTV, Inc. v. Budden*, 420 F.3d 521, 527 (5th Cir. 2005) (defining "includes" to mean "made up of, at least in part; contain"). So Congress deemed "information relating to any" of the clause (ii) circumstances to be an "illustrative application" of "information relating to [an] offer submitted by either party." 42 U.S.C. § 300gg-111(c)(5)(B)(ii). This means that, by statutory definition, any information "relating to" a clause (ii) circumstance also "relat[es] to the offer submitted." The Departments' requirement that arbitrators ignore some subset of the information on the clause (ii) circumstances as purportedly unrelated to a party's offer thus directly conflicts with the statutory text.

*Second*, the Departments' assertion that a provider's training and experience do not "relate to" the provider's offer if they were not necessary to the service at issue or did not have an impact on the care provided is an indefensibly narrow reading of the broad term "relating to." That phrase is "conspicuous for its breadth," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992), and it certainly does not imply necessity or even causation, *see, e.g.*, *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) (concluding that relatedness demands some connection but not a causal one).

In all events, a provider's training and experience are always relevant to the appropriate reimbursement rate. There is a higher opportunity cost associated with a more highly trained and experienced physician's time. While an arbitrator may exercise its discretion to give less weight to the provider's level of training and experience if it was not needed or impactful in a specific case, that is for the arbitrator to decide. The Departments' directive, by requiring arbitrators to *always* assign this information *zero* weight in such circumstances, is contrary to Congress's command that arbitrators "shall consider" this information.

57

To be clear, plaintiffs would have no objection to a relevance requirement consistent with the statute. Nor do they object to the Departments' general definition that information "relates to" a party's offer "if it tends to show that the offer best represents the value of the item or service under dispute." 87 Fed. Reg. at 52,628 (ROA.980). The Departments could have written a lawful relevance requirement by requiring arbitrators to consider information only if it (1) bears on one of the clause (ii) circumstances or (2) otherwise relates to the parties' offers. That is what the statute already says. Instead, the Departments adopted a rule that forces arbitrators to disregard evidence that is relevant—both as a matter of congressional command and common sense.

### 5.  The lopsided credibility test

As noted, plaintiffs also would have no objection to an evenhanded credibility requirement. *See supra* at 41–42. Plaintiffs do *not* contend that arbitrators should consider noncredible information.

What makes the Departments' credibility test unlawful is that, by exempting the QPA, it treats one factor in "a dramatically different fashion" from the others and so, as with the other QPA-favoring rules, it

"distorts the judgment Congress directed the [arbitrators] to make." *Am. Corn Growers Ass'n*, 291 F.3d at 6.

Further, by prohibiting arbitrators from considering whether the QPA was correctly calculated, the Final Rule unlawfully prohibits arbitrators from considering relevant information. Consider a case in which the submitted QPA is incorrectly calculated—*e.g.*, because it includes the $0 rates the Departments have said should not be part of the QPA calculation. *See supra* at 15–16. The Departments say the arbitrator cannot consider this fact. 87 Fed. Reg. at 52,627 & n.31 (ROA.979). But the statute *requires* the arbitrator to consider it. The statute directs the arbitrator to consider the QPA "as defined in" the statute. 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I). Because an incorrectly calculated QPA is not the QPA "as defined in" the statute, there is no basis for requiring the arbitrator to consider it—much less to forbid the arbitrator from questioning its credibility and discounting its weight accordingly.

The Departments offer no reason that presuming the credibility of the QPA is consistent with the statute. They even have recognized that the QPA would "meet the credibility requirement" *only if* it is "calculated … consistent with the detailed rules issued under the [July IFR]" and

"communicated in a way that satisfies the applicable disclosure requirements." 87 Fed. Reg. at 52,627 (ROA.979). But in most cases, the QPA will be an unaudited figure unilaterally calculated by the insurer. And the Departments have acknowledged that insurers have failed to comply with the applicable calculation methodologies. *See supra* at 15–16.

To be sure, the Departments can audit QPAs. Br. 40 (citing 42 U.S.C. § 300gg-111(a)(2)(A)). But it does not follow that the statute permits (let alone requires) arbitrators to ignore relevant information bearing on a specific QPA's credibility—while at the same time scrutinizing all other information more closely.

## C. The Final Rule unlawfully reinstates the QPA-centric scheme Congress rejected.

Finally, the challenged provisions, especially when taken together, unreasonably implement the NSA and must be set aside on that basis. *See Texas*, 497 F.3d at 506. Although the Departments accuse plaintiffs of harping on "modest" and "ancillary" provisions, Br. 19, 29, the challenged rules combine to skew the IDR process in insurers' favor in a way that is "manifestly contrary" to Congress's carefully designed scheme, *DAPA*, 809 F.3d at 182. The Departments' policy preferences

cannot justify disrupting the "finely-tuned balance between the interests of" healthcare providers and insurers that "Congress struck" after extensive deliberation and debate on this very issue. *Texas*, 497 F.3d at 506. As this Court has recognized, agency rules that effectively reinstate a system Congress considered and rejected are unreasonable. *See id.* That is precisely what the Departments' QPA-centric Final Rule does.

The Departments profess doubt that their "modest" rules could possibly "have the effect on independent arbitrators that plaintiffs posit." Br. 26. But consider the differences between the NSA's prescribed process and the one the Final Rule imposes. Under the NSA, an arbitrator must consider the QPA, the five other factors, and any other relevant information in deciding which offer to accept. The arbitrator may not consider the three prohibited factors. The rest is left up to the arbitrator's sound discretion. By contrast, the Final Rule dictates a procedure that focuses first and foremost on the QPA (which an arbitrator may not question) and then forces the arbitrator to clear multiple hurdles before giving weight to the information on the non-QPA factors. *See supra* at 19–23. If an arbitrator gives *any* weight to a non-QPA factor, then the arbitrator must explain to the Departments in writing why the non-QPA

evidence is "not already reflected in the [QPA]," 45 C.F.R. § 149.510(c)(4)(vi)(B), even though providers and arbitrators are given almost no information about the contracted rates used to calculate the QPA, *see id.* § 149.140(d) (requiring insurers to share almost no information about the QPA).

The Departments' Example 3 illustrates how their scheme anchors arbitrators to the QPA. Example 3 says that if the QPA is for a service whose billing code reflects high patient acuity, then the arbitrator may not give any weight to case-specific evidence of high acuity. *Id.* § 149.510(c)(4)(iv)(C). Suppose, however, that the arbitrator also has before it the parties' prior contracted rates for a similar service involving *lower* patient acuity, and those rates are *higher* than the QPA. Absent the Departments' rules, the arbitrator might find the parties' prior contracted rates more probative than the QPA and wish to begin with them, and then adjust upward based on the case-specific evidence of high acuity. The Departments' rules, however, force the arbitrator to begin with the QPA, then discard the case-specific acuity evidence—evidence that is highly probative and that Congress required arbitrators to consider in addition to the QPA.

This lopsided regime makes the QPA the centerpiece of the IDR process and prevents (or, at the very least, discourages) arbitrators from giving weight to any other non-QPA information. It is immaterial that the Final Rule disclaims an express QPA presumption, *see* Br. 25, 40, and pays lip service to an arbitrator's duty to choose the offer that "best represents the value of the [qualified IDR] item or service," Br. 34 (quoting 45 C.F.R. § 149.510(c)(4)(ii)(A)). The problem with the Final Rule is not its specification of the ultimate standard governing the payment determination, but rather its requirement that arbitrators must make that determination "weighing only the considerations" that the Final Rule permits the arbitrators to weigh. 45 C.F.R. § 149.510(c)(4)(ii)(A). The Final Rule elevates the QPA by ensuring that it will always be weighed, while keeping other relevant evidence off the scales. And by so doing, the Final Rule usurps the discretion that Congress deliberately conferred on the independent arbitrators, rather than the Departments.

In the district court, the Departments accused plaintiffs of premising this impact on "armchair psychology," ROA.593, or imputing "bad faith and laziness to the arbitrators," ROA.589. But "anchoring bias"

is not an "armchair" theory; it is a "well-documented" phenomenon that "persists even when the anchoring information is arbitrary or even entirely random." ROA.324–27 (Br. of Physicians Advoc. Inst. *et al.*); *see also Mecham*, 950 F.3d at 268 (recognizing "anchoring effect" in sentencing context). There is nothing "random" about the QPA's "anchoring" role. And it does not take a psychology PhD to see that the Final Rule encourages arbitrators to favor the QPA and downplay other factors. It just takes common sense, as does understanding that arbitrators—who are paid by the claim and not the hour—will give short shrift to information they must jump through hoops to consider. ROA.397–98 (Br. of Am. Med. Ass'n *et al.*) (noting that arbitrators "receive a modest flat-rate payment" of a few hundred dollars per claim and their decisions are typically only "a single paragraph or two"). Arbitrators who succumb to the Departments' not-so-subtle pressure to choose the offer closest to the QPA are not dishonest or lazy—just human.

The Departments let slip to the district court that such pressure was precisely their goal when they argued that the NSA "would not succeed" if the IDR process "result[ed] routinely in payments greater than [the QPA]." ROA.565. Notwithstanding the Departments' candor

below, they now fault the district court for inferring that the agencies "have not relinquished their goal of privileging the QPA." Br. 50 (quoting ROA.1864).[7] But whatever the Departments' intent, the *effect* of their rules renders them unreasonable. Rules skewing IDR results in favor of the QPA are just as unlawful whether the Departments' goal is to reduce healthcare costs by lowering out-of-network rates toward the QPA (the policy goal asserted by the Departments in *TMA I* to defend their interim rule imposing the QPA presumption, *see* 86 Fed. Reg. at 55,980, 56,061) or whether the goal is (as the Departments now contend) to enhance "consistency" and "predictability"—by ensuring that IDR results consistently and predictably hew to the QPA.

To be sure, IDR results would be more predictably uniform under the Final Rule than under the process Congress prescribed. The offer closest to the QPA—that is, the insurer's offer—would more predictably

---

[7] There is no basis for the Departments' claim that this reasonable inference violates the "presumption of regularity" or vitiates the district court's numerous other independent reasons for holding the Final Rule unlawful. Br. 50–51 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)). The district court declined to impute bad faith to the Departments, concluding that, "[a]lthough mistaken, the Departments attempted to draft a rule in accord with the statute and the Court's prior order." ROA.1867 n.13.

65

be chosen under the Final Rule. But even if predictability and uniformity were the purposes underlying the NSA, the Departments are "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994). And here Congress's chosen "means" for determining out-of-network reimbursement did not involve anchoring payment determinations to the QPA.

The "means" Congress chose were the result of extensive deliberation and compromise. Congress considered multiple approaches, including proposals that would have prioritized the QPA in various ways. *See supra* at 12–14. But Congress ultimately rejected these proposals, opting instead for a compromise in which arbitrators must consider *all* relevant information in determining which offer to select. "[A]gencies must respect and give effect to these sorts of compromises." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 94 (2002). Courts have consistently warned against supplementing legislation with terms that Congress considered and rejected. *See, e.g.*, *Doe v. Chao*, 540 U.S. 614, 622–23 (2004); *Smith v. United States*, 507 U.S. 197, 203 n.4 (1993). By

66

doing just that, the Final Rule impermissibly "negates the congressional compromise that was ultimately embodied in the statutory text." *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1264 (D.C. Cir. 2014) (Kavanaugh, J., dissenting), *rev'd sub nom. Michigan v. EPA*, 576 U.S. 743 (2015).

## III. The District Court Did Not Abuse Its Discretion By Vacating The Final Rule's Unlawful Provisions.

The Departments argue that the district court's vacatur was erroneous for three reasons. *First*, the APA does not authorize vacatur at all. *Second*, even if it could have vacated the Final Rule, it should have remanded without vacatur here. And *third*, whatever remedy the court ordered, it should have been limited to the parties. Each argument fails.

Binding precedent forecloses the Departments' first argument: § 706 of the APA "empowers and commands courts to 'set aside' unlawful agency actions," and thus allows a "district court's vacatur [to] rende[r] the [challenged agency action] void." *Texas v. Biden*, 20 F.4th 928, 957 (5th Cir. 2021) (*MPP*), *rev'd on other grounds sub nom. Biden v. Texas*, 142 S. Ct. 2528 (2022); *see also Data Mktg. P'ship*, 45 F.4th at 856 n.2, 859 (holding that this portion of *MPP* "remains binding"); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir.

2022). Indeed, just last Term the Solicitor General told the Supreme Court that, in this Circuit, vacatur is a statutorily authorized remedy in an APA action. *See* Brief for Petitioners at 40, *United States v. Texas*, No. 22-58 (U.S. Sept. 12, 2022) ("[U]nder Fifth Circuit precedent, vacatur renders an agency decision 'void.'" (quoting *MPP*, 20 F.4th at 957)).

That binding precedent flows from the plain language and statutory history of the APA. Section 706(2)(A) requires courts to "set aside" unlawful agency action, and when the APA was enacted, "set aside" meant "to cancel, annul, or revoke." *Black's Law Dictionary* 1612 (3d ed. 1933). Vacatur was a commonplace and well-understood remedy in the "appellate review model that supplied the rubric for judicial review of administrative action in the pre-APA period and that was then incorporated into the APA." Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1133 (2020). In short, contrary to the Departments' one-sided presentation, "[t]houghtful arguments and scholarship exist on both sides of the debate." *United States v. Texas*, 143 S. Ct. 1964, 1985 (2023) (Gorsuch, J., concurring in the judgment). But this Court has already taken a side—and it is not the Departments'.

The Departments' plea for remand without vacatur likewise runs into a wall of contrary precedent.[8] "[B]y default, remand *with* vacatur is the appropriate remedy." *MPP*, 20 F.4th at 1000; *accord Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality) ("[V]acatur of an agency action is the default rule in this Circuit."), *petition for cert. filed*, No. 22-976 (U.S. Apr. 7, 2023). Remand without vacatur is reserved for "rare cases," *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019), in which there is "at least a serious possibility" that the deficiencies can be corrected on remand and vacatur would have "disruptive consequences," *MPP*, 20 F.4th at 1000.

The Departments have not justified deploying this remedial exception here. They do not even try to explain how they could correct the Final Rule's flaws on remand. Nor could they. The Final Rule is unlawful because the Departments have no authority to issue rules in this area *at all*, and even if they did, this particular rule runs contrary to the NSA's

---

[8] After questioning whether the APA authorizes vacatur, the Departments' request for remand without vacatur is ironic given that judges and scholars for decades have argued that the APA does not permit remand without vacatur. *See, e.g.*, *Checkosky v. SEC*, 23 F.3d 452, 493 (D.C. Cir. 1994) (Randolph, J., concurring); Brian S. Prestes, *Remanding Without Vacating Agency Action*, 32 Seton Hall L. Rev. 108, 136 (2001).

text, structure, purpose, and history. No additional explanation, factfinding, or notice-and-comment period could fix those fundamental legal flaws. *See Texas*, 50 F.4th at 529 ("There is no possibility that DHS could obviate these conflicts on remand."). Tellingly, the Departments do not cite a single precedent of this Court ordering remand without vacatur when the challenged agency action conflicted with the governing statute. *Cf., e.g.*, *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021) (remanding without vacatur so agency could "allow industry to comment" and "consider" certain costs); *Cent. & S.W. Servs., Inc v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur so agency could "justify" its decision).

Nor do the Departments explain how vacatur would cause disruption. As the district court rightly found, vacatur merely "preserve[s] the status quo because arbitrators have been—and are presently—deciding payment disputes pursuant to the statute." ROA.1866. The Departments provide no evidence that this state of affairs—the one dictated by Congress—is not working, let alone that it is so dysfunctional as to warrant departure from the normal APA remedy.

Finally, the Departments' vague request for party-specific "equitable" relief is as puzzling as it is wrong. Br. 54–55. To the extent the Departments want vacatur "only with respect to the plaintiffs," *id.* at 55, their request is nonsensical. This Court has already held that, consistent with the text of § 706(2), vacatur operates on the rule, not the parties. *See MPP*, 20 F.4th at 957 ("[T]he district court's vacatur rendered the June 1 Termination Decision *void*." (emphasis added)); *see also Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521–22 (7th Cir. 2021) (contrasting an injunction, which "operates on the enjoined officials," with vacatur, which "unwinds the challenged agency action"). Party-specific vacatur is, in short, an oxymoron.

Perhaps, then, the Departments want this Court to reverse the district court's vacatur and instead issue a party-specific *injunction*. But the Supreme Court has been clear that the "extraordinary relief of an injunction" is not warranted when "a less drastic remedy"—including "partial or complete vacatur"—is available. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). The Departments' "position on the scope of [relief] also sits awkwardly with [their] position on the merits." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 388 (5th Cir. 2023)

71

(en banc), *petition for cert. filed*, No. 23-60 (U.S. July 21, 2023). An injunction requiring arbitrators to apply different procedures depending on the identity of the parties would undermine the very "uniformity and predictability across arbitrations" that—according to the Departments— is critical to "Congress's specification that there should be 'one' [IDR] process." Br. 2. *Cf. Feds for Med. Freedom*, 63 F.4th at 388 (affirming nationwide injunction where limited relief would "prove unwieldy and would only cause more confusion"); *DAPA*, 809 F.3d at 187–88 (same in light of need for uniformity of immigration laws).

In short, the district court did not abuse its discretion in vacating the challenged portions of the Final Rule.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment in all respects.

Respectfully submitted,

Dated: September 11, 2023        */s/ Eric D. McArthur*

ERIC D. MCARTHUR
   *Counsel of Record*
BRENNA E. JENNY
MANUEL VALLE
CODY AKINS
SIDLEY AUSTIN LLP
1501 K Street, NW

Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8011
Email: emcarthur@sidley.com

JAIME L.M. JONES
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-0751
Fax: (312) 853-7036
Email: jaime.jones@sidley.com

***Counsel for Plaintiffs-Appellees***

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2023, a copy of the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Eric D. McArthur*
Eric D. McArthur

# CERTIFICATE OF COMPLIANCE

This document complies with this Court's Order of August 28, 2023, permitting a brief not in excess of 15,000 words because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and Fifth Circuit Rule 32.2, this document contains 14,219 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

Dated: September 11, 2023                    */s/ Eric D. McArthur*
                                            Eric D. McArthur