No. 23-40217

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Texas Medical Association; Tyler Regional Hospital, L.L.C.; Doctor
Adam Corley, *Plaintiffs–Appellees,*
v.
United States Department of Health and Human Services; Department
of Labor; Department of the Treasury; Xavier Becerra, Secretary, U.S.
Department of Health and Human Services; Julie A. Su, Acting
Secretary, U.S. Department of Labor; Janet Yellen, Secretary, U.S.
Department of Treasury, *Defendants–Appellants.*

———————————————

Lifenet, Incorporated; East Texas Air One, *Plaintiffs–Appellees,*
v.
United States Department of Health and Human Services; Xavier
Becerra, Secretary, U.S. Department of Health and Human Services;
United States Department of the Treasury; Janet Yellen, Secretary,
U.S. Department of Treasury; United States Department of Labor; Julie
A. Su, Acting Secretary, U.S. Department of Labor; United States Office
of Personnel Management; Kiran Ahuja, *Defendants–Appellants.*

———————————————

On Appeal from the United States District Court
for the Eastern District of Texas, Tyler Division

———————————————

**BRIEF FOR *AMICI CURIAE* AMERICAN HOSPITAL
ASSOCIATION AND AMERICAN MEDICAL ASSOCIATION IN
SUPPORT OF PLAINTIFFS-APPELLEES**

———————————————

Zhen He Tan
AKIN GUMP STRAUSS HAUER &
FELD LLP
100 Pine Street, Suite 3200
San Francisco, CA 94111

James E. Tysse
Kelly M. Cleary
AKIN GUMP STRAUSS HAUER &
FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
202-887-4000
jtysse@akingump.com

*Counsel for Amici Curiae American Hospital Association and
American Medical Association*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel for *amici curiae* certifies that the following listed persons and entities, in addition to those listed in the briefs of the parties and other *amici curiae*, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Amici Curiae on this Brief**
American Medical Association
American Hospital Association

**Counsel for Amici Curiae on this Brief**
James E. Tysse
Kelly M. Cleary
Zhen He Tan
AKIN GUMP STRAUSS HAUER & FELD LLP

The *amici curiae* associations on this brief are non-profit organizations that have no parent corporations. No publicly traded corporation has any ownership interest in either of the *amici curiae*.

<u>s/James E. Tysse</u>
James E. Tysse
*Counsel for amici curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................... i

INTEREST OF *AMICI CURIAE* ............................................................ 1

INTRODUCTION ................................................................................. 3

ARGUMENT ........................................................................................ 6

    I.      BOTH IN INTENT AND EFFECT, THE FINAL RULE PLACES A THUMB ON THE SCALE IN FAVOR OF INSURERS ............................................................................. 6

        A.    The Final Rule Is A Continuation Of The Departments' Consistent And Intentional Interference With The IDR Process ............................. 6

        B.    The Final Rule Has The Practical Effect Of Coercing Arbitrators To Overweight The QPA ......... 10

            1.    Requiring Arbitrators To Discount Factors Already "Accounted For" By The QPA Impermissibly Elevates The QPA Factor ......... 11

            2.    Requiring Arbitrators To Explain Only Why They Did Not Find A Factor Accounted For In The QPA Impermissibly Elevates The QPA Factor ......................................................... 15

            3.    Requiring Arbitrators To Consider Only Evidence That Relates To The Specific Item Or Service Under Dispute Impermissibly Elevates The QPA Factor ................................. 17

            4.    The Final Rule's Remaining Requirements And Restrictions Further Impermissibly Elevate The QPA Factor ................................... 19

II.   THE      DEPARTMENTS'   *AMICI*   CANNOT
      REHABILITATE THE FINAL RULE ............................... 21

      A.   The QPA Is Not A Reasonable, Objective, Or
           Credible Measure of Market Rates........................... 21

      B.   Providers' Acceptance Of Pre-IDR Offers Does Not
           Reflect Agreement With QPA Rates......................... 25

      C.   The Departments' Guidance Is Not Necessary To
           Ensure Fair IDR Results ......................................... 28

III.  THE FINAL RULE WILL HARM PATIENTS AND
      PROVIDERS ...................................................................... 31

CONCLUSION ..................................................................... 35

CERTIFICATE OF SERVICE............................................... 36

CERTIFICATE OF COMPLIANCE....................................... 37

# TABLE OF AUTHORITIES

<u>CASES</u>:

*Dep't of Commerce v. New York,*
139 S. Ct. 2551 (2019) .............................................................. 7

*Huawei Techs. USA, Inc. v. FCC,*
2 F.4th 421 (5th Cir. 2021) ...................................................... 20

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019) ............................................................. 24

*Landstar Express Am., Inc. v. Federal Maritime Comm'n,*
569 F.3d 493 (D.C. Cir. 2009) ................................................. 20

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.,*
2023 WL 1781801 (E.D. Tex. Feb. 6, 2023) ("*TMA II*") ................. 6, 29

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.,*
587 F. Supp. 3d 528 (E.D. Tex. 2022) ("*TMA I*") ............... 8, 12, 20, 21

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.,*
2023 WL 4977746 (E.D. Tex., Aug. 3, 2023) ("*TMA III*") ......... 8, 26, 27

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.,*
2023 WL 5489028 (E.D. Tex., Aug. 24, 2023) ("*TMA IV*") ... 8, 9, 23, 24

*United Parcel Serv., Inc. v. Postal Regul. Comm'n,*
955 F.3d 1038 (D.C. Cir. 2020) ....................................... 11

<u>STATUTES</u>:

42 U.S.C.
§ 300gg-111(a)(2)(A)(ii) ........................................................ 22
§ 300gg-111(a)(3)(E)(i) ......................................................... 24
§ 300gg-111(c)(5) .................................................................. 20
§ 300gg-111(c)(5)(C) .......................................................... 3, 11
§ 300gg-111(c)(5)(C)(ii) ....................................................... 18
§ 300gg-111(c)(5)(D) ............................................................ 11

R<span>ULES AND</span> R<span>EGULATIONS</span>:

45 C.F.R.
   § 149.140(a)(1)....................................................................23
   § 149.140(a)(12)..................................................................24
   § 149.140(b)(2)(iv) ...............................................................9
   § 149.140(d) .......................................................................22
   § 149.510(c)(4)(ii) ................................................................7
   § 149.510(c)(4)(iii) .................................................11, 17, 19
   § 149.510(c)(4)(vi) .............................................................15

Fed. R. App. P. 29(a)(4)(E) .......................................................1

86 Fed. Reg. 36,872 (July 13, 2021) .....................................22

86 Fed. Reg. 55,980 (Oct. 7, 2021)....................................7, 35

87 Fed. Reg. 52,618 (Aug. 26, 2022)...............11, 12, 13, 14, 17

O<span>THER</span> A<span>UTHORITIES</span>:

American Hospital Association, *No Surprises Act
Independent Dispute Resolution Process* (Feb. 15, 2023)..................27

American Medical Association, *AMA Recommendations to
Resolve NSA-Related Problems* (May 16, 2023) .....................26, 27, 32

Avalere Health, *PCP Contracting Practices and Qualified
Payment Amount Calculation Under the No Surprises Act*
(Aug. 2, 2022) .......................................................................24

CMS, *Calendar Year 2023 Fee Guidance for the Federal
Independent Dispute Resolution Process under the No
Surprises Act* (Oct. 31, 2022) .............................................17

CMS, *Federal Independent Dispute Resolution Process –
Status Update* (Apr. 27, 2023) ............................................29

CMS, *Initial Report on the Independent Dispute Resolution
(IDR) Process, April 15 – September 30, 2022*...................29

Emergency Department Practice Management Association,
*Data Analysis: No Surprises Act Independent Dispute
Resolution Effectiveness* ........................................................ 28

H.R. Rep. No. 116-615 (2020) ........................................ 3, 10, 20

Letter from AMA to the Departments (Jan. 23, 2023) .......................... 22

Letter from American College of Emergency Physicians to
Members of the North Carolina Congressional Delegation
(Dec. 9, 2021) .................................................................... 33, 34

Letter from Sen. Bill Cassidy, M.D., to Hon. Xavier Becerra,
Sec'y., Dep't of Health and Hum. Servs. 12 (Aug. 10, 2023) .............. 23

Press Release, Sen. Bill Cassidy, M.D., *Ranking Member
Cassidy Again Calls on HHS to Implement No Surprises
Act as Congress Intended* (Aug. 10, 2023) ............................. 9

Tepper, Nona, *Coming to a contract negotiation near you: the
No Surprises Act*, MODERN HEALTHCARE, Aug. 3, 2022 ................. 32

U.S. Departments of Labor, Health and Human Services, &
Treasury, *FAQs About Affordable Care Act and
Consolidated Appropriations Act, 2021 Implementation
Part 55* (Aug. 19, 2022) .............................................. 24, 25

## INTEREST OF *AMICI CURIAE*[1]

The American Medical Association is the largest professional association of physicians, residents, and medical students in the United States. The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes. AMA members practice in every state and in every medical specialty.

The American Hospital Association represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations. Founded in 1898, the AHA educates its members on healthcare issues and advocates on their behalf so that their perspectives are heard and addressed in national health policy development, legislative and regulatory debates, and judicial matters. Its members are committed to improving the health of the communities that they serve, and to helping ensure that care is available to and affordable for all Americans.

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than *amici*, their members, and their counsel) have contributed money to fund the preparation or submission of this brief.

1

*Amici* engage in advocacy efforts to support the interests of physicians and hospitals nationwide.  As part of those efforts, *amici* regularly file *amicus curiae* briefs in cases of importance to their members, including in the district court below.  *Amici* agree with Plaintiffs-Appellees that the challenged rule is unlawful.  They submit this brief to emphasize why it is also unworkable as a practical matter, to rebut specific points made by the *amici* supporting the Departments, and to explain the detrimental impact the rule would have on the ability of physicians and hospitals to provide their patients with the excellent care they deserve.

## INTRODUCTION

No one disputes that Congress's principal intention in enacting the No Surprises Act (NSA) was to shield patients from unexpected medical bills. The AHA, the AMA, and their members strongly support this goal. But in "tak[ing] the consumer out of the middle" of billing disputes, Congress understood the need to establish a fair mechanism for healthcare providers and insurers to determine fair payment among themselves. H.R. Rep. No. 116-615, at 56-58 (2020) (quotation marks omitted). To "strike[] an appropriate balance," Congress coupled a "benchmark rate model" with an independent dispute resolution (IDR) process. *Id.* Under this "baseball-style" process, *id.*, arbitrators "shall consider" a list of statutorily enumerated factors in deciding between an insurer's or provider's offers, 42 U.S.C. § 300gg-111(c)(5)(C). The AMA and AHA supported this congressionally designed compromise, which both protected patients from surprise medical bills and established an intentionally balanced approach that did not skew towards either providers or insurers.

Since the enactment of the NSA however, the Departments of Health and Human Services, Labor, and the Treasury, along with the

Office of Personnel Management ("the Departments") have repeatedly sought to tilt the scales. *Amici* agree with Plaintiffs-Appellees and the district court that the Final Rule disrupts Congress's balanced framework by overweighting the importance of the insurer-calculated Qualifying Payment Amount (QPA) at the expense of the other statutorily enumerated factors. The AMA and AHA file this brief to emphasize three points that further demonstrate the flaws and dangers of the Final Rule.

*First*, the Final Rule places a heavy thumb on the scale in favor of insurers in the IDR process—indeed, it is deliberately designed to have that effect. On multiple occasions the Departments have been found to have acted in a manner contrary to the NSA and the Administrative Procedure Act (APA)—each time issuing rules that systematically disadvantage providers. Informed by their real-world experiences of having to arbitrate and settle payment disputes, members of the AHA and AMA are keenly aware of the ways in which the Departments' supposedly "modest procedural" impositions on arbitrators (AOB 27) will routinely lead to skewed outcomes in favor of insurers, at the expense of fair compensation for providers.

4

*Second*, the insurer interests and other *amici* lined up in support of the Departments have made several faulty assertions that warrant specific rebuttal.  While touting the inherent credibility of the QPA, these *amici* fail to address the fact that insurers have been empowered by the Departments—via regulations that have since been declared unlawful—to calculate the QPA in a manner that will systematically drive it below market rates.  These *amici*'s separate suppositions that providers are generally happy with being paid at or below the QPA, and that arbitrators cannot be trusted in the absence of the Departments' interference, are unmoored from reality.  They provide no valid justification for the Final Rule's deviation from the statutory text and design.

*Finally*, the Final Rule jeopardizes the NSA's overarching goal of patient protection—and in fact threatens serious harm.  If the Final Rule is allowed to stand, insurers will be further emboldened to continue insisting on below-market rates, with the comfort that the Final Rule's overemphasis on the QPA will give them the upper hand if the dispute ever reaches an arbitrator.  Worse still, given the Departments' demonstrated preference for the QPA, insurers have already offered

drastically reduced rates to *in-network* providers, threatening to terminate contracts if providers do not acquiesce. Over time, these artificially low rates and disproportionate consolidated power in the hands of insurers will compound, leading to destabilizing market effects—threatening the viability of physician practices and the scope of medical services nationwide. Ultimately, the victims will be the patients who will lose access to care.

## ARGUMENT

### I.    BOTH IN INTENT AND EFFECT, THE FINAL RULE PLACES A THUMB ON THE SCALE IN FAVOR OF INSURERS

#### A.    The Final Rule Is A Continuation Of The Departments' Consistent And Intentional Interference With The IDR Process

As the district court below recognized, the Final Rule must be understood as just one in a series of the Departments' attempts to interfere with congressional design (and favor insurers) through the rulemaking process. *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 2023 WL 1781801, at *12 (E.D. Tex. Feb. 6, 2023) ("*TMA II*"). These repeated attempts by the Departments to tilt the IDR process in one direction—in the teeth of congressional intent to create a balanced process, and in ways that flagrantly exceed their NSA authority—should

6

inform this Court's assessment of the lawfulness of the Final Rule.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (in evaluating the lawfulness of agency action, courts are "not required to exhibit a naiveté from which ordinary citizens are free") (internal quotations omitted).

On three separate occasions, the Departments' NSA regulations have been set aside for substantive and procedural APA violations. *First*, in the predecessor to the Final Rule now on appeal, the Departments issued an interim rule that similarly prioritized the QPA in a manner contrary to the NSA, by requiring arbitrators to "select the offer closest to the [QPA]" unless "credible" information "clearly demonstrates that the [QPA] is materially different from the appropriate out-of-network rate."  45 C.F.R. § 149.510(c)(4)(ii).  In the Departments' own words, the interim rule created a "rebuttable presumption" that the amount closest to the QPA was the proper payment amount.  *See* 86 Fed. Reg. 55,980, 56,056-61 (Oct. 7, 2021).  The district court set aside that rule based on a square conflict with the NSA, which "plainly requires arbitrators to consider all the specified information in determining which offer to select" and nowhere instructs them "to weigh any one factor or

7

circumstance more heavily than the others." *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528, 541 (E.D. Tex. 2022) ("*TMA I*"). The Departments did not pursue an appeal.

*Second*, the Departments were again found to have violated the APA by issuing other rules without following proper notice and comment procedures. Those rules "dramatically increased the administrative fee for participating in the arbitration process" and restricted the ability for providers to "batch" related claims for resolution in a single arbitration. *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 2023 WL 4977746, at *1 (E.D. Tex., Aug. 3, 2023) ("*TMA III*"). Notably, the district court rejected the Departments' attempts to cast those rules as harmless procedural interpretations, instead recognizing the systematic prejudice those rules would impose on providers—including by making it "cost prohibitive for many providers" to submit their claims to the IDR process. *Id.* at *9, *11.

*Third*, the district court also set aside the Departments' regulations concerning how insurers should calculate the QPA. *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 2023 WL 5489028 (E.D. Tex., Aug. 24, 2023) ("*TMA IV*"). Among other things, the Departments' regulations

deviated from the NSA by allowing insurers to calculate the QPA using seldom or even never-provided services, including services furnished by providers in different specialties; to "[e]xclude" from their calculations any "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments," 45 C.F.R. § 149.140(b)(2)(iv); and to calculate a QPA based on rates used by *other* health plans, *id.* § 149.140(a)(8)(iv). *See TMA IV* at *5-10. Collectively, these defects had the systematic effect of "driv[ing] the QPA downward," leading to artificially low prices that do not reflect true market rates. *Id.* at *9.

In short, throughout the rulemaking process, the Departments' regulations have repeatedly failed to establish an IDR process that resembles Congress's intentionally balanced design. Instead, in the words of the ranking member of the Senate Committee on Health, Education, Labor and Pensions, the Departments have "continued to ignore and deviate from statutory instructions explicitly included in the [NSA], creating confusion and uncertainty for patients, health care providers, and other stakeholders." Press Release, Sen. Bill Cassidy, M.D., *Ranking Member Cassidy Again Calls on HHS to Implement No*

*Surprises Act as Congress Intended* (Aug. 10, 2023).[2]  The Final Rule must be understood against this backdrop of repeated efforts by the Departments to tilt the scales against providers in a manner that openly and directly contradicts the NSA.

### B.     The Final Rule Has The Practical Effect Of Coercing Arbitrators To Overweight The QPA

Given this clear intent, it is no surprise that the Departments' Final Rule has the practical effect of overweighting the QPA over other important quality-assuring and market-stabilizing factors, at the expense of providers.  As associations of hospitals and physicians with experience in both negotiating payment disputes and participating in NSA arbitrations, the AMA and AHA can attest to how the Final Rule's atextual impositions will have the real effect of removing the "flexibility" that Congress intended to provide to arbitrators, H.R. Rep. No. 116-615, at 58, instead skewing the IDR process systematically toward the insurer-calculated QPA.

---

[2]                         https://www.cassidy.senate.gov/newsroom/press-releases/ranking-member-cassidy-again-calls-on-hhs-to-implement-no-surprises-act-as-congress-intended.

       *1.    Requiring Arbitrators To Discount Factors Already "Accounted For" By The QPA Impermissibly Elevates The QPA Factor*

The first problem with this Final Rule is its extra-statutory requirement that arbitrators ignore any information relating to the non-QPA factors if those factors have already been "accounted for by the [QPA]." 45 C.F.R. § 149.510(c)(4)(iii)(E). The statute does not say that. Instead, the NSA is clear in what information arbitrators should *not* consider, while vesting discretion in the arbitrator to determine what weight to give each enumerated factor. 42 U.S.C. §§ 300gg-111(c)(5)(C), (D). The Departments cannot therefore require the arbitrator to "accord [a non-QPA factor] appropriate weight" only "[t]o the extent [the] factor is not already reflected in the QPA." 87 Fed. Reg. 52,618, 52,629 (Aug. 26, 2022). Where Congress mandates consideration of a factor, the decisionmaker must give it individualized and independent consideration, regardless of whether the factor "has arguably [already been] considered" elsewhere. *United Parcel Serv., Inc. v. Postal Regul. Comm'n*, 955 F.3d 1038, 1042 (D.C. Cir. 2020).

Practically speaking, the Departments' requirement will be entirely unworkable for providers in ways that also directly conflict with the

11

NSA's framework. Although the Departments suggest that providers can argue to the arbitrator that a mandated factor is "not accounted for in the QPA," 87 Fed. Reg. at 52,629, they have given providers an uphill if not impossible task. Insurers "hold ultimate power—and are charged by regulation—to calculate the QPA." *TMA I*, 587 F. Supp. 3d at 535. They are not required to give providers any information about whether or how the QPA is calculated, much less how it accounts for the other mandated factors. To providers, the makeup of the QPA is essentially a black box.

Providers thus have no way to assess—much less contest—whether the QPA accounts for another given factor when providers and insurers simultaneously submit their offers to the IDR arbitrator. For instance, a physician may submit considerable evidence that her specialized training supports an offer higher than the QPA. But if an insurer claims the QPA already "accounts" for that training, the arbitrator—who must treat the QPA as credible so long as it is calculated and communicated according to regulatory requirements, 87 Fed. Reg. at 52,627—will have no basis on which to disregard the insurer's representation.

Still worse, an arbitrator is powerless to consider evidence regarding a non-QPA factor ostensibly "accounted for" in the insurer-

calculated QPA, *even if* the arbitrator disagrees with the weight the insurer gave it and *even if* this disagreement materially affects the selection of the final rate. For example, although a given QPA may "account" for physician training in a general sense, a physician might still wish to provide—and the arbitrator might wish to consider—evidence related to why specialized training justifies a higher rate in the context of a *specific item or service*. But only if "a factor is not already reflected in the QPA" is an arbitrator permitted to "accord that factor appropriate weight based on information related to it provided by the parties." 87 Fed. Reg. at 52,629. The result is that even if a provider—despite having no real visibility into the QPA—could explain why a particular QPA does not adequately account for her training, the arbitrator must ignore her evidence so long as, according to the insurer, the QPA accounts for that training *in some way*.

The power that the Final Rule confers on the QPA is made stark by the Departments' example of "an emergency department visit for the evaluation and management of a patient." 87 Fed. Reg. at 52,629. In this example, the provider first submits "an offer that is higher than the QPA," as well as "information showing that the acuity of the patient's

condition and the complexity of the qualified IDR service required the taking of a comprehensive history, a comprehensive examination, and medical decision making of high complexity." *Id.* The insurer in turn submits an offer that is identical to the QPA, as well as effectively unrebuttable information showing that the QPA "accounts for the acuity of the patient's condition" and the complexity of the service. *Id.* According to the Departments, if "the information on the acuity of the patient and complexity of the service is already accounted for in the calculation of the QPA," the certified arbitrator simply "*should not give weight* to the additional information provided by the" provider. *Id.* at 52,629-630 (emphasis added). The end result is clear: forced by the Departments to ignore relevant information submitted by providers, the arbitrator will end up choosing the offer closest to the QPA.

In short, the Departments have not only made it virtually impossible for providers to rebut claims of double counting, but also snatched the decision of *how* to weigh the various statutorily mandated factors from the hands of the arbitrator—*i.e.*, the independent entity Congress selected—and placed it squarely in the hands of self-interested insurers.

14

2.   *Requiring Arbitrators To Explain Only Why They Did Not Find A Factor Accounted For In The QPA Impermissibly Elevates The QPA Factor*

Not satisfied with imposing on providers the virtually insurmountable obstacle of showing that a factor is not already "accounted" for in the QPA, the Departments ensured that those fortunate enough to overcome it will rarely get relief. That is because the Departments impose a particular writing requirement on only those arbitrators who might wish to consider non-QPA factors—even though Congress imposed no such one-sided requirement.

Specifically, the Rule requires arbitrators, each time they rely on a non-QPA factor, to explain in a written decision why that factor was not already reflected in the QPA. 45 C.F.R. § 149.510(c)(4)(vi)(B) ("If the certified IDR entity relies on" a non-QPA factor "in selecting an offer, the written decision must include an explanation of why the certified IDR entity concluded that this information was not already reflected in the [QPA]."). But nowhere does the Rule require arbitrators to explain the reverse: why a non-QPA factor *is* reflected in the QPA. In so doing, the Rule heightens the import of the QPA by making it more burdensome for arbitrators to deviate from it.

15

Thus, even assuming the rare case exists where a provider can overcome the Departments' prohibition on considering evidence related to non-QPA factors purportedly accounted for in the QPA, arbitrators will be deterred from actual reliance on such factors by the Departments' added requirement that the arbitrator explain *why* the QPA does not account for the factor. In the experience of AMA's and AHA's members, most IDR decisions are no more than a single paragraph or two. For example, a federal plaintiff quoted a recent IDR arbitrator decision that offered just a handful of sentences as the entire justification for its selection of the insurer's offer:

> As noted above, the [IDR Entity] must consider related and credible information submitted by the parties to determine the appropriate [out-of-network] rate. As set forth in regulation, additional credible information related to certain circumstances was submitted by both parties. ***However, the information submitted did not support the allowance of payment at a higher [out-of-network] rate.***

Complaint at 16-17, *Med-Trans Corp. v. Capital Health Plan, Inc.*, No. 3:22-cv-1077-HES-JBT (M.D. Fl. Oct. 4, 2022), ECF No. 1.

IDR entities are not paid by the word. They instead receive a modest flat-rate payment of $200-$700 for adjudicating a single claim (or $268-$938 for reviewing batched claims). Ctrs. for Medicare & Medicaid

Servs., *Calendar Year 2023 Fee Guidance for the Federal Independent Dispute Resolution Process under the No Surprises Act* at 6 (Oct. 31, 2022).[3]  This is true regardless of the level of complexity or how much work or time each claim decision requires.  Faced with the impracticable, one-sided requirement to justify reliance only on non-QPA factors (not to mention the Departments' clear skepticism regarding the independent relevance of those factors), human nature suggests that arbitrators are likely to hew to the path of least resistance, relying on the QPA alone to select an offer—all according to the Departments' plan.

3.    *Requiring Arbitrators To Consider Only Evidence That Relates To The Specific Item Or Service Under Dispute Impermissibly Elevates The QPA Factor*

The Final Rule is defective in a third way:  it prohibits an arbitrator from even considering a non-QPA factor if the information submitted in its support does not "tend[] to show that the offer best represents the value of the item or service under dispute."  87 Fed. Reg. at 52,628 (defining what it means for information to "relat[e] to" a party's offer); *see* 45 C.F.R. § 149.510(c)(4)(iii)(E) (information cannot be considered unless

---

[3]                        https://www.cms.gov/cciio/resources/regulations-and-guidance/downloads/cy2023-fee-guidance-federal-independent-dispute-resolution-process-nsa.pdf.

it "relate[s] to either party's offer for the payment amount for the qualified IDR item or service"). Once again, Congress imposed no such restriction.

A closer examination of how this requirement works in practice exposes the Departments' agenda. Of the six factors that an arbitrator may consider, it is (at best) unclear whether at least two of them—(1) the respective market shares of the provider and insurer, and (2) the parties' previous good faith efforts to contract, *see* 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(II), (V)—could *ever* relate to a particular "item or service under dispute." That is because, unlike training, experience, patient acuity, and similar factors, information about market shares and prior negotiations do not pertain to a specific "item or service," but rather reflect structural factors that bear on the relationship between providers and insurers in a particular market. Congress sensibly chose to include these factors to encourage more in-network contracting, and to account for the leverage either an insurer or provider carries when negotiating contract rates.

But that is apparently beside the point for the Departments. By preventing arbitrators from considering information unless it relates to

a particular "item or service," the Departments have effectively nullified two of the six factors Congress mandated that they "shall" consider—in direct defiance of the law.

### 4.    *The Final Rule's Remaining Requirements And Restrictions Further Impermissibly Elevate The QPA Factor*

Beyond the three defects identified above, the Final Rule imposes additional requirements that systematically preference the QPA at every turn.   It requires arbitrators to consider the QPA first in every arbitration, before considering any other factors; requires arbitrators to scrutinize the credibility of every factor Congress required them to consider *except for the QPA*; and prohibits arbitrators from considering the accuracy or integrity of QPA calculations.   *See* 45 C.F.R. § 149.510(c)(4)(iii)(A)-(B), (E); *see also* TMA Br. at 42-60.

When all the Departments' extra-statutory requirements are viewed as a whole—and assessed against the backdrop of the Departments' consistent efforts to tilt the IDR process against providers—the import of the Final Rule becomes crystal clear.   The Departments have unduly elevated the weight of the QPA in the IDR

process, wholly undermining Congress's intention to allow arbitrators the "flexibility" to select a fair offer. H.R. Rep. No. 116-615, at 58.

Ultimately, these consistent efforts to tamper with congressional design violate the fundamental principle that "federal agencies can[not] rewrite a statute's plain text[.]" *Landstar Express Am., Inc. v. Federal Maritime Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009); *accord Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021). The Departments' overreach is particularly inappropriate here, where Congress's instructions for what the arbitrator must consider when determining the appropriate payment amount were anything but slapdash. Instead, Congress addressed in "meticulous detail," *TMA I*, 587 F. Supp. 3d at 542, the mandatory factors that the arbitrator "shall" consider in deciding which offer to select, 42 U.S.C. § 300gg-111(c)(5). On this issue, there is simply no room for the Departments' one-sided, policy-driven departures from Congress's design. This Court should hold, once and for all, that *no regulation* is needed to supplement Congress's clear instructions.

## II.    THE DEPARTMENTS' *AMICI* CANNOT REHABILITATE THE FINAL RULE

In seeking to justify this atextual elevation of the QPA, *amici* supporting the Departments rely on several flawed assertions.  Three warrant specific responses.

### A.    The QPA Is Not A Reasonable, Objective, Or Credible Measure of Market Rates

The Departments' *amici*—particularly those representing insurer interests—primarily seek to justify the Final Rule by emphasizing that the QPA is an inherently and uniquely "reasonable" proxy for fair rates. *See*, *e.g.*, Brief of *Amicus Curiae* Blue Cross Blue Shield Association in Support of Appellants and Reversal (Blue Cross Br.) at 6-11 ("reasonable"); Brief of America's Health Insurance Plans as *Amicus Curiae* in Support of Appellants (AHIP Br.) at 24 ("credible"); Brief *Amici Curiae* of the American Benefits Counsel et al. (Business Groups Br.) at 9 ("objective").

But like the proverbial fox guarding the henhouse, the insurers "hold ultimate power" in calculating the QPA, *TMA I*, 587 F. Supp. 3d at 535, and have a strong financial interest in ensuring that the QPA is calculated at the lowest possible rate.  Moreover, because the Departments require insurers to disclose only limited information

21

regarding their unilateral QPA calculations to a provider only upon request, 45 C.F.R. § 149.140(d), providers and arbitrators have no way to effectively verify the integrity of the insurer's methodology for calculating the QPA or the underlying data that is used to make those calculations. Letter from AMA to the Departments, at 4-5 (Jan. 23, 2023).[4]

Although *amici* concede that they calculate the QPAs themselves, they assure the Court that this process is subject to Department oversight. Blue Cross Br. at 6-7; AHIP Br. at 25. But that ignores how meager such oversight is. Under the NSA, unless faced with a complaint directed at a specific insurer, the Departments' annual audits are limited to a "sample" of "not more than 25" insurers. 42 U.S.C. § 300gg-111(a)(2)(A)(ii). Even then, the Department of Health and Human Services has further limited itself to conducting "no more than 9 audits annually." *See* 86 Fed. Reg. 36,872, 36,935 (July 13, 2021). Unsurprisingly, this toothless audit regime has already sparked concerns from Senator Cassidy as to whether such a low number is "sufficient to

---

[4] https://searchlf.ama-assn.org/letter/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2Flfr.zip%2F2023-1-23-Letter-to-Becerra-Walsh-Yellen-re-No-Surprises-Act-v2.pdf.

comply with the requirements" of the NSA. *See* Letter from Sen. Bill Cassidy, M.D., to Hon. Xavier Becerra, Sec'y., Dep't of Health and Hum. Servs. 12 (Aug. 10, 2023).[5]

Moreover, the problems created by the lack of transparency have been exacerbated by the Departments' endorsement of a QPA-calculation methodology that obscures the true median in-network rate of a specific service. Although these regulations have recently been set aside for deviating from the plain text of the NSA in several ways, *see TMA IV*, 2023 WL 5489028, they confirm that the QPA has never served as a truly "reasonable," "credible," or "objective" measure of in-network "market" rates. Take two examples:

- "*Ghost rates*." The Departments were recently found to have flouted the requirement that the QPA encompass only those rates for services that are actually "provided." *See* 45 C.F.R. § 149.140(a)(1) (defining "contracted rate"—the underlying data point for the QPA—as encompassing *all* contracted rates, not just contracted rates for items that are actually "provided by a provider"); *see also TMA IV*, 2023 WL 5489028, at *6 (setting rule aside). Allowing insurers to include such never-paid "ghost rates" in their calculations exerted significant downward pressure on the QPA, since a provider naturally has little incentive to negotiate rates for services he or she rarely or never provides. That problem was not theoretical: A survey of 75 primary care professionals indicated that 68%

---

[5] https://www.help.senate.gov/imo/media/doc/no_surprises_act_letter.pdf.

included in their network-contracts services that they provide fewer than two times a year, while 57% included services they *never* provide.[6] And even the Departments acknowledged that some insurers were calculating QPAs using a $0 contractual rate for services a provider is "not equipped to furnish"—and hence never provides.[7]

- *Non-specialty services.* The Departments were also found to have flouted Congress's clear instruction that a QPA should reflect the "median of the contracted rates" for a service "provided by a provider *in the same or similar specialty*." 42 U.S.C §§ 300gg-111(a)(3)(E)(i)(I)-(II) (emphasis added); *see also TMA IV*, 2023 WL 5489028, at *7 (setting rule aside). In particular, the Departments qualified that statutory command with an atextual instruction for insurers to separate contracted rates by provider specialty only if "consistent with *** [the insurer's] usual business practice." 45 C.F.R. § 149.140(a)(12). That meant insurers could (for example) calculate QPAs using rates for *dermatology* services found in an *anesthesiologist's* contract as long as it was the insurer's business practice to do so—even if the

_____

[6] Avalere Health, *PCP Contracting Practices and Qualified Payment Amount Calculation Under the No Surprises Act* at 4 (Aug. 2, 2022), https://www.acr.org/-/media/ACR/Files/Advocacy/2022-8-15-Avalere-QPA-Whitepaper_Final.pdf.

[7] U.S. Departments of Labor, Health and Human Services, & Treasury, *FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* at 17 n.29 (Aug. 19, 2022) (August 2022 FAQs), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf. While the Departments issued subregulatory instructions that issuers cease using these $0 rates, *id.*, they did not bar issuers from using undervalued, never-used rates *other than* $0. In any event, such guidance "does not impose any legally binding requirements on private parties." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) (internal quotation marks omitted).

anesthesiologist never provided those services (and thus had no incentive to negotiate those rates).[8]

These and other problems created by the Departments' implementing regulations, which insurers had been taking advantage of until the regulations were set aside last month, undermine the premise that a QPA necessarily reflects the true median in-network rate—much less a fair payment amount for out-of-network providers. To then give that QPA disproportionate weight under the Final Rule adds injury to insult.

## B.    Providers' Acceptance Of Pre-IDR Offers Does Not Reflect Agreement With QPA Rates

To justify the Departments' elevation of the QPA *within* the IDR process, the Departments' *amici* argue that providers are generally happy with being compensated at or below the QPA *outside* the IDR process. For this argument, Departments' *amici* rely on the fact that providers often end up accepting payments for services outside of the IDR

---

[8] While the Departments, again through subregulatory statements, subsequently instructed insurers to vary rates by provider specialty "if there is a material difference in the median contracted rates," *see* August 2022 FAQs at 17, self-interested insurers are given the sole (and practically unreviewable) prerogative to decide what is actually "material."

process "at or around the QPA" as evidence that the NSA is "largely working to foster settlements around the QPA." *E.g.*, AHIP Br. at 10-11.

But this inference ignores the systematic and disproportionate barriers that providers face in even attempting to access the IDR process. As mentioned above, the Departments have sought to impose burdensome nonrefundable administrative fees for providers who wish to utilize the IDR process, while restricting the ability of providers to efficiently "batch" claims for quicker and more cost-efficient resolution. *See TMA III*, 2023 WL 4977746, at *1. As members of the AHA and AMA have experienced, these interlocking barriers have resulted in the IDR process being cost-prohibitive for many providers, particularly smaller practices. American Medical Association, *AMA Recommendations to Resolve NSA-Related Problems*, at 3-4 (May 16, 2023) ("May 2023 Letter to Senate Committee Leadership").[9] By way of example, under the Department's (now-set-aside) rules, one of the AHA's members would have had to spend "$10,015 in administrative fees" just to contest an

---

[9] https://searchlf.ama-assn.org/letter/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2Flf.zip%2F2023-5-16-Letter-to-Senate-HELP-Committee-re-Roundtable-NSA-v2.pdf.

offered "total reimbursement of $1,614 on a claim valued at $68,880." American Hospital Association, *No Surprises Act Independent Dispute Resolution Process*, at 6 (Feb. 15, 2023).[10]

Moreover, any reluctance to engage in the IDR process is at least partly attributable to the insurers' own conduct. For one, insurers have habitually questioned the eligibility of claims for the federal IDR process as a tactic to delay or deter the resolution of disputes, without penalty. *See* May 2023 Letter to Senate Committee Leadership, at 4. These threshold delays contribute to a significant backlog for processing IDR claims, in turn creating significant cash-flow disruption for providers. And even when providers prevail in arbitration, some insurers avoid timely payment of an IDR award, forcing practices into even further financial distress. *Id.* at 5. In fact, a recent survey reported that 87% of payers did not pay in accordance with an IDR decision within the statutory 30-day deadline for complying with awards. Emergency

---

[10]    https://www.aha.org/system/files/media/file/2023/02/aha-recommendation-regarding-the-no-surprises-act-independent-dispute-resolution-process-letter-2-15-23.pdf.

Department Practice Management Association, *Data Analysis: No Surprises Act Independent Dispute Resolution Effectiveness*.[11]

The reality is that, rather than being satisfied with QPA payments, providers simply face numerous structural barriers in effectively utilizing the IDR process—yet another way that the Departments' insurer-friendly regulations have undermined the integrity of Congress's balanced design.

## C.   The Departments' Guidance Is Not Necessary To Ensure Fair IDR Results

The Departments' *amici* finally suggest that arbitrators are incapable of fulfilling their statutory duties without agency intervention to prop up the QPA.  Indeed, they do not shy away from arguing that elevating the QPA is the Final Rule's true aim.  *See* Blue Cross Br. at 6 (describing how the Final Rule ensures that the QPA plays a "central role *** in the IDR process"); *id*. at 20 (describing the importance of "designating the QPA as a central consideration in the IDR process").  But despite the Departments' efforts to cloak the Final Rule's substantive

---

[11]     https://edpma.org/wp-content/uploads/2023/04/EDPMA-Data-Analysis-No-Surprises-Act-Independent-Dispute-Resolution-Effectiveness-FINAL.pdf.

impositions as "modest" and "procedural" (AOB 27), their *amici* acknowledge the true, outcome-driven aim of the rule. *E.g.,* Brief of the Leukemia & Lymphoma Society et al. at 29 (describing how the Final Rule will change the "outcomes" of the IDR process); *id.* at 25 (describing the Final Rule's goal of preventing increased payments to providers). Those statements bolster the district court's findings that the Departments' ostensibly procedural rules are, at bottom, aimed at "privileging the QPA" and "tilting arbitrations in favor of insurers." *TMA II¸* 2023 WL 1781801, at *13.

*Amici* seize on the fact that in the vast majority of IDR cases where the Departments' "implementing guidance was largely absent," arbitrators ruled in favor of the initiating party (almost always a healthcare provider or facility). AHIP Br. at 18; *see also* CMS*, Federal Independent Dispute Resolution Process – Status Update*, at 2 (Apr. 27, 2023) (noting that initiating parties were the prevailing parties in 71% of disputes)[12]; CMS, *Initial Report on the Independent Dispute Resolution (IDR) Process*, *April 15 – September 30, 2022*, at 7-8 (96% of initiating

_____

[12]    https://www.cms.gov/files/document/federal-idr-processstatus-update-april-2023.pdf.

parties are health care providers or facilities, with remaining 4% air ambulance service providers).[13]   From there, *amici* assert that these results favoring providers must stem from consideration of "wholly irrelevant factors or double-counting." AHIP Br. at 18; *see* Business Groups Br. at 8-9 (suggesting that the IDR process, absent agency intervention, will be "open to abuse and overuse").

Tellingly, neither the Departments nor their *amici* provide any evidence that the favorable IDR results for providers stem from improper arbitrator decisionmaking.   In the absence of any countervailing evidence, the fairest inference from this data is that arbitrators—when given the chance to apply the statutory factors as written, without interference from the Departments—have simply found that the *providers'* offers better reflect the appropriate rate for a given item or service. *Amici* and the Departments may not like the "IDR results," *e.g.*, Business Groups Br. at 21, but that is no excuse for fundamentally altering the statutory process by elevating one enumerated factor over the others.

---

[13]   https://www.cms.gov/files/document/initial-report-idr-april-15-september-30-2022.pdf.

## III.   THE FINAL RULE WILL HARM PATIENTS AND PROVIDERS

The Final Rule, if reinstated, will harm not only physicians and hospitals, but also the very patients the NSA is intended to protect. Although providers have thus far been successful in enjoining most of the Departments' erroneous regulations, the Departments' past actions have already harmed providers' ability to achieve fair payment rates and provide broad access to care for patients with diverse needs across the country.

A reinstated Final Rule would threaten across-the-board harms for providers—including *in-network* providers.  This is because when insurers know they can rely on the IDR process to obtain a below-market payment amount for out-of-network items and services, that, in turn, will change their approach to in-network contracting.  If an in-network provider refuses to accept a near-QPA rate during contract negotiations, an insurer can simply terminate the in-network contract—forcing that provider out-of-network so that they can obtain their desired rate through IDR arbitration.  In fact, evidence suggests that, under the Departments' regulations, insurers were refusing to enter into good-faith negotiations with providers because they knew the providers' only resort

31

was to an IDR process that the Departments rigged in the insurers' favor. *See* May 2023 Letter to Senate Committee Leadership, at 5. That behavior, while unfortunate, is rational: If the IDR process is inevitably skewed toward the QPA (as desired by the Departments and their *amici*), insurers know that they can refuse to negotiate because they can always fall back on the insurer-friendly IDR process.

Unsurprisingly, in the wake of the Departments' campaign to elevate the QPA, providers immediately saw abrupt demands from insurers for across-the-board rate reductions as high as 50%, and take-it-or-leave-it rate schedules that coalesce around the QPA. Nona Tepper, *Coming to a contract negotiation near you: the No Surprises Act*, MODERN HEALTHCARE, Aug. 3, 2022.[14] For instance, in response to the Departments' interim rule, anesthesiologists, radiologists, and emergency physicians all received letters from Blue Cross Blue Shield of North Carolina demanding that they agree to payment reductions of up to 30%—or forfeit their contracts. *Id.* And UnitedHealthcare similarly requested a 40% rate cut from emergency physicians. *Id.* If the Final

---

[14] https://www.modernhealthcare.com/insurance/no-surprises-act-influencing-insurers-rate-setting-plans.

Rule is reinstated—and its undue preference for the QPA given effect—insurers will naturally be further incentivized to drive physicians and hospitals out of network and into the IDR process, reducing patient choice and access to care.

These dramatic rate cuts also will threaten the viability of many providers and practices. These harms are disproportionately felt by providers who offer services that historically lose money (such as burn units and behavioral health services), and smaller providers (such as small- and mid-sized physician practices that have operated under stable contracts for years). *See, e.g.*, Letter from American College of Emergency Physicians to Members of the North Carolina Congressional Delegation (Dec. 9, 2021) ("ACEP Letter").[15] Insurers' non-negotiable reductions will inevitably lead some physician groups to close their practices. Even short of closing their doors, smaller providers will face other tough decisions, including whether to accept outside funding or consolidate with other provider groups.

---

[15]     https://www.acep.org/globalassets/new-pdfs/advocacy/acep--nccep-insurer-cuts-letter-to-nc-delegation---12092021.pdf.

Ultimately, patients will suffer the worst consequences—particularly rural and other underserved patient populations, who will lose access to readily available and specialized care. Consider the example of just one North Carolina group of emergency physicians, a group that operates on thin margins with no outside corporate or investor funding. *See* ACEP Letter. The group serves 11 emergency departments, including one designated as having a provider shortage and others located in rural areas of the state. In 2020, the group's physicians served 425,000 patients, 44% of whom were uninsured or on Medicaid. *Id.* At the end of 2021, just as the Departments' interim regulations were set to go into effect, Blue Cross Blue Shield of North Carolina threatened to terminate the group's contract if it did not accept an *immediate* 20% cut to its contracted rates. *Id.* Blue Cross made clear that, going forward, it would require the group to accept contracted rates closer to the QPA. *Id.* It is far from clear what will happen to patients when groups like this can no longer afford to serve them.

The Departments previously recognized that significant reductions in provider rates could "threaten the viability of these providers [and] facilities," which "in turn, could lead to participants, beneficiaries and

enrollees not receiving needed medical care, undermining the goals of the No Surprises Act." 86 Fed. Reg. at 56,044. The Departments should heed their own warning. Luckily, there is already a straightforward path for arbitrators to follow that will avoid these harmful consequences for providers and the patients they serve—namely, the balanced one Congress charted in the text of the NSA.

## CONCLUSION

For the reasons set forth above and in Plaintiffs-Appellees' briefs, the Court should affirm the district court's judgment setting aside the Departments' Final Rule.

Dated:  September 18, 2023          Respectfully submitted,

/s/ *James E. Tysse*

James E. Tysse
Kelly M. Cleary
Zhen He Tan
AKIN GUMP STRAUSS HAUER & FELD
LLP

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2023, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ James E. Tysse*
James E. Tysse

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,447 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word Version 2016, 14-point Times New Roman font.

*s/ James E. Tysse*
James E. Tysse