Case No. 23-40217

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.; DOCTOR ADAM CORLEY,

*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; DEPARTMENT OF LABOR; DEPARTMENT OF THE TREASURY; XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY,

*Defendants-Appellants*.

LIFENET, INCORPORATED; EAST TEXAS AIR ONE, L.L.C.,
*Plaintiffs-Appellees*,
v.
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF THE TREASURY; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; KIRAN AHUJA,
*Defendants-Appellants*.

On Appeal from the United States District Court for the Eastern District of Texas
District Court Nos. 6:22-CV-372 and 6:22-cv-373 (Kernodle, J.)

## AMICUS CURIAE BRIEF OF THE PHYSICIANS ADVOCACY INSTITUTE, SIXTEEN STATE MEDICAL ASSOCIATIONS, AND SEVEN SPECIALTY MEDICAL SOCIETIES IN SUPPORT OF APPELLEES

[Counsel Listed on Inside Cover]

Long X. Do
Eric D. Chan
ATHENE LAW, LLP
5432 Geary Blvd., #200
San Francisco, California 94121
Telephone: (415) 722-5351
Facsimile: (844) 619-8022
E-mail: long@athenelaw.com
E-mail: eric@athenelaw.com

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE AND
## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(A), the following organizations each is a non-profit organization that has no parent corporation, and no publicly held corporation owns 10% or more of its stock:

1.  Physicians Advocacy Institute
2.  American Association of Neurological Surgeons
3.  Congress of Neurological Surgeons
4.  American Academy of Otolaryngology-Head and Neck Surgery
5.  American Association of Orthopaedic Surgeons
6.  American College of Surgeons
7.  American Osteopathic Association
8.  American Society of Plastic Surgeons
9.  Louisiana State Medical Society
10. Mississippi State Medical Association
11. California Medical Association
12. Connecticut State Medical Society
13. Florida Medical Association
14. Medical Association of Georgia
15. Kentucky Medical Association
16. Massachusetts Medical Society
17. Nebraska Medical Association
18. Medical Society of New Jersey
19. Medical Society of the State of New York
20. North Carolina Medical Society
21. Oregon Medical Association
22. South Carolina Medical Association
23. Tennessee Medical Association
24. Washington State Medical Association

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed above and in the briefs of the parties and amici curiae parties, have an interest in

i

the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

Amici Curiae Counsel: Long X. Do and Eric. D. Chan of Athene Law, LLP.

/s/ Long X. Do

Long X. Do
*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE AND SUPPLEMENTAL CERTIFICATE OF
INTERESTED PERSONS ............................................................ i

TABLE OF AUTHORITIES ....................................................... v

INTERESTS OF AMICI CURIAE.............................................. 1

INTRODUCTION ..................................................................... 4

BACKGROUND ....................................................................... 6

I.    Purposes of the No Surprises Act............................... 6

II.   Legal Setbacks for the Departments' Regulations and Agency Action..... 7

ARGUMENT ........................................................................... 11

I.    The QPA Standing Alone or Apart from Other Statutory Factors Makes
      For an Imperfect Measure of Fair Market Reimbursement. ................... 11

II.   The Elevation of the QPA in the Final Rule Results in Anchoring Bias
      that Could Artificially Tip the Scales in the IDR Process. ................ 14

      A.    The Final Rule Explicitly Requires IDR Entities to Give Special,
            Deferential Treatment to the QPA.................................. 14

      B.    Anchoring Bias is a Well-Documented Cognitive Function that Can
            Yield Predictable Results.......................................... 15

      C.    Anchoring Bias Will Poison IDRs Conducted Pursuant to the Final
            Rule to Heavily Favor the QPA..................................... 19

III.  An Unavailable and Tilted IDR Will Distort Negotiations and Payor
      Behavior in the Health Insurance Provider Market........................ 20

      A.    The IDR Program Has Been Beset with Problems...................... 20

      B.    With No Effective Recourse to Challenge Unfair Out-of-Network
            Compensation, Provider Networks will Deteriorate. .................. 22

CONCLUSION ......................................................................... 26

ATTACHMENT: DETAILED INFORMATION ON AMICI ...............................27

CERTIFICATE OF COMPLIANCE........................................................33

CERTIFICATE OF SERVICE ...............................................................34

# TABLE OF AUTHORITIES

## CASES

*Ass'n of Air Med. Servs. v. U.S. Dep't of Health & Hum. Servs. et al.*, Case No. CV-21-3031 (RJL), 2023 WL 5094881 (D.D.C., Aug. 9, 2023) ......................10

*Guardian Flight, LLC v. Health Care Serv. Corp.*, case no. 3:23-cv-01861 (N.D. Tex.) (filed Aug. 18, 2023) .................................................................21

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, Case No. 6:22-CV-450-JDK, 2023 WL 5489028 (E.D. Tex. Aug. 24, 2023) ("*TMA III*") ...................................................... 9, 10, 13, 21

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528 (E.D. Tex. 2022), *appeal dismissed*, No. 22-40264, 2022 WL 15174345 (5th Cir. Oct. 24, 2022) ("*TMA I*") .........................................................8

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.,* case no. 6:23-CV-59-JDK, 2023 WL 4977746 (E.D. Tex., Aug. 3, 2023) ("*TMA IV*") .... 10, 21

*Texas Medical Association v. United States Dep't of Health and Human Services*, -- F. Supp. 3d --, 2023 WL 1781801 (E.D. Tex., Feb. 6, 2023), *appeal filed* April 11, 2023 ("*TMA II*") .................................................. 9, 11, 20

## STATUTES

42 U.S.C. §300gg-111 ....................................................... 6, 7, 11

42 U.S.C. §300gg-131 .............................................................6

42 U.S.C. §300gg-132 .............................................................6

## REGULATIONS

45 C.F.R. §149.140 ........................................................ 9, 19

45 C.F.R. §149.510 ....................................................... 14, 15

## RULES

Federal Rules of Appellate Procedure, rule 29 ..................................... i, 1

Fifth Circuit Rule 29.2 ............................................................ i

# OTHER AUTHORITIES

Association of American Medical Colleges (by HIS Markit Ltd.), "The Complexities of Physician Supply and Demand: Projections from 2019 to 2034" (June 2021)........................................................................................23

Avalere Health, "COVID-19's Impact on Acquisitions of Physician Practices and Physician Employment 2019-2021, PHYSICIANS ADVOCACY INST. (April 2022) ..........................................................................................25

Critcher, Clayton R.; Gilovich, Thomas. (October 30, 2007). "Incidental environmental anchors." Journal of Behavioral Decision Making. 21(3)...........17

Disli, Mustafa; Inghelbrecht, Koen; Schoors, Koen; Stieperaere, Hannes. (February 12, 2021). "Stock Price Anchoring." SSRN ......................................................18

Karyn Schwartz et al., "What We Know About Provider Consolidation" Kaiser Family Found. (Sept. 2, 2020) ..............................................................25

Mussweiler, Thomas; Strack, Fritz (1999). "Hypothesis-Consistent Testing and Semantic Priming in the Anchoring Paradigm: A Selective Accessibility Model." Journal of Personality and Social Psychology. 73 (3): 437-446 ..........17

Northcraft, Gregory B.; Neale, Margaret A. (February 1987.) "Experts, amateurs and real estate: An anchoring-and-adjustment perspective on property pricing decisions." ORG. BEHAVIOR & HUMAN DECISION PROCESSES ...........................18

Sherif, Muzafer; Taub, Daniel; Hovland, Carl I. (1958). "Assimilation and contrast effects of anchoring stimuli on judgments." Journal of Experimental Psychology. 55 (2): 150–155 ..............................................................16

Tversky, Amos; Kahneman, Daniel (September 1974). "Judgment under Uncertainty: Heuristics and Biases." Science. 185 (4157): 1124–31..... 15, 16, 17

## INTERESTS OF AMICI CURIAE[1]

The Physicians Advocacy Institute ("PAI") is a not-for-profit organization formed pursuant to a federal district court settlement order in multidistrict class action litigation brought by physicians and state medical associations based on systemic unfair payment practices by the nation's largest for-profit insurers. Consistent with the terms of that court order, PAI's mission is to advance fair and transparent payment policies and contractual practices by payors in order to sustain the practice of medicine for the benefit of patients. PAI champions policies to allow physicians to sustain independent medical practices, which are a cornerstone for delivering care in our healthcare system, particularly in underserved and rural areas. For the past decade, physicians have grappled with increasingly complex payment policies by government and private payers. PAI develops free educational resources, tools, and market information to support practices as they navigate these programs and the administrative burdens and costs. PAI's research shows how challenging it has been for independent practices to survive.

Amici parties on this brief also include the following national specialty medical societies:

---

[1] All parties have consented to the filing of this brief. Pursuant to FRAP 29(a)(4)(E), amici curiae state that no counsel for a party authored this brief, in whole or in part, and no person other than the parties hereto as amici curiae or their counsel contributed money that was intended to fund the preparation or submission of this brief.

1.    American Association of Neurological Surgeons

2.    Congress of Neurological Surgeons

3.    American Academy of Otolaryngology-Head and Neck Surgery

4.    American Association of Orthopaedic Surgeons

5.    American College of Surgeons

6.    American Osteopathic Association

7.    American Society of Plastic Surgeons

All such specialty medical societies are nonprofit organizations that promote research, education, and the highest level of quality care in their respective medical specialties. Collectively, these specialty societies have 355,000 members throughout the United States or the world, with board specializations or equivalent recognition of the greatest degree of training and excellence in a field of medicine. For decades these organizations have advanced their specialty fields through education, outreach, and advocacy, including advocacy before federal and state courts and legislatures to ensure fair reimbursement to maintain specialty practices in all modes and settings for the benefit of patients.

Finally, excluding appellee Texas Medical Association, the medical associations of the states in the Fifth Circuit and fourteen additional states, listed below, comprise a geographically broad coalition of sixteen amici state medical associations:

1.    Louisiana State Medical Society

2.    Mississippi State Medical Association

3.    California Medical Association

4.    Connecticut State Medical Society

5.    Florida Medical Association

6.    Medical Association of Georgia

7.    Kentucky Medical Association

8.    Massachusetts Medical Society

9.    Nebraska Medical Association

10.    Medical Society of New Jersey

11.    Medical Society of the State of New York

12.    North Carolina Medical Society

13.    Oregon Medical Association

14.    South Carolina Medical Association

15.    Tennessee Medical Association

16.    Washington State Medical Association

These amici state medical associations are each nonprofit associations representing physicians at every stage of their careers — medical students, interns, residents, and practicing or retired physicians. They collectively comprise more than 213,000 members across America practicing medicine in a wide range of settings. The state medical associations work toward advancing the science and art of medicine by, among other things, helping physicians sustain viable medical practices and challenging unfair payor practices and policies to protect patient access to medical care.

More detail about each amici party is provided in the Attachment hereto.

# INTRODUCTION

The No Surprises Act (the "Act") is widely lauded as a significant, bipartisan achievement for patients. One co-sponsor, Senator Bill Cassidy, MD (R-LA), heralded the Act as "a milestone in our effort to lower health care costs," and the other co-sponsor, Senator Maggie Hassan (D-NH), called it "groundbreaking legislation to help ensure that Americans aren't left on the hook for [] outrageous [surprise medical] bills."[2] Former President Trump also strongly supported curbing surprise medical bills in a robust manner: "This must end. We're going to hold insurance companies and hospitals totally accountable."[3]

A result of exhaustive negotiations in Congress in which patient, payor, and provider voices were fully heard, the Act adopts what is intended to be a balanced approach to protect patients from the financially devastating consequences of payment disputes between payors and providers, while also making available an independent dispute resolution ("IDR") process that would result in fair out-of-network reimbursement. However, the federal agencies responsible for implementing the Act – appellants the Departments of Health and Human Services,

---

[2] Press release, "Cassidy, Hassan Legislation Ending Surprise Medical Bills Goes into Effect Today," Office of Sen. Bill Cassidy, MD (Jan. 1, 2022) (available online, last visited Sept. 13, 2023).

[3] Rachel Roubein, "Trump prods Congress to eliminate 'surprise medical bills," POLITICO (May 9, 2019) (available online, last visited on Sept. 13, 2023).

Treasury, and Labor (collectively, "Departments") – have issued regulations falling far short of the letter and spirit of the Act.

At issue in this appeal is the proper role of the qualifying payment amount ("QPA") in the IDR process. It is one factor among many that the Act requires an arbiter to consider in selecting the winning offer in the IDR's baseball-style arbitration. However, through the rule *Requirements Related to Surprise Billing*, 87 Fed. Reg. 52618 (August 26, 2022) (the "Final Rule"), the Departments have given the QPA an outsized role, which is irreconcilable with the statutory scheme Congress carefully designed. Indeed, Congressional members have criticized any IDR process that tips sharply in favor of the QPA over the other factors:

> This approach is contrary to statute and could incentivize insurance companies to set artificially low payment rates, which would narrow provider networks and jeopardize patient access to care – the exact opposite of the goal of the law. It could also have a broad impact on reimbursement for in-network services, which could exacerbate existing health disparities and patient access issues in rural and urban underserved communities.[4]

Similarly, more than half the Senate objected that, "[i]n no way does the [Act] privilege any one rate in the IDR process, but rather [it] establishes an open and robust dispute resolution process in which each factor is given equal weighting."[5]

_____

[4] Letter from 152 Congressional Members to Hon. Sec'ys Becerra, Walsh, and Yellen (dated Nov. 5, 2021) (available online, last visited Sept. 15, 2023).

[5] Letter from Senate Republicans to Hon. Sec'ys Becerra, Walsh, and Yellen (dated Dec. 28, 2021) (available online, last visited Sept. 15, 2023).

Every term in the Act regarding the IDR must be faithfully followed. Not only do the usual rules of statutory construction require it, but straying from the text and purposes of the Act would unravel the delicate balance of policy considerations that Congress set. The Departments' Final Rule and its elevation of the QPA, at issue here, impermissibly does precisely what Congress designed the Act not to do.

## BACKGROUND

### I.     Purposes of the No Surprises Act

The Act is "the result of two years of bipartisan, bicameral deliberations and negotiation on solutions to protect patients from surprise medical billing and create a balanced process for providers and payors to settle payment disputes."[6] Indeed, such an approach is readily discernible on the face of the Act.

The Act provides federal protections for patients against surprise billing by limiting out-of-network cost sharing and prohibiting "balance billing" in the circumstances in which surprise bills arise most frequently. *See* 42 U.S.C. §§300gg-111, 300gg-131, 300gg-132. It also establishes detailed procedures for the IDR process. The Act requires payors to reimburse out-of-network providers at a statutorily calculated "out-of-network rate." *Id.* §300gg-111(a)(1)(C)(iv)(II),

---

[6] Letter from Congressional Members. to Sec'ys Becerra, Walsh, and Yellen, and OPM Dir. Ahuja (dated Nov. 5, 2021) (available online, last visited Sept. 15, 2023).

(b)(1)(D). In most states, the out-of-network rate is either the amount agreed to by the insurer and the out-of-network provider or an amount determined through the IDR process. *Id.* Payors must first issue an initial payment or notice of denial of payment for any claim for qualified out-of-network medical services. *Id.* §300gg-111(a)(1)(C)(iv), (b)(1)(C). Providers who disagree with the payor's initial determination may initiate a thirty-day period of open negotiations with the payor to try to resolve the payment dispute. *Id.* §300gg-111(c)(1)(A). If negotiations fail, the parties may then proceed to baseball-style IDR arbitration. *Id.* §300gg-111(c)(1)(B).

In IDR, the provider and payor submit a proposed payment amount and explanation to the arbiter. *Id.* §300gg-111(c)(5)(B). The arbiter must then select one of the two amounts, "taking into account the considerations specified in subparagraph (C)." *Id.* §300gg-111(c)(5)(A)-(B). Subparagraph (C) identifies the QPA and five "additional circumstances." *See id.* §300gg-111(c)(5)(C)(i) and (ii).

## II.    Legal Setbacks for the Departments' Regulations and Agency Action

To implement the Act, the Departments have issued two interim regulations (*Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36872 (July 13, 2021) ("IFR I") and *Requirements Related to Surprise Billing; Part II*, 86 Fed. Reg. 55980 (Oct. 7, 2021) ("IFR II")) and the Final Rule. Through agency guidance, the Departments have set filing fees for the IDR claims and, in

December 2022, dramatically increased the fee from $50 to $350. *See* CMS

Amendment to the Calendar Year 2023 Fee Guidance at 4 (Dec. 23, 2022)

(available online, last visited on Sept. 13, 2023).

      Important, key aspects in the IFR I, IFR II, Final Rule, and agency action

have been successfully challenged in court. Congress intended that the statutory

factors to be considered by the IDR arbiter be weighted equally. In the IFR I, the

Departments imposed a rebuttable presumption in favor of the QPA, even though

the statutory text does not permit it. Such regulatory action was stricken in *Texas*

*Med. Ass'n v. United States Dep't of Health & Hum. Servs*., 587 F. Supp. 3d 528

(E.D. Tex. 2022), *appeal dismissed*, No. 22-40264, 2022 WL 15174345 (5th Cir.

Oct. 24, 2022) ("*TMA I*"). The court there observed, in relevant part, "the Act is

unambiguous [and] . . . . plainly requires arbitrators to consider all the specified

information in determining which offer to select." *Id.* at 540. "Nothing in the Act,

moreover, instructs arbitrators to weigh any one factor or circumstance more

heavily than the others . . . . the Act nowhere states that the QPA is the 'primary'

or 'most important' factor." *Id.* at 541.

      The Departments' Final Rule does not raise a rebuttable presumption but

imposes various requirements that effectively elevate the QPA over other statutory

factors to be considered in the IDR process. Again, such a regulatory approach

failed judicial scrutiny on the first pass. *See Texas Medical Association v. United*

*States Dep't of Health and Human Services*, -- F. Supp. 3d --, 2023 WL 1781801
(E.D. Tex., Feb. 6, 2023), *appeal filed* April 11, 2023 ("*TMA II*"). That ruling is
the subject of the instant appeal.

The IFR I established procedures for calculating the QPA. *See* 45 C.F.R.
§§149.140(a)(1), (a)(8)(iv), (a)(12), (b)(2)(iv). The Departments supplemented
these regulatory provisions with a series of "frequently asked questions." *See
FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021
Implementation Part 55*, DEP'T OF LAB. (Aug. 19, 2022) ("August FAQs"). A
district court in *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
Case No. 6:22-CV-450-JDK, 2023 WL 5489028, at *19 (E.D. Tex. Aug. 24, 2023)
("*TMA III*") found that many aspects of these regulatory rules were inconsistent
with the Act. In particular, the court vacated regulatory directives (1) that the QPA
calculation includes "ghost rates" and out-of-specialty rates but excludes risk
sharing, bonus, penalty, or other incentive-based or retrospective payments or
payment adjustments; (2) that self-insured group health plans can use rates from all
plans administered by a third-party administrator in calculating the QPA; (3) that
the 30-day deadline for notice or denial of payment by payors for air ambulance
claims commences when the payor receives a "clean claim" as opposed to receipt
of the bill; (4) that the QPA calculation for air ambulance services excludes case-

specific or single-case agreements[7]; and finally (5) that there must be two separate IDR processes for a single medical air transport because there are two billing service codes associated with that service.

Finally, in a fourth setback, rules in the IFR I for batching claims in an IDR proceeding and CMS's increase of the IDR fee in December 2022 were stricken in *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.,* case no. 6:23-CV-59-JDK, 2023 WL 4977746 (E.D. Tex., Aug. 3, 2023) ("*TMA IV*").

As a result of the rulings in *TMA III* and *TMA IV*, the Departments temporarily suspended IDR process operations under the Act "in order to make changes necessary to comply with the court's opinion and order." *See* CMS Notice, "Payment disputes between providers and health plans" (updated Sept. 5, 2023) (available online, last visited Sept. 18, 2023). Effective September 5, 2023, the Departments directed IDR entities to proceed with eligibility determinations for single and bundled disputes submitted on or before August 3, 2023; but as of the date of this amicus brief, all other aspects of the IDR process operations remain suspended. *See id.*

---

[7] Another district court has rejected various challenges to the calculation of the QPA for air ambulance services and, in so doing, came to the opposite conclusion in *TMA III* concerning case-specific and single-case agreements for air ambulance reimbursement. *See Ass'n of Air Med. Servs. v. U.S. Dep't of Health & Hum. Servs. et al.*, Case No. CV-21-3031 (RJL), 2023 WL 5094881, at *5 (D.D.C., Aug. 9, 2023).

**ARGUMENT**

## I.  The QPA Standing Alone or Apart from Other Statutory Factors Makes For an Imperfect Measure of Fair Market Reimbursement.

The QPA is central in *TMA II*, now before the Court. As a threshold matter, the QPA has inherent limitations and is of limited value when viewed in isolation. That is why the Act requires arbiters to consider the QPA as part of a gestalt of multi-sourced and multivariable factors that are relevant in free market negotiations for provider reimbursement. While a payor's prevailing in-network rate is one factor, as represented by the QPA, the Act requires arbiters to look to other factors of a different nature, including the out-of-network provider's market share, the provider's level of training and experience, and quality and outcomes measurements. *See* 42 U.S.C. §300gg-111(c)(5)(C) (listing five other factors arbiters must consider in addition to the QPA). Standing alone or with undue emphasis, the QPA's inherent limitations are exposed.

The methodology for calculating the QPA does not account for variations in the quantity of payments for a given service in a given geographic region.[8] It is not indicative of the actual services provided by an individual physician or group under a plan contract and thus does not reflect the <u>prevailing</u> in-network median

---

[8] The IFR I specifies the following with respect to the geographic region for calculating the QPA: "one region for each metropolitan statistical area (MSA) in a state and one region consisting of all other portions of the state." 38 Fed. Reg. 36872 at 36892.

rates paid in private commercial markets to the physicians providing the bulk of the services. The QPA could result in significantly lowering the real-world median contracted rate in each geographic region. Indeed, amici provider associations here are aware of payors referencing the QPA and its prominence in the IDR process as a reason why they need not accept a provider's rate.

Take, for example, a hypothetical region that has one large group of anesthesiologists who perform a high volume of anesthesia services, several mid-size groups with lower volume, and a handful of solo locum tenens physicians with low, intermittent volume. The median rate for this region under the QPA methodology will be determined by lining up all the groups' contracts and picking the middle rate. Such a measure betrays the reality of health care services and payments in this region. In fact, a true measure of the market rate in this scenario would have to assign proper weight to the different contract rates based on the volume of the services provided by the anesthesiology groups of varying sizes.

Including "ghost rates" – namely, artificially low rates for services in a provider's contract that the provider does not actually provide – in calculating the QPA as permitted under the IFR I skews the QPA even more. Providers have little incentive to negotiate forcefully for rates for services they do not provide. "Ghost rates" within a contract, accordingly, are almost invariably lower than other rates for services actually provided. By treating "ghost rates" the same as other

12

negotiated contract rates for which services are provided, the QPA tends to artificially set a new standard that is determined by a plan's broad or narrow contracting, irrespective of the frequency of use or applicability of those contracts in the real-world market.[9]

The IFR I also permits payors to exclude from the QPA calculation risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments to providers, which likewise distorts the picture of real-world market rates. These factors are inextricably part of the total payment providers can receive as reimbursement for medical services. Not including them would artificially depress the QPA, which is supposed to be a measure of what is paid to providers for a given service.

Finally, when artificial components are included in the QPA calculation as explained above, the resulting QPA fails to account for bargaining positions in the marketplace, even though the QPA is intended to capture negotiated in-network rates. Larger medical groups with higher volume have greater bargaining power. Their contract rates can be higher than other rates for smaller groups with less bargaining power. Yet, the QPA skews toward the smaller groups because, under

---

[9] *TMA III* vacated many of the provisions of the IFR I and the August FAQs dictating how the QPA is calculated. That ruling, issued on August 24, 2023, may still be appealed.

13

the Departments' methodology for calculating the QPA, smaller groups with low

volume and lower rates are given equal weight as larger group contracts with

higher volume and rates.

## II.  The Elevation of the QPA in the Final Rule Results in Anchoring Bias that Could Artificially Tip the Scales in the IDR Process.

### A.  The Final Rule Explicitly Requires IDR Entities to Give Special, Deferential Treatment to the QPA.

For all the QPA's limitations as a stand-alone factor, the Departments

directed IDR arbiters to give it special, highly deferential treatment. Arbiters must

consider the QPA separately, before the other factors. *See* 45 C.F.R.

§149.510(c)(4)(iii)(A). Only <u>afterward</u> may the arbiter "consider all additional

information submitted by a party," if at all. *See id.* §149.510(c)(4)(iii)(B).

Furthermore, evidence of the other statutory factors (but not the QPA) may not be

given weight unless the arbiter finds them to be "credible" and "related to the

offer[s] submitted." 45 C.F.R. §149.510(c)(4)(iii)(E). Finally, evidence of other

factors may not be considered to the extent the arbiter determines it "is already

accounted for" in the calculation of the QPA. 45 C.F.R. §149.510(c)(4)(iii)(E).

While arbiters must always issue a written decision, the Final Rule imposes

more when the arbiter does not select the offer closest to the QPA. Specifically, if

the arbiter "relies on additional information or additional circumstances in

selecting an offer" beyond the QPA, the "written decision must include an

explanation of why the certified IDR entity concluded that this information was not already reflected in the QPA." 45 C.F.R. §149.510(c)(4)(vi)(B).

Amici here agree with the detailed reasons offered by appellees Texas Medical Association, Tyler Regional Hospital, and Dr. Adam Corley why such elevated treatment of the QPA is inconsistent with the Act. *See* Brief of Appellees [docket #85] at 42-67. In sum, as appellees stated, "[t]he Final Rule elevates the QPA by ensuring that it will always be weighed, while keeping other relevant evidence off the scales. And by doing so, the Final Rule usurps the discretion that Congress deliberately conferred on the independent arbitrators, rather than the Departments." *Id.* at 63. Research explaining the psychological effects of anchoring bias bolsters these assertions.

### B.     Anchoring Bias is a Well-Documented Cognitive Function that Can Yield Predictable Results.

Anchoring bias is a cognitive bias that causes decisionmakers to rely heavily on the first piece of information given about a topic, i.e., the "anchor."[10] Newer information is interpreted not objectively but from the reference point of the "anchor," resulting in skewed judgments. Anchoring bias has been the subject of

---

[10] Tversky, Amos; Kahneman, Daniel (September 1974). "Judgment under Uncertainty: Heuristics and Biases." Science. 185 (4157): 1124–31 (available online, last visited Sept. 13, 2023).

research for over fifty years.[11] A widely cited 1974 paper by Tversky and

Kahneman described it as follows:

> In many situations, people make estimates by starting from an initial value that is adjusted to yield the final answer. The initial value, or starting point, may be suggested by the formulation of the problem, or it may be the result of a partial computation. In either case, adjustments are typically insufficient.[12]

In one study, two groups of high school students were asked to estimate

within 5 seconds the answer to a math problem. One group was given a sequence

starting with a larger number ("8 x 7 x 6 x 5 x 4 x 3 x 2 x1") than the second test

group ("1 x 2 x 3 x 4 x 5 x 6 x 7 x 8"). The median estimate given by the first

group was 2,250 and for the second group was 512. (The correct answer is 40,320.)

Given the time constraints, the researchers determined that the subjects performed

the first "few steps of computation" and then extrapolated or adjusted on the back

end. Due to anchoring bias, subjects with the sequence starting with small numbers

used the first few numbers as anchors to estimate the value of the equation, while

subjects with the other sequence relied on larger numbers as their anchor.

Anchoring bias explained the widely different estimates.[13]

------

[11] Sherif, Muzafer; Taub, Daniel; Hovland, Carl I. (1958). "Assimilation and contrast effects of anchoring stimuli on judgments." Journal of Experimental Psychology. 55 (2): 150–155 (available online, last visited Sept. 13, 2023).

[12] Tversky and Kahneman, fn. 10, *supra*, at 1128.

[13] *Id*.

Anchoring bias persists even when the anchoring information is arbitrary or even entirely random.[14] In another experiment cited by Tversky and Kahneman, people were asked to estimate the percentage of African countries in the United Nations. As part of the exercise, researchers "sp[un] a wheel of fortune in the subjects' presence," which resulted in a number between 0 and 100. The researchers found that "these arbitrary numbers had a marked effect" on the estimates given. "For example, the median estimates of the percentage of African countries in the United Nations were 25 and 45 for groups that received 10 and 65, respectively, as starting points."[15] In another study, "estimates of an athlete's performance were influenced by the number on his jersey."[16]

The framing of the question also matters. One study asked participants whether Mahatma Gandhi died before or after age 9 or age 140.[17] While both '9' and '140' are implausible anchors, the respondents in the first group gave an average age of 50, while those in the second group gave an average age of 67.[18]

---

[14] *Id.*

[15] *Id.*

[16] Critcher, Clayton R.; Gilovich, Thomas. (October 30, 2007). "Incidental environmental anchors." Journal of Behavioral Decision Making. 21(3) (available online, last visited Sept. 13, 2023).

[17] Mussweiler, Thomas; Strack, Fritz (1999). "Hypothesis-Consistent Testing and Semantic Priming in the Anchoring Paradigm: A Selective Accessibility Model." Journal of Personality and Social Psychology. 73 (3): 437-446 (available online, last visited Sept. 13, 2023).

[18] *Id.* at 442.

Anchoring bias has been replicated in a wide range of contexts other than number calculations and estimates. Relevant here, the effect is readily apparent in real-world scenarios relating to monetary price or valuation. For instance, when assessing the quality and worth of a company, investors "anchor" their valuation to the share price and place higher valuation on high-priced firms, even though stock price has a low correlation to company quality and performance.[19]

Even having expertise in the area of evaluation is not enough to avoid anchoring bias. For instance, researchers conducted studies that asked students and professional real estate agents to tour and then appraise the value of real estate properties.[20] The test subjects were provided with various listing prices before being asked to give their appraisal. The study found that both subject populations were "significantly biased" by the listing prices even though the agents who ostensibly had more expertise in real estate "flatly denied" relying on the "anchor" listing prices.[21]

---

[19] Disli, Mustafa; Inghelbrecht, Koen; Schoors, Koen; Stieperaere, Hannes. (February 12, 2021). "Stock Price Anchoring." SSRN (available online, last visited Sept. 13, 2023).

[20] Northcraft, Gregory B.; Neale, Margaret A. (February 1987.) "Experts, amateurs and real estate: An anchoring-and-adjustment perspective on property pricing decisions." ORG. BEHAVIOR & HUMAN DECISION PROCESSES (available online, last visited Sept. 13, 2023).

[21] *Id*. at 95.

**C.    Anchoring Bias Will Poison IDRs Conducted Pursuant to the Final Rule to Heavily Favor the QPA.**

The special, deferential treatment given to the QPA under the Final Rule assures it will serve as an anchor in the IDR process. Due to anchoring bias, arbiters are subtly predisposed to select the QPA. To reiterate, the Final Rule requires the QPA to be considered first and separate from all other factors. And it raises hurdles and restrictions against consideration of the other factors, further rooting the QPA in the arbiter's calculus. Through requirements on the arbiter's written decision, the Final Rule subtly places additional pressure on the arbiter to tilt toward the QPA. On many fronts, the Final Rule sets the QPA as the anchor and all but expressly guarantees that IDR processes will result in arbiters selecting the payor determined QPA over providers' alternative offer.

The "black box" around the QPA exacerbates the unfair result of anchoring bias in the IDR process. The QPA is exclusively calculated by the payor, following a deeply flawed methodology. *See* Section II, *supra*. Providers have limited insight into how a QPA was calculated[22] and have no means to verify its correctness. Given that the IDR process is designed to favor the QPA, in this light, the Final

---

[22] *See* 45 C.F.R. §149.140(d)(2) (requiring insurers to disclose whether the relevant QPA was calculated using not contracted rates, but rather using an "eligible database" of health care charges and payments was used to calculate the QPA or an "underlying fee schedule rates or a derived amount").

Rule essentially allows payors to unilaterally dictate out-of-network reimbursement. Such government-sponsored rate-setting is directly contrary to the plain language of the Act and the intent of Congress.

## III.    An Unavailable and Tilted IDR Will Distort Negotiations and Payor Behavior in the Health Insurance Provider Market.

### A.    The IDR Program Has Been Beset with Problems.

The IDR process has been fraught with delays, technical issues, confusion, backlogs and constantly shifting ground rules. The net effect of these unending issues has been to "deprive" physicians "of the arbitration process established by the Act." *TMA II*, 2023 WL 1781801, at *8.

By design, the Act took effect on January 1, 2022, over one year after its enactment. The Departments did not launch a rudimentary IDR portal until April 15, 2022. Since then, the IDR has not been able to keep up with demand. There have been 334,828 IDRs initiated through the federal portal between April 15, 2022 and March 31, 2023.[23] But certified IDR entities rendered final payment determinations in just 42,158 of those IDRs, i.e., under 12.6% of the total.[24] Accounting for IDR proceedings that were closed for administrative reasons (e.g.,

---

[23] CMS.gov, Federal Independent Dispute Resolution Process –Status Update (April 27, 2023) (available online, last visited Sept. 13, 2023).

[24] *Id*.

withdrawal of a dispute), the Department's figures show that 228,213 of the IDRs initiated during the portal's first year (over 68%) remain unresolved today.

The IDR portal has also suffered multiple outages, including two last month alone. The Departments took down the portal following the issuance of the rulings in *TMA IV* and, weeks later, in *TMA III*. During such outages, including at the time of submission of this brief, new IDR proceedings cannot be initiated.

These repeated failures of the IDR portal have real-world consequences. Not only are the majority initiating parties "still awaiting eligibility and payment determinations in a large number of disputes," but the slowdown in IDR processes creates persistent uncertainty for providers around revenue cycle and payment. While the Departments urge parties to continue engaging in open negotiations, payors likely will be less willing to negotiate, given that the IDR portal is not likely to be re-opened any time soon.

Perhaps most pernicious, even when providers do prevail in IDR, amici are aware that payors often still decline to pay any additional amounts that the arbiter determines should be paid. At least one provider has taken to the courts to address this problem. *See* Complaint in *Guardian Flight, LLC v. Health Care Serv. Corp.*, case no. 3:23-cv-01861 (N.D. Tex.) (filed Aug. 18, 2023) (alleging payor ignored IDR decisions and failed to pay one million dollars in out-of-network reimbursements awarded by arbiters following IDR proceedings).

**B.    With No Effective Recourse to Challenge Unfair Out-of-Network Compensation, Provider Networks will Deteriorate.**

Combined with the practical and legal setbacks that resulted in the shutdown of the IDR portal, the Final Rule's requirement that arbiters give special treatment to the QPA will in effect set the ceiling for all out-of-network payments at the insurer-established in-network median rate. This all but ensures that physicians and other health care providers will be routinely under-compensated across the board.

Health insurers have, and will continue, to use an elevated QPA for leverage in contract negotiations with providers. Their rationale is obvious and almost unassailable: if providers do not accept a contract rate that the insurer deems appropriate, the insurer could walk away and rely on the provider's services on an out-of-network basis. And if the provider refuses to accept the insurer's reimbursement on a particular claim, the insurer could ultimately claim its average contract rate because arbiters in the IDR process under the Final Rule would likely determine that the insurer's QPA applies to the claim in dispute.

Inadequate compensation to providers threatens the long-term sustainability of physician practices, particularly small, independent practices that serve rural communities and underserved, dense urban neighborhoods. This will allow insurers to shrink already narrow provider networks, thus deteriorating the accessibility and quality of health insurance coverage for beneficiaries. More services will only be available on an out-of-network basis in many areas of the

country, and the services that are accessible by in-network providers will be subject to longer wait times and more administrative hurdles.

When medically necessary in-network care is no longer available or illusory, patients will be forced to seek services out-of-network, resort to emergency rooms for their care, or forego medical care altogether — outcomes that run entirely contrary to the goals of the Act. Patients also will typically incur much higher out-of-pocket costs under the terms of their benefit plans to access out-of-network services, which makes receiving some health care cost-prohibitive for those with high-deductible plans.

Safety net providers such as emergency department physicians and hospital-based specialists are particularly vulnerable to the market impacts that will result from the Departments' Final Rule. Insurers see providers in these high-utilization or high-cost specialties as dispensable. Such providers will be shed first from provider networks due to low-ball rate negotiation tactics or outright ouster by insurers. Specialty physicians are already in short supply in many parts of the country. Such shortages are projected to worsen over the coming decade.[25] These physician workforce challenges will only be exacerbated by barriers to access that

---

[25] *See* Association of American Medical Colleges (by HIS Markit Ltd.), "The Complexities of Physician Supply and Demand: Projections from 2019 to 2034" (June 2021) at p. vii (available online, last visited Sept. 15, 2023)

are artificially created by health insurers' manipulation of reimbursement and provider networks. This will force many Americans to travel long distances or suffer lengthy delays to receive medically necessary specialty care. Some patients may lose access altogether because there are no essential specialists in their community or in their health plan provider networks.

Access to critically necessary specialty services, particularly in emergencies, will suffer under the Final Rule for an additional reason. Physician specialists, particularly neurosurgeons, orthopedic surgeons and general surgeons, will find it more difficult to serve "on-call" at hospitals due to insurer under-compensation and barriers to provider networks. Such on-call specialists are critical to patient care, ensuring the highest possible quality of service and patient safety for a variety of medical services, including life-saving emergency services.

Emergency departments also serve as the site for primary care for many Americans, who will lose access to basic care when emergency room physicians and other on-call specialists are no longer available. Additionally, because certain specialists, such as anesthesiologists or radiologists, are part and parcel of hospital surgical teams, their unavailability from provider networks can deprive patients of needed, if not lifesaving, procedures.

Giving insurers unfettered rate-setting ability will only exacerbate the significant financial pressures that have forced many physician practices to sell to

larger corporate entities or join the employment ranks of large health care

organizations. These alarming trends have been reported in recent PAI-Avalere

research.[26]

In the three years since the start of the COVID-19 pandemic, PAI-Avalere

found a 19 percent increase in the percentage of physicians who left independent

practices to become employed in a health care organization and a 38 percent

increase in the number of physician practice acquisitions by hospitals and other

corporate entities. The most recent data shows a troubling national picture of

corporate consolidation of physician practices: 73.9 percent of physicians in the

U.S. are now employed by hospital and other corporate entities. In other words,

only one in four physicians practice independently.

A large body of research shows that health care provider consolidation raises

prices and increases overall health care spending without clear indications of

quality improvements.[27] Consolidation also undermines patient choice and

continuity of care. Ultimately, individual health insurance premiums will rise, as

---

[26] *See* Avalere Health, "COVID-19's Impact on Acquisitions of Physician Practices and Physician Employment 2019-2021, PHYSICIANS ADVOCACY INST. (April 2022) (available online, last visited Sept. 15, 2023).

[27] *See* Karyn Schwartz et al., "What We Know About Provider Consolidation" Kaiser Family Found. (Sept. 2, 2020) (available online, last visited Sept. 14, 2023).

will the out-of-pocket costs for health care that must be borne by patients. The Final Rule will exacerbate these trends.

## CONCLUSION

For the foregoing reasons and the reasons asserted in the appellees' briefs, amici PAI, the sixteen amici state medical associations, and the seven amici specialty medical societies urge the Court to affirm the judgment of the district court.

Dated:  September 18, 2023          Respectfully submitted,

*/s/ Long X. Do*

Long X. Do
Eric D. Chan
ATHENE LAW, LLP
5432 Geary Blvd. #200
San Francisco, CA 94121
(415) 722-5351
E-mail: long@athenelaw.com

*Counsel for Amici Curiae*

## ATTACHMENT: DETAILED INFORMATION ON AMICI

**A.**    <u>Description of State Medical Associations</u>

**California Medical Association**: Founded in 1856 "to develop in the highest possible degree, the scientific truths embodied in the profession," the California Medical Association ("CMA") has served as a professional organization representing California physicians for more than 160 years. Throughout its history, CMA has pursued its mission to promote the science and art of medicine, protection of public health and the betterment of the medical profession. CMA contributes significant value to its 50,000 members with comprehensive practice tools, services and support including legislative, legal, regulatory, economic, and social advocacy. CMA works to help reduce administrative burdens in physician practices, support physicians in providing quality care and ensure they thrive amid industry consolidation.

**Connecticut State Medical Society:** Since 1792, the Connecticut State Medical Society ("CSMS") has worked on behalf of physicians and patients in Connecticut. Through the CSMS, physicians stand together regardless of specialty to ensure patients have access to quality care and to make our state the best place to practice medicine and to receive care. CSMS is a respected and powerful voice for the medical profession in Connecticut, representing 4,000 physician members and patients before the Connecticut General Assembly, state and federal agencies, health plans, licensing boards, the judicial branch, and more.

**Florida Medical Association:** Founded in 1874, the Florida Medical Association ("FMA") is a professional association dedicated to the service and assistance of Doctors of Medicine and Doctors of Osteopathic Medicine in Florida. The FMA represents more than 25,000 members on issues of legislation and regulatory affairs, medical economics and education, public health, and ethical and legal issues. It advocates for physicians and their patients to promote public health, ensure the highest standards of medical practice, and to enhance the quality and availability of health care in the Sunshine State.

**Medical Association of Georgia:** Founded in 1849, the Medical Association of Georgia ("MAG") is the leading advocate for physicians in the state. MAG's mission is to "enhance patient care and the health of the public by advancing the art and science of medicine and by representing physicians and patients in the policy making process." With more than 8,400 members, including physicians in

every specialty and practice setting, MAG's membership has increased by more than 35% since 2010.

**Kentucky Medical Association:** Established in 1851, the Kentucky Medical Association ("KMA") is a professional organization for physicians throughout the Commonwealth.  Representing over 6,000 physicians, residents, and medical students, the KMA works on behalf of physicians and the patients they serve to ensure the delivery of quality, affordable health care. Members of KMA share a mission of commitment to the profession and services to the citizens of the Commonwealth that extends across rural and urban areas. From solo practitioners to academicians to large, multi-specialty groups, KMA is the only state association representing every specialty and type of medical practice in Kentucky.

**Louisiana State Medical Society:** Since its founding in 1878, the Louisiana State Medical Society ("LSMS") has worked for a singular purpose: to advance healthcare in the state of Louisiana. In today's fast-paced health care environment, there's nothing more important than having well trained, skilled and knowledgeable physicians, and LSMS's mission is to be the trusted advocate for patients and physicians in the state of Louisiana. LSMS represents 4,000 physicians, residents and physicians-in-training throughout Louisiana. These individuals represent a diverse group of demographics and practice settings within the health care community across the state.

**Massachusetts Medical Society:** The Massachusetts Medical Society ("MMS") is the statewide professional association for physicians and medical students, supporting 25,000 members. MMS is dedicated to educating and advocating for the physicians of Massachusetts and patients locally and nationally. A leadership voice in health care, the MMS contributes physician and patient perspectives to influence health-related legislation at the state and federal levels, works in support of public health, provides expert advice on physician practice management, and addresses issues of physician well-being. Under the auspices of its NEJM Group, MMS extends its mission globally by advancing medical knowledge from research to patient care through the New England Journal of Medicine and other publications.

**Mississippi State Medical Association:** The Mississippi State Medical Association ("MSMA") is the largest physician advocacy organization in Mississippi, representing nearly 5,000 physicians and medical students. Since 1856, MSMA has been a trusted health policy leader and professional development resource for physicians, representing the unified voice of physicians statewide on state and federal health care issues while providing information needed to navigate health care legislation and regulatory changes.

**Nebraska Medical Association:** The Nebraska Medical Association ("NMA") was founded in 1868 and represents nearly 3,000 active and retired physicians, residents, and medical students from across the state of Nebraska. NMA's mission is "to serve physician members by advocating for the medical profession, for patients and for the health of all Nebraskans."

**Medical Society of the State of New York:** The Medical Society of the State of New York ("MSSNY") is an organization of approximately 30,000 licensed physicians, medical residents, and medical students in New York State. MSSNY is a nonprofit organization committed to representing the medical profession as a whole and advocating health-related rights, responsibilities, and issues. MSSNY strives to promote and maintain high standards in medical education and in the practice of medicine in an effort to ensure that quality medical care is available to the public.

**Medical Society of New Jersey:** Founded in 1766, the Medical Society of New Jersey ("MSNJ") is the oldest professional society in the United States. The organization and members are dedicated to a healthy New Jersey, working to ensure the sanctity of the physician-patient relationship. In representing all medical disciplines, MSNJ advocates for the rights of patients and physicians alike, for the delivery of the highest quality medical care. This allows response to the patients' individual, varied needs, in an ethical and compassionate environment, in order to create a healthy Garden State and healthy citizens. With 9,500 members, MSNJ's mission is "to promote the betterment of the public health and the science and the art of medicine, to enlighten public opinion in regard to the problems of medicine, and to safeguard the rights of practitioners of medicine."

**North Carolina Medical Society:** North Carolina Medical Society ("NCMS") was founded in 1849 to advance medical science and raise the standards for the profession of medicine. Today, with 8,000 members NCMS continues to champion these goals and ideals while representing the interest of physicians and protecting the quality of patient care.

**Oregon Medical Association:** Founded in 1874, the Oregon Medical Association ("OMA") is Oregon's largest professional society engaging in advocacy, policy, community-building, and networking opportunities for 8,000 of Oregon's physicians, medical students, physician assistants, and physician assistant students. OMA's mission is to speak as the unified voice of medicine in Oregon; advocate for a sustainable, equitable, and accessible health care environment; and energize physicians and physician assistants by building and supporting their community.

**South Carolina Medical Association:** Since 1789, the South Carolina Medical Association ("SCMA") has served as the foremost association of physicians dedicated to pioneering advances in South Carolina's health care. The largest physician organization in the state, SCMA represents more than 6,000 physicians, resident, and medical students and through that representation provides a voice for the medical profession and creates opportunities to improve the health of all South Carolinians. SCMA works to promote the highest quality of medical care through advocacy on the behalf of physicians and patients, continuing medical education, and the promotion of medical and practice management best practices.

**Tennessee Medical Association:** The Tennessee Medical Association ("TMA") advocates for policies, laws and rules that promote health care safety and quality for all Tennesseans and improve the non-clinical aspects of practicing medicine. TMA's mission is to improve the quality of medical practice for physicians and the quality of health care for patients by influencing policies, laws, and rules that affect health care delivery in Tennessee. On behalf of 9,200 members, TMA works to be the most influential advocacy for Tennessee physicians in the relentless pursuit of the best possible health care environment.

**Washington State Medical Association:** The Washington State Medical Association ("WSMA"), established in 1889, is the largest medical professional association in Washington state, representing more than 12,000 physicians, physician assistants, and trainees from all specialties and various practice settings throughout the state. WSMA's mission is to advance strong physician leadership and advocacy to shape the future of medicine and advance quality care for all Washingtonians.

## B.    Description of Specialty Medical Societies

**American Association of Neurological Surgeons:** Founded in 1931 as the Harvey Cushing Society, the American Association of Neurological Surgeons ("AANS") is a scientific and educational association with more than 13,000 members worldwide. Fellows of the AANS are board-certified by the American Board of Neurological Surgery, the Royal College of Physicians and Surgeons of Canada, or the Mexican Council of Neurological Surgery, A.C. The mission of the AANS is to promote the highest quality of patient care and advance the specialty of neurological surgery, which is the medical specialty concerned with the prevention, diagnosis, treatment and rehabilitation of disorders that affect the spinal column, spinal cord, brain, nervous system and peripheral nerves.

**Congress of Neurological Surgeons**: Established in 1951, the Congress of Neurological Surgeons ("CNS") exists to enhance health and improve lives through the advancement of neurosurgical education and scientific exchange. With over 10,000 neurosurgical professionals from more than 90 countries, the CNS advances the practice of neurosurgery globally by inspiring and facilitating scientific discovery and its translation to clinical practice. Quality neurosurgical care is essential to the health and well-being of society. As such, the CNS, together with the AANS, support a Washington Office that carries out their missions by promoting sound health policy and advocating before the courts, regulatory bodies, state and federal legislatures, and other stakeholders.

**American Academy of Otolaryngology-Head and Neck Surgery:** The American Academy of Otolaryngology-Head and Neck Surgery ("AAO-HNS") was founded in 1896. The AAO-HNS serves its 12,000 United States members in many ways to ensure they are able to provide the highest quality care to all patients. Its Core Purpose states: "We engage our members and help them achieve excellence and provide high quality, evidence informed and equitable ear, nose, and throat care through professional and public education, research, and health policy advocacy."

**American Association of Orthopaedic Surgeons:** Representing more than 39,000 members, including Orthopaedic Surgeons and allied health care professionals in the musculoskeletal medicine specialty, the American Association of Orthopaedic Surgeons ("AAOS") promotes and advocates the viewpoint of the orthopaedic community before federal and state legislative, regulatory, and executive agencies. On behalf of its members, AAOS identifies, analyzes, and directs all health policy activities and initiatives to position the AAOS as the trusted leader in advancing musculoskeletal health.

**American College of Surgeons:** The American College of Surgeons ("ACS") is a scientific and educational organization of surgeons that was founded in 1913 to raise the standards of surgical practice and improve the quality of care for all surgical patients. The ACS is dedicated to the ethical and competent practice of surgery. Its achievements have significantly influenced the course of scientific surgery in America and have established it as an important advocate for all surgical patients. The ACS has more than 88,000 members and is the largest organization of surgeons in the world.

**American Osteopathic Association:** The American Osteopathic Association ("AOA") represents more than 186,000 osteopathic physicians (DOs) and osteopathic medical students; promotes public health; encourages scientific research; serves as the primary board certification body for osteopathic physicians;

and is the accrediting agency for osteopathic medical schools. As the primary board certification body for osteopathic physicians and the accrediting agency for all osteopathic medical schools, the AOA works to accentuate the distinctiveness of osteopathic principles and the diversity of the profession. In addition to promoting public health and encouraging scientific research, the AOA advocates at the state and federal levels on issues that affect osteopathic physicians, osteopathic medical students, and patients.

**American Society of Plastic Surgeons:** The American Society of Plastic Surgeons ("ASPS") is the world's largest association of plastic surgeons. Its over 7,000 domestic members represent 93 percent of Board-Certified Plastic Surgeons in the United States. ASPS's mission is to promote the highest quality in professional and ethical standards, advance quality care for plastic surgery patients, and promote public policy that protects patient safety. ASPS's members are highly skilled surgeons who improve both the functional capacity and quality of life for patients, including the reconstruction of defects caused by disease, congenital anomalies, burn injuries, and traumatic injuries; the treatment of hand conditions; and the provision of gender affirming care.

**CERTIFICATE OF COMPLIANCE**

This brief contains 6,445 words, excluding the items exempted by rule 32(f) of the Federal Rules of Appellate Procedure ("FRAP"), and is in 14-point Times New Roman proportional font, except for footnotes in 12-point Times New Roman proportional font. This brief complies with the type-volume limitation set forth in FRAP rules 29(a)(5) and 32(a)(7)(B) and Fifth Circuit Rule 32.1.

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that, on September 18, 2023, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.