No. 23-40217

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

TEXAS MEDICAL ASSOCIATION, TYLER REGIONAL HOSPITAL, LLC.,
DOCTOR ADAM CORLEY,
*Plaintiffs-Appellees*,
v.
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
DEPARTMENT OF LABOR; DEPARTMENT OF THE TREASURY;
XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; JULIE A. SU, ACTING SECRETARY,
U.S. DEPARTMENT OF LABOR; JANET YELLEN, SECRETARY,
U.S. DEPARTMENT OF TREASURY,
*Defendants-Appellants*.

_____

LIFENET, INCORPORATED, EAST TEXAS AIR ONE, LLC,
*Plaintiffs-Appellees,*
v.
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
DEPARTMENT OF LABOR; DEPARTMENT OF THE TREASURY;
XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; JULIE A. SU, ACTING SECRETARY,
U.S. DEPARTMENT OF LABOR; JANET YELLEN, SECRETARY,
U.S. DEPARTMENT OF TREASURY,
*Defendants-Appellants*.

On Appeal from the United States District Court for the Eastern District of Texas
District Court Case Nos. 6:22-cv-372-JDK and 6:22-cv-373-JDK
The Honorable Jeremy D. Kernodle, Judge Presiding

**BRIEF *AMICUS CURIAE* OF
THE EMERGENCY DEPARTMENT PRACTICE
MANAGEMENT ASSOCIATION IN SUPPORT OF APPELLEES**

[COUNSEL LISTED ON FOLLOWING PAGE]

Jack R. Bierig
ARENTFOX SCHIFF LLP
233 South Wacker Drive
Suite 7000
Chicago, IL 60606
Phone: (312) 258-5511
Fax:  (312) 258-5600
jack.bierig@afslaw.com

*Counsel for Amicus Curiae*
*The Emergency Department Practice*
  *Management Association*

## <u>SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Circuit Rules 28.2.1 and 29.2, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1, in addition to those listed in the parties' briefs, have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

*Amicus Curiae*: The Emergency Department Practice Management Association ("EDPMA") is a not-for-profit national trade association and a Section 501(c)(6) corporation. EDPMA has no parent corporation, and no publicly held company has an ownership interest in EDPMA.

*Counsel*: Jack R. Bierig, ArentFox Schiff LLP, Chicago, Illinois.

*/s/ Jack R. Bierig*
Jack R. Bierig

Counsel for *Amicus Curiae*
The Emergency Department Practice
Management Association

# TABLE OF CONTENTS

Page

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ...................... i

IDENTITY AND INTEREST OF *AMICUS CURIAE*.............................................1

INTRODUCTION ........................................................................................4

ARGUMENT.............................................................................................11

I.    The Final Rule Directly Conflicts with the NSA's Clear and Unambiguous Language...................................................................11

    A.    The NSA Expressly Provides for a Robust Arbitration Process in Which All Statutory Factors Must Be Considered in Determining a Fair Out-of-Network Reimbursement Rate. ............................................................11

    B.    The Final Rule Is Contrary to the NSA and Will Result in Severe Underpayments to Physicians—Just as the Departments Intended. ............................................................13

II.    A Presumption in Favor of Even a Properly Calculated QPA Would Be Improper Under the NSA, But the Departments' Other Rules, and Insurers' Manipulation of the QPA, Ensure that IDR Entities Will Not Be Provided with Valid QPAs Upon Which to Make Their Determinations. ................................................17

    A.    The QPA Represents the Median of In-Network Rates, and Therefore Cannot Be a Fair Proxy for Out-of-Network Reimbursement Rates................................................17

    B.    The Actual QPAs as Calculated by Insurers Under the Departments' Rules Are Artificially Low and Do Not Accurately Reflect Market Rates. ........................................18

    C.    Contrary to Defendants' Contentions, Physicians Are Not Satisfied with the IDR Process................................................21

III.    The Final Rule Will Have Serious Adverse Consequences for the Availability of Healthcare in This Nation—Particularly the Delivery of Emergency Care to Patients. ..........................................24

CONCLUSION....................................................................................28

CERTIFICATE OF SERVICE ...........................................................29

CERTIFICATE OF COMPLIANCE...................................................30

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*,
   587 F. Supp. 3d 528 (E.D. Tex. Feb. 23, 2022) ("*TMA I*") ....................... 2, 6, 10\

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 6:23-cv-59-JDK,
   2023 WL 5489028 (E.D. Tex. Aug. 24, 2023) ("*TMA III*")..........................19, 22

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 6:22-cv-450-JDK,
   2023 WL 5489028 (E.D. Tex. Aug. 24, 2023) ("*TMA IV*") .....................9, 21, 22

## <u>Statutes</u>

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) ................................................. 11

42 U.S.C. § 300gg-111(a)(3)(K)........................................................ 11

42 U.S.C. § 300gg-111(b)(1)(D)........................................................ 11

42 U.S.C. § 300gg-111(c)................................................................... 2

42 U.S.C. § 300gg-111(c)(1)(A)........................................................ 12

42 U.S.C. § 300gg-111(c)(1)(B)........................................................ 12

42 U.S.C. § 300gg-111(c)(5)(A)........................................................ 12

42 U.S.C. § 300gg-111(c)(5)(B)........................................................ 12

42 U.S.C. § 300gg-111(c)(5)(C)(i)(I) ................................................. 12

42 U.S.C. § 300gg-111(c)(5)(C)(i)(II)................................................. 12

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(I) ................................................ 12

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(II)............................................... 12

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(III).............................................. 12

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(IV) ............................................. 12

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(V)............................................... 12

42 U.S.C. § 300gg-111(c)(5)(D)........................................................ 13

No Surprises Act, Pub. L. 116-260, div. BB, tit. I, 134 Stat. 1182,
   2757-890 (2020) ................................................................................. 1

Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd ..........3, 23, 25

## Regulations

45 C.F.R. § 149.510 ..................................................................... 2

45 C.F.R. § 149.510(a)(2)(v) ..................................................... 14

45 C.F.R. § 149.510(c)(4)(iii)(E) .............................................. 14

86 Fed. Reg. 55,980 (Oct. 7, 2021) ....................................... 6, 16

87 Fed. Reg. 52,618 (Aug. 26, 2022) ............................. 2, 12, 20

## Other Authorities

"APP Is Latest Physician Staffing Firm to Fold — It follows Envision, and physicians consider further consequences of difficult market," MedPage Today (July 20, 2023), available at https://www.medpagetoday.com/special-reports/features/105562 ......................................................... 23

"Physicians Decry Unintended Consequences of California's Surprise Billing Laws" (Cal. Med. Ass'n Nov. 1, 2019), available at https://www.cmadocs.org/Portals/CMA/files/public/CMA%20Suprise%20Billing%20Survey%20Results%202019.pdf ............................................... 25

Adam V. Russo, Esq., "The Problem with Wraps,'' available at http://blog.riskmanagers.us/the-problem-with-wraps/ ........................................ 27

American Society of Anesthesiologists, "BlueCross BlueShield of North Carolina Abuses No Surprises Act Regulations to Manipulate the Market Before Law Takes Effect" (Nov. 22, 2021) (including link to sample letters), available at https://www.asahq.org/about-asa/newsroom/news-releases/2021/11/bcbs-abuses-no-surprises-act-regulations#/ ........................................................... 26

Becker's, "4 Disputes Involving UnitedHealth, Physician Staffing Firms" (July 22, 2020), available at https://www.beckershospitalreview.com/payer-issues/4-disputes-involving-unitedhealth-physician-staffing-firms.html ......................... 26

Federal Independent Dispute Resolution (IDR) Process Guidance for Disputing Parties" (CMS March 2023), available at https://www.cms.gov/files/document/federal-idr-guidance-disputing-parties-march-2023.pdf .................................................. 9

Federal Independent Dispute Resolution Process—Status Update," at 2 (CMS Apr. 27, 2023), available at https://www.cms.gov/files/document/federal-idr-processstatus-update-april-2023.pdf ..................................................... 9

Independent Dispute Resolution in the No Surprises Act — Deficiencies and Compliance Failures" (EDPMA July 2023), at 1, available at https://edpma.org/wp-content/uploads/2023/08/IDR-in-NSA-Deficiencies-and-Compliance-Failures.pdf ................................................................................. 22

Joint Statement of the Committees on Ways and Means, Energy and Commerce, and Education and Labor, "Protecting Patients from Surprise Medical Bills" (Dec. 21, 2020), available at https://gop-waysandmeans.house.gov/protecting-patients-from-surprise-medical-bills/ ................................................................. 7

Letter from 152 Members of Congress to Defendant Departments (Nov. 5, 2021) at 2, available at https://wenstrup.house.gov/uploadedfiles/2021.11.05_no_surprises_act_letter.pdf ............................................................................................................... 11

Letter from Members of Congress with Health Care Expertise to Defendant Departments (Nov. 5, 2021), available at https://burgess.house.gov/uploadedfiles/2021.11.02_doc_caucus_surprise_billing_letter.pdf ........................................................................................................ 13

Qualifying Payment Amounts and Health Plan Compliance Under the No Surprises Act" (EDPMA 2023), at 1 (available at ........................................................... 20

*The Evolving Role of Emergency Departments in the United States* (RAND Corp. 2013), available at https://www.rand.org/pubs/research_reports/RR280.html ..... 4

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Emergency Department Practice Management Association ("EDPMA") is a physician trade association focused on the delivery of high-quality, cost-effective care to patients in the emergency department.  EDPMA's membership includes emergency medicine physician groups of all sizes, as well as billing, coding, and other professional support organizations that assist physicians in our nation's emergency departments. EDPMA's members provide direct patient care and/or support the provision of care for approximately half of the 146 million patients that visit emergency departments each year.

For more than 25 years, EDPMA has advocated for the rights of emergency physicians and their patients at the federal and state levels, including with respect to the No Surprises Act, Pub. L. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-890 (2020) ("NSA"), and its implementing regulations.  Among other things, EDPMA filed *amicus curiae* briefs in support of Plaintiffs in the district court as well as in other cases challenging the Departments' implementation of the NSA.  EDPMA's members have been active participants in the Independent Dispute Resolution ("IDR") process under the NSA.

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person or entity other than *Amicus Curiae*, its members, or its counsel contributed money intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(2), (4)(E).

The Final Rule challenged in this case[2] directly contravenes the NSA. Although the Final Rule purports to remove the express presumption in favor of the Qualifying Payment Amount ("QPA") that was imposed by the now-vacated Interim Final Rule,[3] the Final Rule effectively creates just such a presumption. The Final Rule would implement a one-sided procedure that would give inappropriate priority to QPA and thereby tilt the IDR process decidedly in favor of insurers.

The result would be reimbursement rates for out-of-network physicians that are unfair, inadequate, and below-market. Contrary to the assertions of the Departments, this conclusion is not speculative. It follows directly from an understanding of the language of the NSA, the methodological flaws in the Departments' regulations regarding calculation of the QPA (and insurers' manipulation of QPAs), and the real-world implementation of the IDR process to date.

Under the Final Rule, the arbitrator's discretion—indeed, statutory obligation—to weigh all NSA-mandated factors is severely circumscribed because, among other reasons, the QPA is given paramount importance over all the other

---

[2] *See* 42 U.S.C. § 300gg-111; 45 C.F.R. § 149.510; 87 Fed. Reg. 52,618 (Aug. 26, 2022). Each Department has issued its own implementing regulations that are without material variation. For ease of reference, EDPMA cites the regulations promulgated by the Department of Health and Human Services.

[3] *See Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, 587 F. Supp. 3d 528 (E.D. Tex. Feb. 23, 2022) ("*TMA I*").

factors.  As a result, the QPA will become the *de facto* benchmark reimbursement rate.  But making the QPA the benchmark reimbursement rate is precisely what Congress had rejected in enacting the NSA.  *See infra* pp.7-8.

The QPA is an insurer-calculated and insurer-manipulated amount of an *in-network* rate, and is not subject to any effective regulatory oversight.  Not surprisingly, the QPA is consistently below a fair market rate for the services of *out-of-network* physicians. The consequences of these below-market QPAs are far-reaching.  Insurers have been using these manipulated QPAs as the pretext for either terminating physicians from longstanding network agreements, or requiring physicians to accept significantly reduced contract rates as a condition of network participation.  As a result, many physicians are being forced out of networks and into accepting inadequate out-of-network rates.   This network contraction, in turn, jeopardizes patient access to care.  This is exactly what key congressional architects of the NSA had feared when they warned the Departments not to require a presumption in favor of the QPA in IDR proceedings.  *See infra* pp.10-11.

All physicians are materially and adversely affected by the Final Rule, but emergency physicians particularly so.  Under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, emergency physicians are required to treat and stabilize all emergency room patients, regardless of their insurance status or ability to pay.  Indeed, for some time, more than two-thirds of uncompensated

medical care in this country has been provided in emergency rooms.[4]

The situation has long since passed a crisis point. The burden of uncompensated and undercompensated care is growing, resulting in the closing of many emergency departments and hospitals and threatening the ability of emergency physicians and departments to care for all patients, including the indigent and rural populations, who rely on emergency departments as an important safety net.[5] The Final Rule will serve only to exacerbate this bleak situation.

EDPMA submits this brief to advise the Court how the Final Rule will adversely affect physicians and their patients—particularly in the emergency medicine arena—and to demonstrate how the IDR process has been functioning in the real world.

## INTRODUCTION

The goals of the NSA are to protect patients from "surprise" medical bills[6] while at the same time providing fair reimbursement to out-of-network physicians. Although the Departments and their *amici* devote a good amount of space to

---

[4] *See The Evolving Role of Emergency Departments in the United States* (RAND Corp. 2013), available at https://www.rand.org/pubs/research_reports/RR280.html.

[5] *See id.* at 2.

[6] "Surprise" bills are bills for emergency services furnished by out-of-network physicians, or non-emergency services furnished by out-of-network physicians at in-network facilities.

decrying the problems of "balance-billing" patients, balance-billing is simply not at issue in this case. The NSA's prohibitions against balance-billing are not challenged here. To the contrary, Plaintiffs and their *amici* strongly support the NSA's goal of protecting patients from surprise medical bills.

The problem here is that the Departments have ignored—indeed, have been actively working to subvert—the other policy underlying the NSA:  ensuring fair reimbursement for physicians.  In fact, the Departments themselves have acknowledged that lowering payments to out-of-network physicians was one of the goals of their regulations. *See infra* pp.15-16.  Thus, what insurers failed to achieve during the legislative process, the Departments have provided to them through the regulations implementing the NSA.

The NSA accomplishes its goals first by prohibiting insurers and out-of-network physicians from charging patients more than what they would have paid had those services been furnished in-network.  The NSA then establishes a process whereby patients are removed from billing disputes, and physicians and insurers negotiate among themselves to arrive at a fair and reasonable payment for the unreimbursed amounts.  Should those negotiations fail, the parties may invoke IDR, a "baseball-style" arbitration process.

The IDR process is, as the name suggests, supposed to be "independent," and not biased in favor of either party.  The IDR entity must consider each of the statutory

5

factors listed in the NSA and examine the particular facts of the claim to determine the appropriate out-of-network rate. Unlike the Final Rule, the NSA does not assign primacy to, or create a presumption in favor of, any of the statutory factors. Nor does it constrain the discretion of the IDR entity in weighing those factors.

By contrast, the Departments' Interim Final Rule created an express, rebuttable presumption granting the QPA paramount status over all the other statutory criteria that the IDR entity must consider. The QPA is the insurer's median contracted (*i.e.*, *in*-network) amount for the service. The QPA is calculated exclusively by the insurer,[7] is consistently below market rates, and is not subject to scrutiny by the IDR entity or meaningful oversight by the Departments. It has been the subject of widespread insurer noncompliance. *See infra* pp.18-20.

Because IDR offers by insurers generally equal the QPA, or at the very least are closer to the QPA than physicians' offers, the presumption in favor of the QPA would make it "inevitable" that the arbitrators would choose the QPA as the out-of-network reimbursement rate, thereby resulting in undercompensation of physicians. *TMA I*, 587 F. Supp. 3d at 538. The district court in *TMA I* correctly vacated the Interim Final Rule as contrary to the unambiguous language of the NSA. *Id.* at 540-44. The Departments then attempted to draft regulations that comport with the NSA.

---

[7] *See, e.g.*, 86 Fed. Reg. 55,980, 55,996 (October 7, 2021) ("[I]t is not the role of the certified IDR entity to determine whether the QPA has been calculated by the [insurer] correctly."

The resulting Final Rule, however, violates the NSA just as the Interim Final Rule did, albeit using carefully crafted, less explicit language. The Final Rule again gives the QPA primacy in the determination of the out-of-network reimbursement rate. The previous express QPA presumption of the Interim Final Rule has been replaced by new, extrastatutory requirements that effectively result in that very same QPA presumption. The Final Rule requires the IDR entity to *first* consider the QPA and *not* to consider any of the other statutory factors unless additional, extrastatutory criteria are satisfied—new criteria that do not apply to the QPA. Consequently, the arbitrator's statutory obligation to weigh all NSA-mandated factors is again severely circumscribed, and the QPA will become the *de facto* benchmark reimbursement rate, resulting in substantial undercompensation to physicians.

This result is precisely what Congress had rejected in the lengthy legislative process leading to enactment of the NSA. During that process, insurers lobbied vigorously to tie out-of-network reimbursement rates to the QPA, and thereby make the QPA the benchmark reimbursement rate. Congress rejected bills that would have done just that,[8] and instead enacted a statute requiring IDR arbitrators to consider *all* statutory factors.

---

[8] *See, e.g.*, Joint Statement of the Committees on Ways and Means, Energy and Commerce, and Education and Labor, "Protecting Patients from Surprise Medical Bills" (Dec. 21, 2020), available at https://gop-waysandmeans.house.gov/protecting-patients-from-surprise-medical-bills/.

As Congress recognized, fair reimbursement of physicians is critical to the viability of our healthcare system, particularly the delivery of emergency medical care. Indeed, the Departments themselves have recognized the perils of physician undercompensation: "[U]ndercompensation could threaten the viability of these providers [and] facilities . . . . This, in turn, could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act." 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021).

Implementation of the Final Rule would drive physician reimbursement down to artificially low, below-market rates—not only for out-of-network services, but for in-network services as well. Indeed, in the eighteen months since the NSA's effective date, insurers' out-of-network payments to emergency physicians have decreased 92% of the time compared to pre-NSA rates, with an average decrease of more than 32%. *See infra* p.20. Because physicians' only recourse under these circumstances is the IDR process, IDR entities have been flooded with physician-initiated IDR requests, resulting in severe backlogs and further delays in physician reimbursement. *See infra* p.22.

Although other Department regulations have made the IDR process cost-prohibitive for many physicians,[9] the physicians who have been able to invoke IDR

---

[9] As described below, not all physicians have been able to invoke the IDR process due to other Department regulations that made it cost-prohibitive to initiate IDR. Those regulations were vacated by the district court in *TMA IV*. *See Texas Med.*

have been prevailing in overwhelming numbers—approximately 70% of the time, according to the Centers for Medicare and Medicaid Services ("CMS").[10]  A significant reason for this success rate is that the Interim Final Rule and the Final Rule, with their express and implied presumptions in favor of the QPA, have not been implemented.  Instead, IDR entities have been operating under Guidance issued by the Departments that instructs IDR entities to consider all NSA statutory factors, and not to give the QPA predominance over the other factors.[11]

The fact that IDR entities have been selecting physicians' offers as the appropriate out-of-network reimbursement rate makes clear that the QPA amounts— and insurers' offers in IDR—are wholly inadequate.  If the Final Rule is implemented, and the QPA is given predominance, the results will be very different.  This is not mere "speculation," as the Departments contend.  As the district court

---

*Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 6:22-cv-450-JDK, 2023 WL 5489028 (E.D. Tex. Aug. 24, 2023); *infra* pp.21-22.

[10] The Departments have noted that providers are the initiating parties in IDR proceedings nearly 100% of the time.  CMS has found that initiating parties prevail in IDR proceedings approximately 71% of the time.  *See* "Federal Independent Dispute Resolution Process—Status Update," at 2 (CMS Apr. 27, 2023), available at  https://www.cms.gov/files/document/federal-idr-processstatus-update-april-2023.pdf.

[11] *See, e.g.*, "Federal Independent Dispute Resolution (IDR) Process Guidance for Disputing Parties" (CMS March 2023), available at https://www.cms.gov/files/document/federal-idr-guidance-disputing-parties-march-2023.pdf.

correctly found, it is "not only likely and imminent," but "inevitable," that implementation of the Final Rule would reduce physicians' recoveries in IDR proceedings. *See TMA I*, 587 F. Supp. 3d at 538.

Even though the Departments' regulatory provisions giving the QPA undue weight have not yet been applied in IDR proceedings, they have adversely affected *in*-network rates as well. The regulations have emboldened insurers either to terminate contracts with physicians or to threaten termination absent physician acceptance of significantly reduced, unfair reimbursement rates. Those notices often specifically cited the primacy the regulations accorded to QPAs as the legal justification for their actions. *See infra* p.26.

Key congressional architects of the NSA predicted that this would be the outcome if the QPA were given preeminence over other statutory factors. They warned the Departments that the Interim Final Rule "could incentivize insurance companies to set artificially low payment rates, which could narrow networks and jeopardize patient access to care—the exact opposite of the goal of the law. It could also have a broad impact on reimbursement for in-network services, which could exacerbate existing health disparities and patient access issues in rural and urban underserved communities."[12] That, unfortunately, is precisely what is happening.

---

[12] Letter from 152 Members of Congress to Defendant Departments (Nov. 5, 2021) at 2, available at https://wenstrup.house.gov/uploadedfiles/2021.11.05_no_surprises_act_letter.pdf.

Implementation of the Final Rule would serve only to reinforce these practices, which are directly to the language and intent of the NSA. If the Final Rule is upheld, the ultimate losers will be patients, who will be deprived of readily accessible, quality emergency care.

## **ARGUMENT**

**I.    The Final Rule Directly Conflicts with the NSA's Clear and Unambiguous Language.**

**A.    The NSA Expressly Provides for a Robust Arbitration Process in Which All Statutory Factors Must Be Considered in Determining a Fair Out-of-Network Reimbursement Rate.**

The NSA prohibits balance-billing patients in excess of their in-network cost-sharing. Out-of-network physicians, therefore, must turn to the patient's insurer for payment of unreimbursed amounts. Under the NSA, insurers are obligated to pay physicians the "out-of-network rate." 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv)(II),(b)(1)(D). The statutory provision at issue in this case states that the out-of-network rate is the amount determined through a 30-day open negotiation process culminating, if necessary, in IDR. *Id.* § 300gg-111(a)(3)(K).

Under the open negotiation process, the insurer must first pay an amount it reasonably believes is payment in full for the services. *See* 87 Fed. Reg. at 52,626 n.29. The parties then engage in a 30-day negotiation process; if that fails, either party may initiate IDR. Each side submits an offer for a payment amount. The IDR entity must choose one of the two offers as the "out-of-network rate." 42 U.S.C.

11

§§ 300gg-111(c)(1)(A), (c)(1)(B), (c)(5)(B), (c)(5)(A).

The NSA does not set a benchmark for the out-of-network rate. Instead, the NSA provides a detailed list of several factors, all of which the IDR entity "*shall consider*" in its determination:

1.  The QPA for comparable services furnished in the same geographic area. *See* 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I).

2.  Five "additional circumstances":

    - The "level of training, experience, and quality and outcomes measurements" of the provider. *Id.* § 300gg-111(c)(5)(C)(ii)(I).

    - The "market share" of the provider or payor in the relevant geographic area. *Id.* § 300gg-111(c)(5)(C)(ii)(II).

    - The "acuity of the individual receiving such item or service" or the "complexity of furnishing such item or service to such individual." *Id.* § 300gg-111(c)(5)(C)(ii)(III).

    - The "teaching status, case mix, and scope of services" of the facility. *Id.* § 300gg-111(c)(5)(C)(ii)(IV).

    - "Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or . . . the plan . . . to enter into network agreements and, if applicable, contracted rates between [those entities] during the previous 4 plan years." *Id.* § 300gg-111(c)(5)(C)(ii)(V).

3.  Any information the IDR requests from the parties. *Id.* § 300gg-111(c)(5)(C)(i)(II).

4.  Any additional information submitted by the parties. *Id.*

Thus, Congress identified with precision each of the factors that IDR entities must take into account in determining the reimbursement rate.[13] Congress left to the

---

[13] The NSA also states what the IDR entity "*shall not* consider": (i) usual and customary charges; (ii) amounts the provider would have billed absent the NSA's

discretion of the IDR entity how to balance each of those factors to arrive at the appropriate reimbursement. The NSA does not instruct IDR entities how to weigh the statutory factors, does not give primacy to the QPA, and does not create a "presumption" that the QPA is the proper reimbursement.

There is no support in the NSA for making QPA the proxy for, or even the predominant factor in calculating, the out-of-network rate. Any "disproportionate emphasis on the QPA . . . necessarily undervalues other factors brought to the arbiter, including quality and outcomes data." As a result, the QPA "is unlikely to reflect actual market-based payment rates for all circumstances."[14]

## B.    The Final Rule Is Contrary to the NSA and Will Result in Severe Underpayments to Physicians—Just as the Departments Intended.

Although purporting to remove the Interim Final Rule's express presumption in favor of the QPA, the Final Rule effectively continues the Departments' policy of giving primacy to the QPA. For example, the Final Rule requires arbitrators to consider whether the other, non-QPA information is "credible." Notably, however, the QPA is exempt from this "credibility" requirement because, according to the

---

ban against balance-billing; and (iii) reimbursement rates by a public payor, such as Medicare. 42 U.S.C. § 300gg-111(c)(5)(D).

[14] Letter from Members of Congress with Health Care Expertise to Defendant Departments (Nov. 5, 2021), available at https://burgess.house.gov/uploadedfiles/2021.11.02_doc_caucus_surprise_billing_l etter.pdf.

Departments, the QPA allegedly "is worthy of belief and is trustworthy"—an assumption that has not been borne out by the facts. 45 C.F.R. § 149.510(a)(2)(v); *see infra* pp.17-20. Furthermore, the Final Rule prohibits giving any weight to factors that allegedly are already reflected in the QPA—the so-called "double-counting" prohibition. *Id.* § 149.510(c)(4)(iii)(E). Thus, although the NSA requires arbitrators to consider patient acuity and complexity of service, the Final Rule prohibits consideration of these factors unless they are both "credible" *and* not already reflected in the QPA. *Id.*

The district court correctly held that the Final Rule violates the express terms of the NSA:

> [T]he Act nowhere states that the QPA is the primary or most important factor—or that it must be weighed more heavily than, or considered before, other factors. Nor does the Act limit arbitrators' discretion in considering the statutory factors, impose heightened scrutiny on information related to the non-QPA factors, or create procedural hurdles before considering that information. . . .
>
> . . .
>
> . . . While avoiding an explicit presumption in favor of the QPA, the Final Rule nevertheless continues to place a thumb on the scale for the QPA by requiring arbitrators to begin with the QPA and then imposing restrictions on the non-QPA factors that appear nowhere in the statute.

ROA.1859-1860.

Thus, rather than a robust arbitration process in which the IDR entity is *required* to evaluate *all* the factors that Congress believed were relevant to determining a proper reimbursement rate, the Final Rule would turn the IDR process

into a truncated, meaningless exercise:  one in which the IDR entity must first consider the QPA, is prohibited from considering the other required statutory factors unless a series of extrastatutory criteria is satisfied, and in which the foregone conclusion is that the QPA—an inadequate, insurer-calculated, and below-market rate—will be selected as the reimbursement amount.

There can be no serious doubt that this was what the Departments intended. First, the Departments pronounced that the NSA "contemplates that typically the QPA will be a reasonable *out*-of-network rate."  86 Fed. Reg. at 55,996 (emphasis added). Had Congress believed that the QPA—the *in*-network rate calculated solely by the insurer—would "typically" be the appropriate amount for *out*-of-network reimbursements, it would have said so.  The fact that Congress specified many factors—*in addition* to the QPA—that the IDR entity is required to consider in arriving at a fair out-of-network rate demonstrates that Congress did not believe that the QPA would "typically" be an adequate and fair reimbursement rate.  As explained below, in-network rates are normally lower than out-of-network rates because in-network physicians agree to accept lower rates in return for the benefits of being in a network—a benefit that out-of-network physicians do not have.  *See infra* pp.17-20.

Second, the QPA is almost always a below-market rate.  *See infra* pp.17-20. Indeed, the Departments themselves have acknowledged that lowering payments to

out-of-network physicians was the intent of the Interim Final Rule and the Final Rule. In drafting the regulations, the Departments had publicly expressed concern that arbitrators would select higher payment amounts favored by providers, resulting in higher healthcare costs. *See* 86 Fed. Reg. at 56,060. Accordingly, the Departments determined to give undue preference to the QPA—which they acknowledged is "typically lower than billed charges"—to attempt to ensure that the arbitrators would routinely select the insurer's offer. *Id.* at 56,056-61.

As the Departments explained, this would "have a downward impact on health care costs" by lowering payment amounts to providers. *Id.* at 56,060. The district court found that this was precisely the Departments' goal:

> The Departments' goal [from the Interim Final to the Final Rule] has not changed: "The goal of the [Final] [R]ule is to keep costs down." Although the Departments have abandoned the "rebuttable presumption" term, *they have not relinquished their goal of privileging the QPA, tilting arbitrations in favor of insurers, and thereby lowering payments to providers.*

ROA.1864 (emphasis added).

Accordingly, the Final Rule is contrary to the plain and unambiguous language of the NSA. The Final Rule exalts the QPA to the practical exclusion of other statutory factors and constrains the arbitrators' statutorily mandated discretion in weighing all relevant factors to arrive at a fair and reasonable reimbursement rate.

**II.    A Presumption in Favor of Even a Properly Calculated QPA Would Be Improper Under the NSA, But the Departments' Other Rules, and Insurers' Manipulation of the QPA, Ensure that IDR Entities Will Not Be Provided with Valid QPAs Upon Which to Make Their Determinations.**

The arguments of the Departments and their *amici* ultimately rest on the assumption that the QPA is the presumptively valid basis for reimbursement to out-of-network physicians.  There is no legal or factual basis for that assumption.  Wholly apart from the improper presumption that the Final Rule would grant to a *valid* QPA, the real-world consequences of granting that presumption to the *actual* QPAs that insurers are submitting would result in out-of-network reimbursement rates that are even more unfair and unreasonable.

**A.    The QPA Represents the Median of In-Network Rates, and Therefore Cannot Be a Fair Proxy for Out-of-Network Reimbursement Rates.**

The plain language of the NSA demonstrates that the QPA is not a proxy for reasonable out-of-network reimbursement rates.  The QPA is the median *in*-network rate, and the NSA requires the IDR entity to consider a number of factors *in addition to* the QPA in determining a reasonable *out*-of-network rate.

The real world of health insurance markets bears this out.  Contracted rates are affected by any number of factors, including the market share of the plan and provider, the unique economic and clinical environment in the communities, and

17

penalty and bonus structures.[15]   In-network physicians often agree to lower contracted rates in exchange for having access to all patients in the payor's network, reimbursement certainty, and administrative efficiencies, including assurances of direct payment—benefits that out-of-network physicians do not have.  Moreover, as demonstrated below, the Departments' other regulations regarding calculation of the QPA, coupled with insurers' improper manipulation of QPA amounts, result in artificially lower QPA amounts.  *See infra* pp.17-20.  In short, using contracted rates as the QPA, and the QPA as a proxy for out-of-network rates, will result in QPAs that deviate drastically from any fair representation of the actual prevailing market rate.

**B.     The Actual QPAs as Calculated by Insurers Under the Departments' Rules Are Artificially Low and Do Not Accurately Reflect Market Rates.**

The QPA would not be an appropriate proxy for out-of-network reimbursement rates even if it accurately reflected median in-network rates.  But a combination of the Departments' other implementing regulations, as well as insurer abuses in manipulating QPAs, has resulted in insurers' submission of QPAs that are even more  significantly below fair market rates.

---

[15]  Indeed, in some contracts, risk-sharing amounts can total 10-15% of the total payments; the contracted rates are adjusted downward to reflect the potential for earning such an incentive.

The Departments' "July Rule" that is the subject of "*TMA III*"[16] (1) allows insurers to include in the calculation of the QPA non-negotiated, unreasonably low contracted rates for services that are not actually provided by the contracting physician, typically because the services are outside his or her specialty ("ghost rates"), and "zero-pay payments," used by insurers to lower the median contracted rate; (2) excuses insurers from incorporating the rates of physicians in the same specialty; (3) requires insurers to exclude from the rates used to calculate the QPA risk-sharing, bonus, and other incentive-based or retrospective payments, which sometimes form a significant portion of the ultimate amount paid to the physician under the contract; and (4) allows self-insured group health plans, at their option, to calculate QPAs based on the (lower) contracted rates of *other* plans administered by the same entity.   The district court held that these provisions improperly allow insurers to manipulate the QPA downward and reimburse for out-of-network services at amounts that are below-market.   *See TMA III*, 2023 WL 5489028, at \*5-10.

This result is not theoretical or speculative.   Quite to the contrary, it is evidenced by the dramatic decline in reimbursement rates for physicians since the NSA.   EDPMA analyzed data from its members to ascertain the effects of the

---

[16] *See Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 6:23-cv-59-JDK, 2023 WL 5489028 (E.D. Tex. Aug. 24, 2023) ("*TMA III*").

implementation of the NSA on emergency medicine. In a 2022 survey of its members, EDPMA compared pre-NSA (2021) out-of-network allowed amounts to post-NSA (2022) allowed amounts. EDPMA found that post-NSA out-of-network payments *decreased 92% of the time* compared to pre-NSA amounts, with an average decrease of 32% per emergency room visit.[17]

EDPMA also found that insurers fail readily to provide the QPA at all in 91% of their initial payments or notices of denial, often off-loading it onto separate portals or look-up tools, imposing unnecessary obligations on an already overburdened delivery system.[18] When they do provide QPAs, the QPA is equal to the insurers' allowed amount at least 93% of the time, demonstrating that insurers are using problematic QPAs as the basis for reimbursement, notwithstanding the NSA's intent that the QPA should not be a "benchmark" payment standard.[19] *See also* 87 Fed. Reg. at 52,625 n.29 ("many plans and issuers make initial payments that are equivalent to or are informed by the corresponding QPA for the item or service at

---

[17] *See* "Qualifying Payment Amounts and Health Plan Compliance Under the No Surprises Act" (EDPMA 2023), at 1 (available at https://edpma.org/wp-content/uploads/2023/02/EDPMA-Data-Data-Analysis-No-Suprises-Act-FINAL.pdf. Furthermore, the allowed amounts for emergency medicine services ranged from a weighted average of 126%-145% of Medicare rates. This represents cuts of at *least* 25-65% from pre-NSA average out-of-network reimbursement levels for emergency medicine. (*Id.* at 2 n.4.)

[18] *Id.* at 1.

[19] *Id.* at 2.

issue").)

### C. Contrary to Defendants' Contentions, Physicians Are Not Satisfied with the IDR Process.

The Departments and their *amici* contend that physicians are generally satisfied with the IDR process because only 3% of all out-of-network bills under the NSA wind up in IDR, while the rest "are resolved voluntarily in QPA-centered negotiations." (*See, e.g.*, Dkt.39-1 at 10-11.) This conclusion is misleading.

First, many physicians do not initiate IDR proceedings because it would be cost-prohibitive and administratively burdensome to do so. As demonstrated in the "*TMA IV*" case,[20] Department regulations regarding the costs of arbitration and the "batching" of claims that are permitted have rendered many physicians unable to participate in IDR. As a result, they are forced to accept insurers' "QPAs" that are significantly below a fair reimbursement rate. (The district court invalidated those regulations as well. *See TMA IV*, 2023 WL 4977746, at *6-12.) EDPMA members have a far higher rate of IDR initiation (60%),[21] but even then, they are unable to submit to IDR all eligible underpaid claims due to insurer misconduct and the extraordinary costs and administrative burdens of IDR as currently implemented by

---

[20] *See Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 6:23-cv-59-JDK, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) ("*TMA IV*").

[21] The Departments' regulations regarding arbitration costs and "batching" have varying effects, depending on the physicians' specialty and practice.

the Departments.[22]

Second, the fact that QPAs are artificially low is evidenced by the enormous volume of IDR proceedings—a fact that even the Departments and their *amici* acknowledge. The Departments have reported that the number of IDRs initiated by providers in the first five months of the program was more than the government had anticipated for an entire year. *See supra* note 17. Indeed, IDR requests have exceeded CMS's projections by more than 700%. This has caused a severe backlog for arbitration and a significant delay in resolutions. A recent study by the EDPMA found that 91% of its members' filed IDR claims remain open and unadjudicated. *See supra* note 22. In addition, insurers' unwillingness to be transparent in their submission of initial payments has resulted in providers being unable to correctly decipher eligible claims to pursue in IDR. This, too, has compounded the backlogs, leading to both provider and IDR cost overruns, as evidenced by the Departments' need to raise IDR administrative fees (which the district court recently struck down in *TMA IV*).

The substantially reduced payments from insurers based on unfairly low QPAs, coupled with declining government insurance reimbursement and the rise in

---

[22] *See* "Independent Dispute Resolution in the No Surprises Act — Deficiencies and Compliance Failures" (EDPMA July 2023), at 1, available at https://edpma.org/wp-content/uploads/2023/08/IDR-in-NSA-Deficiencies-and-Compliance-Failures.pdf.

the number of uninsured patients and uncompensated care, have adversely affected provider viability, resulting in negative cash flow for physician groups, layoffs, and emergency department group insolvencies.   Not only have these developments adversely affected patients, but they have put into question whether emergency medicine can continue to serve the public as a provider of last resort and, consequently, the safety net of the American healthcare system.[23]

Because of the dramatic and unexpected reduction in out-of-network reimbursements by commercial payors, previous subsidizing cross-funding that guaranteed a patient's access to emergency care under EMTALA no longer exists. Instead, hospitals—many of which are already in severe financial distress—are now reluctantly shouldering the brunt of these costs, potentially crippling this country's healthcare safety net.  *See supra* note 17.

Significantly, emergency medicine groups are expected to see a reduction in commercial reimbursement of almost *$1 billion* annually.  *See supra* note 17.  If the Departments' implementation of the NSA is upheld, the current shortage of emergency physicians and concomitant severe understaffing of emergency departments will only grow worse.  The inevitable result will be an even greater

---

[23] *See, e.g.*, "APP Is Latest Physician Staffing Firm to Fold — It follows Envision, and physicians consider further consequences of difficult market," MedPage Today (July 20, 2023), available at https://www.medpagetoday.com/special-reports/features/105562.

reduction in patient access to emergency care, particularly in underserved and rural communities.

**III.    The Final Rule Will Have Serious Adverse Consequences for the Availability of Healthcare in This Nation—Particularly the Delivery of Emergency Care to Patients.**

By placing a thumb on the scale for the QPA, the Final Rule will undermine the ability of physicians to have their offers chosen in IDR proceedings. Consequently, the amounts they are reimbursed for their out-of-network services will decrease.  Indeed, as noted above, the QPAs submitted by insurers to physicians today are well below pre-NSA amounts.  Furthermore, the inadequacy of the insurer-calculated QPAs is demonstrated by the fact that physicians have been prevailing in IDR proceedings to date (in which the arbitrators should not be applying a presumption in favor of the QPA).  Notably, in those cases in which emergency physicians lost their IDR proceedings, EDPMA found that the IDR entity improperly had relied largely on the QPA.  If upheld, the Final Rule would result in a host of adverse consequences for emergency physicians and their patients.

First, there is no serious dispute that "benchmark" payments, like the QPA envisioned by the Final Rule, result in underpayments to physicians and in turn cause the contraction of provider networks and the narrowing of healthcare choices for patients.  The California experience is illustrative.  California enacted a benchmark rate, but that benchmark became the default rate for out-of-network and even some in-network services.  Insurers recognized that they could force providers out of

network by paying the artificially low benchmark rate and then offering take-it-or-leave it contracts.  These networks have been squeezed down in size, scope, and quality, jeopardizing patient access to care.  Small, independent providers could not remain financially viable and were forced to consolidate with larger systems to continue to care for their patients.  This consolidation substantially increased healthcare costs.[24]

For emergency physicians, the problem is even more acute.  EMTALA causes insurers to be even less inclined to keep emergency providers in-network, because their policyholders can access—in fact, must by law receive—emergency care regardless of insurance status.  Insurers have no incentive to enter into fair contracted rates with emergency physicians.

Second, many physicians—including EDPMA members—have received termination notices from insurers of longstanding network agreements (including agreements that currently protect patients in rural and underserved communities), or threats to terminate existing agreements unless the physicians agree to substantial discounts from their contracted rates.  One of these recent letters sent to an EDPMA member group demanded—without any warning or justification—that the

---

[24] "Physicians Decry Unintended Consequences of California's Surprise Billing Laws" (Cal. Med. Ass'n Nov. 1, 2019), available at https://www.cmadocs.org/Portals/CMA/files/public/CMA%20Suprise%20Billing%20Survey%20Results%202019.pdf.

physicians, nurse practitioners, and physician assistants accept an immediate rate reduction of 60%. Some of those termination letters even expressly cited the Rules as justification.[25] The only recourse for physicians who are forced out-of-network is the IDR process, which is not a viable option for many physicians. The representations of Defendants' *amici* that "market forces" allegedly discourage health insurers from unduly narrowing their provider networks and that state law "network adequacy standards" ensure appropriate network coverage is simply not borne out by the facts. (*See, e.g.*, Dkt. 39-1 at 26-27.)[26]

---

[25] American Society of Anesthesiologists, "BlueCross BlueShield of North Carolina Abuses No Surprises Act Regulations to Manipulate the Market Before Law Takes Effect" (Nov. 22, 2021) (including link to sample letters), available at https://www.asahq.org/about-asa/newsroom/news-releases/2021/11/bcbs-abuses-no-surprises-act-regulations#/; Becker's, "4 Disputes Involving UnitedHealth, Physician Staffing Firms" (July 22, 2020), available at https://www.beckershospitalreview.com/payer-issues/4-disputes-involving-unitedhealth-physician-staffing-firms.html.

[26] Insurers have been able to mask the reduction in the number of directly contracted providers in their networks by reporting their network adequacy to state departments of insurance by counting *indirectly* contracted provider agreements in order to fill the gap of nonrenewed/terminated direct contracts. Such indirect contracting utilizes what the industry calls "Wrap Networks." One particular network has become an aggregator in this space by acquiring other networks while keeping their original names so as to disguise the common ownership. Most providers sign agreements with these "Wrap PPOs" because the rates are typically higher than directly contracted rates. But under the rules of those Wrap Networks, insurers may *choose* to refer claims to physicians in the "network," but they are not compelled to do so. Physicians, on the other hand, *must* accept the rates if an insurer *chooses* to present the claim. Under these circumstances, insurers can claim to state regulators to have network "adequacy" (because the Wrap Networks' scope of providers is counted as part of the network for reporting purposes), but are not obligated to maintain direct

Finally, the Departments' assumption that lower reimbursement rates will translate into lower costs to patients is without any basis. In promulgating the Interim Final Rule, the Departments stated that that rule would "help limit the indirect impact on patients that would occur from higher out-of-network rates if plans and issuers were to pass higher costs on to individuals in the form of increases in premiums." 86 Fed. Reg. at 55,996. But there is no evidence that insurers pass their savings from lower reimbursement rates onto their insureds.

In fact, when states provide for fair reimbursement (like New York and Connecticut), the resulting insurance premiums are actually *lower* than the national average. One study examined premiums in New York, Connecticut, and nationwide. In 2019, the percentage growth in premiums was 73% nationwide, but only 50% in New York and 35% in Connecticut.[27] In other words, there is no evidence of a relationship between higher insurance premiums and laws that improve emergency physician reimbursement. In short, implementation of the Final Rule will result in a host of negative consequences for physicians and their patients without any of the hoped-for positives in the form of lower insurance premiums.

---

contracting with provider. *See, e.g.*, Adam V. Russo, Esq., "The Problem with Wraps,'' available at http://blog.riskmanagers.us/the-problem-with-wraps/.

[27] "Percentage Growth in Marketplace Average Benchmark Premiums Since 2015 (EDPMA), available at https://www.edpma.org/downloads/EDPMA_one-pager_CT-NYMarketplace.pdf.

## <u>CONCLUSION</u>

The EDPMA respectfully requests that the judgment of the district court be affirmed.

DATED:  September 18, 2023                    Respectfully submitted,
                                              */s/Jack R. Bierig*
                                              JACK R. BIERIG
                                              **ARENTFOX SCHIFF LLP**
                                              233 South Wacker Drive, Suite 7100
                                              Chicago, IL 60606
                                              Phone: (312) 258-5511
                                              jack.bierig@afslaw.com

                                              *Counsel for Amicus Curiae*
                                              *The Emergency Department Practice*
                                              *Management Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2023, a true and correct copy of the foregoing document was filed electronically using the Court's EM/ECF filing system, which served all counsel of record.

*/s/ Jack R. Bierig*
Jack R. Bierig

*Counsel for Amicus Curiae*
*The Emergency Department Practice*
  *Management Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,303 words, excluding the parts of the brief exempted by Rule 32(f).

This brief also complies with the typeface requirements of Rule 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Jack R. Bierig*
Jack R. Bierig

*Counsel for Amicus Curiae*
*The Emergency Department Practice*
*  Management Association*