No. 23-40217

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**Texas Medical Association et al.,**
*Plaintiffs-Appellees,*
*v.*
**U.S. Department of Health and Human Services, et al.,**
*Defendants–Appellants.*

**LifeNet, Incorporated et al.,**
*Plaintiffs-Appellees,*
*v.*
**U.S. Department of Health and Human Services, et al.,**
*Defendants-Appellants.*

Appeal from the United States District Court for the
Eastern District of Texas

**Amici Curiae Brief of the American Society of Anesthesiologists, the American College of Emergency Physicians, and the American College of Radiology**

Jeremy Lewin
**BARNES & THORNBURG LLP**
One N. Wacker Drive, Suite 4400
Chicago, IL 60606-2833
312.214.8833
jeremy.lewin@btlaw.com

Aaron D. Lindstrom
**BARNES & THORNBURG LLP**
171 Monroe Ave. NW, Suite 1000
Grand Rapids, MI 49503-2694
616.742.3931
aaron.lindstrom@btlaw.com

*Attorneys for Amici Curiae,*
*THE AMERICAN SOCIETY OF ANESTHESIOLOGISTS,*
*THE AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, AND*
*THE AMERICAN COLLEGE OF RADIOLOGY*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Rule 28.2 of the Fifth Circuit Rules, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants:**
>Texas Medical Association
>Tyler Regional Hospital, LLC
>Dr. Adam Corley
>LifeNet, Incorporated
>East Texas Air One

**Attorneys for Plaintiffs-Appellants:**
>Sidley Austin LLP
>Eric Dean McArthur
>Brenna E. Jenny
>Manuel Valle
>Madeleine Joseph
>Cody Akins
>Jaime L.M. Jones
>Joseph R. LoCascio
>Penny Packard Reid
>
>Susman Godfrey LLP
>Stephen Shackleford, Jr.
>Steven M. Shepard
>James Craig Smyser
>Max Isaac Straus

**Defendants-Appellees:**
United States Department of Health and Human Services
Department of Labor
Department of the Treasury
Xavier Becerra, Secretary, U.S. Department of Health and Human
    Services
Julie A. Su, Acting Secretary, U.S. Department of Labor
Janet Yellen, Secretary, U.S. Department of Treasury,

**Attorneys for Defendants-Appellees:**
Civil Division, U.S. Department of Justice
Brian M. Boynton
Damien M. Diggs
Joshua M. Salzman
Kevin B. Soter

**Amici curiae:**
Physicians Advocacy Institute
American Association of Neurological Surgeons
Congress of Neurological Surgeons
American Society of Anesthesiologists
American College of Emergency Physicians
American College of Radiology
American Medical Association
American Hospital Association
The Emergency Department Practice Management Association
American Benefits Council
Business Group on Health
Council of Insurance Agents and Brokers
DFW Business Group on Health
ERISA Industry Committee
Houston Business Coalition on Health
HR Policy Association
National Alliance of Health Care Purchaser Coalitions
National Retail Federation
Purchaser Business Group on Health
Self-Insurance Institute of America
Texas Business Group on Health

Texas Employers for Affordable Healthcare
Leukemia & Lymphoma Society
Hemophilia Federation of America
CancerCare
United States Public Interest Research Group, Inc.
National Multiple Sclerosis Society
Epilepsy Foundation
Families USA Action
ALS Association
America's Health Insurance Plans
Cancer Support Community
The Mended Hearts, Incorporated
U.S. PIRG
Blue Cross Blue Shield Association

**Attorneys for amicus curiae:**

Athene Law, LLP
Long Xuan Do
Eric David Chan

Barnes & Thornburg LLP
Jeremy Lewin
Aaron D. Lindstrom

Akin Gump Strauss Hauer & Feld LLP
James Tysse
Kelly M. Cleary
Kristen Loveland

ArentFox Schiff
Jack R. Bierig

The Stafford Davis Firm, PC
Catherine Susan Bartles
Stafford Grigsby Helm Davis

Groom Law Group
Ryan Temme

Seth T. Perretta
Matthew W. Lanahan

Wardenski P.C.
Joseph J Wardenski

Deutsch Hunt PLLC
Hyland Hunt

O'Melveny & Myers, L.L.P.
Kenneth Lee Blalack, II
Andrew Robert Hellman


Dated: September 18, 2023          */s/ Aaron  D. Lindstrom*

# Table of Contents

**Page**

Statement of amici curiae ........................................................ 1

Introduction .............................................................................. 2

Background ............................................................................... 5

    A.    The No Surprises Act ........................................... 5

    B.    The Act's independent dispute resolution process .............. 6

    C.    This Court vacates the October 2021 interim final rule and its methodology for calculating the QPA. ...................... 9

    D.    The Departments publish a final rule that still preferences the QPA over other factors. ........................... 11

Argument ................................................................................. 12

I.    The QPA does not reflect the fair market value of out-of-network items and services. ........................................... 13

II.    The final rule incentivizes insurers to lower in-network rates, ultimately narrowing provider networks. ........................ 19

III.    The final rule will result in under-compensation of care, which may incentivize the consolidation of practices, undermining market competition. ................................ 24

IV.    Market disruptions and narrower provider networks stemming from the final rule will harm patients in underserved areas struggling with accessibility. ........................ 26

Conclusion .............................................................................. 29

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Am. Corn Growers Ass'n v. EPA,*
291 F.3d 1 (D.C. Cir. 2002 ............................................................. 4, 23

*Silva-Trevino v. Holder,*
742 F.3d 197 (5th Cir. 2014) ............................................................. 21

*Texas Med. Ass'n v. HHS (TMA 1),*
587 F. Supp. 3d 528 (E.D. Tex. 2022) ................................. 4, 11, 23, 30

**STATUTES**

Cal. Health & Safety Code § 1371.31 .................................................. 25

No Surprises Act, Pub. L. No. 116-260,
div. BB, tit. I, 134 Stat. 2757-890 (2020) (codified at 42 U.S.C.
§§ 300gg-111, 300gg-131 to 132; 29 U.S.C. § 1185e; 26 U.S.C. § 9816)
.......................................................................................... passim

**REGULATIONS**

45 C.F.R. § 149.140 ........................................................................... 9, 14

45 C.F.R. § 156.230 ............................................................................... 28

Requirements Related to Surprise Billing,
87 Fed. Reg. 52,618 (Aug. 26, 2022) ................................. 2, 11, 12, 19

Requirements Related to Surprise Billing; Part I,
86 Fed. Reg. 36,872 (July 13, 2021) .................................... 9, 15, 17

Requirements Related to Surprise Billing; Part II,
86 Fed. Reg. 55,980 (Oct. 7, 2021) ........................................... 10

## OTHER AUTHORITIES

Erin L. Duffy, *Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining: California's Experience,* 25 Am. J. Managed Care e243 (2019)..................................................26

H.R. Rep. No. 116-615, pt. 1, at 57 (2020) .................................................................................8

Simon F. Haeder, *Inadequate in the Best of Times: Reevaluating Provider Networks in Light of the Coronavirus Pandemic,* 12 World Med. & Health Pol'y 282 (2020)..........................................27

**STATEMENT OF AMICI CURIAE**

The American Society of Anesthesiologists, the American College of Emergency Physicians, and the American College of Radiology (collectively, "*Amici*") are voluntary, national professional associations that advocate for the interests of their respective members, including on matters concerning adequate and fair reimbursement for items and services provided out-of-network.

The American Society of Anesthesiologists is a professional association comprised of approximately 56,000 physician anesthesiologists and others involved in the medical specialty of anesthesiology, critical care, and pain medicine. The American College of Emergency Physicians is a professional association comprised of approximately 38,000 emergency physicians, residents, and medical students. The American College of Radiology is a professional association comprised of approximately 40,000 diagnostic radiologists, radiation oncologists, interventional radiologists, nuclear medicine physicians, and medical physicists.

*Amici* submit this brief on behalf of their members who provide items and services that are impacted by the No Surprises Act.

## INTRODUCTION

In August 2022, the federal agencies who are appellants in this case—the Department of Health and Human Services, the Department of Labor, the Department of the Treasury, and the Office of Personnel Management—published a final rule under the No Surprises Act to implement the Act's independent dispute resolution (IDR) process. Requirements Related to Surprise Billing, 87 Fed. Reg. 52,618 (Aug. 26, 2022). *Amici* submit this brief to explain to the Court how the final rule unlawfully empowers insurers to dictate both in-network and out-of-network rates for physician services, which will force many physician practices to consolidate and which will harm patient care by narrowing provider networks, particularly in underserved communities.

The No Surprises Act addresses two interrelated problems with the private health insurance market. First, insurers demand low payment rates as a condition of physicians participating in their networks, a demand that forces many physicians to stay out-of-network to remain economically viable. Second, patients who unknowingly receive certain care from out-of-network providers are responsible for amounts not paid by their insurance companies, which is known as

"surprise billing." No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 2757-890 (2020) (codified at 42 U.S.C. §§ 300gg-111, 300gg-131 to 132; 29 U.S.C. § 1185e; 26 U.S.C. § 9816). *Amici* support Congress's reforms, which, if properly implemented, will ensure fair reimbursement to providers and facilities and reasonable cost sharing by patients.

Unfortunately, the Departments—HHS, the Department of Labor, the Department of Treasury, and the Office of Personnel Management—have shifted the balance that Congress struck in protecting both patients and providers into a system that favors the economic interests of private insurers and that will harm patients and providers. The final rule unlawfully slants independent dispute resolution (IDR) decisions toward the qualifying payment amount (known as the QPA), which is determined solely by the insurer and does not reflect the fair market value of physician services. For example, the qualifying payment amount is the median of the contracted rates recognized by the insurer, and insurers deflate the QPA by including "ghost rates"—rates included in contracts with primary care physicians for anesthesiology or radiology services that primary care physicians do

not actually provide; these ghost rates drive down the median rate and so drive down the QPA. For another, the QPA fails to account for the severity and complexity of the condition being treated.

As the district court correctly held in a prior ruling, nothing in the No Surprises Act "states that the QPA is the 'primary' or 'most important' factor" in determining out-of-network rates. *Texas Med. Ass'n v. HHS* (*TMA 1*), 587 F. Supp. 3d 528, 541 (E.D. Tex. 2022) (*quoting Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002)). The final rule suffers from the same types of infirmities that led the district court to invalidate the Departments' prior interim final rules. If the final rule goes into effect, it will depress payments for the anesthesiology, radiology, and emergency services of *Amici*'s members by empowering insurers to lower in-network rates, which, in turn, will depress out-of-network rates. This under-compensation of out-of-network care will threaten the viability of smaller and independent physician practices and the inevitable result will be the consolidation or closure of these practices. This will lead to fewer services in rural and other underserved communities, which ultimately will harm the care of

patients in those areas struggling with accessibility to quality treatment.

For these reasons, and the reasons in the appellees' briefs, the Court should affirm the district court's judgment invalidating the final rule's provisions that unlawfully favor the QPA when determining out-of-network payments.

## BACKGROUND

### A.    The No Surprises Act

The No Surprises Act establishes protections against surprise billing for patients (i.e., for participants, beneficiaries, and enrollees) covered by insurers through group health plans and group and individual health insurance. Specifically, the Act addresses surprise billing when patients receive (1) emergency services provided by an out-of-network provider or out-of-network emergency facility, or (2) non-emergency services from an out-of-network provider furnished during a visit at an in-network health care facility. 42 U.S.C. §§ 300gg-111, 300gg-131 to 132.

The Act also creates a framework for determining fair payment for the provision of certain out-of-network items and services. *Id.* § 300gg-111(c). The Act mandates that insurers reimburse out-of-network

providers at an "out-of-network rate," minus the cost-sharing requirements of the patients. *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D). If the provider disagrees with the insurer's initial payment determination, then the provider can initiate a 30-day open negotiation with the insurer to determine the amount of payment for the out-of-network item or service. *Id.* § 300gg-111(a)(1)(C)(iv)(I), (a)(3)(K)(ii), (c)(1)(A). If the parties cannot agree on the amount for the out-of-network item or service, either party may initiate an IDR process. *Id.* § 300gg-111(c)(1)(B).

## B.    The Act's independent dispute resolution process

Under the Act's IDR process, an independent arbitrator—referred to as the IDR entity—determines appropriate payments for out-of-network health care items and services. *Id.* § 300gg-111(c)(5). Using what is often called baseball-style arbitration, the IDR entity selects one of the offers submitted by the parties to be the payment amount. *Id.* § 300gg-111(c)(5)(A)(i).

Congress dictated specific factors that the IDR entity "shall consider" when determining which of the offers to select. *Id.* § 300gg-111(c)(5)(C)(i). These factors include:

- the qualifying payment amount for the item or service, § 300gg-111(c)(5)(C)(i)(I);

- the level of training and experience of the provider or facility and the quality and outcomes measurements of the provider or facility, § 300gg-111(c)(5)(C)(ii)(I);

- the market share held by the nonparticipating provider or facility, § 300gg-111(c)(5)(C)(ii)(II);

- the acuity of the patient or the complexity of furnishing the item or service, § 300gg-111(c)(5)(C)(ii)(III).

- the teaching status, case mix, and scope of services of the nonparticipating facility, § 300gg-111(c)(5)(C)(ii)(IV).

- demonstrations of good-faith efforts (or lack of good-faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements, § 300gg-111(c)(5)(C)(ii)(V),

- information requested by the IDR entity, § 300gg-111(c)(5)(B)(i)(II), and

- information submitted by the parties to the IDR entity, § 300gg-111(c)(5)(B)(ii).

*See also id.* § 300gg-111(c)(5)(C)(i)(II).

As to the first factor, Congress established the methodology for calculating the qualifying payment amount to ensure that the QPA "is a market-based price" and "reflects negotiations between providers and insurers in a local health care market." H.R. Rep. No. 116-615, pt. 1, at

57 (2020). Congress defined the QPA for an item or service furnished during 2022 as:

> [T]he median of the contracted rates recognized by the plan or issuer, respectively (*determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market . . .*) as the *total maximum payment* (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) *under such plans or coverage*, respectively, on January 31, 2019, for the same or a similar item or service that is *provided by a provider in the same or similar specialty* and provided in the geographic region in which the item or service is furnished [as adjusted by inflation]. [42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).]

Congress also listed specific factors that the IDR entity "shall not consider," including usual and customary charges; the reimbursement rate for such items and services payable by a public payer (e.g., Medicare, Medicaid, the Children's Health Insurance Program, TRICARE, United States Department of Veterans Affairs); or the amount that the out-of-network provider would have billed for the item or service had the No Surprises Act not applied. *Id.* § 300gg-111(c)(5)(D).

## C.  The district court vacates the October 2021 interim final rule and its methodology for calculating the QPA.

On July 13, 2021, the Departments published interim final rules implementing certain provisions of the No Surprises Act, including the methodology for calculating the QPA. Requirements Related to Surprise Billing; Part I, <u>86 Fed. Reg. 36,872</u> (July 13, 2021). In general, to calculate the QPA for items or services furnished in 2022 or later, an insurer must increase the "median contracted rate" for "the same or similar item or service under such plans or coverage, respectively, on January 31, 2019" to adjust for inflation. <u>45 C.F.R. § 149.140(c)(1)(i)–(ii)</u>; *see also id.* § 149.140(c)(1)(iii)–(iv) (establishing a specific QPA methodology for anesthesia services).

Although Congress directed that the IDR entity "shall consider" each of the enumerated factors, <u>42 U.S.C. § 300gg-111(c)(5)</u>, and so did not give presumptive weight to any one factor, the Departments promulgated interim final rules that gave presumptive weight to one factor—the QPA—over all other statutory factors unless the party satisfied additional requirements that are not stated in the No

Surprises Act. Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980, 56,104, 56,116, 56,128 (Oct. 7, 2021).

On February 23, 2022, the district court vacated the October 2021 interim final rule's rebuttable presumption in favor of the QPA. *TMA 1*, 587 F. Supp. 3d at 541. The district court held that the rebuttable presumption conflicted with the unambiguous statute governing the framework for resolving payment disputes for items or services furnished out-of-network and that the Departments promulgated the October 2021 interim final rule in violation of the Administrative Procedure Act's notice-and-comment requirements. The court found that nothing in the No Surprises Act "instructs arbitrators to weigh any one factor or circumstance more heavily than the others," and that the Departments effectively "rewr[ote] clear statutory terms" by slanting the IDR process in favor of the QPA. *Id.* at 541–43. The district court also determined that the Departments' failure to comply with the APA's notice-and-comment requirements provided an independent basis to hold unlawful and set aside the interim final rule's rebuttable presumption in favor of the QPA because the Departments "lacked good cause to bypass notice and comment" procedures. *Id.* at 546.

**D.    The Departments publish a final rule that still preferences the QPA over other factors.**

After the decision in *TMA 1*, the Departments published the final rule establishing new requirements dictating the IDR entity's determination of out-of-network rates for items and services subject to the No Surprises Act. Requirements Related to Surprise Billing, <u>87 Fed. Reg. 52,618</u> (Aug. 26, 2022). The final rule prohibits the IDR entity from considering the non-QPA statutory factors if the information (1) is already accounted for by the QPA or other credible information pertaining to non-QPA statutory factors, (2) does not relate to either party's offer, (3) is not "worthy of belief and is trustworthy" (i.e., credible) after a "critical analysis," or (4) concerns information regarding statutorily excluded factors (such as usual and customary charges, the reimbursement rate for such items and services payable by a public payer, or the amount that the out-of-network provider would have billed for the item or service had the NSA not applied). <u>87 Fed. Reg. at 52,620</u>–21, 52,631, 52,634.

Notably, in the preamble to the final rule, the Departments assert that "in many cases, the additional factors for the certified IDR entity to consider other than the QPA will already be reflected in the QPA." <u>87</u>

Fed. Reg. at 52,629. Further, if an IDR entity chooses to give weight to any information besides the QPA, it must provide a "written decision" containing "an explanation of why the certified IDR entity concluded that this information was not already reflected in the QPA." 87 Fed. Reg. at 52,654. The final rule's heighted evidentiary standard required for consideration of the non-QPA Subparagraph C factors—that is, the factors in § 300gg-111(c)(5)(C)(i)(II) and (C)(ii)—tips the scales of the IDR process in favor of the insurer's QPA.

## ARGUMENT

By significantly restricting the IDR entity's consideration of all statutory factors, the final rule will result in a disproportionately high number of IDR decisions that are closer to the QPA. But the QPA is not reflective of the fair market value of items and services furnished by out-of-network providers in the marketplace. Because the QPA is tied to the insurer's median in-network rates and because the final rule will result in IDR decisions that favor the QPA, the Departments have created a perverse incentive for insurers to significantly reduce their in-network rates or to refuse to enter into network agreements with providers or facilities. If more providers or facilities are forced out-of-

network due to the final rule, patients will lose access to in-network care. In addition, the final rule will undermine the ability of providers and facilities to be reimbursed fairly for their out-of-network services, which will, in turn, threaten their ability to operate in the marketplace. If this occurs, small, independent practices may have no other choice but to consolidate or to cease operating. Patients will lose access to care, particularly in underserved areas.

## I.   The QPA does not reflect the fair market value of out-of-network items and services.

Congress did not give enhanced weight to the QPA in the IDR process, and for good reason: the QPA does not accurately represent the fair, market-based payment rates for out-of-network services. *See* Declaration of Dr. Nicola, No. 6:22-cv-372, Doc. 53-2; Declaration of Dr. Young, No. 6:22-cv-372, Doc. 53-3; Declaration of Dr. Raley, No. 6:22-cv-372, Doc. 53-4. Despite this, the final rule unlawfully skews IDR decisions toward the QPA in at least three distinct ways.

*First*, the QPA excludes a number of arrangements under which providers and insurers agree to rates. By definition, the QPA includes only in-network "contracted rates," excluding single case agreements, letters of agreement, or other similar arrangements between a provider

13

and an insurer to supplement the network of the plan or coverage for a specific patient in unique circumstances. 45 C.F.R. § 149.140(a)(1). Further, in calculating the median contracted rate, an insurer must exclude risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments. *Id.* § 149.140(b)(2)(iv).

These exclusions result in QPAs that are lower than the full payment amount for the applicable item or service. Each of the *Amici* explained this problem to the Departments in comment letters. *See* Am. Coll. of Emergency Physicians Letter[1] at 14–15; Am. Soc'y of Anesthesiologists Letter[2] at 3; Am. Coll. of Radiology Letter[3] at 2. Given that the QPA thus focuses on just a subset of the market for the relevant services and excludes payment adjustments, it under-values the payment amounts that would present fair, market-based values.

*Second*, the Departments' methodology for calculating the median rate focuses on the median contract rate, rather than on the median rate for individual claims. In calculating the median contracted rate,

---

[1] https://www.regulations.gov/comment/CMS-2021-0117-5695.

[2] https://www.regulations.gov/comment/CMS-2021-0117-7410.

[3] https://www.regulations.gov/comment/CMS-2021-0117-7239.

each contracted rate for an item or service is treated as a single data point regardless of the total number of claims paid at that rate. 86 Fed. Reg. at 36,889 ("[T]he rate negotiated under a contract constitutes a single contracted rate regardless of the number of claims paid at that contracted rate."). In other words, if an insurer has a contract with a provider, the rate negotiated with that provider under the contract is treated as a single contracted rate, regardless of the volume of individual claims paid at that rate. In effect, the Departments' method for calculating the QPA ignores the frequency of use or applicability of those in-network contracts in the market, which results in a distortion of the true market value of the out-of-network item or service. Am. Coll. of Emergency Physicians Letter at 11.

Consider, for example, a situation where Practice Group A consists of thousands of physicians and so has the power to bargain with an insurer for fair-market rate (say, $550 for a particular service). But Practice Group A operates in a geography that also includes Practice Groups B, C, D, and E, each of which has just ten physicians in it, and so each of which settles for a lower rate for the same service (say, $496, $498, $500, and $502, respectively). Under the QPA calculation,

the median would be $500, even though the fair-market rate would actually be $550, with thousands of services being provided at that rate compared with just scores provided at rates around $500. So relying on the QPA alone distorts the true market value.

*Third*, the Departments' calculations include rates for specialty services from providers who rarely or never actually perform those services, resulting in ghost rates that lower the median rates. For example, if an insurer enters into a network contract with a provider for services that are rarely performed by the provider, the provider is more likely to accept a lower in-network rate because the provider does not depend on the service at issue for a meaningful fraction of its revenue. Because the median contracted rate fails to take into consideration the volume of the services billed, contracts for low-volume services artificially reduce the QPA. *See* Am. Coll. of Emergency Physicians Letter at 11; Am. Soc'y of Anesthesiologists Letter at 3; Am. Coll. of Radiology Letter at 2.

This methodology allows for the inclusion of "ghost rates" into the calculation of the QPA. Under this practice, which was illuminated by an August 2022 study jointly commissioned by *Amici*, insurers include

rates for certain specialty services in the contracts of different specialists who rarely or never bill for the service. Avalere Health, *PCP Contracting Practices and Qualified Payment Amount Calculation Under the No Surprises Act* (Aug. 2, 2020).[4] The study surveyed primary care physicians and found that 68% of the respondents contract for services they provide fewer than twice a year and that 57% of respondents contract for services they never provide. *Id.* at 4. Because these specialists rarely or never bill for the service, many of them do not negotiate the out-of-specialty rate in their contracts; instead, they simply accept the low rate offered by the insurer. *Id.* Because the Departments do not require insurers to calculate separate QPAs for services provided by different specialties, 86 Fed. Reg. at 36,891, despite the fact that the Act does require that, 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), they may include ghost rates in the calculation of a QPA that applies to the service.

The Departments tried to address this issue in a "Frequently Asked Questions" guidance document. Depts, *FAQs About Affordable*

---

[4] https://www.emergencyphysicians.org/siteassets/emphysicians/all-pdfs/2022-8-15-avalere-qpa-whitepaper_final.pdf.

*Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55*, at 17 (Aug. 19, 2022).[5] The Departments clarified that they would not require insurers to calculate "separate median contracted rates" "when the plan's or issuer's contracting process unintentionally results in contracted rates that vary based on provider specialty." *Id.* at 17. The FAQ states that "contracted rates for an item or service are considered to vary based on provider specialty if there is a *material difference* in the median contracted rates for a service code between providers of different specialties, after accounting for variables other than provider specialty." *Id.* (emphasis added). But the Departments provided no guidance on what a "material" difference is.

As these examples illustrate, the QPA simply does not reflect actual market conditions, nor does it capture the broad range of cost, complexity, and acuity requirements that inform in-network contracting. *See* Declaration of Dr. Nicola, No. 6:22-cv-372, Doc. 53-2; Declaration of Dr. Young, No. 6:22-cv-372, Doc. 53-3; Declaration of Dr. Raley, No. 6:22-cv-372, Doc. 53-4; Am. Soc'y of Anesthesiologists Letter

---

[5] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.

at 4. For these reasons, the QPA does not reflect the true market value of items or services provided out of network.

Because the final rule will result in out-of-network payments that hew closely to the QPA, providers will not be fairly reimbursed for their out-of-network services under the final rule.

## II.    The final rule incentivizes insurers to lower in-network rates, ultimately narrowing provider networks.

Because the final rule tips the scales during the IDR process in favor of the QPA, which is tied to the insurer's median in-network rates, the final rule inappropriately creates an incentive for insurers to reduce their in-network rates or to refuse to enter into network agreements with providers. Under the final rule, the IDR entity has limited authority to consider the non-QPA factors set out in § 300gg-111(c)(5)(C), particularly in light of the Departments' statement in the preamble to the final rule that "in many cases, the additional factors for the certified IDR entity to consider other than the QPA will already be reflected in the QPA." 87 Fed. Reg. at 52,629. But the Departments' view conflicts with that of Congress, as Congress directed the arbitrators to consider those additional factors *separately* from the QPA; put differently, if Congress agreed that the QPA already reflected the

other factors, it is hard to see why Congress separately enumerated those other factors and directed that the IDR entity "shall" consider those factors too. *Silva-Trevino v. Holder*, 742 F.3d 197, 203 (5th Cir. 2014) ("It is an elementary canon of construction that when Congress uses different terms, 'each term [is] to have a particular, nonsuperfluous meaning.'"). By suggesting that the IDR entity should treat the QPA as already including those factors, the final rule both treats as superfluous factors that Congress enumerated and diminishes providers' negotiating position with insurers.

Indeed, treating the QPA as already including the additional factors overlooks a basic fact underlying the No Surprises Act—that in-network services are governed by negotiated contracts, while out-of-network services are not. In the context of an in-network service, the provider and the insurer have negotiated and agreed to a rate for a service that will be provided multiple times over the entire course of the contract period. As a result, they are able to agree to an average rate for the service that smooths out the instances where the service was easier or harder to provide. But what makes a service out of network is that it is not governed by a contract; instead, it is a service that is being

provided on a case-by-case instance. And that is why Congress ordered IDR entities to look at all of the factors—not just the median contracted rate—when determining the out-of-network payment.

Consider two examples. First, imagine a situation where the most highly qualified doctor in the region provides the most complex treatment to a patient whose condition is very acute. Second, imagine the opposite situation, where a provider with below-average qualifications provides a simple service to a patient with a very minor, mild condition. Because the QPA is focused on the median rate, it does not take into account the acuity, complexity, or skill in either of these situations, which would result in undercompensating the highly skilled doctor and in overcompensating the other doctor. It thus makes sense that Congress directed the IDR entity to look at all of the other factors (such as acuity and skill) that apply in the context of a particular out-of-network service and did not assume that the QPA already accounted for those case-specific variables.

The final rule is similar to the vacated October 2021 interim final rule in that it distorts the "independent" dispute resolution process and empowers insurers to lower in-network payment rates artificially.

Under the final rule, the Departments effectively replaced the rebuttable presumption in favor of the QPA with a new set of rules that still skew the IDR entity's decision in favor of the QPA, notwithstanding that nothing in the No Surprises Act "states that the QPA is the 'primary' or 'most important' factor." *TMA 1*, <u>587 F. Supp. 3</u>d. at 541 (*quoting Am. Corn Growers Ass'n*, <u>291 F.3d at 6</u>).

Many members of Congress were concerned that the July 2021 interim final rule would depress payment rates, and those concerns are equally valid now. By letter dated November 5, 2021, 152 members of the U.S. House of Representatives criticized the Departments for "making the median in-network rate the default factor considered in the IDR process" under the October 2021 interim final rule and warned that this "could incentivize insurance companies to set artificially low payment rates." Members of Congress Letter.[6] The members of the U.S. House of Representatives stressed that tying out-of-network payments to the QPA could result in "narrow provider networks . . . jeopardiz[ing]

---

[6] https://www.acep.org/globalassets/new-pdfs/advocacy/2021.11.05-no-surprises-act-letter.pdf.

patient access to care—the exact opposite of the goal of the [No Surprises Act]." *Id.* at 2.

The concerns expressed by these 152 members of Congress unfortunately materialized. For instance, Blue Cross Blue Shield of North Carolina sent letters to providers demanding a reduction in contracted rates as a direct result of the Departments' October 2021 interim final rule. Declaration of Dr. Nicola ¶ 15 (stating that Blue Cross Blue Shield of North Carolina's "letter cites" the interim final rule "as justification to 'warrant a significant reduction in (our) contracted rates with Blue Cross NC' and warns of additional rate reductions once the qualifying payment amount is established"); Declaration of Dr. Raley ¶ 18 (noting that Blue Cross Blue Shield of North Carolina's letter states that the "IFR provides 'enough clarity to warrant a significant reduction in [Wake Emergency Physicians, P.A.'s] contracted rate with Blue Cross NC'"). The letters from Blue Cross Blue Shield of North Carolina further state that if providers do not accept the rate reduction in light of the Departments' interim final rule, their contracts will be "quickly terminated." *See* Declaration of Dr. Nicola ¶ 15; Declaration of Dr. Raley ¶ 18.

The impact of the October 2021 interim final rule will continue under the final rule because the final rule still unlawfully skews IDR decisions in favor of the QPA, which empowers insurers to reduce in-network contracted rates and threatens existing contractual arrangements with providers and facilities.

## III. The final rule will result in under-compensation of care, which may incentivize the consolidation of practices, undermining market competition.

Because providers will not be fairly reimbursed for their out-of-network services, the final rule will impose serious financial pressures on all providers that render items and services out-of-network. As the American Medical Association explained in its comment letter on the interim final rule, the financial strain caused by the final rule will disproportionately affect small, independent practices and rural practices that are already reeling financially from the COVID-19 pandemic. *See* Am. Med. Ass'n Letter.[7] These practices may have no choice but to sell their practices to larger corporate entities—a

---

[7] https://downloads.regulations.gov/CMS-2021-0156-5178/attachment_1.pdf.

phenomenon that occurred in California after the State passed its surprise medical billing law. Cal. Health & Safety Code § 1371.31.

Like the No Surprises Act, California's surprise medical billing law requires insurers to make interim payments to out-of-network providers who could then begin the California IDR process if they felt the rate was inadequate. *See* Cal. Health & Safety Code § 1371.31. But the interim rate was chosen as the "reasonable rate" 98% of the time, essentially functioning as a benchmark rate. Letter from Cal. Med. Ass'n Letter.[8] Thus, like the final rule, California's IDR process favors rates unilaterally set by insurers.

A RAND corporation study showed that the California law "changed the negotiation dynamics between hospital-based physicians and payers," resulting in leverage shifting "in favor of payers" and incentivizing them to "lower or cancel contracts with rates higher than their average as a means of suppressing [out-of-network] prices." Erin L. Duffy, *Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining: California's Experience*, 25 Am. J. Managed Care

---

[8] https://downloads.regulations.gov/CMS-2021-0117-7408/attachment_1.pdf.

e243 (2019).[9] These drastic changes in negotiating power and lower rates accelerated "consolidation and exclusive contracting with facilities" among hospital-based specialists. *Id.* The California bill was cited by several healthcare stakeholders as the factor that "clearly put [consolidation efforts] over the edge." *Id.*

Routine under-compensation of out-of-network care as a result of the final rule similarly threatens the viability of many smaller and independent physician practices and incentivizes the consolidation of practices. This is particularly problematic in underserved areas already struggling with accessibility to care.

## IV.    Market disruptions and narrower provider networks stemming from the final rule will harm patients in underserved areas struggling with accessibility.

The final rule will result in fewer provider networks and the consolidation of practices, which will adversely impact patients' access to care. Patients who are unable to access care from in-network providers may delay care, seek care from an in-network provider in the wrong specialty, rely on emergency departments to receive care, or forgo

---

[9] https://www.ajmc.com/view/influence-of-outofnetwork-payment-standards-on-insurer-provider-bargaining-californias-experience.

care all together. Simon F. Haeder, *Inadequate in the Best of Times:*
*Reevaluating Provider Networks in Light of the Coronavirus Pandemic*,
12 World Med. & Health Pol'y 282, 284 (2020) (noting how "[t]hese
issues raise concerns, even under relatively normal circumstances" but
become "exacerbated" when considering the effects of the COVID-19
pandemic).[10]

Underserved communities that are already struggling with access
to care are disproportionally impacted by narrowing provider networks.
In the previously referenced letter from 152 members of the U.S. House
of Representatives, the Representatives warned that a rule favoring the
QPA could "have a broad impact on reimbursement for in-network
services, which could exacerbate existing health disparities and patient
access issues in rural and urban underserved communities." Members
of Congress Letter at 2. Because the Departments' final rule still puts
its "thumb on the scale for the QPA" over the other statutory factors
laid out by Congress, the Members' concerns regarding access to care

---

[10] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7436480/
pdf/WMH3-12-282.pdf.

remain valid. *TMA 1*, 587 F. Supp. 3d. at 541–42; Members of Congress Letter at 1–2.

Moreover, the final rule's adverse impact on networks is contrary to longstanding efforts by the Departments to preserve or bolster network adequacy. *See, e.g.*, 45 C.F.R. § 156.230 (requiring each qualified health plan issuer that uses a provider network to maintain "a network that is sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure that all services will be accessible without unreasonable delay"). If aggressive actions like Blue Cross Blue Shield of North Carolina's become commonplace, Members' fears of insurers providing lower in-network payment rates will be realized and the IDR process will be skewed to under compensate providers consistently. *See* Declaration of Dr. Nicola ¶ 15 (stating that Blue Cross Blue Shield of North Carolina's "letter cites the [interim final rule] as justification to 'warrant a significant reduction in (our) contracted rates with Blue Cross NC' and warns of additional rate reductions once the qualifying payment amount is established"); Declaration of Dr. Raley ¶ 18 (noting that Blue Cross Blue Shield of North Carolina's letter states that the

interim final rule "provides 'enough clarity to warrant a significant reduction in [Wake Emergency Physicians, P.A.'s] contracted rate with Blue Cross NC'").

Routine under-compensation will threaten the viability of many smaller and independent physician practices that provide care to underserved areas already struggling with accessibility to care. Ultimately, losing providers in these areas will significantly harm patients and actively work against the Departments' stated efforts. The final rule, therefore, threatens the stability of the nation's already fragile health care system by empowering insurers to cut payments both to in-network and out-of-network providers, leading to decreased access to care.

## CONCLUSION

For these reasons, *Amici* respectfully ask that the Court affirm the decision of the district court.

Respectfully submitted,

Dated:  September 18, 2023

JEREMY LEWIN
**BARNES & THORNBURG LLP**
ONE N. WACKER DRIVE, SUITE 4400
CHICAGO, IL 60606-2833
312.214.8833
JEREMY.LEWIN@BTLAW.COM

By  _/s/ Aaron D. Lindstrom_

AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*ATTORNEYS FOR AMICI CURIAE,
THE AMERICAN SOCIETY OF
ANESTHESIOLOGISTS, THE AMERICAN
COLLEGE OF EMERGENCY
PHYSICIANS, AND THE AMERICAN
COLLEGE OF RADIOLOGY*

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Federal Rules of Appellate Procedure 32 (a)(7)(C) and 29(a)(5) and to Fifth Circuit Rule 29.3, the attached amici curiae brief is proportionately spaced, has a typeface of 14 points or more and contains 5,294 words.

Dated:  September 18, 2023     **BARNES & THORNBURG LLP**

BY  */s/ Aaron D. Lindstrom*

AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*ATTORNEYS FOR AMICI CURIAE,
THE AMERICAN SOCIETY OF
ANESTHESIOLOGISTS, THE AMERICAN
COLLEGE OF EMERGENCY PHYSICIANS, AND
THE AMERICAN COLLEGE OF RADIOLOGY*